## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| AMERICAN ASSOCIATION FOR HOMECARE, 2011 Crystal Drive, Suite 725, Arlington, Virginia 22202 | ) ) ) ) | |
| and | ) ) | |
| ACE DRUG, INC., dba HOLLYWOOD MEDICAL SUPPLY, 2131 Hollywood Boulevard, Hollywood, FL 33020, | ) ) ) ) | |
| Plaintiffs, | ) ) | **Civil Action No. _____** |
| vs. | ) ) | |
| Michael O. LEAVITT, in his official capacity as Secretary of the Department of Health and Human Services, 200 Independence Avenue, S.W., Washington, D.C. 20201 | ) ) ) ) ) | |
| and | ) ) | |
| Kerry N. WEEMS, in his official capacity as Acting Administrator for the Centers for Medicare & Medicaid Services, Department of Health and Human Services, 200 Independence Avenue, S.W., Washington, D.C. 20201 | ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs, American Association for Homecare ("AAHomecare") and Ace Drug, Inc.,

dba Hollywood Medical Supply ("Ace Drug"), bring suit against Michael O. Leavitt, Secretary

of the Department of Human Services ("HHS"), and Kerry N. Weems, Acting Administrator for

the Centers for Medicare & Medicaid Services ("CMS"), for declaratory and injunctive relief.

Plaintiffs allege as follows:

**Nature of the Action**

1.    Plaintiffs bring this suit to challenge Defendants' regulatory implementation of the Durable Medical Equipment, Prosthetics, and Supplies ("DMEPOS") provisions of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. 108-173, 117 Stat. 2066 ("MMA").  Specifically, Plaintiffs allege that Defendants' regulatory implementation has resulted in numerous violations of the MMA, Small Business Administration Act ("SB Act"), 15 U.S.C. § 632 (a)(2)(C)(i), (ii), and Administrative Procedures Act ("APA"), 5 U.S.C. §§ 701-706.

**Parties**

2.    Plaintiff AAHomecare represents healthcare providers, equipment manufacturers, and other organizations in the homecare community.  AAHomecare members include DMEPOS suppliers that serve the medical needs of millions of Americans who require (1) oxygen equipment and therapy, (2) mobility assistive technologies, (3) medical supplies, (4) inhalation drug therapy, (5) home infusion, and (6) other durable medical equipment, therapies, services, and supplies furnished to patients for use in the home.  AAHomecare's membership, which includes plaintiff Ace Drug, reflects a broad cross-section of the homecare community, including providers of all sizes operating approximately 3,000 locations in all 50 states. Examples of other AAHomecare members of various sizes include Landauer Metropolitan, Blackburn's Physicians Pharmacy, Homecare Concepts, Seeley Medical, and Wright and Filippis.  AAHomecare's activities in support of the homecare community include advocacy before all three branches of the federal government, as well as counseling its members regarding government relations and legal compliance.

3.    Ace Drug is licensed in Florida as a home medical equipment company and specializes in furnishing durable medical equipment and high end rehabilitation and respiratory

services.  Ace Drug is enrolled as a Medicare durable medical equipment and supply company.

Ace Drug has participated in the Medicare durable medical equipment and supply program

since 1965.  Ace Drug currently supplies DMEPOS to Medicare beneficiaries in the Miami-Fort

Lauderdale-Miami Beach region in Florida.

4.     Michael O. Leavitt is the Secretary of HHS, and as Secretary he is granted

statutory authority to regulate the Medicare system.  *See* 42 U.S.C. § 1395kk.

5.     Kerry N. Weems is the Acting Administrator of CMS, which is the agency

charged with administering the federal Medicare program.  CMS is responsible for the

implementation of the DMEPOS provisions of the MMA.

## Jurisdiction and Venue

6.     This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331 because

the action arises under the laws of the United States.  Judicial review is authorized, and

sovereign immunity is waived, by 5 U.S.C. § 702.  Declaratory and injunctive relief are

authorized by 28 U.S.C. §§ 2201 and 2202, respectively.

7.     Venue is proper in this Court under 28 U.S.C. § 1391(e) because each of  the

defendants is "an officer or employee of the United States or any agency thereof acting in his

official capacity" whose official duties are performed in the District of Columbia.

## Factual Background

Overview of Medicare Program and the Home Medical Equipment Industry

8.     Established as part of the 1965 Amendments to the Social Security Act, Pub. L.

No. 89-97, 79 Stat. 286, the Medicare program is the nation's largest health insurance program.

Medicare covers certain medical items and services for those 65 years of age or older, as well as

individuals under 65 years of age who are disabled or have other specified medical conditions.

CMS, part of HHS, is charged with administering the Medicare program.

