# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| AMERICAN ASSOCIATION FOR HOMECARE, 2011 Crystal Drive, Suite 725, Arlington, Virginia 22202 | ) ) ) | |
| and | ) ) | |
| ACE DRUG, INC., dba HOLLYWOOD MEDICAL SUPPLY, 2131 Hollywood Boulevard, Hollywood, FL 33020, | ) ) ) ) | |
| Plaintiffs, | ) ) | **Civil Action No. _____** |
| vs. | ) ) | |
| Michael O. LEAVITT, in his official capacity as Secretary of the Department of Health and Human Services, 200 Independence Avenue, S.W., Washington, D.C. 20201 | ) ) ) ) ) | |
| and | ) ) | |
| Kerry N. WEEMS, in his official capacity as Acting Administrator for the Centers for Medicare & Medicaid Services, Department of Health and Human Services, 200 Independence Avenue, S.W., Washington, D.C. 20201 | ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## PLAINTIFFS' APPLICATION FOR A PRELIMINARY INJUNCTION AND REQUEST FOR EXPEDITED HEARING

Pursuant to Federal Rule of Civil Procedure 65 and Local Civil Rule 65.1 of the United

States District Court for the District of Columbia, Plaintiffs American Association for Homecare

("AAHomecare") and Ace Drug, Inc., dba Hollywood Medical Supply ("Ace Drug") respectfully

apply to this Court for a preliminary injunction to enjoin the Defendants, their agents, assigns,

and all persons acting in concert or participating with them from implementation of the

competitive acquisition program ("CAP"). Round 1 of the CAP is to be implemented on July 1, 2008. Plaintiffs file this motion concurrently with their Complaint for Declaratory and Injunctive Relief.

Plaintiffs challenge Defendants' regulatory implementation of the Durable Medical Equipment, Prosthetics, and Supplies ("DMEPOS") Competitive Acquisition provisions of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. 108-173, 117 Stat. 2066 ("MMA"). Specifically, Plaintiffs allege that Defendants' regulatory implementation has resulted in numerous violations of the MMA, Small Business Administration Act ("SB Act"), and Administrative Procedures Act ("APA"). As set out fully in the Complaint and Memorandum of Law in support of this Application, Plaintiffs are likely to prevail on the merits of this case.

All four factors that this Court will consider in granting a preliminary injunction support the Plaintiffs' request for an injunction. First, there is a substantial likelihood that Plaintiffs will succeed on the merits in showing numerous violations of the MMA, SB Act, and APA. Second, Plaintiffs will suffer irreparable injury if the injunction is not granted because Ace Drug and other AAHomecare members will be excluded from providing DMEPOS items and services in various regions effective July 1, 2008, suffering a substantial unrecoverable loss of revenue. In contrast, a preliminary injunction pending a final outcome in this lawsuit will not substantially injure the government, particularly since the Defendants took five years to implement Congress's mandate. Finally, the public interest will be furthered immensely by the injunction because, *inter alia*, beneficiary access to DMEPOS will be protected, and it is always in the public interest to have the Executive Branch comply with the statutes passed by Congress.

Based on the foregoing, Plaintiffs respectfully request that the Court grant their Application for a Preliminary Injunction and enjoin the Defendants, their agents, assigns, and all persons acting in concert or participating with them from implementing the CAP.  Pursuant to Local Rule 65.1(d), Plaintiffs request that the Court schedule a hearing on this Motion within 20 days of the date of filing.

Dated:  June 9, 2008                          Respectfully submitted,


                                              /s/ Stephen B. Kinnaird

                                              Stephen B. Kinnaird (454271)
                                              Robert Fabrikant (198119)
                                              Ileana Maria Ciobanu (499413)
                                              SIDLEY AUSTIN LLP
                                              1501 K Street, N.W.
                                              Washington, D.C. 20005
                                              (202) 736-8000

                                              Attorneys for Plaintiffs
                                              American Association for Homecare and Ace
                                              Drug, Inc., dba Hollywood Medical Supply

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| AMERICAN ASSOCIATION FOR HOMECARE, 2011 Crystal Drive, Suite 725, Arlington, Virginia 22202 | ) ) ) | |
| | ) | |
| and | ) | |
| | ) | |
| ACE DRUG, INC., dba HOLLYWOOD MEDICAL SUPPLY, 2131 Hollywood Boulevard, Hollywood, FL 33020, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | **Civil Action No. _____** |
| | ) | |
| vs. | ) | |
| | ) | |
| Michael O. LEAVITT, in his official capacity as Secretary of the Department of Health and Human Services, 200 Independence Avenue, S.W., Washington, D.C. 20201 | ) ) ) ) | |
| | ) | |
| and | ) | |
| | ) | |
| Kerry N. WEEMS, in his official capacity as Acting Administrator for the Centers for Medicare & Medicaid Services, Department of Health and Human Services, 200 Independence Avenue, S.W., Washington, D.C. 20201 | ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFFS' APPLICATION FOR A PRELIMINARY INJUNCTION AND
REQUEST FOR EXPEDITED HEARING**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ iii

INTRODUCTION ......................................................................................................... 1

JURISDICTIONAL STATEMENT ............................................................................... 1

STATEMENT OF THE CASE....................................................................................... 1

    A.    Overview Of Medicare Program And Home Medical Equipment Industry ............ 1

    B.    Relevant Statutory Provisions .................................................................... 3

        1.    The MMA ............................................................................ 3

        2.    The SB Act ........................................................................... 4

    C.    CMS's Promulgation Of Regulations To Implement The Competitive Acquisition Provision Of The MMA .................................................... 6

        1.    Financial Standards ................................................................. 7

        2.    Small Supplier ........................................................................ 8

    D.    Rounds 1 And 2 Of DMEPOS Competitive Bidding .............................. 9

    E.    Criticism Of CMS's Implementation Of The CAP................................. 11

    F.    Parties........................................................................................ 12

    G.    Complaint ................................................................................... 14

STANDARD OF REVIEW ........................................................................................ 15

SUMMARY OF ARGUMENT .................................................................................. 16

ARGUMENT ............................................................................................................. 19

I.    PLAINTIFFS HAVE A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS ........................................................................................ 19

    A.    The Secretary Has Failed To Specify Applicable Financial Standards As Required By The DMEPOS Competitive Acquisition Provision Of The MMA, In Violation Of The APA.................................................... 19

        1.    Financial Standards Are Not Financial Documents.................. 21

2.      Financial Standards Are Not Financial Ratios Without Numeric Values ..........................................................................22

3.      Even If The Secretary Did Specify Financial Standards, They Were Not Published With Opportunity For Notice And Comment, As Required By The MMA ............................................................26

B.      The Defendants' Decision To Define Small Suppliers As Having Annual Total Revenues Of Up To $3.5 Million Is In Violation Of The SB Act, The MMA, And The APA ....................................................................27

1.      All Federal Agencies Must Use The SBA's Published Size Standards Or Lawfully Obtain Approval To Use A Different Standard *After* Publishing The Alternative Standard For Comment .........28

2.      Even If The Defendants Were Free To Define Small Supplier Without Regard To The Rules Of The SB Act, Their Definition Is Arbitrary And Capricious ........................................................32

3.      The Defendants' Failure To Publish And Propose The Size Standard Also Violated The Notice-And-Comment Provisions Of The MMA And APA ..............................................................33

II.     PLAINTIFFS WILL SUFFER IRREPARABLE INJURY ABSENT THE REQUESTED RELIEF ..........................................................................36

III.    AN INJUNCTION WOULD NOT SUBSTANTIALLY INJURE THE DEFENDANTS ........................................................................................39

IV.     THE PUBLIC INTEREST WILL BE FURTHERED BY ISSUING A PRELIMINARY INJUNCTION .............................................................40

V.      THE JURISDICTION-STRIPPING PROVISIONS OF THE MMA DO NOT APPLY TO THIS ACTION .......................................................................42

CONCLUSION ..............................................................................................45

# TABLE OF AUTHORITIES

## CASES

*Abigal Alliance for Better Access to Developmental Drugs v. Eschenbach*,
469 F.3d 129 (D.C. Cir. 2006) ...................................................................................14

*Aid Ass'n for Lutherans v. U.S. Postal Serv.*,
321 F.3d 1166 (D.C. Cir. 2003) ................................................................................32

*Albuquerque Indian Rights v. Lujan*,
930 F.2d 49 (D.C. Cir. 1991) ....................................................................................37

*\*Amgen, Inc. v. Smith*,
357 F.3d 103 (D.C. Cir. 2004) ..................................................................................43

*Appalachian Power Co. v. EPA*,
249 F.3d 1032 (D.C. Cir. 2001) ................................................................................36

*Armstrong v. Executive Office of the President*,
810 F. Supp. 335 (D.D.C. 1993) ..............................................................................33

*\*Bowen v. Mich. Acad. of Family Physicians*,
476 U.S. 667 (1986)...........................................................................................43, 44

*COMSAT Corp. v. FCC*,
114 F.3d 223 (D.C. Cir. 1997) ..................................................................................44

*Chaplaincy of Full Gospel Churches v. England*,
454 F.3d 290 (D.C. Cir. 2006) ..................................................................................16

*Citizens United v. FEC*,
530 F. Supp. 2d 274 (D.D.C. 2008) ..........................................................................19

*City of Portland v. EPA*,
507 F.3d 706 (D.C. Cir. 2008) ..................................................................................34

*Clinton v. City of New York*,
524 U.S. 417 (1998)...................................................................................................36

*Comm. for Full Employment v. Blumenthal*,
606 F.2d 1062 (D.C. Cir. 1979) ................................................................................37

*Cmty. for Creative Non-Violence v. Reid*,
490 U.S. 730 (1989)...................................................................................................19

*Conn. Nat'l Bank v. Germain*,
503 U.S. 249 (1992).................................................................................19

*Crowley's Yacht Yard, Inc. v. Pena*,
863 F. Supp. 18 (D.D.C. 1994) .................................................................32

*Cuomo v. U.S. NRC*,
772 F.2d 972 (D.C. Cir. 1985) ..................................................................40

*Doran v. Salem Inn, Inc.*,
422 U.S. 922 (1975).................................................................................38

*El Rio Santa Cruz Neighborhood Health Ctr. v. HHS*,
396 F.3d 1265 (D.C. Cir. 2005) ................................................................33

*\*Envtl. Integrity Project v. EPA*,
425 F.3d 992 (D.C. Cir. 2005) ...........................................................34, 35

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000).................................................................................41

*Gulf Oil Corp. v. DOE*,
514 F. Supp. 1019 (D.D.C. 1981) .............................................................38

*Hoffmann-Laroche, Inc. v. Califano*,
453 F. Supp. 900 (D.D.C. 1978) ...............................................................38

*Lepelletier v. FDIC*,
164 F.3d 37 (D.C. Cir. 1999) ....................................................................36

*Long Island Care at Home, Ltd. v. Coke*,
127 S. Ct. 2339 (2007).............................................................................34

*MCI Telecomms. Corp. v. AT&T Co.*,
512 U.S. 218 (1994).................................................................................41

*Martini v. Fed. Nat'l Mortgage Ass'n*,
178 F.3d 1336 (D.C. Cir. 1999) ................................................................19

*Mistick PBT v. Chao*,
440 F.3d 503 (D.C. Cir. 2006) ..................................................................42

*\*Nat'l Mining Ass'n v. Mine Safety & Health Admin.*,
116 F.3d 520 (D.C. Cir. 1997) ...........................................................34, 35

*Nat'l Mining Ass'n v. Mine Safety & Health Admin.*,
512 F.3d 696 (D.C. Cir. 2008) ....................................................................35

*Nat'l Nutritional Foods Ass'n v. Weinberger*,
512 F.2d 688 (2d Cir. 1975) ........................................................................33

*Nw. Mining Ass'n v. Babbitt*,
5 F. Supp. 2d 9 (D.D.C. 1998) ....................................................................30

*Sargeant v. Dixon*,
130 F.3d 1067 (D.C. Cir. 1997) ..................................................................36

*\*Sharp Healthcare v. Leavitt*,
No. 08-CV-0170, 2008 WL 962628 (S.D. Cal. Apr. 8, 2008) ..............39, 40

*Shell Oil Co. v. EPA*,
950 F.2d 741 (D.C. Cir. 1991) ....................................................................35

*Time Warner Entm't Co. v. FCC*,
56 F.3d 151 (D.C. Cir. 1995) ......................................................................30

*U.S. Air Tour Ass'n v. FAA*,
298 F.3d 997 (D.C. Cir. 2002) ....................................................................33

*United States ex rel. Goldman v. Meredith*,
596 F.2d 1353 (8th Cir. 1979) ....................................................................16