3

9.    Medicare consists of multiple parts, each of which is set forth under different sections of the Social Security Act.  Relevant here is Part B, a supplementary medical insurance program that covers, among other things, the rental or purchase of "[d]urable medical equipment" ("DME"), "[s]upplies necessary for the effective use of DME other than inhalation drugs," "[e]nteral nutrients, equipment, and supplies," and "[o]ff-the-shelf orthotics," 42 C.F.R. § 414.402, collectively known as DMEPOS, for use in the patient's home.  42 U.S.C. §§ 1395k, 1395x(n); *see id.* § 1395w-3.

10.    DME spending accounts for less than two percent of Medicare spending.  It is also the slowest-growing segment of Medicare costs.  AAHomecare, Press Release, Errors Plague Medicare "Competitive Bidding" Program (Apr. 3, 2008).

11.    Medicare has to date paid for "durable medical equipment . . . using a different fee schedule for each class of covered items."  H.R. Rep. No. 108-391, at 572 (2003).  CMS developed the fee schedule for each item of DMEPOS by using "a weighted average of either local or regional prices, subject to national limits (both floors and ceilings)" that were updated annually.  *Id.*

12.    The vast majority of DME suppliers are small businesses as defined by the Small Business Administration ("SBA").  *See* 71 Fed. Reg. 25,654, 25,695 (proposed May 1, 2006).

13.    As part of the Balanced Budget Act of 1997, Congress authorized demonstration projects to test whether a competitive acquisition program would be a more efficient method of paying for DMEPOS.  *See* H.R. Rep. No. 108-178, pt. II, at 192 (2003).

Relevant Provisions of the MMA

14.    Section 302 of the MMA requires the Secretary to develop and implement competitive bidding programs for DMEPOS suppliers throughout the United States and establishes a phased-in implementation for such programs.  42 U.S.C. § 1395w-3(a).

15.    Section 302 of the MMA states that except as otherwise provided, "payment shall not be made for items and services . . . furnished by a contractor and for which competition is conducted . . . unless—(i) the contractor has submitted a bid for such items and services . . . and (ii) the Secretary has awarded a contract to the contractor for such items and services."  42 U.S.C. § 1395w-3(b)(6)(A).

16.    Section 302 of the MMA mandates that "[t]he Secretary may not award a contract to any entity" unless "the Secretary finds," among other things, that "[t]he entity meets applicable financial standards specified by the Secretary, taking into account the needs of small providers."  42 U.S.C. § 1395w-3(b)(2)(A)(ii).

17.    Section 302 of the MMA provides that "[t]he Secretary shall establish a Program Advisory and Oversight Committee," which "shall provide advice to the Secretary with respect to" "[t]he establishment of financial standards."  42 U.S.C. § 1395w-3(c)(1), (c)(3)(ii).

18.    Section 302 of the MMA mandates that "[i]n developing procedures relating to bids and the awarding of contracts, . . . the Secretary shall take appropriate steps to ensure that small suppliers of items and services have an opportunity to be considered for participation in the program."  42 U.S.C. § 1395w-3(b)(6)(D).

19.    Congress did not specifically define "small suppliers" or "small providers" in Section 302 of the MMA.  *See* 42 U.S.C. § 1395w-3.

20.    Congress has further required that "[n]o rule, requirement, or other statement of policy (other than a national coverage determination) that establishes or changes a substantive legal standard governing the scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish or receive services or benefits under this

subchapter shall take effect unless it is promulgated by the Secretary by regulation."  42 U.S.C. § 1395hh(a)(2).

21.    For all such standards, "the Secretary shall provide for notice of the proposed regulation in the Federal Register and a period of not less than 60 days for public comment thereon."  42 U.S.C. § 1395hh(b)(1).

22.    Section 902 of the MMA mandates that when "a final regulation includes a provision that is not a logical outgrowth of a previously published notice of proposed rulemaking or interim final rule, such provision shall be treated as a proposed regulation and shall not take effect until there is the further opportunity for public comment and a publication of the provision again as a final regulation."  42 U.S.C. § 1395hh(a)(4).

The SB Act

23.    In 1953, Congress passed the SB Act, which "declared" as a matter of Congressional policy

> that the Government should aid, counsel, assist, and protect, insofar as is possible, the interests of small-business concerns in order to preserve free competitive enterprise, to insure that a fair proportion of the total purchases and contracts or subcontracts for property and services for the Government (including but not limited to contracts or subcontracts for maintenance, repair, and construction) be placed with small-business enterprises, to insure that a fair proportion of the total sales of Government property be made to such enterprises, and to maintain and strengthen the overall economy of the Nation.

15 U.S.C. § 631(a).  Federal agencies are required to promote small business interests in all federal programs, unless inconsistent with other national policy.  *Id.* § 631a(a) ("[I]t is the continuing policy and responsibility of the Federal Government to use all practical means . . . to implement and coordinate all Federal department, agency, and instrumentality policies,

programs, and activities in order to: foster the economic interests of small businesses . . . [and] reduce the concentration of economic resources and expand competition . . . .").