*Utility Solid Waste Activities Group v. EPA*,
236 F.3d 749 (D.C. Cir. 2001) ....................................................................27

*Winkleman v. N.Y. Stock Exch.*,
445 F.2d 786 (3d Cir. 1971) ........................................................................24

*Wis. Gas Co. v. FERC*,
758 F.2d 669 (D.C. Cir. 1985) ....................................................................38

*Zivotofsky v. Sec'y of State*,
444 F.3d 614 (D.C. Cir. 2006) ....................................................................36

## STATUTES AND REGULATIONS

1965 Amendments to the Social Security, Pub. L. No. 89-97, 79 Stat. 286 ....................................1

*\*Small Business Credit and Business Opportunity Enhancement Act of 1992, Pub. L.
No. 102-366, 106 Stat. 986 ........................................................................5

*Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, 117 Stat. 2066 ................................................................................................1

*5 U.S.C. § 553 ...........................................................................................................33
*5 U.S.C. § 706(2) ...............................................................................................*passim*

7 U.S.C. § 6(b) ...........................................................................................................21
7 U.S.C. § 6f(b) ..........................................................................................................21

12 U.S.C. § 1426(a) ...................................................................................................21
12 U.S.C. § 1464(t) ....................................................................................................21
12 U.S.C. § 1842(a)(5)(C)(i)(I) ..................................................................................21
12 U.S.C. § 2279aa-5 .................................................................................................21

*15 U.S.C. § 631 ....................................................................................................5, 31
*15 U.S.C. § 631a(a) ..............................................................................................5, 29
*15 U.S.C. § 632(a)(2) ..............................................................................5, 28, 29, 31
*15 U.S.C. § 637(a)(1)(A) ..........................................................................................31

42 U.S.C. § 1395(k) .....................................................................................................2
42 U.S.C. § 1395(x) .....................................................................................................2
*42 U.S.C. § 1395hh .............................................................................4, 16, 26, 27, 34
*42 U.S.C. § 1395w-3 ..........................................................................................*passim*
42 U.S.C. § 1395w-26 ................................................................................................20
42 U.S.C. § 1395w-112 ..............................................................................................20

12 C.F.R. § 121.903(a) ..........................................................................................31, 32
12 C.F.R. pt. 225, app. B ............................................................................................21
12 C.F.R. §§ 567.2-567.12 .........................................................................................21
12 C.F.R. §§ 932.2-932.3 ...........................................................................................21

*13 C.F.R. pt. 121 ...................................................................................................5, 29
13 C.F.R. § 121.201 ......................................................................................................9
13 C.F.R. §§ 121.901-121.904 ...................................................................................29
*13 C.F.R. § 121.903 ..........................................................................................6, 29, 31

17 C.F.R. § 1.17 .........................................................................................................21

42 C.F.R. § 414.402 .....................................................................................................2
*42 C.F.R. § 414.414 ..........................................................................................*passim*
42 C.F.R. § 422.382(a) ...............................................................................................20
42 C.F.R. § 422.386 ...................................................................................................20
42 C.F.R. § 422.388 ...................................................................................................20
42 C.F.R. § 423.420(a) ...............................................................................................21

*71 Fed. Reg. 25,654 (proposed May 1, 2006) .............................................2, 6, 9, 34

72 Fed. Reg. 16,794 (notice Apr. 5, 2007) ...................................................................6

*72 Fed. Reg. 17,992 (Apr. 10, 2007) ............................................................. *passim*

## RULES

Fed. R. Civ. P. 65(a) ...................................................................................................1
D.C. R. Civ. P. 65.1(c)................................................................................................1

## ADMINISTRATIVE DECISION

*Implementation of Sections of the Cable Television Consumer Prot. & Competition Act of 1992: Rate Regulation*, 9 F.C.C.R. 5327 (1994) ...........................................................30

## LEGISLATIVE HISTORY

H.R. Rep. No. 108-178 (2003)....................................................................................3

H.R. Rep. No. 108-391 (2003)....................................................................................2

138 Cong. Rec. S11770 (daily ed. Aug. 6, 1992) .......................................................29

## OTHER AUTHORITIES

*The American Heritage Dictionary* (2d ed. 1985) ......................................................20

2 *Shorter Oxford English Dictionary* (5th ed. 2003) ..................................................20

*Webster's Third New International Dictionary* (1993) ...............................................20

Sheldon Gates, *101 Business Ratios: A Manger's Handbook of Definitions, Equations, and Computer Algorithms* (1993) .................................................................................24

Roger H. Hermanson & James Don Edwards, *Financial Accounting: A Business Perspective* (7th ed. 1998) .........................................................................................24

Belverd E. Needles, Jr., *Financial Accounting* (5th ed. 1995) ...................................24

Risk Mgmt. Ass'n, *Annual Statement Studies: Financial Ratio Benchmarks* (2007-2008) ..........24

## INTRODUCTION

Plaintiffs, American Association for Homecare ("AAHomecare") and Ace Drug, Inc., dba Hollywood Medical Supply ("Ace Drug"), have brought suit against Michael O. Leavitt, Secretary of the Department of Human Services ("HHS"), and Kerry N. Weems, Acting Administrator for the Centers for Medicare & Medicaid Services ("CMS"), for declaratory and injunctive relief. Plaintiffs challenge Defendants' regulatory implementation of the Durable Medical Equipment, Prosthetics, and Supplies ("DMEPOS") Competitive Acquisition provisions of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. 108-173, 117 Stat. 2066 ("MMA"). Specifically, Plaintiffs allege that Defendants' regulatory implementation has resulted in numerous violations of the MMA, Small Business Administration Act ("SB Act"), and Administrative Procedures Act ("APA"). Plaintiffs respectfully request that this Court issue a preliminary injunction, ordering the Defendants, their agents, assigns, and all persons acting in concert or participating with them to cease the implementation of the competitive acquisition program ("CAP") and to be enjoined from future implementation of the CAP. *See* Fed. R. Civ. P. 65(a); D.C. R. Civ. P. 65.1(c).

## JURISDICTIONAL STATEMENT

This Court has jurisdiction of this action because it arises under the laws of the United States. 28 U.S.C. § 1331. Judicial review is authorized, and sovereign immunity is waived, by the Administrative Procedure Act. 5 U.S.C. § 702.

## STATEMENT OF THE CASE

### A.     Overview Of Medicare Program And Home Medical Equipment Industry

Established as part of the 1965 Amendments to the Social Security Act, Pub. L. No. 89-97, 79 Stat. 286, the Medicare program is the nation's largest health insurance program. Medicare covers certain medical items and services for those 65 years of age or older, as well as

individuals under 65 years of age who are disabled or have other specified medical conditions. CMS, part of HHS, is charged with administering the Medicare program.

Medicare consists of multiple parts, each of which is set forth under different sections of the Social Security Act. Relevant here is Part B, a supplementary medical insurance program that covers, among other things, the rental or purchase of "[d]urable medical equipment" ("DME"), "[s]upplies necessary for the effective use of DME other than inhalation drugs," "[e]nteral nutrients, equipment, and supplies," and "[o]ff-the-shelf orthotics," 42 C.F.R. § 414.402, collectively known as DMEPOS, for use in the patient's home. 42 U.S.C. §§ 1395k, 1395x(n); *see id.* § 1395w-3. "DMEPOS spending accounts for less than two percent of Medicare spending. It is also the slowest-growing segment of Medicare costs." Ex. 1 ¶ 12 (Declaration of Tyler J. Wilson); *see also* Ex. 2 (AAHomecare, Press Release, Errors Plague Medicare "Competitive Bidding" Program (Apr. 3, 2008)).[1]

Medicare has to date paid for "durable medical equipment . . . using a different fee schedule for each class of covered items." H.R. Rep. No. 108-391, at 572 (2003). CMS developed the fee schedule for each item of DMEPOS by using "a weighted average of either local or regional prices, subject to national limits (both floors and ceilings)" that were updated annually, *id.*, and subject to various caps and payment reductions. *See* 42 U.S.C. § 1395m(a). The vast majority of DME suppliers are small businesses as defined by the Small Business Administration ("SBA"). *See* 71 Fed. Reg. 25,654, 25,695 (proposed May 1, 2006).

As part of the Balanced Budget Act of 1997, Congress authorized demonstration projects to test whether a competitive acquisition program would be a more efficient method of paying for DMEPOS. *See* H.R. Rep. No. 108-178, pt. II, at 192 (2003). "About three-quarters of the

---

[1] Ex. 35 (Declaration of Meredith Kelly) contains all the website addresses for all the exhibits that are available on the Internet.

winning bidders in the demonstration were small suppliers, defined by the Small Business Administration at the time as under $5 million in sales per year." Ex. 3, at 3 (Statement of Laurence D. Wilson, Director, Chronic Care Policy Group, Center for Medicare Management, CMS (Oct. 31, 2007)).

### B.    Relevant Statutory Provisions

#### 1.    The MMA

In 2003, Congress required the Secretary to develop and implement competitive bidding programs for DMEPOS suppliers throughout the United States and established a phased-in implementation for such programs. 42 U.S.C. § 1395w-3(a). Congress made clear that except as otherwise provided, "payment shall not be made for items and services . . . furnished by a contractor and for which competition is conducted . . . unless—(i) the contractor has submitted a bid for such items and services . . . and (ii) the Secretary has awarded a contract to the contractor for such items and services." *Id.* § 1395w-3(b)(6)(A).

Congress provided many restrictions on the Secretary's implementation of the CAP. Because the competitive bidding statute would curtail the number of suppliers in a market, often severely, Congress was particularly concerned that the new contract suppliers would have the financial wherewithal to serve potentially large shares of the applicable market over the lifetime of the contract. Thus, Congress mandated that "[t]he Secretary may not award a contract to any entity" unless "the Secretary finds," *inter alia*, that "[t]he entity meets applicable financial standards specified by the Secretary, taking into account the needs of small providers." *Id.* § 1395w-3(b)(2)(A)(ii). Congress also provided that "[t]he Secretary shall establish a Program Advisory and Oversight Committee" ("PAOC"), which "shall provide advice to the Secretary with respect to" "[t]he establishment of financial standards." *Id.* § 1395w-3(c)(1), (c)(3)(ii).

To maintain a level playing field between large and small DME suppliers, Congress also mandated that "[i]n developing procedures relating to bids and the awarding of contracts, . . . the Secretary shall take appropriate steps to ensure that small suppliers of items and services have an opportunity to be considered for participation in the program." *Id.* § 1395w-3(b)(6)(D). Congress did not specifically define "small suppliers" or "small providers" in the Competitive Acquisition provision of the MMA. *Id.* § 1395w-3.

The Medicare statute also imposes precise procedural safeguards to ensure adequate notice and comment on CMS actions affecting benefits or supplier eligibility:

> No rule, requirement, or other statement of policy (other than a national coverage determination) that establishes or changes a substantive legal standard governing the scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish or receive services or benefits under this subchapter shall take effect unless it is promulgated by the Secretary by regulation.

*Id.* § 1395hh(a)(2). For all such standards, "the Secretary shall provide for notice of the proposed regulation in the Federal Register and a period of not less than 60 days for public comment thereon." *Id.* § 1395hh(b)(1). Finally, Congress has mandated that when "a final regulation includes a provision that is not a logical outgrowth of a previously published notice of proposed rulemaking or interim final rule, such provision shall be treated as a proposed regulation and shall not take effect until there is the further opportunity for public comment and a publication of the provision again as a final regulation." *Id.* § 1395hh(a)(4).

**2.      The SB Act**

Congress passed the SB Act in 1953, which declared as a matter of Congressional policy

> that the Government should aid, counsel, assist, and protect, insofar as is possible, the interests of small-business concerns in order to preserve free competitive enterprise, to insure that a fair proportion of the total purchases and contracts or subcontracts for property and services for the Government (including but not

4

> limited to contracts or subcontracts for maintenance, repair, and construction) be placed with small-business enterprises, to insure that a fair proportion of the total sales of Government property be made to such enterprises, and to maintain and strengthen the overall economy of the Nation.

15 U.S.C. § 631(a).  Federal agencies are required to promote small business interests in all federal programs, unless inconsistent with other national policy.  *Id.* § 631a(a) ("[I]t is the continuing policy and responsibility of the Federal Government to use all practical means . . . to implement and coordinate all Federal department, agency, and instrumentality policies, programs, and activities in order to: foster the economic interests of small businesses . . . [and] reduce the concentration of economic resources and expand competition . . . .").