24.     The SB Act created the Small Business Administration ("SBA"), a new federal agency independent of all other agencies and departments, to pursue these Congressional policies.  15 U.S.C. § 633(a).

25.     Under the SB Act, as modified in 1992 by the Small Business Credit and Business Opportunity Enhancement Act of 1992, Pub. L. No. 102-366, § 222, 106 Stat. 986, 994-96, the SBA Administrator has authority to define and specify the criteria all federal agencies must use to determine whether a businesses qualifies as small business, "for the purposes of [the SB Act] *or any other Act*."  15 U.S.C. § 632(a)(2)(A) (emphasis added).

26.     The SBA's size standards for each industry are published at 13 C.F.R. part 121 ("Small Business Size Regulations").  In the absence of a specific statutory authorization, all federal agencies must either (1) use the SBA's published size standards to determine whether a business is small, or (2) follow prescribed substantive and procedural requirements in order to define a different size standard.  To use a different size standard, an agency must propose its alternate standard for public notice and comment, use only statutorily enumerated factors, and receive specific approval from the SBA Administrator.  15 U.S.C. § 632(a)(2)(C)(i), (ii).

27.     SBA regulations clarify that an agency may, "[i]n limited circumstances," create and use different size criteria for a specific program, "but only when" the agency complies with rigid procedural requirements prior to requesting the SBA Administrator's approval.  13 C.F.R. § 121.903(a).  Under those requirements, the agency must first consult with SBA in writing, specifying the proposed alternative size standard and its justification.  *Id.* § 121.903(a)(2).  At least fourteen days later, the agency must "propose[ ] the size standard for public comment

pursuant to the [APA]." *Id.* § 121.903(a)(3).  Once the notice and comment period has passed, the agency must collect all comments received in response to its proposal for an alternative standard and include them in its formal request for SBA Administrator Approval.  *Id.* § 121.903(a)(5)(i).

<u>CMS's Promulgation of Regulations To Implement Section 302 of the MMA</u>

<u>Overview</u>

28.    Three years after Congress passed the MMA, on May 1, 2006, CMS published a proposed rule for the Competitive Acquisition of Certain Durable Medical Equipment, Prosthetics, Orthotics and Supplies (DMEPOS).  71 Fed. Reg. 25,654 ("Proposed Rule").

29.    Four years after the passage of the MMA, CMS announced on April 5, 2007, that it needed additional time to publish a final rule "due to the extensive comments received [over 2,000]" and the "extremely complex policy and legal issues which require extensive consultation and analysis."  72 Fed. Reg. 16,794 (notice Apr. 5, 2007).

30.    The following week CMS published a final rule effective June 11, 2007.  72 Fed. Reg. 17,992 (Apr. 10, 2007) ("Final Rule").

31.    CMS summarized the Final Rule as "establish[ing] competitive bidding programs for certain Medicare Part B covered items of [DMEPOS] throughout the United States in accordance with sections 1847(a) and (b) of the Social Security Act."  *Id.* at 17,992.  CMS explained that these competitive bidding programs would be "phased in over several years" and "utilize bids submitted by DMEPOS suppliers to establish applicable payment amounts under Medicare Part B."  *Id.  See* 42 U.S.C. § 1395w-3(a), (b).

<u>Financial Standards</u>

32.    Notwithstanding the statutory mandate, the Secretary did not specify in either the Proposed Rule or Final Rule the applicable financial standards that DME suppliers must meet to

be awarded a contract, despite comments from the industry that advance specification of financial standards in the Final Rule, as well as the opportunity for notice and comment, was necessary to avoid tainting of the bid pool.

33.    CMS also ignored comments criticizing the agency for specifying financial documents instead of financial standards as required by the MMA, as the two are not equivalent.

34.    The Defendants in the Final Rule issued a regulation that merely states the following: "Financial standards.  Each supplier must submit along with its bid the applicable financial documentation specified in the request for bids."  42 C.F.R. § 414.414(d); *see also* 72 Fed. Reg. at 18,088.

<u>Small Supplier</u>

35.    The SBA has developed size eligibility standards for small businesses by industry. The SBA size standard for a small supplier in the home health equipment rental business is $6.5 million in total annual receipts.  13 C.F.R. § 121.201 (NAICS code 532291).  *See also* 72 Fed. Reg. at 18,056.

36.    In the Proposed Rule, CMS "proposed using the SBA's small business definition when evaluating whether a DMEPOS supplier is a small supplier."  72 Fed. Reg. at 18,056.

37.    In the Final Rule, CMS instead reclassified a small supplier as having less than $3.5 million in annual receipts, including Medicare *and* non-Medicare receipts.  72 Fed. Reg. at 18,071.

38.    This reclassification occurred without any explanation in the Final Rule as to the basis for CMS's selection of $3.5 million in total annual receipts as the definition of "small supplier."