Under the SB Act, as modified in 1992 by the Small Business Credit and Business Opportunity Enhancement Act of 1992, Pub. L. No. 102-366, § 222, 106 Stat. 986, 994-96, the SBA Administrator has authority to define and specify the criteria all federal agencies must use to determine whether a businesses qualifies as small business, "for the purposes of [the SB Act] *or any other Act*."  15 U.S.C. § 632(a)(2)(A).[2]  The SBA's size standards for each industry are published at 13 C.F.R. pt. 121 ("Small Business Size Regulations").  In the absence of a specific statutory authorization, all federal agencies must either (1) use the SBA's published size standards to determine whether a business is small, or (2) follow prescribed substantive and procedural requirements in order to define a different size standard.  To use a different size standard, an agency must propose its alternate standard for public notice and comment, use only statutorily enumerated factors, and receive specific approval from the SBA Administrator.  15 U.S.C. § 632(a)(2)(C)(i), (ii).

SBA regulations clarify that an agency may, "[i]n limited circumstances," create and use different size criteria for a specific program, "but only when" the agency complies with rigid

---

[2] Unless otherwise noted, all emphases are added.

procedural requirements prior to requesting the SBA Administrator's approval.  13 C.F.R.
§ 121.903(a).  Under those requirements, the agency must first consult with SBA in writing,
specifying the proposed alternative size standard and its justification.  *Id.* § 121.903(a)(2).  At
least fourteen days later, the agency must "propose[ ] the size standard for public comment
pursuant to the [APA]."  *Id.* § 121.903(a)(3).  Once the notice and comment period has passed,
the agency must collect all comments received in response to its proposal and include them in its
formal request for SBA Administrator Approval.  *Id.* § 121.903(a)(5)(i).

> ### C.    CMS's Promulgation Of Regulations To Implement The Competitive Acquisition Provision Of The MMA

Three years after Congress passed the MMA in 2003, CMS published, on May 1, 2006, a
proposed rule for the Competitive Acquisition of Certain Durable Medical Equipment,
Prosthetics, Orthotics and Supplies (DMEPOS).  71 Fed. Reg. 25,654 ("Proposed Rule").  One
year later, on April 5, 2007, CMS announced that it needed additional time to publish a final rule
"due to the extensive comments received [over 2,000]" and the "extremely complex policy and
legal issues, which require extensive consultation and analysis."  72 Fed. Reg. 16,794, 16,794
(notice Apr. 5, 2007).  Notwithstanding this announcement, the following week, CMS published
a final rule effective June 11, 2007.  72 Fed. Reg. 17,992 (Apr. 10, 2007) ("Final Rule").  CMS
summarized the Final Rule as "establish[ing] competitive bidding programs for certain Medicare
Part B covered items of [DMEPOS] throughout the United States in accordance with sections
1847(a) and (b) of the Social Security Act."  *Id.* at 17,992.  CMS explained that these
competitive bidding programs would be "phased in over several years" and "utilize bids
submitted by DMEPOS suppliers to establish applicable payment amounts under Medicare Part
B."  *Id.*  *See* 42 U.S.C. § 1395w-3(a), (b).  Two parts of the Final Rule are at issue here.

1.    **Financial Standards**

Notwithstanding the statutory mandate to specify financial standards that contract

suppliers must meet before they are awarded any contract, CMS specified no such standards in

the Final Rule.  CMS ignored industry comments that advance specification of financial

standards in the Final Rule, as well as the opportunity for notice and comment, was necessary:

> Proposed regulation section 414.414(d) requires bidders to provide
> bank references, credit history, insurance documentation, evidence
> of lines of credit and business capacity, and other information, but
> does not detail how those financial standards may be applied to
> suppliers.  We believe that the lack of detail on this important
> section of the Proposed Rule makes it impossible to provide
> effective comments.  *The absence of any transparency with respect
> to the financial standards is not at all appropriate in view of the
> centrality of the standards in the bid process, and leaves open the
> possibility that such standards could be used to unfairly
> discriminate against and eliminate many willing and respectable
> businesses from participation in the CBP.  Nonetheless, we agree
> that satisfaction of some type of very definite and objective
> standards must be a precondition to bidding.*  If the standards are
> too restrictive, fewer suppliers will be able to participate in the bid
> process, diminishing beneficiary choice and potentially adversely
> affecting the single payment amount.  If the standards are not
> restrictive enough, unsound suppliers may be awarded contracts.
> Accordingly, *we believe that the financial standards are another
> issue that should be included in a new NPRM for public comment
> before any final rule or interim final rule is issued.*

Ex. 4, at 18-19 (Letter from Fulbright & Jaworski L.L.P. to CMS (June 30, 2006)).[3]  CMS also

ignored comments criticizing the agency for specifying financial documents instead of financial

---

[3] *See also* Ex. 5, at 4 (Letter from Carolina Homecare to CMS (undated)) ("The final rule needs to contain more detailed information regarding financial standards that are going to be utilized during the bid process and how they are going to be utilized.  *CMS needs to define what financial ratios that they will be requiring, what the ratios should be*, etc. so that providers know going in if they are considered viable candidates before submitting their bids."); Ex. 6, at 3 (Letter from Drucker Drugs L.L.C. to CMS (undated)) ("CMS needs to define what financial ratios that they will be requiring, what the ratios should be, etc., so that providers know going in if they are considered viable candidates before submitting their bids."); Ex. 7, at 6 (Letter from The SCOOTER Store to CMS (June 30, 2006)) ("*CMS must, at a minimum, clearly define and*

standards as required by the MMA, as the two are not equivalent.  *See, e.g.*, Ex. 13, at 12 (Letter

from Advanced Medical Technology Association to CMS (June 30, 2006)) ("Proposing data

collection instruments is not the same as proposing financial eligibility standards.  CMS should

first consider the difficult question of which financial standards are appropriate, and then

determine the documentation needed to implement those standards.").  Ignoring these comments,

the Defendants in the Final Rule issued a regulation that merely states the following: "Financial

standards.  Each supplier must submit along with its bid the applicable financial documentation

specified in the request for bids."  42 C.F.R. § 414.414(d); see also 72 Fed. Reg. at 18,088.

### 2.    Small Supplier

As noted above, the MMA requires that the Secretary take into account "the needs of

small providers" in determining financial standards, and to develop procedures ensuring that

---

*publish what ratios are needed to qualify*, who decides what constitutes adequate insurance documentation and coverage, and what score qualifies a company to have a positive credit history."); Ex. 8, at 54 (Letter from Apria Healthcare to CMS (undated)) ("[T]he financial standards are not 'standards' at all since they do not specify a minimum threshold, range of acceptable performance or other criteria that is defined as 'acceptable.' . . .  CMS has not stated what the financial standards or range of performance need to be, such as Cash Flow of X, DSO of Y, what defines a 'positive credit history,' etc."); Ex. 9, at 7 (Letter from Air Products Healthcare to CMS (June 29, 2006)) ("Please define the 'applicable financial standards.'  We would request the *objective, quantitative measures that will be used by CMS* . . . .  CMS should define the financial standards and/or measures that will be required from suppliers to bid.  Only those suppliers who meet those standards and/or measures should be allowed to bid.  This will ensure only financially stable suppliers are chosen as winning bidders."); Ex. 10, at 18 (Letter from National Association for the Support of Long Term Care to CMS (June 30, 2006)) ("CMS should clarify, revise and reissue its proposed financial standards for comment as a separate rulemaking."); *id.* ("The failure to specify financial standards leaves both beneficiaries and suppliers vulnerable , and CMS should specify standards in time for comment prior to the effective date of the Proposed Rule."); Ex. 11, at 12 (Letter from PolyMedica Corp. to CMS (June 29, 2006)) ("CMS's failure to specify financial standards leaves both beneficiaries and suppliers vulnerable, and CMS should specify standards in time for comment prior to the effectiveness of the Proposed Rule."); Ex. 12, at 10 (Letter from AAHomecare to CMS (June 30, 2006)) ("CMS should publish the criteria it will use to assess the supplier's financial stability and how it will rank the supplier based on the criteria.  The information on rankings should be published in the interim final and final regulations as well as in the request for bids (RFB).").

"small suppliers" have an opportunity to be considered for participation in the CAP.  In the Proposed Rule, CMS "proposed using the SBA's small business definition when evaluating whether a DMEPOS supplier is a small supplier."  72 Fed. Reg. at 18,056; *see also* 71 Fed. Reg. at 25,695.  The SBA has developed size eligibility standards for small businesses by industry. The SBA size standard for a small supplier in the home health equipment rental business is $6.5 million in total annual receipts.  13 C.F.R. § 121.201 (NAICS code 532291); *see also* 72 Fed. Reg. at 18,056.  Despite proposing the SBA definition, in the Final Rule CMS reclassified a small supplier as having less than $3.5 million in annual receipts, including Medicare *and* non-Medicare receipts.  *Id.* at 18,071.  This reclassification occurred without any explanation in the Final Rule as to the basis for CMS's selection of $3.5 million in total annual receipts as the definition of "small supplier."  This reclassification also occurred without CMS seeking notice and comment on the reclassification.  Moreover, CMS included for the first time in the Final Rule a special preference for small businesses, ensuring that small suppliers would be added to the pool of contractors for a given CBA product so as to reach a target that 30 percent of contractors would be small suppliers.  *Id.* at 18,058; *see* 42 C.F.R. § 414.414(g)(1).

### D.    Rounds 1 And 2 Of DMEPOS Competitive Bidding

On April 2, 2007, CMS announced the 10 competitive bidding areas ("CBAs") where the initial bidding would be conducted.  *See* Ex. 14 (Metropolitan Statistical Areas for First Round of Bidding).  CMS also established that there would be 9-10 product categories in each CBA in which bids would be solicited.  Ex. 15 (Product Categories for First Round of Competitive Bidding).

On May 15, 2007, CMS issued a request for bids for the first round of the CAP in these initial 10 CBAs, and the bidding period ultimately closed on September 25, 2007.  Ex. 16 ((DMEPOS) Competitive Bidding Program Milestones).

The request for bid ("RFB") instructions for Round 1 included a list of financial documents to be provided with no accompanying financial standards under the heading, "Financial Information." Ex. 17, at 10-11 (Instructions for Completing Bid Forms for Medicare DMEPOS Competitive Bidding Program).

CMS issued a one-page announcement dated May 25, 2007, entitled "CMS Announces Financial Measures for the Medicare DMEPOS Competitive Bidding Program." *See* Ex. 18. The release listed a series of financial ratios, but failed to specify any values for those ratios that alone or in combination could serve as the financial standards that the Secretary must find each winning supplier must meet.

After this release was posted, during an educational teleconference on June 6, 2007, one caller asked, "When are the basic financial standard requirements going to be published, such as what you required for a current ratio or collection period, et cetera?" A representative of the Competitive Bidding Implementation Contractor ("Palmetto") retained by CMS to implement the CAP, *see* 42 U.S.C. § 1395w-3(b)(9), responded that it was "not ready to divulge that kind of information." Ex. 19, at 20 (Palmetto GBA Telepresentation). CMS to date has not published in the Federal Register or otherwise financial standards for suppliers bidding in the CAP.

In March 2008, for each CBA, CMS selected the single payment amounts for each competitively bid item within a product category, and CMS then individually notified Round 1 bidders of their contract status. Ex. 20 (Suppliers Selected for New Program That Reduces Costs for Certain DMEPOS). In May 2008, the government publicly announced the winning bidders for each product category in the 10 CBAs. *Id.* Of the 6,209 bids that were submitted, 3,043 were rejected for lack of accreditation or missing information (about 49%), 1,831 were rejected because the prices were not low enough (about 29.5%), and 1,335 were accepted (about 21.5%).

Ex. 21 (*Lawmakers, Industry Representatives, Officials Discuss Medicare Competitive Bidding Program for Durable Medical Equipment*, Medical News Today (May 8, 2008)).

DME suppliers who are not winning bidders in any one of the product categories in the 10 specified CBAs, including Ace Drug, will be excluded for three years effective July 1, 2008, from furnishing bid items to Medicare beneficiaries in those CBAs unless a limited grandfathering provision applies. *See* 42 U.S.C. § 1395w-3(b)(3)(B) ("The Secretary shall recompete contracts under this section not less often than once every 3 years.").

CMS has posted accreditation deadlines for Round 2, which will establish CBAs covering 70 more of the largest MSAs. Suppliers must be accredited or have applied for accreditation by July 21, 2008, in order to submit a bid for the second round of competitive bidding, and suppliers must be accredited before January 14, 2009, in order to be awarded a contract. *See* Ex. 22 (Medicare Announces Over 320 Winning Suppliers Selected for Competitive Bidding Program for DMEPOS).