39.    This reclassification also occurred without CMS seeking notice and comment on the reclassification.

40.    CMS included for the first time in the Final Rule a special preference for small businesses, ensuring that small suppliers would be added to the pool of contractors for a given CBA product so as to reach a target that 30% of contractors would be small suppliers.  72 Fed. Reg. at 18,058; *see* 42 C.F.R. § 414.414(g)(1).

Round 1 of DMEPOS Competitive Acquisition Program ("CAP")

41.    On April 2, 2007, CMS announced the ten (10) competitive bidding areas ("CBAs") where the initial bidding would be conducted:

> Charlotte-Gastonia-Concord, North Carolina/South Carolina
> Cincinnati-Middletown, Ohio/Kentucky/Indiana
> Cleveland-Elyria-Mentor, Ohio
> Dallas-Fort Worth-Arlington, Texas
> Kansas City, Missouri/Kansas
> Miami-Fort Lauderdale-Miami Beach, Florida
> Orlando, Florida
> Pittsburgh, Pennsylvania
> Riverside-San Bernardino-Ontario, California
> San Juan-Caguas-Guaynabo, Puerto Rico.

42.    The CBA designation is based largely upon the related Metropolitan Statistical Area ("MSA"), with minor adjustments.  An MSA is a unit designed by the Office of Management and Budget through census data, and represents geographic areas surrounding a "core" area with a high degree of social and economic integration (measured by commuting ties).

43.    CMS also established that there would be 9-10 product categories in each CBA in which bids would be solicited.

44.    On May 15, 2007, CMS issued a request for bids for the first round of the CAP in these initial 10 CBAs, and the bidding period ultimately closed on September 25, 2007.

45.    The request for bid ("RFB") instructions for Round 1 included a list of financial documents to be provided, with no accompanying financial standards, under the heading, "Financial Information."

46.    CMS issued a one-page announcement dated May 25, 2007, entitled "CMS Announces Financial Measures for the Medicare DMEPOS Competitive Bidding Program." The release listed a series of financial ratios, but failed to specify any values for those ratios that alone or in combination could serve as the financial standards that the Secretary must find each winning supplier must meet.

47.    CMS to date has not published in the Federal Register or otherwise any financial standards for suppliers bidding in the CAP.

48.    In March 2008, for each CBA, CMS selected the single payment amounts for each competitively bid item within a product category.  CMS then individually notified Round 1 bidders of their contract status.  In May 2008, the government publicly announced the winning bidders for each product category in the 10 CBAs.

49.    Of the 6,209 bids that were submitted, 3,043 were rejected for lack of accreditation or missing information (approximately 49%), 1,831 were rejected because they offered prices that were not low enough (approximately 29.5%), and 1,335 were accepted (approximately 21.5%).

50.    DME suppliers who are not winning bidders in any one of the product categories in the 10 specified CBAs, including Ace Drug, will be excluded for three years effective July 1, 2008, from furnishing bid items to Medicare beneficiaries in those CBAs unless a limited grandfathering provision applies.  *See* 42 U.S.C. § 1395w-3(b)(3)(B) ("The Secretary shall recompete contracts under this section not less often than once every 3 years.").

51.    CMS has posted accreditation deadlines for Round 2, which will establish CBAs covering seventy (70) more of the largest MSAs.  Suppliers must be accredited or have applied for accreditation by July 21, 2008, in order to submit a bid for the second round of competitive bidding, and suppliers must be accredited before January 14, 2009, in order to be awarded a contract.

52.    If not enjoined, implementation of Round 1 will occur on July 1, 2008, and bidding for Round 2 is scheduled to begin soon thereafter.

Parties

53.    Ace Drug submitted bids in all ten product categories in the Miami-Fort Lauderdale-Miami Beach, Florida CBA pursuant to Round 1 of the CAP, and intends to submit bids in the same product categories in the Palm Bay-Melbourne-Titusville, Florida and Cape Coral-Ft. Myers, Florida CBAs pursuant to Round 2 of the CAP.  Ace Drug's bids in seven of the ten product categories in Round 1 were unsuccessful because the bid amount for each product category was too high.  Because Ace Drug has a total annual revenue of approximately $3.7 million, it is a small business as defined by the SBA.

54.    AAHomecare has 481 members, including both very large suppliers (more than $500 million in total annual homecare revenue) and very small suppliers (under $1 million in total annual homecare revenue).  AAHomecare's membership, which includes plaintiff Ace Drug, reflects a broad cross-section of the homecare community, including providers of all sizes operating approximately 3,000 locations in all 50 states.

55.    AAHomecare members submitted qualified but unsuccessful bids in every CBA and in 71 of the 92 CBA-product categories pursuant to Round 1 of the CAP. AAHomecare's members plan to submit bids for Round 2 of the CAP as well.

56.    DMEPOS suppliers who are not winning bidders, including Ace Drug and other AAHomecare members, will suffer a significant loss of clientele and revenue due to their inability to provide DMEPOS to Medicare beneficiaries in the CBAs for Round 1 and subsequently for Round 2.