If not enjoined, implementation of Round 1 will occur on July 1, 2008, *see* Ex. 16, and bidding for Round 2 is scheduled to begin soon thereafter. On May 29, 2008, Defendant Weems stated that "the full schedule for the 70 MSAs in the second group should be out in the next two weeks." Ex. 23 (*CMS Proceeds with DME Competitive Bidding Despite Pressure To Delay*, Inside CMS, May 29, 2008).

### E.    Criticism Of CMS's Implementation Of The CAP

Rep. Dave Camp (R-Mich.), the House Ways and Means Health Subcommittee ranking member, has expressed concern that CMS's implementation of the CAP "could ultimately reduce the number of companies that supply these items and actually increase costs in the long run." Ex. 24 (Opening Statement of Ranking Member Dave Camp (May 6, 2008)). Similarly, Pete Stark (D-Calif.), the chairman of the House Ways and Means Health Subcommittee has stated

that "CMS' bidding process is somewhere between 'flawed and lousy.'"  Ex. 25 (*House Subcommittee Attacks Medicare DME Bidding Program*, Inside CMS (May 15, 2008) (quoting Pete Stark)).  Several Representatives and Senators from both political parties have written letters to CMS asking for delays in the implementation of the CAP until problems with the CAP could be resolved, and a bipartisan group of 132 House members have recently sent a letter to the leadership of the House Ways and Means Committee to block implementation of the CAP for one year.  *See* Ex. 26.

     **F.**    **Parties**

     Ace Drug submitted bids in all ten product categories in the Miami-Fort Lauderdale-Miami Beach, Florida CBA pursuant to Round 1 of the CAP, and intends to submit bids in the same product categories in the Palm Bay-Melbourne-Titusville and Cape Coral-Ft. Myers, Florida CBAs pursuant to Round 2 of the CAP.  Ex. 27 ¶¶ 7-8 (Declaration of Robert Lichtenstein).  Ace Drug's bids in seven of the ten product categories were unsuccessful because the bid amount for each product category was too high.  *Id.* ¶ 9.  Because Ace Drug has a total annual revenue of about $3.7 million, *id.* ¶ 5, it is a small business under the SBA.

     DMEPOS suppliers who are not winning bidders, including Ace Drug and other AAHomecare members, will suffer a significant loss of clientele and revenue due to their inability to provide DMEPOS to Medicare beneficiaries in those CBAs.  *See* Ex. 27 ¶ 13 (stating that "Ace Drug's total cumulative loss will be at least $225,000"); Ex. 1 ¶ 8.  This revenue loss likely is an underestimate because many private insurers base their fee schedule rates on a percentage of the Medicare rates, and thus current private reimbursement rates could be negatively impacted by the decreases in the Medicare rates that the CAP will implement  Ex. 27 ¶ 14; Ex. 1 ¶ 9.  Finally, it is also possible that referral sources are likely to completely stop sending patients to non-winning suppliers because it is too confusing to remember which

suppliers have won for which products; instead, referral sources will likely look for the supplier that has won the most categories and send *all* patients to the same place. Ex. 27 ¶ 15; Ex. 1 ¶ 10.

AAHomecare has associational standing to bring this action on behalf of its members. AAHomecare represents healthcare providers, equipment manufacturers, and other organizations in the homecare community. Ex. 1 ¶ 3. AAHomecare members include DMEPOS suppliers that serve the medical needs of millions of Americans who require (1) oxygen equipment and therapy, (2) mobility assistive technologies, (3) medical supplies, (4) inhalation drug therapy, (5) home infusion, and (6) other durable medical equipment, therapies, services, and supplies furnished to patients for use in the home. *Id.* AAHomecare's activities in support of the homecare community include advocacy before all three branches of the federal government, as well as counseling its members regarding government relations and legal compliance. *Id.* ¶ 4. AAHomecare's membership, which includes plaintiff Ace Drug, reflects a broad cross-section of the homecare community, including providers of all sizes operating 3,000 locations in all 50 states. *Id.* ¶ 5.

AAHomecare members submitted qualified but unsuccessful bids in every competitive bidding area ("CBA") and in 71 of the 92 CBA-product categories pursuant to Round 1 of the CAP. *Id.* ¶ 6. AAHomecare's members plan to submit bids for Round 2 of the CAP as well. *Id.* ¶ 7. AAHomecare members will suffer a significant loss of clientele and revenue due to their inability to provide DMEPOS to Medicare beneficiaries in the CBAs for Round 1 and subsequently for Round 2. *Id.* ¶ 8. Moreover, AAHomecare members that win bids in Round 2 will suffer further injury in Round 2 in those CBA-product categories where small suppliers whose bids are above the pivotal award bid are offered contracts so that the target of 30 percent of contract suppliers in a CBA-product category be small suppliers is reached. If only suppliers

that have at most $3.5 million in total annual revenues are considered small suppliers, prevailing

bidders who have total annual revenues between $3.5 million and $6.5 million are not counted

toward the 30 percent target, making it more likely that more small suppliers will be awarded

contracts to reach the 30 percent threshold, which in turn reduces the market share and business

opportunity of the AAHomecare members who win bids in Round 2.  *Id.* ¶ 11.  It would be

impractical to require each of AAHomecare's members affected by the CAP to participate

individually in this litigation; their individual presence and participation are not necessary in this

suit.  *Id.* ¶ 13.

Finally, independent of AAHomecare's associational standing to bring suit,

AAHomecare has direct standing to bring suit.  Because the Defendants' failure to specify

financial standards and their unexpected reclassification of "small supplier" created confusion

among AAHomecare's membership, AAHomecare has had to devote substantial resources to its

members struggling with the Final Rule as enacted as well as in preparing bids.  If the

Defendants had complied with the law, these resources could have been expended toward the

normal work on behalf of AAHomecare's members.  *See Abigal Alliance for Better Access to*

*Developmental Drugs v. Eschenbach*, 469 F.3d 129, 132-33 (D.C. Cir. 2006).

### G.    Complaint

Plaintiffs have alleged several claims.  First, the Defendants' failure to specify financial

standards as mandated by the Competitive Acquisition provision of the MMA is "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C.

§ 706(2)(A).  Second, the Defendants' failure to promulgate financial standards as mandated by

the Competitive Acquisition provision of the MMA as a regulation with required notice and

opportunity for comment for the required period after notice is "without observance of procedure

required by law."  *Id.* § 706(2)(D).  Third, because Congress intended CMS either (1) to use the

SBA definition of small business in the home healthcare rental equipment business or (2) to adopt a different definition in compliance with SBA procedures, CMS's change in the Final Rule to $3.5 million in annual total revenue as the upper limit of what a small supplier can earn without compliance with the SBA procedures, as intended by the MMA, is both "without observance of procedure required by law," and "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A), (D).  Fourth, both the MMA and APA require that when HHS publishes a final rule that includes a provision that is not a "logical outgrowth" of the proposed rule, it must treat that provision as a proposed rule subject to public comment and publication before being adopted as a final rule, and CMS's failure to comply with this mandate in adopting a small supplier definition requiring $3.5 million or less in total annual revenue was "without observance of procedure required by law." *Id.* § 706(2)(D).  Plaintiffs seek, *inter alia*, declarations of the unlawfulness of the Defendants' actions and a permanent injunction against the implementation of Rounds 1 and 2 of the CAP.  Plaintiffs bring this application for preliminary injunction to preserve the status quo ante pending determination of these claims.

## STANDARD OF REVIEW

This Court of Appeals for the D.C. Circuit has stated:

> To warrant preliminary injunctive relief, the moving party must show (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction were not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction.  A district court must balance the strengths of the requesting party's arguments in each of the four required areas.  If the showing in one area is particularly strong, an injunction may issue even if the showings in other areas are rather weak.  Despite this flexibility, though, a movant must demonstrate at least some injury for a preliminary injunction to issue for the basis of injunctive relief in the federal courts has always been irreparable harm.

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (citations and internal quotation marks omitted).  As this action raises strictly legal questions concerning the validity of those determinations, resolution of those questions for purposes of a preliminary injunction will also resolve the merits of this case, and this Court may enter a permanent injunction or declaration of invalidity.  *See United States ex rel. Goldman v. Meredith*, 596 F.2d 1353, 1358 (8th Cir. 1979) ("[D]isposition on the merits may be appropriate whenever the evidence presented at the preliminary hearing indicates that there is no conflict of material fact that would justify holding the full trial on the merits.").

### SUMMARY OF ARGUMENT

All four factors that this Court will consider in granting a preliminary injunction support the Plaintiffs' request for an injunction.  First, there is a substantial likelihood that Plaintiffs will succeed on the merits in showing numerous violations of the MMA, SB Act, and APA.

Congress has mandated that "[t]he Secretary may not award a contract to any entity" unless "the Secretary finds," among other things, that "[t]he entity meets applicable financial standards specified by the Secretary, taking into account the needs of small providers."  42 U.S.C. § 1395w-3(b)(2)(A)(ii).   Under the plain meaning of the statute, and consistent with other statutes requiring entities to meet financial standards, the Secretary was obliged to define levels of financial performance and/or condition against which a potential supplier can be evaluated; it is not enough for the Secretary merely to require the submission of financial documentation or even to list the types of financial ratios that the Secretary would consider.  Moreover, because the statute requires the Secretary to find that a supplier meets the specified financial standards in order to be awarded a contract, the Secretary must specify those standards by regulation prior to the award of any contracts.  *See id.* § 1395hh(a)(2).  Nonetheless, the Final Rule governing both Round 1 and Round 2 does not specify the financial standards mandated by

law.  Consequently, the Defendants' failure to specify the Congressionally mandated financial standards and to allow for the required notice and opportunity for comment through publication in a regulation is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," as well as "without observance of procedure required by law."  5 U.S.C. § 706(2)(A), (2)(D).

Congress has also mandated that "[i]n developing procedures relating to bids and the awarding of contracts, . . . the Secretary shall take appropriate steps to ensure that small suppliers of items and services have an opportunity to be considered for participation in the program."  42 U.S.C. § 1395w-3(b)(6)(D).  CMS has sought to implement this statutory mandate by establishing a preference for small suppliers in the form of a target that 30 percent of contract suppliers in a CBA product category will be small suppliers.  72 Fed. Reg. at 18,058; *see* 42 C.F.R. § 414.414(g)(1).  If small suppliers do not constitute 30 percent of prevailing bidders in a CBA product category after the initial selection, CMS will award contracts to additional eligible small suppliers whose bids were too high until the 30 percent target is met.  72 Fed. Reg. at 18,058; 42 C.F.R. § 414.414(g)(1).

Because Congress did not specifically define small suppliers in the DMEPOS Competitive Acquisition provision of the MMA, or otherwise exempt the Defendants from the SB Act requirements in deviating from the SBA definition of a small supplier in the home healthcare equipment rental business, Congress intended the Defendants either to use the SBA standard or to adhere to the procedural and substantive limitations in the SB Act, the MMA, and APA in promulgating a different standard.  Because the Defendants did not do either, but instead promulgated an alternative size standard definition for small suppliers without the requisite notice and comment, the Defendants have violated the SB Act, the MMA, and the APA.

Moreover, the Defendants' change to $3.5 million as the upper limit at which a supplier qualifies as a small supplier is also arbitrary and capricious because the Defendants did not provide a reasoned explanation as to why they chose in the Final Rule to select $3.5 million as the new cutoff number. Finally, the Defendants' abandonment of a small supplier definition consistent with the SBA and adoption of a definition requiring no more than $3.5 million in total annual revenue to qualify for small supplier status was not a logical outgrowth of the Proposed Rule and therefore should have been subject to notice-and-comment rulemaking under both the MMA and APA before being adopted in final form. Consequently, the Defendants' failure to comply with these statutory mandates was "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

Plaintiffs will suffer irreparable injury if the injunction is not granted. Specifically, Ace Drug, as well as other members of AAHomecare, have been excluded from providing DMEPOS items and services in Round 1 CBAs for which they submitted bids as a result of the legally defective CAP administered by Defendants, in which suppliers were selected without meeting the statutory requirement that they meet financial standards specified by the Secretary according to law. If Round 1 is implemented, Plaintiffs will also suffer substantial unrecoverable loss of revenue. Plaintiffs will suffer the same imminent injury in the upcoming Round 2. Moreover, because Ace Drug and other AAHomecare members have annual total revenues greater than $3.5 million but less than $6.5 million, they are injured by exclusion from the small supplier preference by the Defendants' unlawful acts in both Round 1 and Round 2. And these injuries translate into substantial revenue loss for Plaintiffs. In contrast, a preliminary injunction pending a final outcome in this lawsuit will not substantially injure the government, particularly since CMS took five years to implement Congress's mandate. Finally, the public interest would be

furthered immensely by the injunction because, *inter alia*, beneficiary access to DMEPOS would be protected, and it is always in the public interest to have the Executive Branch comply with the statutes passed by Congress.