57.    Ace Drug's annual revenue loss from implementation of Round 1 will be at least $75,000, which is approximately 75% of Ace Drug's total annual Medicare revenue.  Since the contracts for Round 1 are in effect for three years, Ace Drug's total cumulative loss will be at least $225,000.  These numbers are low-end estimates because they do not show the projected growth that would have been expected under a noncompetitive bid environment.

58.    This revenue loss likely is an underestimate because many private insurers base their fee schedule rates on a percentage of the Medicare rates, and thus current private reimbursement rates could be negatively impacted by the decreases in the Medicare rates that the CAP will implement.  *See* 42 U.S.C. § 1395w-3(b)(2)(A)(iii) ("The total amounts to be paid to contractors in a competitive acquisition area are expected to be less than the total amounts that would otherwise be paid."); 72 Fed. Reg. at 18,024 ("We will also assure savings because we will not accept a bid to furnish an item unless the submitted bid price is at or below the fee schedule amount for the item.").

59.    It is also possible that referral sources are likely to completely stop sending patients to non-winning suppliers because it is too confusing to remember which suppliers have won for which products.  Instead, referral sources will likely look for the supplier that has won the most categories and send all patients (Medicare *and* non-Medicare) to the same place.

60.    AAHomecare members that win bids in Round 2 will suffer further injury in Round 2 in those CBA-product categories where small suppliers whose bids are above the

pivotal award bid are offered contracts so that the target of 30 percent of contract suppliers in a CBA-product category be small suppliers is reached.  If only suppliers that have at most $3.5 million in total annual revenues are considered small suppliers, prevailing bidders who have total annual revenues between $3.5 million and $6.5 million are not counted toward the 30 percent target, making it more likely that more small suppliers will be awarded contracts to reach the 30 percent threshold, which in turn reduces the market share and business opportunity of the AAHomecare members who win bids in Round 2.

61.     Because the Defendants' failure to specify financial standards and their unexpected reclassification of "small supplier" created confusion among AAHomecare's membership, AAHomecare has had to devote substantial resources to its members struggling with the Final Rule as enacted as well as in preparing bids.

62.     Plaintiffs have no means of obtaining relief through HHS or CMS.

## Count I

63.     Plaintiffs reallege and incorporate by reference paragraphs 1 through 62 of the Complaint as though specifically set forth herein.

64.     Section 302 of the MMA mandates that "[t]he Secretary may not award a contract to any entity" unless "the Secretary finds," among other things, that "[t]he entity meets applicable financial standards specified by the Secretary, taking into account the needs of small providers."  42 U.S.C. § 1395w-3(b)(2)(A)(ii).

65.     Because a bidding entity must meet financial standards in order to be awarded a contract, the Secretary must specify those standards by regulation prior to the award of any contracts.

66.     The Final Rule governing both Round 1 and Round 2 fails to specify the financial standards mandated by law.

67. Under the MMA, the financial standards that must be met in order for an entity to be awarded a contract constitute "a substantive legal standard governing . . . the eligibility of individuals, entities, or organizations to furnish . . . services or benefits under this subchapter," which cannot take effect "unless it is promulgated by the Secretary by regulation." 42 U.S.C. § 1395hh(a)(2).

68. The Defendants' failure to specify financial standards as mandated by Section 302 of the MMA is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

69. The Defendants' failure to promulgate financial standards as mandated by Section 302 of the MMA as a regulation with required notice and opportunity for comment for the required period after notice is "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

70. Ace Drug is injured by the Defendants' unlawful acts because it has been excluded from providing DMEPOS items and services in Round 1 CBAs for which it submitted bids as a result of the legally defective CAP administered by Defendants, in which suppliers were selected without meeting the statutory requirement that they meet financial standards specified by the Secretary according to law.

71. Ace Drug will be further imminently injured by the Defendants' unlawful acts because its ability to provide DMEPOS items and services in Round 2 CBAs for which it will submit bids will be determined by the legally defective CAP administered by Defendants, in which suppliers will be selected without meeting the statutory requirement that they meet financial standards specified by the Secretary according to law.

72.    AAHomecare members are injured by the Defendants' unlawful acts or omissions because they have been excluded from providing DMEPOS items and services in Round 1 CBAs for which they submitted bids as a result of the legally defective CAP administered by Defendants, in which suppliers were selected without meeting the statutory requirement that they meet financial standards specified by the Secretary according to law.

73.    AAHomecare members will be further imminently injured by the Defendants' unlawful acts or omissions because their ability to provide DMEPOS items and services in Round 2 CBAs for which they will submit bids will be determined by the legally defective CAP administered by Defendants, in which suppliers will be selected without meeting the statutory requirement that they meet financial standards specified by the Secretary according to law.