## ARGUMENT

## I.  PLAINTIFFS HAVE A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS.

A movant for a preliminary injunction need only raise "questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation."  *Citizens United v. FEC*, 530 F. Supp. 2d 274, 282 (D.D.C. 2008) (internal quotation marks omitted).  Plaintiffs more than meet this standard.

### A.  The Secretary Has Failed To Specify Applicable Financial Standards As Required By The DMEPOS Competitive Acquisition Provision Of The MMA, In Violation Of The APA.

"The starting point for [the] interpretation of a statute is always its language," *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 739 (1989), and "courts must presume that a legislature says in a statute what it means and means in a statute what it says there," *Connecticut National Bank v. Germain*, 503 U.S. 249, 253-54 (1992).  Where, as here, the words of the statute are unambiguous, the "judicial inquiry is complete."  *Id.* at 254.  If a statute speaks clearly "to the precise question at issue," a court "must give effect to the unambiguously expressed intent of Congress."  *Martini v. Fed. Nat'l Mortgage Ass'n*, 178 F.3d 1336, 1342 (D.C. Cir. 1999) (internal quotation marks omitted).

The MMA unequivocally mandates that "[t]he Secretary may not award a contract to any entity" unless "the Secretary finds," among other things, that "[t]he entity meets applicable financial standards specified by the Secretary, taking into account the needs of small providers." 42 U.S.C. § 1395w-3(b)(2)(A)(ii).   The plain meaning of a "standard" is "a *definite level* or

degree of quality that is proper and adequate for a specific purpose," and "something that is set up and established by authority *as a rule* for the measure of quantity, weight, extent, value, or quality." *Webster's Third New International Dictionary* 2223 (1993); *see also The American Heritage Dictionary* 1188 (2d ed. 1985) ("An acknowledged measure of comparison for quantitative or qualitative value; criterion."); *id.* ("A degree or level of requirement"); 2 *Shorter Oxford English Dictionary* 3000 (5th ed. 2003) ("A rule, a means of judgment or estimation; a criterion."); *id.* ("A fixed numerical quantity."). Thus, a "financial standard" by its plain terms states a definite level of financial condition and/or performance that can be used as a measure of comparison with the condition or performance of any entity. This is further evident from the statutory requirement that the Secretary find, at the contract award stage, that any particular bidder "*meets* applicable financial standards." 42 U.S.C. § 1395w-3(b)(2)(ii). Congress clearly intended that the Secretary have defined levels of financial performance or condition against which any bidder could be compared at the contract award stage.

The Defendants understood and accepted the meaning of financial "standards" when implementing two other Medicare statutes, 42 U.S.C. §§ 1395w-26(a) and 1395w-112(d). CMS and HHS's "standards . . . relating to the financial solvency and capital adequacy" of unlicensed Medicare Part C providers, as required by 42 U.S.C. § 1395w-26(a), include requirements that the provider demonstrate a net worth of at least $1.5 million (or $1 million if other criteria are satisfied), 42 C.F.R. § 422.382(a); an ability to maintain a current ratio of 1:1, *id.* § 422.386(b)(2), (d)(3); and a $100,000 deposit for insolvency assurance, *id.* § 422.388. The Defendants established similar standards (as required by 42 U.S.C. § 1395w-112(d)(1)) for unlicensed Part D providers, including: (1) net worth of $1.5 million, (2) "cash" net worth of $750,000, and (3) maintenance of a 1:1 current ratio. Ex. 28 (Medicare Prescription Drug

Benefit: Solicitation for Applications for new Prescription Drug Plans (PDP) Sponsors, 2009 Contract Year, at 68, 70). *See* 42 C.F.R. § 423.420(a) ("CMS establishes and publishes reasonable financial solvency and capital adequacy standards").

In a number of other statutes, Congress has similarly required that federal agencies establish "financial standards" or "capital standards" for regulated entities. *See*, *e.g.*, 7 U.S.C. §§ 6(b), 6f(b) (Commodities Futures Trading Commission prescribes "minimum financial standards" for brokers or sellers of commodities futures contracts); 12 U.S.C. § 1426(a)(1)-(3) (Federal Housing Finance Board prescribes capital standards for federal home loan banks); *id.* § 1464(t) (Director of the Office of Thrift Supervision prescribes capital standards for savings associations); *id.* § 1842(a)(5)(C)(i)(I) (Board of Governors of the Federal Reserve Bank prescribes financial standards for Bank Holding companies); *id.* § 2279aa-5(a)(2)(B) (Board of Directors of Farmer Mac prescribes capital standards for certified agricultural mortgage marketing facilities). Occasionally, Congress itself will set the outer boundaries of these permissible standards, *see id.* § 1464(t)(2), but in most cases the agency defines the range of acceptable values for chosen financial measures in the first instance. *See* 17 C.F.R. § 1.17 (C.F.T.C. "Minimum Financial Requirements for Futures Commission Merchants"); 12 C.F.R. pt. 225, app. B (Federal Reserve Board's financial standards for bank holding companies); *id.* §§ 932.2-932.3 (Fed. Housing Fin. Bd. Standards for home loan banks); *id.* §§ 567.2-567.12 (Office of Thrift Supervision standards for savings associations).

### 1.    Financial Standards Are Not Financial Documents.

Despite this clear statutory mandate, the Final Rule governing both Round 1 and Round 2 fails to specify the financial standards mandated by law. The Final Rule states only: "Financial standards. Each supplier must submit along with its bid the applicable financial documentation specified in the request for bids." 42 C.F.R. § 414.414(d). And consistent with that regulation

focusing only on financial documentation, the RFB instructions for Round 1 provided only a list of financial documents to be provided with no accompanying financial standards under the heading, "Financial Information." Ex. 17, at 10-11.

The Defendants cannot seriously argue that financial standards are equivalent to financial documents. Financial documents provide only the data that might be used in determining an entity's compliance with financial standards, if the latter were specified. Indeed, the MMA draws this very distinction between standards and data: the PAOC that is established to aid the Secretary in its implementation of the CAP "shall provide advice to the Secretary with respect to . . . *[t]he establishment of financial standards* for purposes of subsection (b)(2)(A)(ii)," 42 U.S.C. § 1395w-3(c)(3)(A)(ii), separate and apart from its advice on "establishment of requirements for collection of data for the efficient management of the program," *id.* § 1395w-3(c)(3)(A)(iii). Moreover, the Secretary's usage of the term "financial standards" belies any argument by the Defendants that the term can mean "financial documents." *See, e.g.*, 72 Fed. Reg. at 18,037 ("We welcomed comments on the financial standards, in particular the most appropriate documents that would support these standards.").

## 2. Financial Standards Are Not Financial Ratios Without Numeric Values.

Nor can Defendants claim that they have performed their obligations under the MMA by the one-page CMS announcement dated May 25, 2007, entitled "CMS Announces Financial Measures for the Medicare DMEPOS Competitive Bidding Program." *See* Ex. 18. That announcement did no more than list the several financial ratios that CBIC would ostensibly use "to determine whether the supplier will be able to participate in the program and maintain viability for the duration of the contract period":

22

- Current ratio = current assets/current liabilities
- Collection period = (accounts receivable/sales) x 360
- Accounts payable to sales = accounts payable/net sales
- Quick ratio = (cash + accounts receivable)/current liabilities
- Current liabilities to net worth = current liabilities/net worth
- Return on sales = net sales/inventory
- Sales to Inventory
- Working capital = current assets – current liabilities
- Quality of earnings = cash flow from operations/(net income + depreciation)
- Operating cash flow to sales = cash flow from operations/(revenue – adjustment to revenue)

*Id.*

This CMS release is ineffective because it was not promulgated as a regulation with notice and comment, *see infra* at 26-27, but regardless it also does not satisfy the Secretary's obligation under the MMA substantively. A laundry list of ratios is not equivalent to specifying financial standards. In order to establish standards, the Secretary would have had to specify the level of a ratio (or combination of ratios) that the entity must meet in order to participate as a supplier in the CAP. In other words, "[c]urrent ratio" is not a financial standard; by contrast, a "current ratio of 2:1" is a financial standard because the bidder's current ratio can be calculated and compared to a 2:1 standard and the Secretary could thus fulfill his statutory duty of determining whether or not the bidder thus "meets the applicable financial standards."[4]

General financial practice confirms the distinction between a financial ratio and a financial standard (the *value* of the ratio used for comparison of performance or conditions). "Ratios are guides or shortcuts that are useful in evaluating a company's financial position and operations *making comparisons with results in previous years or with other companies*."

---

[4] To the extent the Defendants wish to argue that "financial standards" were made available in the Final Rule when the Secretary found "general financial condition, adequate financial ratios, positive credit history, adequate insurance documentation, adequate business capacity and line of credit, net worth, and solvency were important considerations for evaluating financial stability," 72 Fed. Reg. at 18,037, this phrase cannot constitute financial standards either because there are no numbers attached.

Belverd E. Needles, Jr., *Financial Accounting* 696 (5th ed. 1995).  "Current ratio" or "working capital" is just a mathematical operation based on a company's financial data.  But such calculations have little utility without comparison to some financial standard or benchmark.  *See* Sheldon Gates, *101 Business Ratios: A Manger's Handbook of Definitions, Equations, and Computer Algorithms* 196 (1993) ("The process of ratio presentation may be incomplete if it fails to include historical company data or outside information relevant to the current data.  These 'compare to' numbers are called standards.").  While there are general rules of thumbs for certain ratios, *see, e.g.*, Roger H. Hermanson & James Don Edwards, *Financial Accounting: A Business Perspective* 315 (7th ed. 1998) ("A rule of thumb is that the ratio of quick assets to current liabilities should be 1:1 or higher."), there are myriad financial standards that analysts and regulators develop for different industries, *see, e.g.*, Risk Mgmt. Ass'n, *Annual Statement Studies: Financial Ratio benchmarks* 1 (2007-2008) (providing median and quartile values, organized by industry, for "[n]ineteen of the most widely used ratios in the financial services industry").  The standard to be applied depends not only on industry type but also on the analyst's purpose.  A regulator, an investor, and a lender may all use different values for ratios because the analytical tasks are distinct, and the same lender may use different standards of the same ratio for different circumstances (higher standards may be required for higher risk lending, such as unsecured or high-value loans, for example).

There is no doubt that Congress intended for the Secretary to specify the actual financial standards (*i.e.,* the comparison values) that would be appropriate for the home health care DME industry and tailored to the purposes of the CAP, and to set those standards "taking into account the needs of small providers" (which CMS also never did).  *See generally Winkleman v. N.Y.*

24

*Stock Exch.*, 445 F.2d 786, 790 (3d Cir. 1971) (New York Stock Exchange delisted company

because it was not "able to meet the established financial standards of the Exchange").

Indeed, possible financial standards for the CAP were vetted in a PAOC meeting from

February 28, 2005 to March 2, 2005.  Palmetto, CMS's contractor in charge of implementing the

CAP, presented slides for a presentation entitled "Financial Capabilities."  Ex. 29.  In that

presentation to the PAOC, which did not "reflect CMS views or policies," *id.* at Slide 1,

Palmetto explained the financial standards used in the demonstration projects, and demonstrated

that financial standards are numbers, not just abstract ratios: "The thresholds to compare the

suppliers were developed from industry norms as calculated by Dunn and Bradstreet.  Dunn and

Bradstreet uses samples to calculate 'typical balance-sheet figures' for an array of industry types.

They sequence this information to report figures from best to worst within an industry code and

company size."  *Id.* at Slide 9.[5]  Palmetto concluded its presentation with several questions,

including, importantly, "What are appropriate financial ratios and other evaluation factors to be

considered?"  *Id.* at Slide 31.