74.    DME supplier Ace Drug and other members of AAHomecare are within the zone of interests protected by the MMA and are aggrieved by the Secretary's unlawful acts.

75.    The interests AAHomecare seeks to protect are germane to its purposes.

76.    It would be impractical to require each of AAHomecare's members affected by the CAP to participate individually in this litigation; their individual presence and participation are not necessary in this suit.

77.    Because the Defendants' failure to specify financial standards created confusion among AAHomecare's membership, AAHomecare has had to devote substantial resources to its members struggling with the Final Rule as enacted as well as in preparing bids.  If the Defendants had complied with the law, these resources could have been expended toward the normal work on behalf of AAHomecare's members.

78.    The Final Rule governing both Round 1 and Round 2 that fails to specify financial standards required by law is final agency action.

**Count II**

79.   Plaintiffs reallege and incorporate by reference paragraphs 1 through 62 of the Complaint as though specifically set forth herein.

80.   Section 302 of the MMA mandates that "[i]n developing procedures relating to bids and the awarding of contracts, . . . the Secretary shall take appropriate steps to ensure that small suppliers of items and services have an opportunity to be considered for participation in the program."  42 U.S.C. § 1395w-3(b)(6)(D).

81.   CMS has sought to implement this statutory mandate by establishing a preference for small suppliers in the form of a target that 30 percent of contract suppliers in a CBA product category will be small suppliers.  72 Fed. Reg. at 18,058; *see* 42 C.F.R. § 414.414(g)(1).  If small suppliers do not constitute 30% of prevailing bidders in a CBA product category after the initial selection, CMS will award contracts to additional eligible small suppliers whose bids were too high until the 30% target is met.  72 Fed. Reg. at 18,058; 42 C.F.R. § 414.414(g)(1).

82.   In defining what business constitutes a small business concern, the SB Act requires agencies either to use the SBA standard or to adhere to the procedural and substantive limitations in 15 U.S.C. § 632(a)(2)(C) in departing from the SBA standard.

83.   After originally proposing to use the SBA's size standards to determine whether a DMEPOS supplier is "small," the Defendants, without congressional authorization in the MMA, elected to use an alternative size standard without following the mandatory procedures for obtaining SBA's approval, including publishing the alternative standard for notice and comment.

84.   Adoption of the previously-unknown size standard rendered small businesses like AAHomecare member Ace Drug ineligible for the small supplier "protection" mandated by the

MMA, *see* 42 U.S.C. §1395w-3(b)(6)(D), but affected small businesses never had an opportunity to address whatever undisclosed concerns allegedly motivated the shift.

85.    CMS's adoption of its own, arbitrary size standard violated the SB Act and MMA, in violation of the APA.  5 U.S.C. § 706(2)(A).

86.    Even if the Defendants were free to define small supplier without regard to the rules of the SB Act, CMS's change, capping the total amount of Medicare and non-Medicare revenue at $3.5 million, is also arbitrary and capricious because CMS did not provide a reasoned explanation why it chose in the Final Rule to select $3.5 million as the new cutoff number under which a supplier would qualify as a small supplier.  *See* 5 U.S.C. § 706(2)(A).

87.    Section 902 of the MMA requires that when HHS publishes a final rule that includes a provision that is not a "logical outgrowth" of the proposed rule, it must treat that provision as a proposed rule subject to public comment and publication before being adopted as a final rule.  42 U.S.C. § 1395hh(a)(4).  The notice-and-comment provision of the APA, 5 U.S.C. § 553, requires the same.

88.    CMS's abandonment of a small supplier definition consistent with the SBA and its adoption of a definition requiring less than $3.5 million in total annual revenue was not a logical outgrowth of the Proposed Rule and therefore should have been subject to notice-and-comment rulemaking before being adopted in final form.  CMS's failure to comply with the notice-and-comment provisions of the MMA and APA was "without observance of procedure required by law."  5 U.S.C. § 706(2)(D).

89.    Ace Drug has annual total revenues greater than $3.5 million, but less than $6.5 million, and is injured because it is excluded from the small supplier preference by the Defendants' unlawful acts.

90.    Other AAHomecare members whose annual total revenues are greater than $3.5 million but less than $6.5 million would also be injured because they are excluded from the small supplier preference by the Defendants' unlawful acts.

91.    Because, as a result of the Defendants' unlawful acts, prevailing bidders who have total annual revenues greater than $3.5 million but less than $6.5 million are not counted toward the small supplier target of 30 percent, AAHomecare members that win bids in Round 2 will suffer further injury in Round 2 in those CBA-product categories where small suppliers whose bids are above the pivotal award bid are offered contracts so that the target of 30 percent of contract suppliers in a CBA-product category be small suppliers is reached.  If only suppliers that have at most $3.5 million in total annual revenues are considered small suppliers, prevailing bidders who have total annual revenues between $3.5 million and $6.5 million are not counted toward the 30 percent target, making it more likely that more small suppliers will be awarded contracts to reach the 30 percent threshold, which in turn reduces the market share and business opportunity of the AAHomecare members who win bids in Round 2.