Despite the clear understanding that financial standards referred to definite financial

values against which a bidder's performance or condition could be compared, the Defendants

never followed through on their statutory obligation to define financial standards.  Because of the

Defendants' abdication, contract suppliers will unlawfully have the sole right to furnish DME in

---

[5] *See also* Ex. 29 at Slide 4 (showing an example of ratio standards (return on sales) and
suggesting a ratio number that is excellent, good, and poor); *id.* at Slide 5 (explaining that
"[s]uppliers were measured on a scale from 0-15" and "[s]uppliers had to score 70% in financial
evaluation to be acceptable with most actually evaluated as 'unacceptable'"); *id.* at Slide 7
(explaining that it used financial statements to "compute key business ratios to determine the
capacity for growth of potential demonstration suppliers"); *id.* at Slides 15-18 (explaining that
Palmetto computed the following ratios to determine financial soundness: Return on sales (profit
margin) ratio, Return on assets ratio, Accounts payable to sales ratio, Current ratio, Sales to
inventory ratio, Current liabilities to inventory).  Commenters also shared this understanding.
*See supra* at 7 n.3.

the CBAs even though the Secretary has never made the objective standard-based determination of financial soundness that the MMA requires.   Thus, because the Defendants failed to specify financial standards as mandated by the competitive acquisition provision of the MMA, Defendants' actions are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

       **3.**     **Even If The Secretary Did Specify Financial Standards, They Were Not Published With Opportunity For Notice And Comment, As Required By The MMA.**

Even if this Court were to find that the financial ratios without numeric values posted by CMS constitute financial standards specified by the Secretary, the Defendants are still in violation of the MMA.  Because MMA financial standards must be met in order for an entity to be awarded a contract, such financial standards constitute "a substantive legal standard governing . . . the eligibility of individuals, entities, or organizations to furnish . . . services or benefits under this subchapter" that cannot take effect "unless [they are] promulgated by the Secretary by regulation."  42 U.S.C. § 1395hh(a)(2).

There can be no doubt that financial standards are subject to notice and comment under this rule.  No entity can furnish DME items or services in a CBA without a contract, and an entity's "eligibility . . . to furnish . . . services" depends on meeting the financial standards specified by the Secretary.  *Id.* § 1395w-3(b)(2)(A)(ii).  Defendant Weems effectively acknowledged that financial standards are a substantive eligibility standard when he stated that "financial standards will ensure that Medicare contracts with financially sound suppliers that are able to meet beneficiaries care needs for the long term."  Ex. 30, at 9 (Kerry Weems, Acting Administrator, Centers for Medicare & Medicaid Service on DMEPOS Competitive Bidding Program Before the House Comm. on Ways and Means, Subcomm. on Health (May 6, 2008)).

Furthermore, the MMA mandates that when

> a final regulation includes a provision that is not a logical
> outgrowth of a previously published notice of proposed rulemaking
> or interim final rule, such provision shall be treated as a proposed
> regulation and shall not take effect until there is the further
> opportunity for public comment and a publication of the provision
> again as a final regulation.

42 U.S.C. § 1395hh(a)(4).  Even if *arguendo* Defendants were to prevail in arguing to this Court

that they in fact employed financial standards "specified by the Secretary," any such standards

would not have been published and properly subjected to notice and comment.  Thus, the

Defendants' failure to promulgate financial standards as mandated by the MMA in a regulation

with required notice and opportunity for comment for the required period after notice is "without

observance of procedure required by law."  5 U.S.C. § 706(2)(D).  *See Utility Solid Waste*

*Activities Group v. EPA*, 236 F.3d 749, 754 (D.C. Cir. 2001) ("This court has never found that

Internet notice is an acceptable substitute for publication in the Federal Register, and we refuse

to do so now.").

> **B.**    **The Defendants' Decision To Define Small Suppliers As Having Annual**
> **Total Revenues Of Up To $3.5 Million Is In Violation Of The SB Act, The**
> **MMA, And The APA.**

Plaintiffs likewise have a substantial likelihood of success on their claims that the

Defendants' definition of "small supplier" is unlawful.  The MMA mandates that "[i]n

developing procedures relating to bids and the awarding of contracts, . . . the Secretary shall take

appropriate steps to ensure that small suppliers of items and services have an opportunity to be

considered for participation in the program."  42 U.S.C. § 1395w-3(b)(6)(D).  The Defendants

sought to implement this statutory mandate by establishing a preference for small suppliers in the

form of a target that 30 percent of contract suppliers in a CBA product category will be small

suppliers.  72 Fed. Reg. at 18,058; *see* 42 C.F.R. § 414.414(g)(1).  If small suppliers do not

constitute 30 percent of prevailing bidders in a CBA product category after the initial selection,

CMS will award contracts to additional eligible small suppliers whose bids were too high until the 30 percent target is met.  72 Fed. Reg. at 18,058; 42 C.F.R. § 414.414(g)(1).

In defining what business constitutes a small business concern, the SB Act requires agencies either to use the SBA standard or to adhere to the procedural and substantive limitations in 15 U.S.C. § 632(a)(2)(C) in departing from the SBA standard.  Unfortunately, after originally proposing to use the SBA's size standards to determine whether a DMEPOS supplier is "small," the Defendants, without congressional authorization in the MMA, elected to use an alternative size standard without following the mandatory procedures for obtaining SBA's approval, including publishing the alternative standard for notice and comment.  Adoption of the previously-unknown size standard rendered small businesses like Ace Drug ineligible for the small supplier "protection" mandated by the MMA, *see* 42 U.S.C. §1395w-3(b)(6)(D), but affected small businesses never had an opportunity to address whatever undisclosed concerns allegedly motivated the shift.  CMS's adoption of its own, arbitrary size standard violated the SB Act and MMA.

Moreover, even if the Defendants were free to define small supplier without regard to the rules of the SB Act, their choice of $3.5 million or less in total annual revenue is arbitrary and capricious in violation of the APA.  Finally, even apart from the SB Act, the Defendants' definition of small supplier is procedurally defective in violation of the notice-and-comment provisions of the MMA and APA because it was not a logical outgrowth of the Proposed Rule definition adopting the SBA definition.

      **1.**    **All Federal Agencies Must Use The SBA's Published Size Standards Or Lawfully Obtain Approval To Use A Different Standard *After* Publishing The Alternative Standard For Comment.**

Congress has established a national policy "to implement and coordinate *all* Federal department, agency, and instrumentality policies, programs, and activities in order to[ ] foster the

economic interests of small businesses" and afford them an opportunity to compete. 15 U.S.C. § 631a(a). Under the SB Act, the SBA "may specify detailed definitions or standards by which a business concern may be determined to be a small business concern for the purposes of this chapter or any other Act," *id.* § 632(a)(2)(A), and the SBA's standards shall "reflect the differing characteristics of the various industries." *Id.* § 632(a)(3). The SBA's size standards are used for government contracting and aid programs administered by the SBA, *see* 13 C.F.R. pt. 121 ("Small Business Size Regulations"), and indeed extend to all other federal programs where a business's "small" status is relevant, *see id.* §§ 121.901-121.904 ("Size Eligibility Requirements for Compliance with Programs of Other Agencies").

Congress has recognized that, occasionally, another agency's program might present a compelling need to modify SBA's generally-applicable size standard for the relevant industry. If the agency wants to use a non-SBA definition, Congress has mandated that the agency base its alternative standard on specified statutory factors; propose that standard for notice and comment; and then request the SBA Administrator's approval of the alternative standard. 15 U.S.C. § 632(a)(2)(C)(i); *accord* 13 C.F.R. § 121.903. An agency can only depart from these procedural and substantive restrictions if it is "specifically authorized" by statute to define the size of small business concerns. 15 U.S.C. § 632(a)(2)C). In amending the SB Act in 1992 to enact this requirement, Congress specifically sought to outlaw the common practices of agencies to promulgate their own small business size standards after merely consulting with the SBA Chief Counsel for Advocacy. Congress instead "require[d] *any* agency size standard to be approved by the SBA Administrator . . . and to *comply with SBA policies* regarding the establishment of size standards." 138 Cong. Rec. S11,770, S11,776 (daily ed. Aug. 6, 1992) (statement of Sen. Bumpers).

Nothing in the MMA authorized the Defendants to dispense with compliance with the SB Act's rules governing size standards. The Act did not grant the Secretary specific independent authority to define size standards for determining which entities would receive "small supplier" protection under the Act. Certainly, the mere usage of the terms "small supplier" or "small provider" in the MMA is of no moment and does not constitute specific authorization; Congress used such terminology simply because those are the only small business concerns who would be involved in the CAP.

The size rule of the SB Act is not triggered only where a statute uses the term "small business." For example, in *Northwest Mining Ass'n v. Babbitt*, 5 F. Supp. 2d 9, 15 (D.D.C. 1998), this Court held that a Bureau of Land Management rule violated the Regulatory Flexibility Act because the Bureau adopted a definition of "small miner" that was inconsistent with the SBA's small business size standard for the mining industry.

The SBA also recognizes that its size standards govern all agency definitions where an entity's "small" status is significant, even if the agency does not explicitly state that it is defining small *businesses*. In at least one instance, the SBA affirmatively (and successfully) argued that the Federal Communications Commission must use notice-and-comment rulemaking to adopt a non-SBA definition of "small [cable] operator." *See Implementation of Sections of the Cable Television Consumer Prot. & Competition Act of 1992: Rate Regulation*, 9 F.C.C.R. 5327 (1994); *see also Time Warner Entm't Co. v. FCC*, 56 F.3d 151, 203 n.31 (D.C. Cir. 1995) (per curiam) (discussing the same rulemaking but refusing to address this issue). The MMA should be read in harmony with the SB Act, as each has the same policy concerns of ensuring opportunity for small businesses in government contracting and programs. Congress did not

authorize a departure from the SB Act in the MMA, and thus Defendants were not free to define "small supplier" without adhering to the procedural and substantive safeguards of SB Act.

Indeed, CMS was specifically "remind[ed]" by the U.S. House of Representatives Committee on Small Business "that should [CMS] adopt a different size standard, it will need to comply with the procedural requirements of [15 U.S.C. § 632(a)(2)(C)(i)]." Ex. 31, at 5 (Letter from Donald A. Manzullo, Chairman, House Committee on Small Business to CMS (June 30, 2006)). Clearly, CMS's definition of "small supplier" was governed by 15 U.S.C. § 632(a)(2)(C)(i) and 13 C.F.R. § 121.903.

CMS asserted that it was not subject to the SB Act because Medicare supplier contracts are not procurement contracts. 72 Fed. Red. at 18,050. While it is true that competitive acquisition contracts are not procurement contracts (because they create eligibility for Medicare insurance reimbursement of DMEPOS procured by the beneficiary), that is irrelevant. First, as explained above, the rules on size definitions apply for all agency purposes, not just contracting. Second, CMS had an independent duty to "facilitate competition by and among small business concerns, taking all reasonable steps to eliminate obstacles to their participation." 15 U.S.C. § 631(j)(2). This obligation exists for all "contracting opportunities of the Government," not just procurement contracts. *Id.* § 631(j). *Compare, e.g.*, *id.* § 637(a)(1)(A).

In passing the MMA, Congress intended that the Secretary comply with the requirements of the SB Act, and the Defendants starkly failed to do so. Although CMS attempted partial compliance by sending a letter to the SBA with a proposed alternative definition, *see* Ex. 32, tbl.3.2 (Report on the Regulatory Flexibility Act FY 2007), that action does not exonerate CMS from the notice-and-comment requirements of the SB Act. It cannot be disputed that CMS failed to "propose[ ] the size standard for public comment pursuant to the [APA]." 12 C.F.R.

§ 121.903(a)(3).  And because CMS failed to submit the alternative size standard to public

comment, it could not collect all comments received in response to its proposal for an alternative

standard and include them in its formal request for SBA Administrator Approval, as also

required under the SB Act.  *Id.* § 121.903(a)(5)(i).  "Courts . . . cannot abdicate their

responsibility to insure compliance with congressional directives setting the limits on [agency]

discretion."  *Aid Ass'n for Lutherans v. U.S. Postal Serv*., 321 F.3d 1166, 1173 (D.C. Cir. 2003)

(internal quotation marks omitted).

> **2.    Even If The Defendants Were Free To Define Small Supplier Without Regard To The Rules Of The SB Act, Their Definition Is Arbitrary And Capricious.**

Even if the Defendants were free to define the size standard for small suppliers without

regard to the rules of the SB Act, their choice of a $3.5 million-or-less-in-total-annual-revenues

standard is arbitrary and capricious in violation of the APA.  *See* 5 U.S.C. § 706(2)(A).  Small

business suppliers like Ace Drug and others were denied reasoned analysis in the Final Rule as to

why they were excluded.  The Defendants' sole "explanation" for why they decided to define

"small supplier" differently from "small business" under the SBA was that the SBA term "small

business" "would encompass too many suppliers" given that most DMEPOS suppliers are small

businesses under the SBA.  72 Fed. Reg. at 18,058.  However, such reasoning is faulty because

in general "[s]mall firms . . . [r]epresent 99.7 percent of all employer firms."  Ex. 33 (SBA,

FAQs: Advocacy Small Business Statistics and Research).  Clearly, Congress is not opposed as a

general matter to the SBA defining small business in a manner such that practically all

businesses are protected under that Act.  Thus, the Defendants failed to "articulate[ ] a rational

connection between [their] factual judgment and [their] ultimate policy choice," creating an

arbitrary and capricious rule.  *Crowley's Yacht Yard, Inc. v. Pena*, 863 F. Supp. 18, 21 (D.D.C.