92.    DME supplier Ace Drug and other members of AAHomecare are within the zone of interests protected by the MMA and are aggrieved by the Secretary's unlawful acts.

93.    The interests AAHomecare seeks to protect are germane to its purposes.

94.    It would be impractical to require each of AAHomecare's members affected by the CAP to participate individually in this litigation; their individual presence and participation are not necessary in this suit.

95.    Because the Defendants' unexpected reclassification of "small supplier" created confusion among AAHomecare's membership, AAHomecare has had to devote substantial resources to its members struggling with the Final Rule as enacted as well as in preparing bids.

If the Defendants had complied with the law, these resources could have been expended toward the normal work on behalf of AAHomecare's members.

96.     The Final Rule governing both Round 1 and Round 2 that adopts an unlawful and unreasonable standard for "small supplier" under the Act is final agency action.

**Prayer for Relief**

WHEREFORE, Plaintiffs respectfully request the following relief:

1.     A declaration that the Secretary's failure to specify financial standards is in violation of the MMA and "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(D).

2.     A declaration that the Secretary's failure to specify applicable financial standards by regulation published after notice and comment is without observance of procedure required by law, 5 U.S.C. § 706;

3.     A declaration that CMS's decision to define small suppliers as having total annual revenue of $3.5 million or less violates the MMA and SB Act and is "without observance of procedure required by law," and "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), (D);

4.     A preliminary and permanent injunction ordering the Defendants, their agents, assigns, and all persons acting in concert or participating with them to cease the implementation of the CAP and to be enjoined from future implementation of the CAP until (a) the Secretary specifies applicable financial standards and provides notice and comment regarding this proposed rule required by law, and (b) CMS adopts the SBA definition of a small supplier, or, alternatively, complies with the SB Act and the notice-and-comment provisions of the MMA and APA, in promulgating $3.5 million as the cutoff number for small suppliers;

5.     Costs of suit;

6.     All appropriate attorneys' fees; and

7.     Any other relief that this Court deems just and appropriate.

AMERICAN ASSOCIATION FOR HOMECARE AND
ACE DRUG, INC., DBA HOLLYWOOD MEDICAL
SUPPLY


Dated:  June 9, 2008                    Respectfully submitted,



                                        /s/ Stephen B. Kinnaird

                                        Stephen B. Kinnaird (SBN 454271)
                                        Robert Fabrikant (SBN 198119)
                                        Ileana Maria Ciobanu (SBN 499413)
                                        SIDLEY AUSTIN LLP
                                        1501 K Street, N.W.
                                        Washington, D.C. 20005
                                        (202) 736-8000

                                        Attorneys for Plaintiffs
                                        American Association for Homecare and Ace
                                        Drug, Inc., dba Hollywood Medical Supply

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| | |
| **(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF<br>**(EXCEPT IN U.S. PLAINTIFF CASES)** | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT<br>**(IN U.S. PLAINTIFF CASES ONLY)**<br>NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED |
| **(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) | ATTORNEYS (IF KNOWN) |

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

1 U.S. Government Plaintiff

2 U.S. Government Defendant

3 Federal Question
(U.S. Government Not a Party)

4 Diversity
(Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | 1 | 1 | Incorporated or Principal Place of Business in This State | 4 | 4 |
| Citizen of Another State | 2 | 2 | Incorporated and Principal Place of Business in Another State | 5 | 5 |
| Citizen or Subject of a Foreign Country | 3 | 3 | Foreign Nation | 6 | 6 |

## IV.  CASE ASSIGNMENT AND NATURE OF SUIT
**(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)**

| **A.** *Antitrust* | **B.** *Personal Injury/ Malpractice* | **C.** *Administrative Agency Review* | **D.** *Temporary Restraining Order/Preliminary Injunction* |
|---|---|---|---|
| 410 Antitrust | 310 Airplane<br>315 Airplane Product Liability<br>320 Assault, Libel & Slander<br>330 Federal Employers Liability<br>340 Marine<br>345 Marine Product Liability<br>350 Motor Vehicle<br>355 Motor Vehicle Product Liability<br>360 Other Personal Injury<br>362 Medical Malpractice<br>365 Product Liability<br>368 Asbestos Product Liability | **151 Medicare Act**<br><br>**Social Security:**<br>**861 HIA ((1395ff)**<br>**862 Black Lung (923)**<br>**863 DIWC/DIWW (405(g)**<br>**864 SSID Title XVI**<br>**865 RSI (405(g)**<br>**Other Statutes**<br>**891 Agricultural Acts**<br>**892 Economic Stabilization Act**<br>**893 Environmental Matters**<br>**894 Energy Allocation Act**<br>**890 Other Statutory Actions (If Administrative Agency is Involved)** | Any nature of suit from any category may be selected for this category of case assignment.<br><br>*(If Antitrust, then A governs)* |