1994) (internal quotation marks omitted).

More importantly, the Final Rule does not discuss how many suppliers fall within the range of $3.5 million to $6.5 million in total annual revenues and thus explain why it is appropriate to deny small supplier protection to that number of suppliers, effectively treating that handful of suppliers as equivalent to large suppliers with revenues, for example, in excess of $25 million.  "[E]ven under the 'arbitrary, capricious' standard agency action will not be upheld where inadequacy of explanation frustrates review."  *Nat'l Nutritional Foods Ass'n v. Weinberger*, 512 F.2d 688, 701 (2d Cir. 1975); *see also Armstrong v. Executive Office of the President*, 810 F. Supp. 335, 339 (D.D.C. 1993).  Because CMS did not "examine[ ] the relevant data and articulate[ ] a satisfactory explanation for its action including a rational connection between the facts found and the choice made," *El Rio Santa Cruz Neighborhood Health Center, Inc. v. HHS*, 396 F.3d 1265, 1276 (D.C. Cir. 2005) (internal quotation marks omitted); *see also U.S. Air Tour Ass'n v. FAA*, 298 F.3d 997, 1005 (D.C. Cir. 2002), the Defendants' lack of reasoned analysis produced a rule that is thus "[a]rbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

> ### 3.     The Defendants' Failure To Publish And Propose The Size Standard Also Violated The Notice-And-Comment Provisions Of The MMA And APA.

Section 902 of the MMA, which is modeled after the notice-and-comment provision of the APA, 5 U.S.C. § 553, requires that when HHS publishes a final rule that includes a provision that is not a "logical outgrowth" of the proposed rule, it must treat that provision as a proposed rule subject to public comment and publication before being adopted as a final rule:

> If the Secretary publishes a final regulation that includes a provision that is not a logical outgrowth of a previously published notice of proposed rulemaking or interim final rule, such provision shall be treated as a proposed regulation and shall not take effect until there is the further opportunity for public comment and a publication of the provision again as a final regulation.

42 U.S.C. § 1395hh(a)(4). Even if notice and comment were not independently required by the SB Act, the Defendants' abandonment of a small supplier definition consistent with the SBA's size standard and adoption of a definition requiring no more than $3.5 million in total annual revenues to qualify as a small supplier was *not* a logical outgrowth of the Proposed Rule and therefore should have been subject to notice-and-comment rulemaking pursuant to the MMA and APA before being adopted in final form.

Though there is "no precise definition of what counts as a logical outgrowth," courts must consider whether the purposes of notice and comment have been satisfied, that is, "whether the notice given affords exposure to diverse public comment, fairness to affected parties, and an opportunity to develop evidence in the record." *Nat'l Mining Ass'n v. Mine Safety & Health Admin.*, 116 F.3d 520, 531 (D.C. Cir. 1997) (per curiam) (internal quotation marks omitted); *cf. Long Island Care at Home, Ltd. v. Coke*, 127 S. Ct. 2339, 2351 (2007) ("The object, in short, is one of fair notice."). The logical outgrowth test is satisfied only if the "commenters should have anticipated" that the agency "might issue the final rule it did." *City of Portland v. EPA*, 507 F.3d 706, 715 (D.C. Cir. 2007) (internal quotation marks omitted).

"If the APA's notice requirements mean anything, they require that a reasonable commenter must be able to trust an agency's representations about *which particular* aspects of its proposal are open for consideration." *Envtl. Integrity Project v. EPA*, 425 F.3d 992, 998 (D.C. Cir. 2005) (emphasis in original). In the present case, commenters had no reason to suspect based on the Proposed Rule that the Defendants would completely abandon the proposed definition of small supplier, which was based "on the expertise of the SBA," 71 Fed. Reg. at 25,682, in favor of a definition based on an arbitrarily-selected value for gross receipts unmoored to previously published standards or to objective data about the DMEPOS industry.

Some commenters complained about the SBA definition, advocating a definition based on the number of FTE employees or a smaller value for gross receipts. 72 Fed. Reg. at 18,071 ("Many commenters disagreed with using the definition of the SBA (less than $6 million in annual receipts). . . . They recommended defining a small supplier as a supplier that generates less than $3 million in annual receipts. . . . Most suggested that we define a small supplier as a supplier having fewer than 10 FTE employees."). Though the "logical outgrowth" inquiry occasionally considers the comments and proposals made during the notice-and-comment period, *see National Mining Ass'n v. Mine Safety & Health Admininstration*, 512 F.3d 696, 699 (D.C. Cir. 2008), and cases cited therein, the purposes of the notice-and-comment requirement are served only when potential commenters have actual notice of the comment proposing a novel modification as well as "some reason to believe the agency will take the proposal seriously." *Nat'l Mining Ass'n v. Mine Safety & Health Admin.*, 116 F.3d 520, 531-32 (D.C. Cir. 1997) (per curiam). The vast majority of commenters that addressed the proposed protections for small suppliers implicitly accepted the SBA definition and argued that the Defendants did not go far enough to protect the interests of small suppliers so-defined. Plaintiffs had no reason to suspect that, despite the Proposed Rule's expression of reliance on the SBA's expertise and its widely accepted size standards, the Defendants would revise the definition of small supplier to exclude all small businesses with receipts between $3.5 million and $6.5 million. The Defendants' failure to comply with Section 902 of the MMA and with the notice-and-comment provision of the APA was "without observance of procedure required by law." 5 U.S.C. § 706(2)(D). *See Envtl. Integrity Project*, 425 F.3d at 996 (stating that the legal requirements under the APA prohibit agencies from "us[ing] the rulemaking process to pull a surprise switcheroo on regulated entities"); *Shell Oil Co. v. EPA*, 950 F.2d 741, 751 (D.C. Cir. 1991) (per curiam) ("[A]n

unexpressed intention cannot convert a final rule into a 'logical outgrowth' that the public should have anticipated.").

## II.    PLAINTIFFS WILL SUFFER IRREPARABLE INJURY ABSENT THE REQUESTED RELIEF.

Plaintiffs will suffer immediate and irreparable injury if the requested relief is not granted.  As a result of the legally defective CAP administered by Defendants, in which suppliers were selected without meeting the statutory requirement that they meet financial standards specified by the Secretary according to law, AAHomecare's members, including Ace Drug, have been excluded from providing DMEPOS items and services in Round 1 CBAs for which they submitted bids.  Separate and apart from any economic injury, plaintiffs have been injured by denial of a statutory right to a lawful process in which they may only be excluded from a CBA in favor of lower bidder who meet the statutorily required standards.  The Secretary's unlawful implementation of the CAP, in which suppliers were chosen without regard to lawful standards, injured the plaintiffs excluded from any CBA product category, and that injury is irreparable by money damages or any action at law.  *See generally Zivotofsky v. Sec'y of State*, 444 F.3d 614, 619 (D.C. Cir. 2006) ("[A] concrete and particular injury for standing purposes can also consist of the violation of an individual right conferred on a person by statute."); *Sargeant v. Dixon*, 130 F.3d 1067, 1070 (D.C. Cir. 1997) ("The receipt of information is a tangible benefit the denial of which constitutes an injury."); *Appalachian Power Co. v. EPA*, 249 F.3d 1032, 1067 (D.C. Cir. 2001) (per curiam) ("If EPA's ground for refusing to crunch the data for Pittsburgh is illegal, Pennsylvania has been wrongly denied potential benefits."); *Lepelletier v. FDIC*, 164 F.3d 37, 42 (D.C. Cir. 1999) ("This court, however, has held that the denial of a business opportunity satisfies the injury requirement."); *Clinton v. City of New York*, 524 U.S. 417, 433 n.22 (1998) ("We have held, however, that a denial of a benefit in the bargaining process can itself create an

Article III injury, irrespective of the end result."); *Albuquerque Indian Rights v. Lujan*, 930 F.2d

49, 56 (D.C. Cir. 1991) ("This Court has granted standing where the injury asserted is based on

the denial of an opportunity to exercise rights pursuant to a statute."); *Comm. for Full*

*Employment v. Blumenthal*, 606 F.2d 1062, 1065 (D.C. Cir. 1979) ("Complainants are injured if

this procedural right is denied them, regardless of whether the complaint is ultimately found

meritorious.").

Moreover, Defendants will cause additional imminent injury to AAHomecare's members,

including Ace Drug, because their ability to provide DMEPOS items and services in Round 2

CBAs for which they will submit bids will be determined by the same legally defective CAP

administered by Defendants, in which suppliers will be selected without meeting the statutory

requirement that they meet financial standards specified by the Secretary according to law.

Moreover, Ace Drug and other AAHomecare members that have annual revenues greater than

$3.5 million but less than $6.5 million face imminent irreparable injury because they are being

excluded from the small supplier preference by the Defendants' unlawful acts, making these

suppliers less likely to be selected in Round 2.

DME suppliers who are not winning bidders, including Ace Drug and other

AAHomecare members, have suffered (and will suffer) additional economic injury in the form of

significant loss of clientele and revenue due to their inability to provide DMEPOS to Medicare

beneficiaries in those CBAs. *See* Ex. 27 ¶ 13 (stating that "Ace Drug's total cumulative loss will

be at least $225,000"); Ex. 1 ¶ 8. This revenue loss likely is an underestimate because many

private insurers base their fee schedule rates on a percentage of the Medicare rates, and thus

current private reimbursement rates could be negatively impacted by the decreases in the

Medicare rates that the CAP will implement. Ex. 27 ¶ 14; Ex. 1 ¶ 9. *See* 42 U.S.C. § 1395w-

3(b)(2)(A)(iii) ("The total amounts to be paid to contractors in a competitive acquisition area are expected to be less than the total amounts that would otherwise be paid."); 72 Fed. Reg. at 18,024 ("We will also assure savings because we will not accept a bid to furnish an item unless the submitted bid price is at or below the fee schedule amount for the item.").  Finally, it is also possible that referral sources are likely to completely stop sending patients to non-winning suppliers because it is too confusing to remember which suppliers have won for which products; instead, referral sources will likely look for the supplier that has won the most categories and send all patients (Medicare and non-Medicare) to the same place.  Ex. 27 ¶ 15; Ex. 1 ¶ 10.

A threat of substantial loss of business constitutes the type of irreparable injury that may serve as the basis for preliminary injunction.  *See Doran v. Salem Inn, Inc.,* 422 U.S. 922, 932 (1975); *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam) (economic harm constitutes irreparable injury when it cannot adequately be recovered through legal means or when the economic harm substantially threatens a business's existence); *Gulf Oil Corp. v. DOE*, 514 F. Supp. 1019, 1025 (D.D.C. 1981) (finding irreparable injury where "the monetary injury [is] sufficiently large in proportion to the plaintiff's operations that the loss of the amount of money involved would also cause extreme hardship to the business"); *Hoffmann-Laroche, Inc. v. Califano*, 453 F. Supp. 900, 903 (D.D.C. 1978) (finding irreparable injury where "plaintiff will suffer loss of sales and good will for which it would have no right of recourse").

Finally, AAHomecare members that win bids in Round 2 will suffer further injury in Round 2 in those CBA-product categories where small suppliers whose bids are above the pivotal award bid are offered contracts so that the target of 30 percent of contract suppliers in a CBA-product category be small suppliers is reached.  *See* 72 Fed. Reg. at 18,058; 42 C.F.R. § 414.414(g)(1).  If only suppliers that have at most $3.5 million in total annual revenues are

considered small suppliers, prevailing bidders who have total annual revenues between $3.5

million and $6.5 million are not counted toward the 30 percent target, making it more likely that

more small suppliers will be awarded contracts to reach the 30 percent threshold, which in turn

reduces the market share and business opportunity of the AAHomecare members who win bids

in Round 2.  Ex. 1 ¶ 11.

## III.    AN INJUNCTION WOULD NOT SUBSTANTIALLY INJURE THE
##          DEFENDANTS.

No undue hardship will be imposed on Defendants by the granting of Plaintiffs'

preliminary injunction. The MMA was promulgated in 2003.  Thus, five years have passed with

the DMEPOS industry continuing as it had for decades.  Indeed, "DMEPOS spending accounts

for less than two percent of Medicare spending.  It is also the slowest-growing segment of

Medicare costs."  Ex. 1 ¶ 12; *see also* Ex. 2; *compare* Ex. 34 tbl.3 (CMS, National Health

Expenditure Projections 2007-2017: Forecast Summary and Selected Tables) (providing

historical estimates and projections regarding overall Medicare expenditures), *with id.* tbl.15

(providing historical estimates and projections regarding DME Medicare expenditures).