| **E.** *General Civil (Other)* | **OR** | **F.** *Pro Se General Civil* | |
|---|---|---|---|
| **Real Property**<br>210 Land Condemnation<br>220 Foreclosure<br>230 Rent, Lease & Ejectment<br>240 Torts to Land<br>245 Tort Product Liability<br>290 All Other Real Property<br><br>**Personal Property**<br>370 Other Fraud<br>371 Truth in Lending<br>380 Other Personal Property Damage<br>385 Property Damage Product Liability | **Bankruptcy**<br>422 Appeal 28 USC 158<br>423 Withdrawal 28 USC 157<br><br>**Prisoner Petitions**<br>535 Death Penalty<br>540 Mandamus & Other<br>550 Civil Rights<br>555 Prison Condition<br><br>**Property Rights**<br>820 Copyrights<br>830 Patent<br>840 Trademark<br><br>**Federal Tax Suits**<br>870 Taxes (US plaintiff or defendant<br>871 IRS-Third Party 26 USC 7609 | **Forfeiture/Penalty**<br>610 Agriculture<br>620 Other Food &Drug<br>625 Drug Related Seizure of Property 21 USC 881<br>630 Liquor Laws<br>640 RR & Truck<br>650 Airline Regs<br>660 Occupational Safety/Health<br>690 Other<br><br>**Other Statutes**<br>400 State Reapportionment<br>430 Banks & Banking<br>450 Commerce/ICC Rates/etc.<br>460 Deportation | 470 Racketeer Influenced & Corrupt Organizations<br>480 Consumer Credit<br>490 Cable/Satellite TV<br>810 Selective Service<br>850 Securities/Commodities/ Exchange<br>875 Customer Challenge 12 USC 3410<br>900 Appeal of fee determination under equal access to Justice<br>950 Constitutionality of State Statutes<br>890 Other Statutory Actions (if not administrative agency review or Privacy Act |

| **G.** *Habeas Corpus/ 2255* | **H.** *Employment Discrimination* | **I.** *FOIA/PRIVACY ACT* | **J.** *Student Loan* |
|---|---|---|---|
| 530 Habeas Corpus-General<br>510 Motion/Vacate Sentence | 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | 895 Freedom of Information Act<br>890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | 152 Recovery of Defaulted Student Loans (excluding veterans) |

| **K.** *Labor/ERISA (non-employment)* | **L.** *Other Civil Rights (non-employment)* | **M.** *Contract* | **N.** *Three-Judge Court* |
|---|---|---|---|
| 710 Fair Labor Standards Act<br>720 Labor/Mgmt. Relations<br>730 Labor/Mgmt. Reporting & Disclosure Act<br>740 Labor Railway Act<br>790 Other Labor Litigation<br>791 Empl. Ret. Inc. Security Act | 441 Voting (if not Voting Rights Act)<br>443 Housing/Accommodations<br>444 Welfare<br>440 Other Civil Rights<br>445 American w/Disabilities-Employment<br>446 Americans w/Disabilities-Other | 110 Insurance<br>120 Marine<br>130 Miller Act<br>140 Negotiable Instrument<br>150 Recovery of Overpayment & Enforcement of Judgment<br>153 Recovery of Overpayment of Veteran's Benefits<br>160 Stockholder's Suits<br>190 Other Contracts<br>195 Contract Product Liability<br>196 Franchise | 441 Civil Rights-Voting (if Voting Rights Act) |

## V. ORIGIN

| 1 Original Proceeding | 2 Removed from State Court | 3 Remanded from Appellate Court | 4 Reinstated or Reopened | 5 Transferred from another district (specify) | 6 Multi district Litigation | 7 Appeal to District Judge from Mag. Judge |
|---|---|---|---|---|---|---|

## VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

| **VII. REQUESTED IN COMPLAINT** | CHECK IF THIS IS A **CLASS ACTION** UNDER F.R.C.P. 23 | **DEMAND $**<br>**JURY DEMAND:** | Check YES only if demanded in complaint<br>**YES**          **NO** |
|---|---|---|---|

| **VIII. RELATED CASE(S) IF ANY** | (See instruction)          **YES**          **NO** | If yes, please complete related case form. |
|---|---|---|

| **DATE** | **SIGNATURE OF ATTORNEY OF RECORD** |
|---|---|

### INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The **JS-44** civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.      COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT  (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed <u>only</u> if diversity of citizenship was selected as the Basis of Jurisdiction under Section **II**.

IV.     CASE ASSIGNMENT AND NATURE OF SUIT:  The assignment of a judge to your case will depend on the category you select that best represents the <u>primary</u> cause of action found in your complaint. You may select only <u>one</u> category. You <u>must</u> also select <u>one</u> corresponding nature of suit found under the category of case.

VI.     CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.   RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.