Plaintiffs are merely asking for the Court to maintain the status quo until the Secretary complies

with the DMEPOS statute and the APA.

As another district court has recognized in relation to the CAP program:

> The Secretary cannot identify hardships that even remotely rival
> those identified by Plaintiffs.  At most, implementation of the
> demonstration project will be delayed for a period of months.
> Given that roughly five years have passed since Congress
> authorized the project, it is doubtful that a short delay will have a
> significant impact in the ultimate long term goal of reducing
> Medicare costs.

*Sharp Healthcare v. Leavitt*, No. 08-CV-0170, 2008 WL 962628, at *6 (S.D. Cal. Apr. 8, 2008).

Similarly, in this case, the short time that will elapse while this Court reviews Plaintiffs' claims

and the Defendants are ordered to comply with the DMEPOS statute and APA provides no undue hardship for the Defendants, particularly when balanced against the real hardship that suppliers will face when locked out of markets in ten of the largest CBAs in the United States, with lockout in another 70 CBAs soon, suffering substantial revenue losses.

## IV.    THE PUBLIC INTEREST WILL BE FURTHERED BY ISSUING A PRELIMINARY INJUNCTION.

The public interest has "many faces" and could potentially include public health and safety, preserving the intent of Congress when it passed a statute, protecting the public fisc, and promoting economic competition. *Cuomo v. U.S. NRC*, 772 F.2d 972, 978 (D.C. Cir. 1985) (per curiam). Here, the "many faces" of public interest support the granting of an injunction.

*First*, granting a preliminary injunction will preserve public health and safety. As explained *supra*, at 19-27, despite the clear understanding that financial standards referred to definite financial values against which a bidder's performance or condition could be compared, the Defendants never followed through on their statutory obligation to define financial standards. Because of the Defendants' abdication, contract suppliers will unlawfully have the sole right to furnish DME in the CBAs even though the Secretary has never made the objective standard-based determination of financial soundness that the MMA requires. As a result, there is *no* assurance that the suppliers that were chosen—and which the government must use for three years under the terms of the contracts—have the financial wherewithal to serve all of the beneficiaries that need services within a given CBA for Round 1, thereby jeopardizing beneficiary health. *See, e.g.*, Ex. 11, at 12 ("CMS's failure to specify financial standards leaves both beneficiaries and suppliers vulnerable . . . ."). "[C]ourts have routinely considered and granted injunctive relief based on the potential harm to patients" in Medicare cases. *Sharp Healthcare*, 2008 WL 962628, at *5 (citing cases).

*Second*, it is in the Defendants' interest to ensure that such financial standards are set because these financial standards will ensure the future viability of the CAP, both protecting the public fisc and promoting economic competition.  Rep. Dave Camp (R-Mich.), the House Ways and Means Health Subcommittee ranking member, has expressed concern that CMS's implementation of the CAP "could ultimately reduce the number of companies that supply these items and actually increase costs in the long run."  Ex. 24.  This is a particularly grave concern because one of the necessary effects of the CAP is to limit the number of suppliers in any CBA, and CMS anticipated that many winning contractors would expand to serve the market formerly served by other entities prior to the implementation of the CAP.  72 Fed. Reg. at 18,039.  This purpose is undermined if the financial condition of many bidders has never been assessed against defined financial standards, as the MMA requires.

*Third*, it is in the public interest for agencies to comply with statutes.  *See generally FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 161 (2000) ("an administrative agency's power to regulate in the public interest must always be grounded in a valid grant of authority from Congress"); *MCI Telecomms. Corp. v. AT&T Co.*, 512 U.S. 218, 231 n.4 (1994) (an agency is "bound, not only by the ultimate purposes Congress has selected, but by the means it has deemed appropriate, and prescribed, for the pursuit of those purposes").  This is especially true when the statutory provisions preserve the integrity of a program, by ensuring that companies selling to the public meet adequate standards and by protecting small businesses.

*Fourth*, the notice-and-comment provisions of the MMA and APA were enacted to ensure that the interest of the public would be carefully considered in the enactment of any rule or policy affecting the CAP.  Allowing affected members of the public to comment upon the

41

change in the definition of a small supplier, as well as on any financial standards the Secretary eventually specifies, promotes this congressional intent.

For all of the above reasons, the public interest will be furthered by the granting of a preliminary injunction.

## V.    THE JURISDICTION-STRIPPING PROVISIONS OF THE MMA DO NOT APPLY TO THIS ACTION.

Despite the clear grounds for a preliminary injunction, it is anticipated that Defendants will claim that this Court lacks jurisdiction to enjoin their illegal acts.  However, the judicial review bar of the MMA has no application here.

Congress has barred from judicial or administrative review only certain enumerated actions that the Secretary may undertake in administering the CAP established by the MMA. Section 1395w-3(b)(10) provides:

> There shall be no administrative or judicial review . . . of—
> (A) the establishment of payment amounts under paragraph (5);
> (B) the awarding of contracts under this section;
> (C) the designation of competitive acquisition areas under subsection (a)(1)(A) of this section;
> (D) the phased-in implementation under subsection (a)(1)(B) of this section;
> (E) the selection of items and services for competitive acquisition under subsection (a)(2) of this section; or
> (F) the bidding structure and number of contractors selected under this section.

42 U.S.C. § 1395w-3(b)(10).

"[T]here is a strong presumption that Congress intends judicial review of administrative action.  [O]nly upon a showing of clear and convincing evidence of a contrary legislative intent should the courts restrict access to judicial review."  *Mistick PBT v. Chao*, 440 F.3d 503, 509 (D.C. Cir. 2006) (internal citations and quotation marks omitted) (quoting *Bowen v. Michigan Acad. of Family Physicians*, 476 U.S. 667, 670 (1986) and *Abbott Labs. v. Gardner*, 387 U.S.

136, 141, (1967)).  Accordingly, judicial review bars are narrowly construed.  *Bowen*, 476 U.S. at 670; *Amgen Inc. v. Smith*, 357 F.3d 103, 112 (D.C. Cir. 2004).

In *Bowen*, the U.S. Supreme Court rejected the government's attempt to give broad effect to statutes limiting jurisdiction over certain claims related to Medicare Part B.  The plaintiffs claimed that an HHS regulation which authorized different payment amounts under Part B for different kinds of physicians violated the Medicare statute.  476 U.S. at 668-69.  The Supreme Court rejected the government's position that a statute that authorized judicial review (after exhaustion of administrative remedies) of determinations of the amount of benefit payments under Medicare Part A but not Part B impliedly foreclosed review of the regulation governing Part B; the Court held that judicial review was precluded only of individual benefit determinations, but not the *regulation* governing payment methods, declaring it "implausible to think [Congress] intended that there be *no* forum to adjudicate statutory and constitutional challenges to regulations promulgated by the Secretary."  *Id.* at 678.

Here, plaintiffs do not seek review of any of the specific determinations of the Secretary for which Congress has barred jurisdiction—namely, the selection of payment amounts in the CBA product categories, the actual contract awards in those different categories, the designation of CBAs, the Secretary's phase-in decision, the selection of items for competitive bidding, or the choice of bidding structure in the CBA product categories.  All of those concern the kind of "piecemeal" and fact-intensive individual claims by disappointed bidders that would clog the courts and impair the efficient implementation of the CAP according to the statutory mandate. *See Amgen*, 357 F.3d at 112.  There is simply no clear and convincing evidence that Congress took the extraordinary step of barring judicial review of whether the Secretary's regulations complied with the statute.  Courts "ordinarily presume that Congress intends the executive to

obey its statutory commands and, accordingly, that it expects the courts to grant relief when an executive agency violates such a command.  That presumption has not been surmounted here." *Bowen*, 476 U.S. at 681.

Even if some of Plaintiffs' claims arguably fall within the categories specified by § 1395w-3(b)(10), the Defendants cannot rely on the jurisdiction stripping provision because their actions violated and exceeded their authority under § 1395w-3.  *See COMSAT Corp. v. FCC*, 114 F.3d 223, 226-28 (D.C. Cir. 1997).  Because § 1395w-3 only precludes review of particular actions taken "under this section," or under a sub-division of "this section," it provides no protection for actions that violated § 1395w-3 itself.  *Id.* at 224, 227 (recognizing that the jurisdictional inquiry "merges [with] consideration of the legality of the [agency]'s action" and holding that "there is no preclusion of judicial review where, as here, the [agency] has acted outside the scope of its authority.")  Because Defendants' actions challenged in this suit were not actions "under" or authorized by § 1395w-3, subsection (b)(10) does not bar this suit. Consequently, this provision is no barrier to considering Plaintiffs' claims.

## CONCLUSION

This Court should grant a preliminary injunction ordering the Defendants to cease the implementation of the CAP and preventing any future application of the CAP under the Final Rule.

Dated:  June 9, 2008                                    Respectfully submitted,


/s/ Stephen B. Kinnaird
_____

Stephen B. Kinnaird (454271)
Robert Fabrikant (198119)
Ileana Maria Ciobanu (499413)
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000

Attorneys for Plaintiffs
American Association for Homecare and Ace
Drug, Inc., dba Hollywood Medical Supply

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 9th day of June, 2008, I caused a true and correct copy of the

foregoing PLAINTIFFS' APPLICATION FOR A PRELIMINARY INJUNCTION AND

REQUEST FOR EXPEDITED HEARING, as well as the accompanying MEMORANDUM OF

LAW IN SUPPORT OF PLAINTIFFS' APPLICATION FOR A PRELIMINARY INJUNCTION

AND REQUEST FOR EXPEDITED HEARING and PROPOSED ORDER, to be served upon the

Defendants in this matter by mailing the same by United States mail, postage prepaid, to the

following:

|  |  |
|---|---|
| Michael O. Leavitt, Secretary of the<br>Department of Health and Human Services<br>200 Independence Avenue, S.W.<br>Washington, D.C. 20201 | Kerry N. Weems, Acting Administrator of the<br>Centers for Medicare and Medicaid Services<br>200 Independence Avenue, S.W.<br>Washington, D.C. 20201 |
| Office of the U.S. Attorney<br>Civil Process Clerk<br>555 4th Street, N.W.<br>Washington, D.C.  20530 | U.S. Attorney General<br>U.S. Department of Justice<br>950 Pennsylvania Avenue N.W.<br>Washington, DC 20530-0001 |

/s/ Stephen B. Kinnaird
Stephen B. Kinnaird (SBN 454271)

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| AMERICAN ASSOCIATION FOR HOMECARE, 2011 Crystal Drive, Suite 725, Arlington, Virginia 22202 | ) ) ) ) | |
| and | ) ) | |
| ACE DRUG, INC., dba HOLLYWOOD MEDICAL SUPPLY, 2131 Hollywood Boulevard, Hollywood, FL 33020, | ) ) ) ) | |
| Plaintiffs, | ) ) | **Civil Action No. _____** |
| vs. | ) ) ) | |
| Michael O. LEAVITT, in his official capacity as Secretary of the Department of Health and Human Services, 200 Independence Avenue, S.W., Washington, D.C. 20201 | ) ) ) ) ) | |
| and | ) ) | |
| Kerry N. WEEMS, in his official capacity as Acting Administrator for the Centers for Medicare & Medicaid Services, Department of Health and Human Services, 200 Independence Avenue, S.W., Washington, D.C. 20201 | ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## <u>PROPOSED ORDER</u>

The Court GRANTS Plaintiffs' motion for a preliminary injunction and ORDERS that Defendants, their employees, their agents, their assigns, and all persons acting in concert or participating with them cease the implementation of the DMEPOS Competitive Acquisition Program and be enjoined from future implementation of such Program.

The injunction shall remain in place until further order of the Court.

Dated: _____, 2008.


_____

United States District Judge

## *UNITED STATES DISTRICT COURT*
## *FOR THE DISTRICT OF COLUMBIA*

**AMERICAN ASSOCIATION FOR**
  **HOMECARE,  et al**

                    Plaintiff(s)

            vs.                         Civil Case No: **08-992(RMU)**

**LEAVITT**

                    Defendant(s)

## <u>NOTICE REGARDING BULKY EXHIBIT</u>

Pursuant to the procedures for filing documents electronically.  This notice serves as

notification of bulky  exhibits in pdf version with the Clerk's Office. It is available for

public viewing and copying between the hours of 9:00 a.m. and 4:00 p.m., Monday

through Friday.


                              **NANCY MAYER-WHITTINGTON**

                                    Clerk