# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| AMERICAN ASSOCIATION FOR HOMECARE; and ACE DRUG, INC., dba HOLLYWOOD MEDICAL SUPPLY, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 08-992 (RMU) |
| MICHAEL O. LEAVITT in his official capacity as Secretary of the Department of Health and Human Services, and KERRY M. WEEMS, in his official capacity as Acting Administrator for the Centers for Medicare & Medicaid Services, | ) ) ) ) ) | |
| Defendants. | ) ) | |

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' APPLICATION FOR A PRELIMINARY INJUNCTION AND REQUEST FOR EXPEDITED HEARING

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.....................................................................................................iv

INTRODUCTION ............................................................................................................1

BACKGROUND ..............................................................................................................3

I.     OVERVIEW OF MEDICARE PART B ..................................................................3

II.    SECTION 302 OF THE MEDICARE PRESCRIPTION DRUG,
        IMPROVEMENT, AND MODERNIZATION ACT OF 2003 ............................4

III.   CMS' RULEMAKING .......................................................................................7

     A.    Financial Standards ...................................................................................8

     B.    Small Suppliers .......................................................................................10

IV.   ROUND I OF THE DMEPOS COMPETITIVE BIDDING PROGRAM .............12

PRELIMINARY INJUNCTION STANDARDS .........................................................13

ARGUMENT ..................................................................................................................14

I.     PLAINTIFFS CANNOT ESTABLISH AN IRREPARABLE INJURY ................14

     A.    The Fact That Plaintiffs Delayed Filing Suit for Over a Year
         After the Final Agency Action That They Purport to Challenge
         by Itself Defeats Plaintiffs' Ability to Establish Irreparable Injury ..........14

     B.    Plaintiffs' Unsubstantiated Assertion Of An Injury That Is In
         Essence purely Economic Cannot Satisfy Their Burden
         To Establish Irreparable Injury ...............................................................16

II.    THIS COURT LACKS SUBJECT MATTER JURISDICTION ...........................19

     A.    Through the Statutory Bar in 42 U.S.C. § 1395w-3(b)(10), Congress
         Has Precluded Judicial Review of the Secretary's Determinations
         Regarding the Structure of DMEPOS Competitive Bidding and the
         Awarding of Contracts ...........................................................................19

B.  If Judicial Review Is Not Statutorily Barred, Jurisdiction Is Lacking Because Plaintiffs Would Be Both Able and Required to Exhaust Medicare's Administrative Claims Process, Which They Have Not Done ...................................................................................25

III.  PLAINTIFFS LACK STANDING .........................................................................27

A.  Plaintiff AAHomecare Cannot Establish Standing on Its Own Behalf ......28

B.  Plaintiff AAHomecare Cannot Bring Suit on Behalf of Its Members Because Those Members Have Conflicting Interests ................................29

C.  Ace Drug and Other AAHomecare Members Have Not Suffered An Injury-in-Fact Fairly Traceable to Defendants' Actions ....................30

D.  Ace Drug and Other AAHomecare Members Fail to Meet Prudential Standing Requirements Because Their Grievance Does Not Fall Within the Zone of Interests Protected by the MMA .........32

IV.  PLAINTIFFS HAVE FAILED TO DEMONSTRATE THAT THEY ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS .....................34

A.  Plaintiffs Are Not Likely To Succeed On The Merits Of Their Claim Regarding The Financial Standards Requirement In 42 U.S.C. § 1395w-3(b)(2)(A)(ii) ...............................................34

B.  Plaintiffs Are Not Likely To Succeed On The Merits Of Their Claim Regarding CMS' Definition of Small Suppliers .......................................39

1.  SBA Requirements Governing Small Business Protections Do Not Apply to the MMA's Provisions Referencing Small DMEPOS Suppliers ....................................................................39

2.  CMS Complied With Any Applicable Rulemaking Requirements ................................................................42

V.  THE BALANCE OF HARDSHIPS AND THE PUBLIC INTEREST FAVOR DENIAL OF PLAINTIFFS' REQUEST FOR INJUNCTIVE RELIEF ...............................................................................................43

CONCLUSION ...............................................................................................45

## TABLE OF AUTHORITIES

### CASES

Air Transport Ass'n v. Reno, 80 F.3d 477 (D.C. Cir. 1996) ...........................................................27

All Fla. Network Corp. v. United States, No. 08-441 (C.F.C. filed June 17, 2008) .....................29

Amgen, Inc. v. Smith, 357 F.3d 103(D.C. Cir. 2004) ...........................................21, 23, 32, 33, 34

AMA v. Thompson, 2001 WL 619510 (N.D. Ill. May 29, 2001) ..................................... 21-22, 22

Am. Chiropratic Ass'n, Inc. v. Leavitt, 431 F.3d 812 (D.C. Cir. 2005) .......................................32

Am. Legal Foundation v. FCC, 808 F.2d 84 (D.C. Cir. 1987) .....................................................28

Am. Soc'y of Anesthesiologists v. Shalala, 90 F. Supp. 2d 973 (N.D. Ill. 2000) .....................22, 23

Am. Soc'y of Cataract & Refractive Surgery v. Thompson, 279 F.3d 447 (7th Cir. 2002) .....21, 22

Am. Soc'y of Dermatology v. Shalala, 962 F. Supp. 141 (D.D.C. 1996),
    aff'd, 116 F.3d 941 (D.C. Cir. 1997) ................................................................................... 22

Apotex, Inc. v. Food & Drug Admin., 449 F.3d 1249 (D.C. Cir. 2006) ...........................................14

Atlantic Urological Assocs. v. Leavitt, No. 08-141, 2008 WL 1931443 (D.D.C. May 5, 2008) ....26

Barton v. Dist. of Columbia, 131 F. Supp. 2d 236 (D.D.C. 2001) ......................................................13

Bennett v. Spear, 520 U.S. 154 (1997) ........................................................................................32

*Carolina Med. Sales, Inc. v. Leavitt, No. 07-1298, slip op.
    (D.D.C. June 19, 2008)..........................................................................1, 19, 21, 22, 24, 39

Cartwright Intern. Van Lines, Inc. v. Doan, 525 F. Supp. 2d 187 (D.D.C. 2007) ........................19

Ctr. for Law & Educ. v. Dep't of Educ., 396 F.3d 1152 (D.C. Cir. 2005) ...................................28

Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290 (D.C. Cir. 2006) ............13, 14, 16

Chevron, U.S.A., Inc. v. Natural Res. Defense Council, 467 U.S. 837 (1984) .............................41

Citibank, N.A. v. Citytrust, 756 F.2d 273 (2d Cir. 1985) ........................................................15-16

CityFed Fin. Corp. v. Off. of Thrift Supervision, 58 F.3d 738 (D.C. Cir. 1995) ...................13, 14

Clarke v. Sec. Indus. Ass'n, 479 U.S. 388 (1987) .........................................................32

Fair Employment Council of Greater Wash., Inc. v. BMC Mktg., 28 F.3d 1268 (D.C. Cir. 1994) ....28

Fund for Animals v. Frizzell, 530 F.2d 982 (D.C. Cir. 1975) .......................................15

Fund for Animals v. Norton, 281 F. Supp. 2d 209 (D.D.C. 2003) .................................18

Gidatex, S.r.L. v. Campaniello Imports, Ltd., 13 F. Supp. 2d 417 (S.D.N.Y. 1998)....................16

Green v. Cashman, 605 F.2d 945 (6th Cir. 1979) .........................................................33

Heckler v. Ringer, 466 U.S. 602 (1984) ....................................................................26

Hunt v. Wash. State Apple Advertising Comm'n, 432 U.S. 333 (1977) ...........................28

Local 1812, Am. Fed'n of Gov't Employees v. U.S. Dep't of State,
         662 F. Supp. 50 (D.D.C. 1987) ...................................................................29

Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992) .................................................30

Mazurek v. Armstrong, 520 U.S. 968 (1997) ............................................................13

Munaf v. Geren, Nos. 06-1666, 07-394, 2008 WL 2369260 (U.S. June 12, 2008) .....................20

Mylan Laboratories, Inc. v. Leavitt, 484 F. Supp. 2d 109 (D.D.C. 2007) ......................17

Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs, 417 F.3d 1272 (D.C. Cir. 2005) ...32

Nat'l Athletic Trainers' Ass'n, Inc. v. U.S. Dep't of Health & Human Servs.,
         455 F.3d 500 (5th Cir. 2006) ...................................................................33

Nat'l Maritime Union of Am. v. Commander, Military Sealift Command,
         824 F.2d 1228 (D.C. Cir. 1987) ...............................................................29

Nat'l Propane Gas Ass'n v. U.S. Dep't of Homeland Security, 534 F. Supp. 2d 16 (D.D.C. 2008)...15

Natural Res. Defense Council v. Pena, 147 F.3d 1012 (D.C. Cir. 1998) ......................15

Newdow v. Bush, 355 F. Supp. 2d 265 (D.D.C. 2005) ...............................................15

Nuclear Energy Inst., Inc. v. EPA, 373 F.3d 1251 (D.C. Cir. 2004) ..............................28

Nw. Mining Ass'n v. Babbitt, 5 F. Supp. 2d 9 (D.D.C. 1998) ......................................40

Owner-Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety Admin.,
    494 F.3d 188 (D.C. Cir. 2007) ...........................................................31

Painter v. Shalala, 97 F.3d 1351 (10th Cir. 1996) ...............................................21, 22

Palisades Gen. Hosp. v. Leavitt, 426 F.3d 400 (D.C. Cir. 2005) ...................................21

P.R. Ass'n of Physical Medicine & Rehab., Inc. v. United States,
    521 F.3d 46 (1st Cir. 2008) ..............................................................26

Quince Orchard Valley Citizens Ass'n Inc. v. Hodel, 872 F.2d 75 (4th Cir. 1989) ...............15, 16

Retired Chicago Police Ass'n v. City of Chicago, 7 F.3d 584 (7th Cir. 1993) ............................29

Sandoz, Inc. v. FDA, 439 F. Supp. 2d 26 (D.D.C. 2006) .........................................17

*Santa Cruz County v. Leavitt, No. 07-02888, 2008 WL 686831(N.D. Cal. Mar. 11, 2008) ...21, 23

*Shalala v. Ill. Council on Long Term Care, Inc., 529 U.S. 1 (2000) .................................25, 26, 27

Sharp Healthcare v. Leavitt, No. 08-170, 2008 WL 962628 (S.D. Cal. Apr. 8, 2008) .................44

Shays v. FEC, 414 F.3d 76 (D.C. Cir. 2005) ....................................................30

Skagit County Pub. Hosp. v. Shalala, 80 F.3d 379 (9th Cir. 1996) ................................21

TAP Pharms. v. U.S. Dep't of Health & Human Servs., 163 F.3d 199 (4th Cir. 1998) ...............33

Tough Traveler, Ltd. v. Outbound Prods., 60 F.3d 964 (2d Cir. 1995) .........................15

Triad at Jeffersonville I, LLC v. Leavitt, No. 08-329, 2008 WL 1777404
    (D.D.C. Apr. 21, 2008) ...............................................................26-27

Ty, Inc. v. Jones Group, Inc., 237 F.3d 891 (7th Cir. 2001) .........................................15

United States v. Erika, Inc., 456 U.S. 201 (1982) ...............................................3

United States v. Rural Elec. Convenience Coop. Corp., 922 F.2d 429 (7th Cir. 1991) ................43

<u>Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n</u>, 259 F.2d 921 (D.C. Cir. 1958) .................14

<u>Wis. Gas Co. v. FERC</u>, 758 F.2d 669 (D.C. Cir. 1985) ............................................................18-19

<u>Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.</u>, 559 F.2d 841 (D.C. Cir. 1977) ...13-14

## <u>STATUTES</u>

5 U.S.C. § 553 ..............................................................................................................................26

Regulatory Flexibility Act ("RFA"), 5 U.S.C. § 611 ....................................................................40

Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706 .......................................................2

5 U.S.C. § 706 ..............................................................................................................................35

Federal Advisory Committee Act ("FACA"), 5 U.S.C. app. 2 ........................................................6

Small Business Act, 15 U.S.C. § 632 ................................................................................2, 39, 42

28 U.S.C. § 1331 ..........................................................................................................................25

Medicare Act, 42 U.S.C. §§ 1395 <u>et seq.</u> .......................................................................................3

42 U.S.C. § 405 ......................................................................................................................25, 26

42 U.S.C. § 1395<i>l</i> ...........................................................................................................................22

 42 U.S.C. § 1395m ........................................................................................................................6

42 U.S.C. § 1395w-3 ...........................................................................................................<i>passim</i>

42 U.S.C. § 1395w-4 ....................................................................................................................22

42 U.S.C. § 1395w-26 ...........................................................................................................36, 36-37

42 U.S.C. § 1395w-112 ..........................................................................................................36, 37

42 U.S.C. § 1395ff ........................................................................................................................20

42 U.S.C. § 1395hh ............................................................................................................37, 38, 42

42 U.S.C. § 1395ii ........................................................................................................................25

42 U.S.C. § 1395ww ...................................................................................................22

Balanced Budget Act of 1997 ("BBA"), Pub. L. No. 105-33, § 4319, 111 Stat. 251 (1997) ..........4

Medicare Prescription Drug, Improvement, and Modernization Act of 2003,
    Pub. L. No. 108-173, § 302, 117 Stat. 2066 (2003) .............................................4

## **LEGISLATIVE HISTORY**

H.R. Conf. Rep. No. 108-391, 2003 WL 22767289, § 302 (2003) ..................................4

H.R. Rep. No. 108-178(II), 2003 WL 21690538, § 302 (2003) ......................4, 5, 34, 43

## **REGULATIONS**

42 C.F.R. §§ 405.904 -.906 ........................................................................................ 25

42 C.F.R. § 414.402 ...............................................................................................41, 42

42 C.F.R. § 414.414 ....................................................................8, 9, 12, 23, 31, 35, 37

42 C.F.R. § 422.382 ...................................................................................................37

42 C.F.R. § 422.386 ...................................................................................................37

42 C.F.R. § 422.388 ...................................................................................................37

42 C.F.R. § 423.420 .................................................................................................. 37

## **ADMINISTRATIVE MATERIALS**

71 Fed. Reg. 25,654 (May 1, 2006) ....................................................7, 8, 9, 10, 11, 42

71 Fed. Reg. 72,734 (Dec. 11, 2006) ............................................................................7

72 Fed. Reg. 16,794, 16,794 (Apr. 5, 2007) .................................................................7

72 Fed. Reg. 17,992 (Apr. 10, 2007) ............................................. 8, 9, 10, 11, 12, 35, 42

## **MISCELLANEOUS**

Nancy-Ann DeParle, Medicare at 40: A Mid-Life Crisis?,
    7 J. Health Care L. & Pol'y 70 (2004) .............................................................3

**INTRODUCTION**

Plaintiffs seek to halt – on the eve of its realization – an effort by the Centers for Medicare & Medicaid Services ("CMS") to curb wasteful spending of taxpayer money by reducing the high costs that Medicare pays for medical items and services. The competitive bidding program that Congress initiated in 2003 for durable medical equipment, prosthetics, orthotics, and supplies ("DMEPOS") is anticipated – based on the success of demonstration projects – to produce significant cost savings (approximately $1 billion annually, after the initial phase-in) with no negative impact on the quality of care provided to Medicare beneficiaries. After preparations and consultations that have spanned the past five years, CMS' Final Rule has been issued, the first round of bidding has occurred, and payment under the new system is scheduled to begin in the first ten areas on July 1. Yet, despite the fact that the Final Rule was issued over a year ago, plaintiffs – an organization purporting to represent DMEPOS suppliers of all sizes, together with one of its members – waited to file this action until 21 days before the new payment system is supposed to go into effect – and they ask this Court for a preliminary injunction on the basis that they are now suddenly facing imminent and irreparable harm.

Plaintiffs are not entitled to preliminary injunctive relief based on an emergency of their own making. In addition, because their asserted harm is only economic, they have no irreparable injury that could justify a preliminary injunction. Moreover, as this Court has recently recognized, Congress has effectively "insulate[d] the entire [DMEPOS Competitive Bidding P]rogram from [judicial] review." Carolina Med. Sales, Inc. v. Leavitt, No. 07-1298, slip op. at 13 (D.D.C. June 19, 2008). The same statutory bar on judicial review that this Court applied in Carolina Medical Sales also deprives the Court of jurisdiction here. In this case, which plaintiffs

attempt to style as a challenge to CMS' Final Rule under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, plaintiffs specifically allege that the Secretary failed to specify financial standards that Congress required be applied to screen qualified bidders for financial soundness.  They further allege that the Secretary failed to comply with the requirements of the Small Business Act, 15 U.S.C. § 632, when promulgating a definition of "small supplier" to comply with Congress' requirement that the Secretary take into account the needs of small suppliers in various aspects of the bidding process.  Both of these challenges concern determinations by the Secretary that are inextricably tied to the awarding of contracts, the bidding structure, and the number of contractors selected and thus fall squarely within areas that Congress expressly barred from judicial review.

If the statutory bar – which covers both judicial and administrative review – did not apply here, plaintiffs would then have to fulfill the Medicare Act's requirement that claims be channeled through CMS' administrative process.  Since plaintiffs have not done so, jurisdiction would still be lacking.  Furthermore, plaintiffs lack standing to raise these claims because plaintiff AAHomecare purports to represent members with conflicting interests; the particular provisions that plaintiffs challenge cannot have caused them injury; and plaintiffs' pecuniary interests in sustaining their Medicare profits are not aligned, in this case, with the interests of Medicare beneficiaries in reducing their own Medicare costs.

Even if plaintiffs could surmount these jurisdictional obstacles, they have not shown they are likely to succeed on the merits.  The Secretary did what was required in ensuring winning bidders are financially stable based on the standards that he specified, and the definition of "small supplier" in the Final Rule is not in violation of the Small Business Act.  The Final Rule

as promulgated satisfies all rulemaking requirements.  Finally, the public interest here lies in

proceeding with efforts to reduce excessive Medicare costs, and the disruption to the government

will be severe, should an injunction issue on the eve of this program's final liftoff, particularly

where plaintiffs have waited past the eleventh hour to file their challenge.  Because plaintiffs fail

to demonstrate that any of the relevant factors – much less all of them – militate in favor of an

injunction, preliminary injunctive relief should be denied.

## BACKGROUND

I.    **OVERVIEW OF MEDICARE PART B**

Title XVIII of the Social Security Act, commonly known as Medicare, 42 U.S.C. §§ 1395

et seq., provides federally-subsidized health insurance coverage to the elderly and disabled.

Medicare Part A pays for inpatient hospital services and other institutional care.  Id. §§ 1395c to

1395i-5.  Part B is a supplemental program that pays for other health care services such as

physician visits, outpatient services, and durable medical equipment.  Id. §§ 1395j to 1395w-4;

see United States v. Erika, Inc., 456 U.S. 201, 202-03 (1982).  Part B coverage is funded by

premiums paid by Part B beneficiaries, and government contributions, which go into the Federal

Supplementary Medical Insurance Trust Fund ("Trust Fund").  Id. at 202-03 (citing 42 U.S.C. §§

1395r, 1395s, 1395t, 1395w).  As trustee of the Trust Fund, see id. at 203, the Secretary has a

fiduciary duty to protect the Trust Fund's assets.  Experts expect that "Medicare spending will

continue to grow at a rate higher than the rest of the economy for the foreseeable future."  See

Nancy-Ann DeParle, Medicare at 40: A Mid-Life Crisis?, 7 J. Health Care L. & Pol'y 70, 85

(2004).  Accordingly, "Medicare faces significant long-term financing challenges."  Id.

II.    **SECTION 302 OF THE MEDICARE PRESCRIPTION DRUG, IMPROVEMENT, AND MODERNIZATION ACT OF 2003**

Plaintiffs challenge the manner in which the Secretary has implemented a provision of Medicare Part B, specifically, section 302 of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ("MMA" or "the Act"), Pub. L. No. 108-173, § 302(b)(1), 117 Stat. 2066 (2003), codified at 42 U.S.C. § 1395w-3. Section 302 directs the Secretary to establish a competitive bidding program through which DMEPOS suppliers compete for contracts to supply Medicare beneficiaries in designated areas. Id. Under the pre-MMA regime, which is currently still in effect, Medicare pays for DMEPOS using a fee schedule that sets prices for each class of covered items based on "a weighted average of either local or regional prices, subject to national limits (both floors and ceilings)" that have been updated annually. H.R. Conf. Rep. No. 108-391, 2003 WL 22767289, § 302 (2003). Congress investigated the DMEPOS fee schedule payment system, reviewing numerous studies conducted by the Department of Health and Human Services ("HHS") and the Government Accountability Office ("GAO"), and concluded that the existing Medicare fee schedule was too expensive for both taxpayers and Medicare beneficiaries and that it did not provide adequate value in relation to its cost. H.R. Rep. No. 108-178(II), 2003 WL 21690538, § 302 (2003).

In an effort to combat the waste, fraud, and abuse that it found in the current system, Congress in 1997 directed the Secretary to conduct demonstration projects to explore whether the use of competitive bidding to set Medicare Part B prices for DMEPOS items and services would save money. Balanced Budget Act of 1997 ("BBA"), Pub. L. No. 105-33, § 4319, 111 Stat. 251 (1997) (enacting former version of 42 U.S.C. § 1395w-3). These demonstration projects –

- 4 -

conducted in Polk County, Florida, and San Antonio, Texas – were successful.  Congress found that both taxpayers and Medicare beneficiaries "saved significantly and quality standards were higher under the demonstration."  H.R. Rep. No. 108-178 (II), § 302.  In addition, and of particular relevance to this litigation, Congress also found that "three-quarters of the [DMEPOS] winners" in the competitive bidding demonstration projects "were small businesses and beneficiary satisfaction remained high."  Id.

Accordingly, as part of its 2003 enactment of the MMA, Congress directed the Secretary to "establish and implement programs under which competitive acquisition areas are established throughout the United States for contract award purposes for the furnishing under this part of competitively priced [DMEPOS] items and services[.]" 42 U.S.C. § 1395w-3(a)(1).  The programs are to be phased in, geographically, beginning with 10 of the largest metropolitan areas in 2007, rising to 80 such areas in 2009, and adding additional areas after that.  Id. § 1395w-3(a)(1)(B)(i).  Congress also authorized the Secretary, in his discretion, to phase in the selection of items and services for which payment rates are established through competitive bidding, beginning with the "highest cost and highest volume items and services," or those that "the Secretary determines have the largest savings potential."  Id. § 1395w-3(a)(1)(B)(ii).

In the way of direction regarding the Program's implementation, Congress required the Secretary to conduct "a competition among entities supplying items and services," id. § 1395w-3(b)(1), wherein suppliers submit bids that specify a set price for the provision of DMEPOS items and services for a period of up to three years.  Id. § 1395w-3(b)(6)(B).  Congress also required the Secretary to impose safeguards meant to ensure that the Program's goals are met, though leaving it to the Secretary to develop the specific criteria for these safeguards.  First, the Secretary must

ensure that winning bidders "meet[] applicable quality standards specified by the Secretary under [§] 1395m(a)(20)."  Id. § 1395w-3(b)(2)(A)(i).[1]  Second, the Secretary must ensure that winning bidders "meet[] applicable financial standards specified by the Secretary, taking into account the needs of small providers."  Id. § 1395w-3(b)(2)(A)(ii).  Third – and, given the purpose of the transition to competitive bidding, most obviously – the Secretary must ensure that "[t]he total amounts to be paid to contractors in a competitive acquisition area are expected to be less than the total amounts that would otherwise be paid."  Id. § 1395w-3(b)(2)(A)(iii).  In other words, the winning bidders must save Medicare money, but they must also provide a high level of quality care to beneficiaries and must be financially stable, thus ensuring beneficiaries' continued access to the DMEPOS items and services that they supply.

Congress also directed the Secretary to establish a Program Advisory and Oversight Committee ("PAOC") that would provide advice regarding program implementation, "the establishment of financial standards for purposes of subsection (b)(2)(A)(ii)," and the establishment of quality standards, among other things.  Id. § 1395w-3(c)(1), (3)(A).  This committee is not subject to the provisions of the Federal Advisory Committee Act ("FACA"), 5 U.S.C. app. 2.  42 U.S.C. § 1395w-3(c)(4).

As indicated, Congress directed the Secretary to "tak[e] into account the needs of small providers" when specifying the financial standards that winning bidders must satisfy.  Id. § 1395w-3(b)(2)(A)(ii).  Congress also directed the Secretary, as he "develop[s] procedures relating

---

[1]Section 1395m(a)(20) requires that suppliers be accredited by a CMS-approved accreditation organization before placing a bid or being awarded a contract.  42 U.S.C. § 1395m(a)(20); see also CMS, Competitive Acquisition for DMEPOS, New Quality Standards, available at http://www.cms.hhs.gov/CompetitiveAcqforDMEPOS/04_New_Quality_Standards.

to bids and the awarding of contracts," to "take appropriate steps to ensure that small suppliers of items and services have an opportunity to be considered for participation" in the competitive bidding program. Id. § 1395w-3(b)(6)(D). These provisions, like the requirement that contracts be awarded "to multiple entities submitting bids in each area for an item or service," id. § 1395w-3(b)(4)(B), serve to maintain the "access of individuals to a choice of multiple suppliers" in each competitive bidding area. Id. § 1395w-3(b)(2)(A)(iv).

As discussed in greater detail below, Section 302 also contains a provision precluding administrative or judicial review of fundamental aspects of the competitive bidding programs – "the establishment of payment amounts," "the awarding of contracts," "the designation of competitive acquisition areas," "the phased-in implementation," "the selection of items and services" for competitive bidding, and "the bidding structure and number of contractors selected" – that the Secretary and CMS are to implement pursuant to the authority granted to them by the statute. Id. § 1395w-3(b)(10).

## III. CMS' RULEMAKING

Pursuant to the Secretary's rulemaking authority, CMS issued a Proposed Rule for the implementation of the DMEPOS Competitive Bidding Program on May 1, 2006 and began accepting public comments on its proposal. 71 Fed. Reg. 25,654 (May 1, 2006). In a Unified Agenda issued on December 11, 2006, in which various federal agencies set forth their rulemaking schedules, CMS indicated that the Final Rule would be published in March 2007. See 72 Fed. Reg. 16,794, 16,794 (Apr. 5, 2007) (citing 71 Fed. Reg. 72734 (Dec. 11, 2006)). However, CMS was unable to meet that deadline, and on April 5, 2007, issued a notice that it was extending the timeline for publishing the final rule for approximately a month, until April 30,

2007.  Id.  Ultimately, CMS was able to publish the final rule earlier than expected, on April 10, 2007.  72 Fed. Reg. 17,992 (Apr. 10, 2007).  In this case, plaintiffs challenge two aspects of the Final Rule – (1) its implementation of the requirement that the Secretary specify financial standards that winning bidders must satisfy, and (2) its implementation of requirements related to "small suppliers."

> ### A.    Financial Standards

In its Proposed Rule, CMS addressed the MMA's requirement that winning bidders meet certain "financial standards specified by the Secretary," 42 U.S.C. § 1395w-3(b)(2)(A)(ii), in connection with proposed regulation 42 C.F.R. § 414.414, setting forth the "conditions for awarding contracts."  71 Fed. Reg. at 25,675, 25,700.  CMS explained that its evaluation of financial standards would assist in "assessing the expected quality of suppliers, estimating the total potential capacity of selected suppliers, and ensuring that selected suppliers are able to continue to serve market demand for the duration of their contracts," ultimately "help[ing] maintain beneficiary access to quality services."  Id. at 25,675.  CMS indicated that it had found during the demonstration project that "general financial condition, adequate financial ratios, positive credit history, adequate insurance documentation, adequate business capacity and line of credit, net worth, and solvency, were important considerations for evaluating financial stability."  Id.  CMS proposed to identify the specific information that bidders would have to submit when it issued the Request for Bids ("RFB"), and indicated that such information may include bank references, credit history, insurance documentation, business capacity and line of credit, net worth, and solvency.  Id.  CMS indicated that it would further develop a "methodology for financial standards" that would attempt to "obtain as much information as possible while

- 8 -

minimizing the burden on bidding suppliers and the bid evaluation process."  Id.

      In the Final Rule, CMS responded to comments that the list of possible financial documentation was too burdensome, particularly on small suppliers, by limiting the documentation required during the initial round of competition to "certain schedules from [bidders'] tax returns, a copy of the 10K filing report from the [past three years], certain specified financial statement reports, . . . and a copy of their current credit report."  72 Fed. Reg. at 18,037; see also id. at 18,038 ("We believe we have balanced the needs of small suppliers and the needs of the beneficiaries in requesting documentation that will provide us with sufficient information to determine the financial soundness of a supplier.").  CMS noted that it planned to require the same types of information for subsequent competitions, but it "might choose to add or delete specific document requests as [it] gather[s] experience on what financial information most accurately predicts whether a supplier is financially stable enough to participate in the Medicare DMEPOS Competitive Bidding Program."  Id.  CMS thus revised its proposed regulation to state that "[e]ach supplier must submit along with its bid the applicable financial documentation specified in the request for bids."  42 C.F.R. § 414.414(d).[2]  The preamble to the Final Rule listed the particular financial documents that would be required for the initial round of bidding.  72 Fed. Reg. at 18,038.

      Some commenters requested that CMS specify the particular criteria that would be used to evaluate bidders' financial documentation, and some suggested that particular financial ratios be used.  72 Fed. Reg. at 18,037-38.  CMS responded that it would "use appropriate financial ratios,"

---

[2]The proposed version of the rule had stated that "[a]ll suppliers must meet the applicable financial standards specified in the request for bids."  71 Fed. Reg. at 25,700.

but that it would be "reviewing all financial information in the aggregate and w[ould] not be basing [its] decision on one ratio but rather overall financial soundness." Id. at 18,038. CMS subsequently published the financial measures it would use through a listserv and on the CMS website. Declaration of Martha Kuespert ("Kuespert Decl.") ¶ 27 (attached hereto as Ex. A).

**B.     Small Suppliers**

In its preamble to the Proposed Rule, CMS devoted a section to addressing Congress' directions that the Secretary "take appropriate steps to ensure that small suppliers of items have an opportunity to be considered for participation in the Medicare DMEPOS Competitive Bidding Program," and that "the needs of small suppliers . . . be taken into account when evaluating whether an entity meets applicable financial standards." 71 Fed. Reg. at 25,682. CMS first addressed the fact that the term "small supplier" was not defined. It noted that, "for some purposes," the Small Business Administration ("SBA") had developed size definitions using the North American Industry Classification System ("NAICS"), and that, for the categories into which, according to the SBA, DMEPOS suppliers would fall – "home health equipment rental," and "pharmacies" – the NAICS defined small businesses as those "having less than $6 million in annual receipts." Id. Noting that it was "relying on the expertise of the SBA to determine what constitutes the appropriate definition of a small supplier," CMS "propose[d] using the SBA small business definition when evaluating whether a DMEPOS supplier is a small supplier." Id. At the same time, CMS noted that its data suggested that "the majority of suppliers in the DMEPOS industry qualify as small businesses according to the SBA definitions." Id. (indicating that "at least 90 percent of DMEPOS suppliers had Medicare allowed charges of less than $1 million in 2003"); see also id. at 25,691 (again estimating that "approximately 90 percent of registered

- 10 -

DMEPOS suppliers are considered small according to the SBA definition"). CMS indicated that it had considered, though it was not currently proposing, the possibility of allowing suppliers with fewer than 10 full-time employees to designate an area smaller than the entire competitive bidding area when submitting their bid. Id. CMS specifically solicited comments on that issue. Id.

Apart from the definitional issue, CMS proposed certain steps "to ensure that small suppliers have the opportunity to be considered for participation in the program." Id. (recognizing "the importance, benefits and convenience offered by the local presence of small suppliers"). First, it noted that Section 302's requirement that multiple winners be selected in each Competitive Bidding Area ("CBA") "should make it easier for small suppliers to participate" because a single supplier would not be responsible for meeting the entire demand in a CBA. Id. Second, it proposed to conduct "separate bidding competitions for product categories" in order to facilitate bids from "small suppliers that specialize in one or a few product categories." Id. at 25,683-84. CMS also noted that it had hired a contractor to conduct focus groups with small suppliers in order to obtain more input on how to facilitate their participation in the program.

In its preamble to the Final Rule, CMS discussed the input received in focus groups as well as public comments. 72 Fed. Reg. at 18,057. Some commenters opposed CMS' proposed application of the SBA definition to the term "small supplier" and suggested that CMS distinguish between suppliers with over $3 million in gross revenue and those with revenue below $3 million. Id.; id. at 18,058. Several commenters "agreed with the option to define small supplier as fewer than 10 FTE employees." Id. at 18,057. In response, CMS concluded that "[t]he SBA definition" of small businesses as including all businesses that generate less than $6.5 million in gross receipts "is not representative of small suppliers that provide DMEPOS items to Medicare

beneficiaries, as it would encompass too many suppliers." Id.  CMS also recognized that "[t]he

SBA definition refers to small businesses rather than 'small suppliers.'" Id.  "In coordination with

the SBA," it therefore defined a "small supplier" as a "supplier that generates gross revenue of

$3.5 million or less in annual receipts." Id.  Before promulgating this definition, CMS received

SBA approval for establishing this size standard for small DMEPOS suppliers for purposes of the

DMEPOS Competitive Bidding Program.  Kuespert Decl. ¶ 20.

Commenters also urged CMS to adopt more specific protections for small suppliers, and

proposed that at least 50 percent of winning bidders should be small suppliers with less than $3

million in gross revenue.  Id. at 18,057.  In response, CMS added the current subsection (g) to 42

C.F.R. § 414.414, providing special rules for small suppliers.  72 Fed. Reg. at 18,058.  Under

subsection (g), CMS sets a target number for DMEPOS small supplier participation in each

competitive bidding program, to be calculated by multiplying 30% times the total number of

qualified bidders.  42 C.F.R. § 414.414(g)(1)(i).  If the number of qualified bidders that are small

suppliers is less than the target number, CMS identifies the small supplier whose bid was closest

to the cut-off (or "pivotal") bid and offers a contract to that supplier.  Id. § 414.414(g)(1)(ii)-(iii).

This process has no impact on the payment amounts established through the competitive bidding

process.  Id. § 414.414(g)(2).  Nor is any qualified bidder removed from the list of winning

bidders through this process.

## IV.    ROUND I OF THE DMEPOS COMPETITIVE BIDDING PROGRAM

On April 2, 2007, around the same time that CMS promulgated the Final Rule pursuant to

§ 1395w-3, CMS announced the ten Metropolitan Statistical Areas ("MSAs") where the first

DMEPOS competitive bidding competitions would take place.  On May 15, 2007, CMS issued a

request for bids.  The bidding deadline was extended a number of times, and bidding ultimately

ended on September 25, 2007.  Bidders were informed of their bidding status in March 2008, and

winning bidders were publicly announced in May 2008.  On July 1, payments for the selected

DMEPOS items and services in the ten MSAs chosen to participate in Round 1 are scheduled to

begin to be made according to the prices determined through competitive bidding.

Plaintiffs filed their Complaint in this case on June 9, 2008 – over a year after the Final

Rule was issued, but only twenty-one days before July 1, 2008, when the competitive bidding

prices for Round 1 go into effect.

### PRELIMINARY INJUNCTION STANDARDS

A preliminary injunction "is an extraordinary and drastic remedy, one that should not be

granted unless the movant, *by a clear showing*, carries the burden of persuasion."  Mazurek v.

Armstrong, 520 U.S. 968, 972 (1997) (emphasis in original).  Given the steep burden that the

movant must carry, it is unsurprising that courts have been exceedingly reluctant to grant

preliminary injunctions.  See Barton v. Dist. of Columbia, 131 F. Supp. 2d 236, 242 (D.D.C.

2001) (Urbina, J.) ("[B]ecause preliminary injunctions are extraordinary forms of judicial relief,

courts should grant them sparingly.").  For plaintiffs to prevail on their motion for a preliminary

injunction, they must demonstrate:  (i) that they have a substantial likelihood of success on the

merits; (ii) that they would suffer irreparable injury if the injunction is not granted; (iii) that an

injunction would not substantially injure other interested (non-moving) parties; and (iv) that the

public interest would be furthered by the injunction.  Chaplaincy of Full Gospel Churches v.

England, 454 F.3d 290, 297 (D.C. Cir. 2006); see also CityFed Fin. Corp. v. Off. of Thrift

Supervision, 58 F.3d 738, 746 (D.C. Cir. 1995); Wash. Metro. Area Transit Comm'n v. Holiday

- 13 -

Tours, Inc., 559 F.2d 841, 842-43 (D.C. Cir. 1977); Va. Petroleum Jobbers Ass'n v. Fed. Power

Comm'n, 259 F.2d 921, 925 (D.C. Cir. 1958).  Plaintiffs must satisfy all four factors, and the

Court must also find that the four factors together justify the drastic intervention of a preliminary

injunction.  See Chaplaincy of Full Gospel Churches, 454 F.3d at 304; CityFed, 58 F.3d at 747.  A

failure to show either irreparable harm or a likelihood of success on the merits obviates the need

for the Court to address the remaining factors.  See Apotex, Inc. v. Food & Drug Admin., 449

F.3d 1249, 1253-54 (D.C. Cir. 2006) (affirming denial of preliminary injunction based solely on

ground that the movant had little likelihood of success on the merits); CityFed, 58 F.3d at 747

(declining to reach district court's consideration of other factors where movant made no showing

of irreparable injury).  For the reasons that follow, plaintiffs have failed to carry their burden to

show that any of these factors — let alone all of them — favor a preliminary injunction here.

## ARGUMENT

## I.    PLAINTIFFS CANNOT ESTABLISH AN IRREPARABLE INJURY

### A.    The Fact That Plaintiffs Delayed Filing Suit for Over a Year After the Final Agency Action That They Purport to Challenge by Itself Defeats Plaintiffs' Ability to Establish Irreparable Injury

Plaintiffs have waited to bring this suit and to file for a preliminary injunction until the

very eve of Round 1 of CMS's implementation of the new payment regime under the DMEPOS

Competitive Bidding Program.[3]  Yet, the final agency action that plaintiffs purport to challenge

under the APA is the Final Rule implementing the Program, which was issued by CMS over a

---

[3]Specifically, plaintiffs have waited until exactly 21 days before July 1, 2008, when the new payment system in the designated MSAs is scheduled to begin.  It is likely no coincidence that LCvR 65.1(d) sets 20 days as the time within which a court must hold a hearing on a preliminary injunction – though only where the court has not earlier "decide[d] the motion on the papers or ma[de] a finding that a later hearing date will not prejudice the parties."

year ago, on April 10, 2007.  Compl. ¶¶ 78, 96.  This 13-month delay in filing suit and seeking

preliminary injunctive relief wholly undermines plaintiffs' claim of imminent irreparable injury

and is alone a sufficient basis for denying plaintiffs' application.  Nat'l Propane Gas Ass'n v. U.S.

Dep't of Homeland Security, 534 F. Supp. 2d 16, 19 (D.D.C. 2008) ("If the plaintiff has failed to

prosecute its claim for injunctive relief promptly, and if it has no reasonable explanation for its

delay, [a] district court should be reluctant to award relief." (quoting Natural Res. Defense

Council v. Pena, 147 F.3d 1012, 1026 (D.C. Cir. 1998))); Newdow v. Bush, 355 F. Supp. 2d 265,

292 (D.D.C. 2005) ("An unexcused delay in seeking extraordinary injunctive relief may be

grounds for denial because such delay implies a lack of urgency and irreparable harm."); cf.

Quince Orchard Valley Citizens Ass'n Inc. v. Hodel, 872 F.2d 75, 79-80 (4th Cir. 1989) (where

delays to an agency's implementation of a project "could easily be avoided by promptly

challenging administrative decisions, the denial of preliminary relief lies well within the sound

discretion of the trial judge").

Indeed, the D.C. Circuit has viewed a delay in challenging a Final Rule to be significant to

its decision denying a preliminary injunction when the delay was only 44 days.  Fund for Animals

v. Frizzell, 530 F.2d 982, 987 (D.C. Cir. 1975) ("Our conclusion that an injunction should not

issue is bolstered by the delay of the appellants in seeking one.").  Here, a delay of over a year

unquestionably "undercuts the sense of urgency that ordinarily accompanies a motion for

preliminary relief and suggests that there is, in fact, no irreparable injury."  Tough Traveler, Ltd.

v. Outbound Prods., 60 F.3d 964, 968 (2d Cir. 1995) (internal quotation and citation omitted).[4]

---

[4]See also Ty, Inc. v. Jones Group, Inc., 237 F.3d 891, 903 (7th Cir. 2001) ("Delay in
pursuing a preliminary injunction may raise questions regarding the plaintiff's claim that he or
she will face irreparable harm if a preliminary injunction is not entered."); Citibank, N.A. v.

Plaintiffs have failed to provide any justification for this significant delay.  The delay cannot be attributed to any uncertainty regarding where the first round of bidding would occur.  CMS announced the ten MSAs selected for the first round of DMEPOS bidding competitions on April 2, 2007, even before the Final Rule was published in the Federal Register.  Thus, by the end of April 2007, plaintiffs were fully aware not only of the provisions that they now challenge but also where those provisions were first going to take effect.  Yet, plaintiffs waited to file suit until 21 days before payment is scheduled to begin in these MSAs under the rates established through competitive bidding.  Plaintiffs' application for a preliminary injunction under these circumstances is unwarranted because, to the extent that an emergency situation exists, it is one that plaintiffs have created.  Quince Orchard, 872 F.2d at 79 (denying preliminary injunction where the imminent nature of any potential harm to plaintiff is "the product of his own delay in pursuing this action").

### B.    Plaintiffs' Unsubstantiated Assertion Of An Injury That Is In Essence Purely Economic Cannot Satisfy Their Burden To Establish Irreparable Injury

Plaintiffs have also failed to meet their burden of demonstrating irreparable injury because they have not identified any legitimate injury that they or their members may suffer other than one that is purely economic.  The D.C. Circuit "has set a high standard for irreparable injury."  Chaplaincy of Full Gospel Churches, 454 F.3d at 297.  To carry this substantial burden, plaintiffs must demonstrate not only that the injury they seek to avoid is "both certain and great," and

---

Citytrust, 756 F.2d 273, 276 (2d Cir. 1985) ("Although a particular period of delay may not rise to the level of laches and thereby bar a permanent injunction, it may still indicate an absence of the kind of irreparable harm required to support a preliminary injunction."); Gidatex, S.r.L. v. Campaniello Imports, Ltd., 13 F. Supp. 2d 417, 419 (S.D.N.Y. 1998) ("Courts typically decline to grant preliminary injunctions in the face of unexplained delays of more than two months.").

"actual and not theoretical," but also that "[t]he injury complained of is of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm." Id. (internal quotation and citation omitted).

Plaintiffs' claim of irreparable injury fails because economic injury alone – "money, time and energy necessarily expended in the absence of a stay" – almost never satisfies these stringent requirements. Id. at 297-98 (recognizing that "[t]he possibility that adequate compensatory or other corrective relief will be available at a later date" for such injury " weighs heavily against a claim of irreparable harm"). Indeed, even where a plaintiff may not be able to recoup monetary loss, an economic injury "must be such that it causes extreme hardship to the business, or even threatens destruction of the business," before it can qualify as "irreparable" for purposes of obtaining a preliminary injunction. Mylan Laboratories, Inc. v. Leavitt, 484 F. Supp. 2d 109, 123 (D.D.C. 2007) (internal quotation and alteration marks omitted); accord Sandoz, Inc. v. FDA, 439 F. Supp. 2d 26, 31-32 (D.D.C. 2006).

Plaintiffs do not even attempt to argue that Ace Drug or any of AAHomecare's members face the possibility of "extreme hardship" or "destruction" if payment under the Competitive Bidding Program begins in the first ten MSAs as scheduled on July 1, 2008. Cf. Pl. App. at 36-39 (omitting any assertion that Ace Drug or any AAHomecare member might go out of business). Indeed, the only tangible loss that they mention in their brief is the $225,000 that Ace Drug estimates it will not receive. Id. at 37. As a supplier with purported annual revenues of $3.5 to $6.5 million, Ace Drug does not appear to be threatened with destruction by this potential loss.

Instead of arguing that their economic injury warrants injunctive relief, plaintiffs attempt to characterize their alleged injury as something other than economic. They claim that, "apart

- 17 -

from any economic injury," they have been injured because their "statutory right to a lawful process" of bidder selection has been violated. However, an alleged procedural injury alone is insufficient to justify a preliminary injunction. <u>Fund for Animals v. Norton</u>, 281 F. Supp. 2d 209, 221 (D.D.C. 2003) (recognizing that procedural violation of National Environmental Protection Act alone would be insufficient). Such an injury is not irreparable because, if plaintiffs were to prevail on the merits, defendants would presumably be ordered to follow the procedures that plaintiffs assert are required. Moreover, plaintiffs' alleged procedural injury has already occurred, through the promulgation of the Final Rule, and thus cannot be prevented by a preliminary injunction that simply maintains the status quo.

It is clear, however, that plaintiffs' goal through this application is not to avoid any procedural injury but is to avoid the economic loss that they project will occur once the new payment system is in place.[5] For the reasons mentioned, plaintiffs have not asserted a sufficiently severe economic injury to warrant preliminary injunctive relief. Moreover, certain scenarios that plaintiffs predict will further exacerbate their economic loss – such as a "likel[ihood]" that referral sources will "completely stop sending patients to non-winning suppliers because it is too confusing" to do otherwise, Pl. App. at 38, and the ramifications of the bidding process on selected small suppliers' market share, <u>id.</u> at 39 – are purely speculative and therefore cannot provide a basis to establish an irreparable injury. <u>See</u> <u>Wis. Gas Co. v. FERC,</u> 758 F.2d 669, 674

---

[5]Indeed, for the proposition that their alleged procedural injury constitutes an irreparable injury sufficient to warrant a preliminary injunction, plaintiffs cite cases that do not actually concern an application for a preliminary injunction but merely discuss the injury-in-fact requirement for purposes of establishing Article III standing. Pl. App. at 36-37. Of course, establishing an injury-in-fact cognizable for Article III standing purposes is not sufficient to establish entitlement to a preliminary injunction. Nor, as discussed below, have plaintiffs sufficiently established an injury-in-fact.

(D.C. Cir. 1985) (recognizing that the party seeking a preliminary injunction must "substantiate" any claims of injury and that "[b]are allegations of what is likely to occur are of no value since the court must decide whether the harm will *in fact* occur").

Considering plaintiffs' failure to demonstrate any real threat of irreparable injury, their last-minute initiation of this suit and application for a preliminary injunction is best viewed as a protest mounted against the DMEPOS Competitive Bidding Program as a whole. However, it cannot be overstated that the Program's exclusion of some DMEPOS suppliers that previously served Medicare beneficiaries and received Medicare payments is an <u>inevitable</u> result of the simple fact that a competitive bidding process yields both winning and losing bids. Congress' overarching purpose in passing the MMA was to reduce the amount the government and Medicare beneficiaries pay for various items and services. Any harm to DMEPOS suppliers in the form of lost profits is the incidental, but unavoidable, result of the program that Congress enacted, and is thus attributable entirely to Congress, not the Secretary.

## II.    THIS COURT LACKS SUBJECT MATTER JURISDICTION

### A.    Through the Statutory Bar in 42 U.S.C. § 1395w-3(b)(10), Congress Has Precluded Judicial Review of the Secretary's Determinations Regarding the Structure of DMEPOS Competitive Bidding and the Awarding of Contracts

Just as this Court recently held in another case seeking to halt the July 1 initiation of payments under Round 1 of the Competitive Bidding Program, <u>Carolina Med. Sales</u>, No. 07-1298, slip op. at 2, plaintiffs' application for a preliminary injunction also must fail – and their Complaint should be dismissed – because the Court lacks subject matter jurisdiction over their claims. <u>Cartwright Intern. Van Lines, Inc. v. Doan</u>, 525 F. Supp. 2d 187, 193 (D.D.C. 2007)

(denying preliminary injunction based on lack of subject matter jurisdiction).[6]  The threshold barrier to subject matter jurisdiction in this action is simple.  By promulgating rules that implement the DMEPOS Competitive Bidding Program, the Secretary is acting pursuant to the explicit directive from Congress that he "shall establish and implement" competitive bidding programs "throughout the United States for contract award purposes" in order to reduce the costs that the government and Medicare beneficiaries pay for selected DMEPOS items.  42 U.S.C. § 1395w-3(a)(1)(A).  The non-reviewability provision in the statute that contains this directive, 42 U.S.C. § 1395w-3(b)(10), unequivocally precludes judicial review of any element that goes into the Secretary's awarding of contracts or the determination of bidding structure or how many contractors to select under 42 U.S.C. § 1395w-3, and these elements include the specification of financial standards for purposes of screening qualified bidders, and the definition of small supplier for purposes of facilitating small supplier participation, that are the subjects of plaintiffs' challenge.

The statute could not be more plain:  There "shall be no administrative or judicial review" under 42 U.S.C. § 1395ff "or otherwise," 42 U.S.C. § 1395w-3(b)(10), of the "awarding of contracts," id. § 1395w-3(b)(10)(B), just as there shall be no administrative or judicial review of

---

[6]Defendants believe that the jurisdictional issues in this case are straightforward and should lead this Court to dismiss plaintiffs' Complaint without further proceedings.  Even if the Court does not dismiss this action immediately on jurisdictional grounds, the jurisdictional question alone should lead the Court to deny plaintiffs' application for a preliminary injunction.  See Munaf v. Geren, Nos. 06-1666, 07-394, 2008 WL 2369260 at *2 (U.S. June 12, 2008) ("A difficult question as to jurisdiction is, of course, no reason to grant a preliminary injunction.  It says nothing about the 'likelihood of success on the merits,' other than making such success more *unlikely* due to potential impediments to even reaching the merits.") (emphasis in original).  Alternatively, pursuant to Fed. R. Civ. P. 65(a)(2), this Court should consolidate plaintiffs' application for a preliminary injunction with consideration of the merits following further briefing, which is expected to include a motion to dismiss for lack of subject matter jurisdiction.

the "bidding structure and number of contractors selected," id. § 1395w-3(b)(10)(B), nor of various other determinations.[7]  Despite acknowledging the MMA's bar of judicial review in their application for a preliminary injunction, plaintiffs suggest that the bar applies only to "certain enumerated actions" of the Secretary.  Pl. Mem. at 42.  However, this Court has already recognized that "[t]he scope of the . . . areas" set forth in § 1395w-3(b)(10) for which judicial review is precluded indicates "a scheme to insulate the entire program from review, as does the broad, general language used."  Carolina Med. Sales, No. 07-1298, slip op. at 13.

This provision is no different, in that respect, from the "no review" clauses in other Medicare Part B provisions to which courts have consistently given effect.  See Palisades Gen. Hosp. v. Leavitt, 426 F.3d 400, 403-05 (D.C. Cir. 2005); Amgen, Inc. v. Smith, 357 F.3d 103, 112 (D.C. Cir. 2004); Am. Soc'y of Cataract & Refractive Surgery v. Thompson, 279 F.3d 447, 452 (7th Cir. 2002); Painter v. Shalala, 97 F.3d 1351, 1356-57 (10th Cir. 1996); Skagit County Pub. Hosp. v. Shalala, 80 F.3d 379, 385 (9th Cir. 1996); Santa Cruz County v. Leavitt, No. 07-02888, 2008 WL 686831 at *3-6 (N.D. Cal. Mar. 11, 2008); AMA v. Thompson, 2001 WL 619510 at *3-

---

[7]The subsection containing the statutory bar on judicial review states in full: [t]here shall be no administrative or judicial review under section 1395ff of this title, section 1395oo of this title, or otherwise, of –
  (A) the establishment of payment amounts under paragraph (5);
  (B) the awarding of contracts under this section;
  (C) the designation of competitive acquisition areas under subsection (a)(1)(A) of this section;
  (D) the phased-in implementation under subsection (a)(1)(B) of this section;
  (E) the selection of items and services for competitive acquisition under subsection (a)(2) of this section; or
  (F) the bidding structure and number of contractors selected under this section.
Id. § 1395w-3(b)(10).

7 (N.D. Ill. May 29, 2001); <u>Am. Soc'y of Anesthesiologists v. Shalala</u>, 90 F. Supp. 2d 973, 974-76

(N.D. Ill. 2000); <u>Am. Soc'y of Dermatology v. Shalala</u>, 962 F. Supp. 141, 146 (D.D.C. 1996),

<u>aff'd</u>, 116 F.3d 941 (D.C. Cir. 1997)).[8]

    In <u>Carolina Med. Sales</u>, this Court held that subsections (D) (precluding review of

"phased-in implementation") and (E) (precluding review of "selection of items and services") of §

1395w-3(b)(10) barred those plaintiffs' challenge to the Secretary's inclusion of mail order

diabetic supplies in Round 1 of the DMEPOS competitive bidding implementation.  <u>Carolina</u>

<u>Med. Sales</u>, No. 07-1298, slip op. at 10, 16.  Rejecting the distinction that the plaintiffs attempted

to draw between selection of "items and services" and the selection of "delivery method" for those

items and services, this Court refused to "parse the definition[s]" of the categories listed in §

1395w-3(b)(10) "into individually challengeable sub-components," recognizing that to do so

"would frustrate Congress's intent and potentially hamstring the Secretary's ability to

expeditiously implement the bidding program."  <u>Id.</u>, slip op. at 16.[9]  In support of its analysis, this

---

[8]Significantly, a number of the other Medicare provisions that bar judicial review insulate aspects of CMS' methodology for determining fees, just as does § 1395w-3.  In particular, 42 U.S.C. § 1395w-4(i)(1), which precludes review of the process through which the Secretary establishes a Medicare fee schedule for physicians' services, is the equivalent of § 1395w-3(b)(10) for the fee schedule payment system that the DMEPOS competitive bidding system is meant to supersede.  <u>See also</u> 42 U.S.C. § 1395<i>l</i>(t)(12) (barring review of equitable adjustments made in prospective Part B payments to hospitals for outpatient services); <u>id.</u> § 1395ww(d)(10)(C)(iii)(II) (barring review of adjustments to a hospital's geographic classification, a factor affecting Medicare's inpatient hospital services reimbursement rates).

[9]The Court's holding on this point was consistent with the repeated holdings by other courts that, where Congress precludes review of a particular determination by the Secretary, <u>every</u> element that goes into that determination is unreviewable; courts have consistently declined to carve out individual pieces of these determinations for judicial review.  <u>Am. Soc'y of Cataract</u>, 279 F.3d at 452-54 ("transition formula" for determining one part of relative values found unreviewable); <u>Painter</u>, 97 F.3d at 1355-56 (action that reduced conversion factor unreviewable); <u>AMA</u>, 2001 WL 61956 at *3-5 (calculation that affects unreviewable conversion

Court cited the recent decision of a federal district court in California, which recognized that where the only purpose served by CMS' establishment of "fee schedule areas" was to aid in its determination of "geographic adjustment factors" – unreviewable under 42 U.S.C. § 1395w-4(i)(1) – the establishment of fee schedule areas was also unreviewable; otherwise Congress' purpose in insulating geographic adjustment factors from review would be defeated. Santa Cruz, No. 07-02888, 2008 WL 686831, at *5 (refusing to "read 42 U.S.C. § 1395w-4(i)(1) to allow litigants to challenge specific items that are 'integral to and essential components of the congressional- protected determinations' because this would frustrate the congressional mandate and defeat the Secretary's ability to make the protected determination itself").

Just like in Carolina Med. Sales and Santa Cruz County, Congress has foreclosed judicial review of certain determinations by the Secretary that clearly encompass the issues plaintiffs raise here, which this time concern the standards to be used to screen qualifying bidders for financial soundness before awarding them a contract, and the ways in which the Secretary has taken into account small supplier needs in specifying these financial standards and in designing the bidding process. The relevant subsections of § 1395w-3(b)(10) are, as suggested above, subsection (B), which covers "the awarding of contracts," and subsection (F), which covers "the bidding structure and number of contractors selected." 42 U.S.C. § 1395w-3(b)(10)(B), (F).[10]

---

factor is also unreviewable); Am. Soc'y of Anesthesiologists, 90 F. Supp. 2d at 974-76 (declining to divide aspects of the relative values into reviewable and non-reviewable categories); Am. Soc'y of Dermatology, 962 F. Supp. at 146 (relative values unreviewable).

[10]The statutory preclusion encompasses both substantive and procedural challenges and therefore also precludes plaintiffs' rulemaking claims. See Amgen, Inc., 357 F.3d at 113 ("If a no-review provision shields particular types of administrative action, a court may not inquire whether a challenged agency decision is arbitrary, capricious, or procedurally defective, but it must determine whether the challenged agency action is of the sort shielded from review.").

In regard to financial standards, the Secretary's determination of how to evaluate the financial stability of bidders is part of the process of selecting the winning bidders and awarding contracts (review of which is precluded by (b)(10)(B)). The financial standards also contribute to CMS's assessment of supplier capacity, which in turn affects the number of contractors selected (review of which is precluded by (b)(10)(F)). In regard to small supplier protections, the Secretary's determination of an appropriate definition of "small supplier" for purposes of the bidding process, and his designation of a method, in 42 C.F.R. § 414.414(g), through which more small suppliers may be awarded contracts, are also precursors to the awarding of contracts (review precluded by (b)(10)(B)), and are part and parcel of the overall bidding structure and number of contracts awarded (review precluded by (b)(10)(F)). Judicial review of both these matters is therefore barred under both § 1395w-3(b)(10)(B) and (F). Just as the Secretary is "imbued . . . with the authority . . . to economize" through his selection of particular items and services for competitive bidding, Carolina Med. Sales, slip op. at 10, the Secretary is also imbued with the authority to ensure that the winning bidders are financially stable enough that they will be able to meet their supply obligations to Medicare beneficiaries within the designated MSAs; he is imbued with the authority to ensure that a sufficient number of bidders will be selected to meet beneficiaries' demand for the designated DMEPOS items and services; and he is imbued with the authority to ensure that the small suppliers that he deems particularly in need of protection in light of the overall DMEPOS supplier population, and whose availability to beneficiaries he deems particularly important, will be considered during the bidding and award process.[11] Plaintiffs offer

---

[11]While it may be true that Congress required the Secretary to show some "solicitude" for small suppliers by taking their needs into account when making certain determinations, Carolina Med. Sales, slip op. at 10, Congress nowhere provides in 42 U.S.C. § 1395w-3 for an express

no cognizable explanation as to why the Court should ignore Congress' express preclusion of judicial review and consider the Secretary's implementation of these aspects of the DMEPOS Competitive Bidding Program.

> **B.    If Judicial Review Is Not Statutorily Barred, Jurisdiction Is Lacking Because Plaintiffs Would Be Both Able and Required to Exhaust Medicare's Administrative Claims Process, Which They Have Not Done**

If, despite the preceding analysis, this Court were to conclude that judicial review of plaintiffs' claims was not precluded by the clear statutory bar in 42 U.S.C. § 1395w-3(b)(10), then that provision would also pose no bar to administrative review.  In that case, plaintiffs would be able to – and therefore must – seek administrative review under 42 C.F.R. §§ 405.904 -.906.  Under those regulations, a Medicare beneficiary or Medicare-enrolled supplier who believes that a claim should have been paid by Medicare is generally entitled to an administrative appeals process.  Id.[12]  Because administrative review would be available, it would have to be exhausted prior to this Court's exercise of jurisdiction over plaintiffs' claims.  See Shalala v. Ill. Council on Long Term Care, Inc., 529 U.S. 1, 8-9 (2000); see also 42 U.S.C. §§ 405(h), 1395ii (precluding jurisdiction under 28 U.S.C. § 1331 for "any claim arising under" the Medicare Act).

By asking this Court to enjoin CMS' implementation of the new DMEPOS payment system on the ground that CMS' Final Rule implementing DMEPOS competitive bidding is

---

exception to the jurisdictional bar for small suppliers or otherwise indicates that this particular aspect of awarding of contracts, designing of the bidding structure, or determining the number of contractors to select should be carved out from the plain language of § 1395w-3(b)(10)(B) & (F).

[12]Even if a supplier were not able to pursue an administrative claim on its own behalf because it was not qualified as Medicare enrolled, a supplier may always furnish supplies to a Medicare beneficiary and then obtain an assignment of claims from the beneficiary in order to proceed through the administrative process.

invalid, plaintiffs are seeking to extend their own eligibility to receive Medicare payments under the current fee schedule payment system. See Compl., Prayer for Relief, ¶ 4. Plaintiffs' claims, even if ultimately reviewable, are barred by § 405(h) in their current posture. See P.R. Ass'n of Physical Medicine & Rehab., Inc. v. United States, 521 F.3d 46, 48-49 (1st Cir. 2008) (recognizing that the Medicare Act's channeling requirement, set forth in § 405(h), governs any suit which "seeks at its heart the extension of Medicare benefits"). In P.R. Ass'n, like here, the plaintiffs sought to challenge a regulation that imposed "a limitation on the claims that Medicare will pay and so foreshadow[ed] the denial of such claims." Id. at 49. The First Circuit recognized that the challenge to the regulation could, and therefore must, be channeled through the Medicare Act's administrative claim process before it was reviewed by a court. Id.; see also Ill. Council, 529 U.S. at 23.[13] Here, plaintiffs have not yet been denied reimbursement for DMEPOS. However, the delay associated with waiting until plaintiffs are denied reimbursement and until they then proceed through the administrative claims process is not sufficient to allow them to bypass the administrative process entirely. Courts have rejected the notion that such a delay is equivalent to denial of any review at all. E.g., P.R. Ass'n, 521 F.3d at 49-50; see also Atlantic Urological Assocs. v. Leavitt, No. 08-141, 2008 WL 1931443 at *11 (D.D.C. May 5, 2008) (rejecting argument that "administrative review will be costly and time- consuming" as a basis for concluding that "judicial review is essentially precluded"); Triad at Jeffersonville I, LLC v.

---

[13] Nor does it matter that plaintiffs seek to enjoin enforcement of Medicare regulations that allegedly fail to comply with APA notice and comment requirements. The Supreme Court explained in Heckler v. Ringer, 466 U.S. 602 (1984), that procedural challenges based on the rulemaking requirements of 5 U.S.C. § 553 are equally subject to channeling through the administrative claims process because rulemaking claims in this context are "inextricably intertwined" with claims for benefits. Ringer, 466 U.S. at 614.

Leavitt, No. 08-329, 2008 WL 1777404 at *9 (D.D.C. Apr. 21, 2008) (recognizing that "an individual hardship based on delay" is insufficient to circumvent administrative process). Thus, should this Court find that judicial review of plaintiffs' claims is not precluded by § 1395w-3(b)(10), it necessarily follows that administrative review of those claims would also not be barred and would, in fact, be both available and required. See Ill. Council, 529 U.S. at 10-12, 24.

In short, the MMA either precludes judicial and administrative review or it does not. If it does, this Court lacks jurisdiction to hear plaintiffs' claims in any posture; if it does not, then plaintiffs must exhaust their claims administratively under Illinois Council as a prerequisite for judicial review. In either case, plaintiffs' present claims are jurisdictionally barred and plaintiffs therefore cannot demonstrate a likelihood of success on the merits.

## III.    PLAINTIFFS LACK STANDING

According to the Complaint, plaintiff AAHomecare is an organization comprised of 481 member businesses in the healthcare provider, equipment manufacture, and other homecare-related industries. Compl. ¶¶ 2, 54.[14]  Its membership includes DMEPOS suppliers of all sizes, ranging from under $1 million to over $500 million in annual revenue. Id. ¶ 54. Plaintiff Ace Drug, Inc., is a DMEPOS supplier and is a member of AAHomecare. Id. ¶¶ 2-3.

An organization seeking to bring suit may have standing to sue on behalf of its members ("associational" standing) or on its own behalf ("organizational" standing). Air Transport Ass'n v. Reno, 80 F.3d 477, 483 & n.6 (D.C. Cir. 1996). In order to bring suit in an associational capacity, a membership organization must establish that "(a) [its] members would otherwise have

---

[14]According to its website, AAHomecare is primarily engaged in lobbying activities in legislative and regulatory arenas. See http://www.aahomecare.org/.

standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Hunt v. Wash. State Apple Advertising Comm'n, 432 U.S. 333, 343 (1977); see Am. Legal Foundation v. FCC, 808 F.2d 84, 89 (D.C. Cir. 1987). To bring suit on its own behalf, an organization must itself meet the requirements for standing. Id. These standing requirements include both constitutional standing prerequisites under Article III and prudential standing considerations. See Nuclear Energy Inst., Inc. v. EPA, 373 F.3d 1251, 1266 (D.C. Cir. 2004). For the reasons discussed below, neither AAHomecare nor Ace Drug can establish standing.

### A.    Plaintiff AAHomecare Cannot Establish Standing on Its Own Behalf

AAHomecare alleges that it has suffered injury by virtue of the fact that it has diverted time and resources from other activities in order to try to help its members deal with the "confusion" caused by defendants' alleged failures. See Compl. ¶ 61, 77. It is well established in this Circuit, however, that a membership organization's voluntary decision to divert its resources to respond in a particular way to an agency action provides no basis for organizational standing. Fair Employment Council of Greater Wash., Inc. v. BMC Mktg., 28 F.3d 1268, 1277 (D.C. Cir. 1994) ("By this logic, the time and money that plaintiffs spend in bringing suit against a defendant would itself constitute a sufficient 'injury in fact', a circular position that would effectively abolish the [standing] requirement altogether."); accord Ctr. for Law & Educ. v. Dep't of Educ., 396 F.3d 1152, 1161-62 (D.C. Cir. 2005). AAHomecare therefore lacks standing to bring suit on its own behalf.

- 28 -

**B.    Plaintiff AAHomecare Cannot Bring Suit on Behalf of Its Members Because Those Members Have Conflicting Interests**

According to AAHomecare's own representation, its members include DMEPOS suppliers of "all sizes."  Compl. ¶ 2.  Yet, AAHomecare seeks to pursue a claim that can only benefit suppliers of a particular size – those with between $3.5 and $6.5 million in annual revenue.  In the context of a competitive bidding program, a claim that could benefit some bidders may inevitably harm others.  Here, moreover, a change in definition of "small supplier" would deprive those who meet the current definition from benefitting from the 30% requirement in § 1395w-3(g).  A number of courts have held that where such a conflict between an organization's members exists, their individual participation is required, and associational standing cannot be maintained.  See Retired Chicago Police Ass'n v. City of Chicago, 7 F.3d 584, 606-07 (7th Cir. 1993) (discussing cases).  While in Nat'l Maritime Union of Am. v. Commander, Military Sealift Command, 824 F.2d 1228, 1233-34 (D.C. Cir. 1987), the D.C. Circuit rejected an argument that member conflict precluded standing, that case did not involve members who were competing bidders for the same contracts.  At the very least, the conflicts among AAHomecare's members cast further doubt on the appropriateness of a preliminary injunction.  See Local 1812, Am. Fed'n of Gov't Employees v. U.S. Dep't of State, 662 F. Supp. 50, 55 (D.D.C. 1987) (denying preliminary injunction based in part on possible conflicts between plaintiff association's members, which called associational standing into question).[15]

---

[15]The real possibility of a conflict among AAHomecare's members is vividly illustrated in another case filed in the Court of Federal Claims.  See All Fla. Network Corp. v. United States, No. 08-441 (C.F.C. filed June 17, 2008).  There, a winning bidder has sought to intervene to oppose the challenge to the DMEPOS Competitive Bidding Program brought by nonwinning bidders.  See dkt. # 14 (filed June 23, 2008) (Ablecare Medical, Inc.'s Motion to Intervene).

### C.     Ace Drug and Other AAHomecare Members Have Not Suffered An Injury-in-Fact Fairly Traceable to Defendants' Actions

In order to establish Article III standing, a plaintiff must show that it has suffered an "injury-in-fact" that is "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." Shays v. FEC, 414 F.3d 76, 83 (D.C. Cir. 2005) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)). As indicated above, plaintiffs challenge two particular aspects of the Final Rule promulgated by the Secretary and CMS – regarding the Secretary's specification of financial standards, and the definition of small suppliers.

With regard to financial standards, 42 U.S.C. § 1395w-3(b)(2)(A)(ii) indicates that the Secretary may not award a contract to any DMEPOS supplier that fails to meet the specified standards. However, plaintiffs do not assert that Ace Drug or any AAHomecare member was denied a contract under the competitive bidding program because they failed to meet financial standards. To the contrary, Ace Drug asserts that 7 out of 10 of its bids were unsuccessful for an entirely different reason – "because the bid amount for each product category was too high." Compl. ¶ 53.[16] Moreover, while plaintiffs appear to assert that they suffered a procedural injury as a result of CMS' alleged failure to follow rulemaking requirements, see id. ¶¶ 70, 72, any such failure must be deemed harmless because plaintiffs have failed to "indicate with reasonable specificity . . . how [they] might have responded" to the Secretary's specification of financial standards "if given the opportunity," and have failed to show that they might have mounted a

---

[16]The fact that 3 bids were accepted also indicates that Ace Drug must have satisfied CMS' criteria for financial stability. There is no question, then, that Ace Drug lacks standing to pursue this claim. Because AAHomecare has not alleged that any specific members have standing other than Ace Drug, AAHomecare's standing is also called into doubt on this basis.

- 30 -

credible challenge.  Owner-Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety

Admin., 494 F.3d 188, 202 (D.C. Cir. 2007) (internal quotation omitted).

　　　　With regard to CMS' definition of small supplier in 42 C.F.R. § 414.402, plaintiffs have

failed to establish that this definition affected them in any way whatsoever.  While plaintiffs assert

that they or some of their members would qualify as small suppliers if CMS had adopted the

SBA's definition, with a $6.5 million annual revenue threshold, rather than the $3.5 million

threshold, they fail to explain what impact this difference could have had on them.  At the same

time CMS defined "small supplier" to mean suppliers with less than $3.5 million in annual

revenue, it also set forth "special rules" through which, after the initial group of winning bidders

were selected through the competitive bidding process, the percentage of small suppliers in the

initial group would be calculated, and, if the percentage were below 30%, additional small

suppliers would be offered contracts.  See 42 C.F.R. § 414.414(g).  If "small supplier" were

defined to include all suppliers with less than $6.5 million in annual revenue, then, as described

above, 90% of DMEPOS suppliers would qualify as small suppliers.  In that event, it seems highly

unlikely – and plaintiffs have offered nothing to suggest – that the initial group of winning bidders

would ever fail to include at least 30% small suppliers, so no additional suppliers would ever be

added through operation of § 414.414(g).  Thus, suppliers with an annual revenue of between $3.5

million and $6.5 million – the group that was ostensibly excluded by CMS' definition – do not

actually stand to gain anything if the definition were what they suggest.  They therefore cannot

claim to have suffered any injury fairly traceable to CMS' definition.

　　　　Of course, as noted above, to the extent an individual supplier's participation in Medicare

is lost or reduced as result of the transition from a fee-schedule payment system to a competitive

bidding payment system, that injury results not from any CMS action but from Congress' establishment of competitive bidding as the means to set payments for DMEPOS supplier, with its inherent requirement that some bidders win while others lose.

> **D.    Ace Drug and Other AAHomecare Members Fail to Meet Prudential Standing Requirements Because Their Grievance Does Not Fall Within the Zone of Interests Protected by the MMA**

Even where constitutional standing requirements are met, a plaintiff must also satisfy prudential standing requirements by having a grievance that "'arguably fall[s] within the zone of interests protected or regulated by the statutory provision'" in question. Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs, 417 F.3d 1272, 1287 (D.C. Cir. 2005) (quoting Bennett v. Spear, 520 U.S. 154,162 (1997)). For APA purposes, a plaintiff meets the zone of interests test if he is himself the "'subject of the contested regulatory action,'" or if his interests "are not 'so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'" Amgen Inc., 357 F.3d at 108 (quoting Clarke v. Sec. Indus. Ass'n, 479 U.S. 388, 399 (1987)).

Here, plaintiffs, as DMEPOS suppliers and their representatives, have not asserted interests that are within the scope of interests that Congress intended to advance through its establishment of the DMEPOS Competitive Bidding Program. A number of cases have addressed whether the interests of Medicare providers are within the zone of interests of various Medicare provisions. Courts have concluded the zone of interests requirement is satisfied in cases where the interests asserted by providers will, if vindicated, have a tangible positive impact on the interests of Medicare beneficiaries; in such cases, the interests of providers and beneficiaries are aligned. Cf. Am. Chiropratic Ass'n, Inc. v. Leavitt, 431 F.3d 812, 816 (D.C. Cir. 2005) (holding

providers of chiropractic services had interests aligned with Medicare beneficiaries where the alleged injury was preventing beneficiaries from receiving chiropractic services); Amgen, Inc., 357 F.3d at 109 (holding a drug manufacturer's "commercial interest in selling [a particular drug] is congruent with the interests of beneficiaries in obtaining access to the technology" where Medicare's payment structure was based on the premise that "hospitals inadequately reimbursed for new drugs or biologicals are less likely to provide them and more likely to steer beneficiaries towards older, less expensive treatments"); Nat'l Athletic Trainers' Ass'n, Inc. v. U.S. Dep't of Health & Human Servs., 455 F.3d 500, 503 (5th Cir. 2006) (an association representing medical providers had prudential standing where the statutory "interest comports with the physician's interest in providing services and the Medicare beneficiary's interest in receiving those services").

On the other hand, where a provider only seeks to protect its own commercial interests and its requested remedy will have no positive impact on beneficiaries – and indeed will have a negative impact by perpetuating the current, unjustifiably high fee schedules – its interests have been held to lie outside the applicable zone of interests for prudential standing purposes. See TAP Pharms. v. U.S. Dep't of Health & Human Servs., 163 F.3d 199, 205 (4th Cir. 1998) (holding that a pharmaceutical company's interest in selling a particular brand of drug was not aligned with Medicare beneficiaries' interests where there was no reason to believe the company's brand was superior to others); cf. Green v. Cashman, 605 F.2d 945, 946 (6th Cir. 1979) ("We do not find in the statute authorizing Medicare . . . any legislative intention to provide financial assistance to providers of care for their own benefit. Rather the statute is designed to aid the patients and clients of such facilities . . . .").

While the D.C. Circuit considered TAP's analysis too limiting, the alternative test that it

adopted – whether a party "in practice can be expected to police the interests that the statute

protects," <u>Amgen Inc.</u>, 357 F.3d at 110 (internal quotation omitted) – is not satisfied here.

Congress enacted Section 302 of the MMA to counteract the waste, fraud, and abuse that it found

to be present under the previous DMEPOS fee schedule payment method.  <u>See</u> H.R. Rep. No.

108-178 (II), § 302.  The statute relies on the notion that DMEPOS suppliers will compete against

each other and thereby offer payment rates that are closer to the market rate than the current fee

schedule.  The intended effect of the statute is for payments to DMEPOS suppliers to be reduced.

It cannot be anticipated, therefore, that DMEPOS suppliers will be vigilant in "polic[ing] the

interests that the statute protects."  To the contrary, it is more likely that DMEPOS suppliers will

seek to safeguard their former rates of return – a motive that would be precisely antithetical to the

MMA's purpose of reducing Medicare costs for both CMS and beneficiaries.

  Even in regard to small suppliers, which Congress expressly mentioned in the MMA, it

cannot be said that Congress intended to afford them protection independent of the interests of

Medicare beneficiaries.  The statutory structure makes clear that beneficiaries' interests are

paramount; indeed, as noted above, CMS understood at least one reason that Congress sought to

afford the smallest suppliers sufficient protection was that Medicare beneficiaries benefit from

access to a variety of suppliers, including small suppliers.

**IV.** **PLAINTIFFS HAVE FAILED TO DEMONSTRATE THAT THEY ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS**

  **A.** **Plaintiffs Are Not Likely To Succeed On The Merits Of Their Claim Regarding The Financial Standards Requirement In 42 U.S.C. § 1395w-3(b)(2)(A)(ii)**

As indicated above, the final agency action that plaintiffs purport to challenge under the

APA is the Final Rule promulgated by the Secretary on April 10, 2007.  Count I of plaintiffs'
Complaint alleges that the Final Rule "fails to specify the financial standards mandated by" 42
U.S.C. § 1395w-3(b)(2)(A)(ii).  Plaintiffs appear to assert that the provision in the Final Rule
governing financial standards is arbitrary and capricious, in violation of 5 U.S.C. § 706(2)(A), and
that CMS' failure to promulgate a provision that addresses financial standards in the manner that
plaintiffs believe would be proper is "without observance of procedure required by law" in
violation of 5 U.S.C. § 706(2)(D).  Compl. ¶¶ 64-69.

        Plaintiffs' arguments on these points are without merit.  The Secretary did promulgate a
final rule that addresses financial standards by providing that "[e]ach supplier must submit along
with its bid the applicable financial documentation specified in the request for bids."  42 C.F.R. §
414.414(d).  As described above, the preamble to the final rule specifically listed the
documentation that would be required for Round 1 of the DMEPOS Competitive Bidding
Program.  This list was repeated in the Request for Bids, and the specific ratios that CMS intended
to use in evaluating bidders' financial soundness were published well before the bid submission
deadline.  Significantly, CMS emphasized that it did not plan to rely on any single financial ratio
as determinative but would "review[] all financial information in the aggregate" in order to reach
a conclusion on "overall financial soundness."  72 Fed. Reg. at 18,038.

        While plaintiffs, citing dictionary definitions, argue that the Secretary was required to
publish, and promulgate through the rulemaking process, specific numerical values that bidders
must meet or surpass in order to qualify as financially sound, Pl. App. at 20, there is no basis for
imposing a requirement that the Secretary specify financial standards in that particular manner
rather than – as he did here – provide the general rubric within which financial soundness would

be evaluated.  Certainly, when promulgating a rule that will continue to govern the Competitive Bidding Program in the future, the Secretary has discretion in regard to whether it would it make sense to go into that level of detail.

Here, as described above, because CMS' use of competitive bidding as a means to set Medicare payment rates is still quite new, CMS is in the early stages of determining the best and most accurate indicators of a DMEPOS supplier's financial stability and economic viability. CMS indicated as much in its preamble to both the Proposed and Final Rules, and further indicated that it expected to make changes in how it evaluates these criteria for DMEPOS suppliers as it gains more experience in what criteria are most accurate.  CMS also did not want to provide bidders with information that could be used to falsely manipulate the data that they submitted.  Kuespert Decl. ¶ 29.  In light of these concerns as well as its stated intention to evaluate financial soundness in the aggregate based on submitted financial documentation, CMS did not promulgate a rule that set forth an inflexible numerical threshold as the financial standard.

In their effort to establish a basis for challenge, plaintiffs cite two other Medicare statutes – 42 U.S.C. §§ 1395w-26(a) and 1395w-112(d) – as evidence that any CMS regulation implementing 42 U.S.C. § 1395w-3(b)(2)(A)(ii) is, in effect, arbitrary per se if it does not include the exact numbers that CMS intends to apply.  Pl. App. at 20.  The two statutes plaintiffs cite, however, actually undercut their argument because both of these statutes provide an express direction to the Secretary regarding how to set forth the relevant standards, and in each case, the Secretary did what the statute required.  Thus, where one provision directed the Secretary to "establish, on an expedited basis and using a negotiated rulemaking process . . . , standards . . . that entities must meet to qualify as provider-sponsored organizations . . . ," 42 U.S.C. § 1395w-

26(a)(1)(A) (emphasis added), CMS promulgated the standards through rulemaking.  See 42

C.F.R. §§ 422.382, .386, .388.  Where another provision directs the Secretary to "establish and

publish . . . financial solvency and capital adequacy standards," 42 U.S.C. § 1395w-112(d)(1),

CMS establishes and publishes the standards (but does not promulgate them through the

rulemaking process).  See 42 C.F.R. § 423.420(a) (indicating that "CMS establishes and publishes

reasonable financial solvency and capital adequacy standards" for the relevant entities).  These

examples therefore demonstrate the unremarkable fact that where Congress expressly directed the

Secretary to do something, the Secretary did it.

Here, the same is true.  The direction that Congress gave the Secretary in Section 302 was

to deny a contract to any entity that fails to "meet[] applicable financial standards specified by the

Secretary, taking into account the needs of small providers."  42 U.S.C. § 1395w-3(b)(2)(A)(ii).

The statute is silent on how or when the standards are to be specified; rather, it gives the Secretary

unfettered discretion to make those determinations. In order to ensure the Secretary's ability to

carry out the mandate of this provision – which, again, is focused on denying contracts to

financially unstable bidders – the Final Rule requires bidders to submit the financial

documentation requested in the Request for Bids, 42 C.F.R. § 414.414(d).  CMS considers the

ability to submit such documentation to be one indicator of financial soundness, and other

indicators were listed in the Final Rule preamble and on the CMS website.  Kuespert Decl. ¶¶ 22-

30.  Plaintiffs cannot prevail on a claim that the Secretary failed to specify financial standards or

that the promulgated  regulation is arbitrary, capricious, or contrary to law.

Plaintiffs' argument that the absence of any specific financial ratios or numerical threshold

values in the Final Rule violates 42 U.S.C. § 1395hh is also without merit.  Section 1395hh

requires that any "rule, requirement, or other statement of policy . . . that establishes or changes a substantive legal standard governing . . . the eligibility of individuals, entities, or organizations to furnish or receive [Medicare] services or benefits" be promulgated through notice-and-comment rulemaking, subject to certain exceptions. 42 U.S.C. § 1395hh(a)(2), (b). At the outset, it must be observed that plaintiffs' statement of their cause of action is confused. Plaintiffs have stated that their challenge is to the Final Rule, Compl. ¶ 78, which undisputedly did go through notice-and-comment rulemaking. It does not make sense to challenge the Final Rule, as plaintiffs do, on the basis of a violation of rulemaking requirements. Essentially, plaintiffs' purported rulemaking challenge is nothing more than a recycling of their previous argument that the promulgated regulation addressing financial standard requirements is insufficiently detailed.

For the same reasons that have been discussed, therefore, plaintiffs' challenge on this basis must fail. Moreover, the "substantive legal standard" at issue here is that which Congress set forth in § 1395w-3(b)(2)(A)(ii), requiring that bidders be deemed financially sound before being awarded a contract under the competitive bidding program. The method for determining whether a bidder is financially sound is committed to the Secretary's discretion, in consultation with PAOC, as matters requiring technical expertise, and here, moreover, the Secretary has indicated that financial information will be reviewed in the aggregate and will not be evaluated based on a single ratio. Moreover, threshold numbers are not likely to remain static. As discussed above, the Proposed and Final Rules discussed CMS' expectation that its understanding of which financial ratios or other figures were the most accurate indicators of financial stability was likely to change as CMS gained more experience in evaluating DMEPOS supplier bids.

**B.      Plaintiffs Are Not Likely To Succeed On The Merits Of Their Claim
Regarding CMS' Definition of Small Suppliers**

**1.      SBA Requirements Governing Small Business Protections Do Not
Apply to the MMA's Provisions Referencing Small DMEPOS
Suppliers**

Plaintiffs are unlikely to succeed in their attempt to impose Small Business Act

requirements on a Medicare competitive bidding program that is intended to reduce prices paid by

Medicare and its beneficiaries for DMEPOS items and services.  Plaintiffs argue that a provision

of the Small Business Act, 15 U.S.C. § 632(a)(2)(A), curtails the Secretary's broad discretion in

implementing the DMEPOS Competitive Bidding Program when it comes to protecting small

DMEPOS suppliers.  Pl. App. at 28.  This SB Act provision states that, "[u]nless specifically

authorized by statute, no Federal department or agency may prescribe a size standard for

categorizing a business concern as a small business concern, unless such proposed size standard–

(i) is proposed after an opportunity for public notice and comment; . . . . and (iii) is approved by

the Administrator."  15 U.S.C. § 632(a)(2)(A).[17]  Plaintiffs' argument cannot be sustained in the

face of the language of the statute governing the DMEPOS Competitive Bidding Program and the

realities of DMEPOS supplier characteristics.

As this Court has recently observed, there is no question that Congress intended the

Secretary to show some solicitude for the smallest members of the DMEPOS supplier industry

when designing the DMEPOS Competitive Bidding Program.  Carolina Med. Sales, No. 07-1298,

slip op. at 10.  Section 1395w-3 expressly states that the Secretary must "tak[e] into account the

needs of small providers" when specifying the applicable financial standards that bidders must

---

[17]In addition, subsection 632 (a)(2)(A)(ii) imposes requirements regarding how the size of
a business concern may be measured. 15 U.S.C. § 632(a)(2)(A)(ii).

meet in order to qualify for a contract in the Program.  42 U.S.C. § 1395w-3(b)(2)(A)(ii).

Congress also directed the Secretary to "take appropriate steps to ensure that small suppliers of

items and services have an opportunity to be considered for participation in the [P]rogram" when

"developing procedures relating to bids and the awarding of contracts."  Id. § 1395w-3(b)(6)(D).

However, as plaintiffs concede, when Congress set forth these requirements, it did not use the

term "small business" or "small business concern."  Instead, it referred specifically only to "small

providers" and "small suppliers."  The plain language of the statute therefore does not invoke the

provisions of the SB Act.

     The single case plaintiffs cite for the curious proposition that the SB Act's "size rule" for

small businesses "is not triggered only where a statute uses the term 'small business,'" Pl. App. at

30, does not support their argument.  That case addressed whether the Bureau of Land

Management had applied the correct definition of "small entity" when performing the regulatory

flexibility analysis required by the Regulatory Flexibility Act ("RFA"), 5 U.S.C. § 611, which

required a description of the impact of a proposed rule on "small entities."  Nw. Mining Ass'n v.

Babbitt, 5 F. Supp. 2d 9, 14-15 (D.D.C. 1998).  The court concluded that the BLM was required to

use the SBA's definition of "small business concern" because the RFA expressly defined "small

entity" to mean "small business," and defined "small business" to have the same meaning as the

term "small business concern" in the SB Act.  Id. at 15.[18]  That case demonstrates that in order to

conclude that Congress intended one term to mean the equivalent of another term with a

significant particularized meaning, the relevant statutes must clearly define the two terms as

---

     [18]The court had previously concluded that the RFA's definition of "small entity" included
small miners.  Id. at 13.

- 40 -

equivalent.  Here, Congress did not define "small provider" or "small supplier" as the equivalent of a "small business concern."  There is no basis for concluding that Congress intended the Secretary to use the SBA standards in adhering to the requirements of § 1395w-3.

To the contrary, as CMS recognized and discussed in the preambles to the Proposed and Final Rules, it would not make sense for Congress to have required the Secretary to apply the SBA standards rather than his own judgment and his agency's expertise.  While plaintiffs make light of the fact, they do not deny that approximately 90% of all DMEPOS suppliers would meet the SBA's definition of "small business."  Compl. ¶ 12; Pl. App. at 32.  Thus, if CMS were to have adopted that definition for the terms "small provider" and "small supplier," its obligations to take into account the needs of such entities and ensure that they have an opportunity to be considered for participation in the Program would become meaningless.  It is difficult to imagine that Congress intended to show special solicitude for a group that comprises 90% of the total. Moreover, the "special rules" that CMS set forth to ensure that a sufficient number of small suppliers – under its definition – would be awarded contracts would be superfluous if the SBA definition of small business were used because, if 90% of suppliers were "small," it is virtually inevitable that at least 30% of the qualified bidders would be small.  See 42 U.S.C. § 1395w-3(g).

Even if the terms "small provider" and "small supplier" in 42 U.S.C. § 1395w-3 were deemed ambiguous, the interpretation of the Secretary, as made manifest through CMS's promulgation of a definition of "small supplier" in 42 C.F.R. § 414.402, is entitled to deference under Chevron, U.S.A., Inc. v. Natural Res. Defense Council, 467 U.S. 837 (1984), because the Secretary is the one charged with administering this statute.  This definition responds to the comments made during the notice and comment period, incorporates advice from the SBA, and

serves the purpose of protecting the truly small suppliers and protecting the access of Medicare beneficiaries to such suppliers as well. The definition is plainly not arbitrary or capricious.

### 2.    CMS Complied With Any Applicable Rulemaking Requirements

Plaintiffs argue that even if the definition of "small supplier" in 42 C.F.R. § 414.402 is not arbitrary, it is invalid under the SB Act, 15 U.S.C. § 632(a)(2)(C)(i), and under 42 U.S.C. § 1395hh because the ultimate definition chosen by CMS was not subjected to an additional notice and comment period. To the contrary, CMS complied with any notice and comment requirements that the Court might deem applicable. As described above, the preamble discussion to the Proposed Rule "proposed" that CMS would use the SBA small business definition to evaluate whether a DMEPOS supplier was a small supplier. 71 Fed. Reg. at 25,682. At the same time, however, CMS indicated that it had considered a different definition – having fewer than 10 full-time employees – and that the SBA definition could include up to 90% of all DMEPOS suppliers. Id. This discussion clearly opened the door to comments on the definition, and indeed, CMS received a number of comments suggesting that the definition be changed to include only the truly small suppliers. 72 Fed. Reg. at 18,057-58. CMS revised its definition as a direct response to these comments, and those obtained through focus groups run by a contractor, as well as its consultation with the SBA. Id. The final definition therefore plainly qualifies as a "logical outgrowth" of the rulemaking process that had already occurred, and no further comment period was required. See 42 U.S.C. § 1395hh(a)(4).

By the same token, even assuming *arguendo* that the SB Act applied, CMS adhered to its requirements. CMS received express approval from the SBA for the definition of DMEPOS small supplier that it adopted. Kuespert Decl. ¶ 20. There is no basis for concluding that, where notice

and comment has already occurred and the final definition is a logical outgrowth of the original,

the SB Act would require an entirely new comment period.  Rather, all that is required is what

occurred here – that the definition in general be opened up for public comment.  See 15 U.S.C. §

632(a)(2)(C)(i) (requiring a new size standard be proposed "after an opportunity for public notice

and comment").

## V.    THE BALANCE OF HARDSHIPS AND THE PUBLIC INTEREST FAVOR DENIAL OF PLAINTIFFS' REQUEST FOR INJUNCTIVE RELIEF

The balance of harms and the public interest both weigh against the issuance of an

injunction.  In cases involving federal agencies, "the government's interest is in large part

presumed to be in the public interest."  United States v. Rural Elec. Convenience Coop. Corp.,

922 F.2d 429, 440 (7th Cir. 1991).  The Secretary's interest in implementing the DMEPOS

competitive bidding program is well established.  Congress investigated the existing

DMEPOS fee schedule payment system, reviewing numerous studies (including an assessment of

DMEPOS demonstration projects) conducted by HHS and the Government Accountability

Office, and concluded that the existing fee schedule was too expensive for both taxpayers and

Medicare beneficiaries and that it did not provide adequate value for what Medicare paid. H.R.

Rep. No. 108-178 (II), at Title III, § 302 (2003). Congress has found that the competitive bidding

program would reduce Medicare costs, thus protecting the integrity of the Medicare trust fund.

Congress also found that the program would reduce beneficiary costs (i.e., Medicare copayments),

increase quality standards, and combat waste, fraud, and abuse in the Medicare

program. Id. Thus, the millions of current and future Medicare beneficiaries would be harmed

by any delay in the implementation of this congressionally-mandated, cost-saving change in the

way Medicare pays for DMEPOS.

Moreover, winning bidders will be harmed by any delay in implementation, as many have expended substantial resources to compete in the bidding process, established subcontracting relationships with other suppliers to furnish items in competitive bidding areas, purchased additional inventory, and expanded warehouse and office space.  Kuespert Decl. ¶ 40.

Plaintiffs' claim that no "undue hardship" will be imposed on defendants if the injunction is granted is therefore wrong.  The fact that five years have passed since the MMA's enactment says nothing about the costs that will be incurred if the Program is suddenly halted on the eve of Round 1 of its final implementation.  Plaintiffs' citation of Sharp Healthcare v. Leavitt, No. 08-170, 2008 WL 962628, at *6 (S.D. Cal. Apr. 8, 2008), is inapposite.  Sharp concerned a single demonstration project being conducted in a single metropolitan area.  See id.  Here, the demonstration projects are over and this long-awaited program is set to begin payments for Round 1, with Round 2 bidding soon to follow.  An entire national network of operations will be forced to grind to a halt, and the prior system will have to be re-imposed, if the injunction is issued.  See Kuespert Decl. ¶¶ 35-38 (describing the government's commitment of resources to the Program).

On the issue of the public interest, plaintiffs suggest that "public health and safety" is at risk because defendants have allegedly failed to ensure that the winning bidders selected for Round 1 are in fact financially stable.  Pl. App. at 40.  Plaintiffs provide nothing in support of this assertion other than their allegations, which are belied by CMS' discussions in the preambles to the Proposed and Final Rules and by the Declaration attached to this brief.  Aside from this suggestion, plaintiffs rely on the public interest in laws being followed.  While such an interest cannot be denied, it is not the kind of interest that supports a preliminary injunction because, one

- 44 -

way or another, it will ultimately, and inevitably, be served upon the final resolution of this case.

Finally, implementation of a massive Medicare program, such as the DMEPOS competitive bidding program, requires extensive resources and investment on the part of the agencies implementing the program.  A preliminary injunction would cause major disruption, interference, and delay.  Consideration of the significant public interests promoted by the competitive bidding program and the hardship injunctive relief would create weighs against of the imposition of injunctive relief, particularly where plaintiffs have waited until the last possible moment to seek relief from this Court.  Because plaintiffs have failed to demonstrate that any of the four preliminary injunction factors — let alone all of them — cut in their favor, defendants respectfully request that this Court deny plaintiffs' request for a preliminary injunction.

## <u>CONCLUSION</u>

For the reasons stated, plaintiffs' application for a preliminary injunction should be denied.

Dated: June 25, 2008                                   Respectfully submitted,

GREGORY G. KATSAS
Acting Assistant Attorney General
JEFFREY A. TAYLOR
United States Attorney
SHEILA LIEBER
Deputy Director

/s/ Kathryn L. Wyer
KATHRYN L. WYER
U.S. Department of Justice, Civil Division
20 Massachusetts Avenue, N.W.
Washington, DC  20530
Tel.  (202) 616-8475 / Fax (202) 616-8470
kathryn.wyer@usdoj.gov
*Attorneys for Federal Defendant*s

- 45 -

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

AMERICAN ASSOCIATION FOR
HOMECARE; and ACE DRUG, INC., dba
HOLLYWOOD MEDICAL SUPPLY,

       Plaintiffs,

       v.

MICHAEL O. LEAVITT in his official capacity
as Secretary of the Department of Health and
Human Services, and KERRY M. WEEMS, in his
official capacity as Acting Administrator for the
Centers for Medicare & Medicaid Services,

       Defendants.

Civil Action No. 08-992 (RMU)

## DECLARATION OF MARTHA KUESPERT

Martha Kuespert, pursuant to 28 U.S.C. § 1746, declares under penalty of perjury under the laws of the United States of America that the following is true and correct:

1. I am the Director of the Division of Durable Medical Equipment, Prosthetics, Orthotics, and Supplies ("DMEPOS") Policy in the Centers for Medicare & Medicaid Services ("CMS") within the U.S. Department of Health and Human Services ("HHS"). This Division is responsible for implementing the DMEPOS competitive bidding program that is at issue in this lawsuit. The statements made herein are based on my personal knowledge and information given to me in my official capacity.

1

2. As required by Section 302 of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ("MMA"), Pub. L. No. 108-73 (Dec. 8, 2003) (codified at 42 U.S.C. § 1395w-3), the Secretary published a proposed rule designed to establish a competitive bidding program for the supply of DMEPOS to Medicare beneficiaries. This Rule was published at 71 Fed. Reg. 25654 (May 1, 2006). CMS received, reviewed, and responded to hundreds of comments on the proposed rule in issuing the final rule published at 72 Fed. Reg. 17992 (April 10, 2007).

3. Congress required the implementation of competitive bidding for DMEPOS after it had directed the Secretary to conduct DMEPOS competitive bidding demonstration projects. The demonstration projects were authorized pursuant to Section 4319 of the Balanced Budget Act of 1997 (BBA), Pub. L. No. 105-33 (August 5, 1997). These demonstration projects were carried out in Polk County, Florida from 1999-2002 and in the San Antonio, Texas Metropolitan Statistical Area from 2000 through 2002. See 72 Fed. Reg. at 17996.

4. In 1998, CMS contracted with the University of Wisconsin-Madison, which worked in conjunction with the Research Triangle Institute (collectively "RTI") to thoroughly evaluate the progress and results of the demonstration projects. RTI conducted beneficiary surveys, site visits, worked with focus groups, suppliers and members of other affected groups, analyzed supplier bids, fee schedules, reviewed operational and documentary materials, and analyzed the demonstrations for their effects on Medicare expenditures and their impacts upon beneficiaries, suppliers and other affected parties. The RTI prepared reports on the progress of the demonstration projects for CMS. These reports found that the projects were progressing well and were demonstrating real value to the Medicare program in competitive bidding for DMEPOS.

2

5.  The Final RTI Report found that the competitive bidding projects had little effect on utilization of the DMEPOS items but produced an estimated 19.1 percent reduction in Medicare allowed charges over the demonstration period.  Medicare expenditures (defined as allowed charges less co-payments and deductibles) fell by about $7.5 million, and beneficiary payments fell by about $1.9 million.

6.  The Final RTI report opined that the competitive bidding program demonstrated little overall impact on beneficiary access to needed DMEPOS products and beneficiaries reported high levels of satisfaction with DMEPOS services in the demonstration sites.  The quality of the DMEPOS products remained high and competitive bidding had relatively little effect on market concentration, while suppliers were split on whether competitive bidding made the DMEPOS market more competitive.

7.  RTI concluded that "[b]ased on our evaluation, we believe that the overall impacts of the demonstration were largely positive.  Competitive bidding produced lower prices, leading to lower allowable charges for the Medicare program beneficiaries.  We found that the demonstration had relatively little effect on beneficiary access, quality and product selection.  Beneficiaries remained as satisfied with their DMEPOS suppliers during the demonstration as they were before the demonstration."

8.  The Secretary sent his final Report to Congress in 2004, attaching the Final RTI findings.  Two prior reports filed with Congress, each attaching the Interim RTI reports, had reported findings consistent with those outlined in the Final Report.  The Final Report to Congress noted that the competitive bidding demonstration "largely met Medicare's objectives in terms of program savings; maintaining access, quality and product selection; preserving

3

competition in DMEPOS markets; and administrative feasibility.

9. As a result of the success of the demonstration projects, Congress passed the MMA in December 2003, requiring the Secretary and CMS to make competitive bidding the permanent method for establishing payment amounts for DMEPOS. 42 U.S.C. § 1395w-3(a)(1)(B). 42 U.S.C. § 1395w-3(a)(1)(A). The DMEPOS Competitive Bidding Program is to be phased in over a period of several years, beginning with ten Metropolitan Statistical Areas. 42 U.S.C. § 1395(a)(1)(B).

10. Section 1847(b)(2) of the Social Security Act, 42 U.S.C. § 1395w-3(b)(2), is entitled "Conditions for Awarding Contract." This provision states that the Secretary of HHS may not award a contract to an entity unless the Secretary finds that, among other things, the entity meets "applicable financial standards specified by the Secretary, taking into account the needs of small providers."

11. Section 1847(b)(6)(D) of the Social Security Act, 42 U.S.C. § 1395w-3(b)(6)(D), is entitled "Protection of Small Suppliers." This provision states:

> In developing procedures relating to bids and the awarding of contracts under this section, the Secretary shall take appropriate steps to ensure that small suppliers of items and services have an opportunity to be considered for participation in the program under this section.

12. As part of its direction in the MMA for implementing the DMEPOS Competitive Bidding Program, Congress directed the Secretary to establish a Program Advisory and Oversight Committee ("PAOC") to provide advice to CMS on various issues relating to program implementation, including in particular the "establishment of financial standards." 42 U.S.C. § 1395w-3(c). The committee members represent a broad mix of relevant industry, consumer

4

and government parties. The first PAOC meeting was held on October 6, 2004, with subsequent

meetings in December 2004, February-March 2005, September 2005 and May 2006. Although

Congress exempted the PAOC from the Federal Advisory Committee Act, the PAOC meetings

have been open to the public, with interested parties presenting various points of view, and have

provided CMS with an additional source of information and comments that it has taken into

account during the rulemaking process.

13. On May 1, 2006 CMS issued its proposed rule to implement the DMEPOS

Competitive Bidding Program established by the MMA. 71 Fed. Reg. 25654 et seq.

14. In the preamble to the proposed rule CMS addressed proposed policies regarding

financial standards. 71 Fed. Reg. 25675. CMS stated in part:

> [A]s part of the bid selection process, the RFBs [request for bids] will identify the
> specific information we will require to evaluate suppliers, which may include: a
> supplier's bank reference that reports general financial condition, credit history, insurance
> documentation, business capacity, and line of credit to successfully fulfill the contract, net
> worth, and solvency. We welcome comments on the financial standards, in particular the
> most appropriate documents that will support these standards.
>
> We found that in the demonstration, general financial condition, adequate
> financial ratios, positive credit history, adequate insurance documentation, adequate
> business capacity and line of credit, net worth, and solvency, were important
> considerations evaluating financial stability.
>
> As we develop our methodology for financial standards, we will further consider
> which individual measures should be required so that we can obtain as much information
> as possible while minimizing the burden on bidding suppliers and the bid evaluation
> process.

71 Fed. Reg. 25675.

15. In the proposed rule preamble, CMS also addressed how aspects of the proposed rule

would allow small suppliers to be considered in the competitive bidding process and discussed

5

the proposed definition of small supplier. 71 Fed. Reg. 25682. CMS proposed to use the

"[Small Business Administration] small business definition when evaluating whether a

DMEPOS supplier is a small supplier." Id. CMS also stated:

> Information available to us on the size distribution of businesses that provide DMEPOS
> indicates that the majority of suppliers in the DMEPOS industry qualify as small
> businesses according to the SBA definitions. Our analysis of DMEPOS claims data
> suggests that at least 90 percent of DMEPOS suppliers had Medicare allowed charges of
> less than $1 million in 2003. The figure of $1 million could be an underestimate of total
> receipts, since it does not include non-Medicare receipts, but it does suggest that most
> DMEPOS suppliers are small.

Id. The proposed rule also noted that CMS had considered allowing suppliers with fewer than 10

full-time equivalent employees to submit bids for an area smaller than an entire competitive

bidding area (CBA), but rejected that approach in order to ensure that beneficiaries would have

the choice of going to any contract supplier in the CBA. Id. CMS then went on to state: "We

recognize the importance of small suppliers in the DMEPOS industry, and we welcome

comments on any of the options identified above." Id.

16. We received numerous public comments on the proposed rule, including a comment

from plaintiff AAHomecare. However, we have identified no comments from plaintiff Ace

Drug. A number of commenters – although not AAHomecare – addressed CMS' proposed

definition of small supplier.

17. For example, LifeScan, Inc. stated in its public comment:

> The MMA requires the Secretary to take appropriate steps to ensure that small suppliers
> of items and services have an opportunity to be considered for participation in the
> DMEPOS competitive bidding program. In our view, the proposed rule has not gone far
> enough in this regard. CMS has proposed a definition of "smallness" that includes
> roughly 90 percent of all suppliers. We doubt that Congress intended to mandate special
> procedures for nearly all suppliers, as opposed to a smaller subset of suppliers. In
> addition, while nearly all suppliers may meet the Small Business Administration's

definition of a small business, this masks a wide range of "smallness."

We urge CMS to provide a fairer and more balanced commercial climate for small suppliers. One option would be to permit truly small suppliers (perhaps defined by the number of full time equivalent employees in the firm, or by total revenues substantially below the SBA cut-off for a small business) to serve less than the full competitive bidding area. . . . In addition, special treatment for truly small suppliers is likely to have a positive impact on beneficiary access, since smaller suppliers are more likely to be serving less populated areas of a competitive bidding area and closer to the homes of beneficiaries living in these less populated areas than other contract suppliers.

Comment of LifeScan, Inc. (attached hereto as Exhibit 1) at 11.

18.  Similarly, Ms. Sandra Rindt specifically stated that "[w]e strongly disagree with using the SBA's definition of small business" and "[t]here needs to be much more emphasis to protect those who do less than 3 million in sales a year." The comment went on to recommend "[r]edefining small business definition to under 3 million." Comment of Ms. Sandra Rindt (attached hereto as Exhibit 2).

19.  CMS consulted informally with the SBA regarding the definition of "small supplier" both before and after it issued the proposed rule. Based on the written comments CMS received after the proposed rule was issued, CMS determined that the SBA definition included too many suppliers that were larger than the truly small DMEPOS suppliers. CMS first consulted informally with the SBA about changing the "small supplier" definition in the final rule. CMS then sent a letter to the SBA that indicated that the MMA referred to "small suppliers," not small businesses, and requested the SBA's approval for CMS to adopt a size standard of "small supplier" to include only those suppliers with less than $3.5 million in annual revenue.

20.  In a letter dated March 14, 2007 (attached hereto as Exhibit 3), Steven C. Preston, Administrator of the U.S. Small Business Administration (SBA), wrote to CMS, stating in part:

7

[F]or the purpose of [the DMEPOS Competitive Bidding Program], you request approval to adopt a size standard of $3.5 million in average annual receipts to define a small supplier. I approve your requested size standard of $3.5 million with two revisions to your draft final rule. . . .

I agree with the reasons you provided for requesting a $3.5 million size standard. On May 1, 2006, CMS proposed to adopt a $6 million size standard that SBA previously had established for the home health equipment and pharmacy industries. After your review of comments on the proposal and meetings with focus groups of small suppliers, you conclude that SBA's size standard captured more suppliers as small than intended for the Program. Under a $3.5 million size standard, a more reasonable proportion of suppliers qualify as small.

Thus, the SBA approved the substance of the size standard for defining small suppliers that CMS ultimately adopted in the final rule. Although the SBA was fully aware of the procedural posture – citing the proposed size standard set forth in the proposed rule, CMS's review of public comments and meetings with focus groups, and CMS's draft final rule – it raised no concerns or objections.

21. In the final rule published in the Federal Register, CMS responded to comments received on the proposed rule and promulgated final regulations. 72 Fed. Reg. at 17992 et seq.

22. In the final rule preamble, CMS addressed policies regarding financial standards. 72 Fed. Reg. 18037-39. CMS reiterated a statement made in the proposed rule: "We found that, in the demonstration, general financial condition, adequate financial ratios, positive credit history, adequate insurance documentation, adequate business capacity and line of credit, net worth, and solvency, were important considerations for evaluating financial stability." Id. at 18037. CMS then addressed the public comments.

23. CMS stated in the final rule preamble that "Several comments argued that the financial standards were too strict" and "should be flexible enough" to regulate certain categories

8

of entities, including small local suppliers. Id. These commenters expressed concerns about

financial standards being too restrictive or too lax. Id. CMS responded as follows:

> We . . . agree that our financial standards should not be so burdensome that suppliers,
> especially small suppliers, cannot satisfy them. After further consideration and in
> response to comments, we believe that the proposed financial documentation discussed in
> the preamble to the proposed rule (71 FR 25675) would be too burdensome. Therefore,
> in order to obtain a sufficient amount of information while minimizing the burden on
> both bidding suppliers and the bid evaluation process, we will require that for the initial
> round of competition, suppliers must submit certain schedules from their tax returns, a
> copy of the 10K filing report from the immediate 3 years immediately prior to the date on
> which the bid is submitted (if the supplier is publicly traded) certain specified financial
> statement reports, such as cash flow statements, and a copy of their current credit report . .
> . . This financial information will allow us to determine financial ratios, such as a
> supplier's debt-to-equity ratio, and credit worthiness, which will allow us to assess a
> supplier's financial viability.

Id.

24. The final rule also noted that: "One commenter wanted CMS to define a set ratio, for

example, asset ratio should not be higher than (X percent) and the asset to liability ratio should

be no lower than (X percent)." Id. at 18038. CMS responded in part, "We will be reviewing all

financial information in the aggregate and will not be basing our decision on one ratio but rather

overall financial soundness." Id.

25. The final rule also stated: "Other commenters argued that the financial standards

proposed are too burdensome and discourage small suppliers from participating." 72 Fed. Reg.

18038. CMS responded:

> We are committed to ensuring the financial soundness of contract suppliers in the
> competitive bidding program. . . . We have determined that we can obtain the necessary
> information through collection of a limited number of financial documents and believe
> that the submission of this information will be less burdensome for all suppliers,
> including small suppliers. We believe we have balanced the needs of small suppliers and
> the needs of the beneficiaries in requesting documentation that will provide us with
> sufficient information to determine the financial soundness of a supplier.

Id.

26. The Request for Bid (RFB) instructions (attached hereto as Exhibit 4), released on May 15, 2007, specify the financial information that must be submitted by a bidder. See RFB instructions at 10-11.

27. On May 25, 2007, CMS announced through an electronic listserv transmission (see, e.g., Exhibit 5) the financial measures it would use to evaluate bids. CMS announced "the measures that will be used to evaluate the financial stability of suppliers that bid under the new Medicare DMEPOS Competitive Bidding Program." This announcement was also posted on the website www.dmecompetitivebid.com. This website is routinely used as one means for disseminating information to the public about various specifics pertaining to the ongoing implementation of the DMEPOS Competitive Bidding Program.

28. The announcement also stated:

> All bids must include certain financial documentation in order for the supplier to be considered for a contract under the program. CMS and its Competitive Bidding Implementation Contractor (CBIC) will evaluate each bidder's financial documentation to determine whether the supplier will be able to participate in the program and maintain viability for the duration of the contract period.

> CMS and the CBIC will also be utilizing the supplier's credit history in evaluating the financial health of the supplier.

(Emphasis added.)

29. CMS did not publish exact numeric thresholds that suppliers must satisfy. CMS has been concerned that, if it were to announce numeric thresholds for financial ratios, bidders might attempt to inappropriately manipulate numbers on the documentation that they submit in order to satisfy those thresholds.

30. CMS believes that the ability to submit complete and valid financial documents is itself a standard; if a supplier cannot submit complete and valid financial documents, its financial soundness and viability are at best questionable. The rulemaking documents also specify financial documents that must be submitted; CMS stated, "This financial information will allow us to determine financial ratios, such as a supplier's debt-to-equity ratio, and credit worthiness, which will allow us to assess a supplier's financial viability." 72 Fed. Reg. at 18037. In addition, CMS has indicated that bidders must demonstrate "overall financial soundness," and that financial stability will not be determined based on any single financial ratio. Id. at 18038.

31. Plaintiff Ace Drug met the financial standards specified by CMS. CMS notified Ace Drug that its bids for (1) Hospital Beds, (2) Support Surfaces, and (3) Negative Pressure Wound, were winning bids. Ace Drug was awarded contracts for Hospital Beds and Support Surfaces, but rejected a contract for Negative Pressure Wound. Plaintiffs' Exhibit 27. It was not chosen as a winning bidder for several other DMEPOS items based on its bid prices. Id.

32. In the final rule CMS also addressed policies regarding small suppliers. 72 Fed. Reg. 18056-58, 18071. CMS stated in the preamble to the final rule:

> Many commenters disagreed with using the definition of the SBA for a "small business" (less than $6 million in annual receipts) because the CY 2003 Medicare data showed that at least 90 percent of suppliers had less than $1 million in allowed charges. They recommended defining a small supplier as a supplier that generates less than $3 million in annual receipts.

72 Fed. Reg. 18058.

33. CMS responded to the public comments by stating in part:

> As of January 2006, the SBA defines a small business as generating less than $6.5 million in annual receipts. The SBA definition refers to small businesses rather than "small

11

suppliers." We believe that $6.5 million is not representative of small suppliers that provide DMEPOS items to Medicare beneficiaries, as it would encompass too many suppliers. In coordination with the SBA, we are defining a small supplier as a supplier that generates gross revenue of $3.5 million or less in annual receipts . . . .

72 Fed. Reg. at 18058; see also id. at 18071.

34. The bidding phase of Round 1 of the DMEPOS Competitive Bidding Program resulted in the selection of 328 suppliers, which received contracts for 1367 bids to provide DMEPOS supplies in the ten selected Metropolitan Statistical Areas (MSAs). The prices that were set through competitive bidding for the selected items average 26% less than Medicare's previous payment amounts under the fee schedule. CMS has estimated that the DMEPOS competitive bidding program will result in savings, both to the Medicare program and to Medicare beneficiaries, of hundreds of millions of dollars annually – with increased savings as the program is fully phased in; in particular, CMS estimated that the DMEPOS competitive bidding program will result in savings to the Medicare program of at least $1 billion annually beginning in fiscal year 2010. See 72 Fed. Reg. 18078-80.

35. Between the demonstration projects, the promulgation of competitive bidding rules, and our reviews of DMEPOS competitive bids to date, CMS has invested ten years and many millions of dollars preparing for and implementing the DMEPOS competitive bidding program. For purposes of the DMEPOS project CMS hired a contractor to develop an online bidding system. CMS also hired a Competitive Bidding Implementation Contractor (CBIC) to assist in the implementation of the DMEPOS Competitive Bidding Program, in accordance with section 302(b)(9) of the MMA.

36. CMS has invested significant resources enhancing existing claims processing

12

systems to accommodate the processing of competitive bidding claims.

37.   CMS has expended substantial resources conducting numerous State and local outreach programs across the country – including mass mailings, web postings, and meetings – to educate stakeholders, such as Medicare beneficiaries, providers, suppliers, and State insurance officials, on the new payment system.  For example, CMS is in the process of mailing notification of the new DMEPOS program to the 3.7 million households in the ZIP codes affected by phase 1 of the program.  More than 90 percent of those mailings have gone out with the remainder on schedule to be issued by June 25, 2008.  These mailings give beneficiaries detailed information as to the imminent changes in how they will receive DMEPOS items and services, and they provide beneficiaries with a list of approved contract suppliers in their area.  If Phase I were to be enjoined, CMS would have to expend additional resources to reeducate beneficiaries as to the status of the program, potentially causing confusion among beneficiaries.  This is but one example of the extensive reeducation efforts in which CMS would have to engage.  CMS would have to communicate in a similar fashion with providers and physicians who prescribe DMEPOS items and services, hospital discharge planners, pharmacies, physical and occupational therapists, and advocacy groups and organizations that serve the aged and disabled, for example, all of whom have received extensive information to date from CMS about Phase I of the competitive bidding program.

38.   At this point the bidding process is complete.  Therefore, if the program were halted, CMS would need to cancel or revise contracts with those winning suppliers.  CMS would have to publicize that the program and contracts will not be implemented at this time and that suppliers should continue to offer supplies under the old system.  Costs associated with canceling or

13

revising contracts would be substantial.

39. The HHS Office of Inspector General and the GAO have issued reports recognizing that Medicare has been substantially overpaying for DMEPOS for many years.

40. CMS also believes that winning suppliers would be harmed by stopping the competitive bidding program, because they have already begun to prepare for the July 1, 2008 implementation of the program. Indeed, we are aware that one winning bidder, Ablecare Medical, Inc., has a filed a motion to intervene on behalf of the government in a protest to the bidding process filed in the Court of Federal Claims. All Florida Network Corp. v. United States, No. 08-441C (Fed. Cl.). It is difficult to estimate the extent of the harm to winning bidders but we know that they have expended substantial resources for activities such as competing in the bidding process, establishing subcontracting relationships with other suppliers to furnish items in competitive bidding areas, purchasing additional inventory, and expanding warehouse and office space.

41. As described above, I believe that the Medicare program, Medicare beneficiaries and many suppliers will suffer substantial harm if the competitive bidding program is not implemented as planned on July 1, 2008.


Dated:        June 25, 2008
              Baltimore, Maryland


MARTHA KUESPERT

14

# EXHIBIT 1



LifeScan, Inc. 1000 Gibraltar Drive, Milpitas, CA 95035-6312
Tel: 408•956•4900  Fax: 408•956•4966  www.LifeScan.com

*22-4*

**Eric P. Milledge**
Company Group Chairman

June 28, 2006

The Honorable Mark McClellan, MD
Administrator
Centers for Medicare and Medicaid Services
Department of Health and Human Services
Attention CMS-1270-P
Mail Stop C4-26-05
7500 Security Boulevard
Baltimore, MD 21244-1850

Re:    **Comments on Proposed Rule for Medicare Competitive Acquisition for Certain
       Durable Medical Equipment, Prosthetics, Orthotics, and Supplies (DMEPOS) and
       Other Issues – CMS-1270-P**

Dear Dr. McClellan:

On behalf of LifeScan Inc., a Johnson & Johnson company, I am writing in response to the
Centers for Medicare & Medicaid Services (CMS) Proposed Rule published in the May 1, 2006
*Federal Register* for Medicare Competitive Acquisition for Certain DMEPOS and Other Issues.
We appreciate the opportunity to submit comments in the spirit of assisting in the successful
implementation of a very complex program mandated by the Medicare Prescription Drug,
Improvement, and Modernization Act of 2003 (MMA). LifeScan is a leading manufacturer of
blood glucose monitoring products and other diabetes management systems. LifeScan is
committed to improving the lives of all patients with diabetes today and with continued innovation
in the future.

LifeScan commends CMS as it faces the challenge of requiring DMEPOS suppliers to meet
consistent, strong quality standards, achieve cost savings in the DMEPOS benefit category, and
at the same time, make sure that Medicare beneficiaries get the care and treatment necessary to
meet their medical needs. This is an overwhelmingly complex process to implement based on
the outcomes of two relatively small demonstration projects that focused on a limited range of
products. We urge CMS to be thorough, careful, and conservative in the implementation of
Medicare Competitive Bidding for the least disruption for the beneficiaries and to consider
program savings for the long term with full consideration of the administrative costs and costs
possibly shifted into other benefit areas such as Part A.

Before turning to our comments on specific sections of the proposed rule, we would like to make
a few key points that need to be kept in mind when considering DMEPOS used by Medicare
beneficiaries to help manage their diabetes.

**Diabetes is a life-threatening condition that is affecting a growing number of Americans.** A
four-part series published in the January 9-12, 2006 issues of the *New York Times* recently
catalogued the growing problem of diabetes in the United States, labeling it a "crisis" and calling
attention to its "awful toll." A subsequent editorial concluded that this is "the time to develop a

**4741**

2

coordinated plan with a long view to take control of diabetes." As of 2005, the Centers for Disease Control and Prevention reported 20.8 million Americans with diabetes, of which over 6 million remain undiagnosed. According to a report released on March 1, 2005 by the Agency for Healthcare Research and Quality (AHRQ), the agency found that *"Medicare could save $1.3 billion annually, and Medicaid $386 million a year by reducing hospital admissions for diabetes complications. Up to $2.5 billion—roughly two thirds of the total—might have been averted with appropriate primary care for individuals with complications."* The proposed rule listed Medicare allowed charges for diabetes supplies and equipment in 2003 at about $1.1 billion. However, CMS has also acknowledged that the care of beneficiaries with diabetes consumes roughly 32 percent of total Medicare expenditures. In 2003, Medicare Part A and B benefit payments totaled $275.9 billion dollars. Thus, in that year, Medicare allowed charges for diabetes supplies and equipment represented only about 1.2 percent of all Medicare expenditures for the care of patients with diabetes, that is $1.1 billion ÷ $88.3 billion ($275.9 billion × 0.32).

Devastating and costly diabetes complications due to lack of appropriate glucose control may include: kidney failure, heart attack, stroke, diabetic retinopathy and other vision problems, neuropathy, and amputation. Regimented self-testing is a critical component to tight glucose management. While it is difficult for any patient to effectively manage a chronic condition, even more challenges exist when older Americans are faced with the daily struggles of proper glucose control often managed by multiple therapies (oral agents, insulin, behavior modification including diet and exercise) and possibly the added burden of treating co-morbidities. If Medicare beneficiary access or continued access to the most appropriate glucose-monitoring device is disrupted, patient compliance with their treatment regimen may be jeopardized and health outcomes could be adversely impacted.

**Blood glucose meters and their supplies are an integrated system.** Patients must use the unique blood glucose test strips made for their brand of blood glucose monitor, not just any brand of test strips. Blood glucose monitoring is an integrated technology where the test strips are designed specifically and uniquely to work with a specific meter. A glucose meter without the right test strips is worthless. Any required change in manufacturer of glucose meter or test strips would require the beneficiary to change to a different monitoring system. A change in system will require re-education of the patient, which has associated costs.
**There are significant differences between blood glucose systems and many other DMEPOS products**, including the following:

- Patients with diabetes typically go to a supplier, such as a local pharmacy, to obtain their blood glucose monitoring equipment and related supplies; unlike other DMEPOS products, such as oxygen and oxygen equipment, that supplier does not usually deliver the products to the patient's home.
- Patients purchase their diabetes supplies on a regular basis, often monthly; this is a fundamental difference from the typical one-time acquisition of other DMEPOS products, such as a hospital bed or wheelchair.
- Patients now can and do routinely obtain their diabetes supplies from a wide range of sources, including pharmacies, food and drug stores, mass merchandisers, small DME shops, and even mail order companies; they are not restricted to just a few options. In fact, there are more than 56,000 retail outlets now offering diabetes equipment and supplies. Close-to-home access helps minimize the risk that patients will fail to test their blood as indicated if their procurement of diabetes supplies is disrupted or confusing. Also, regular contact with a pharmacist, often an important member of the diabetes management team, can reinforce proper diabetes care. Neglecting to test and manage blood glucose levels can lead to the many costly and devastating issues mentioned previously.
- Variation and fluctuation in patient condition may require product, testing frequency and other adjustments in blood glucose monitoring in order to continue to meet the current needs of the individual. Manufacturers of blood glucose monitoring systems continue to provide innovative products designed to better meet the needs of patients with diabetes.

**4742**

3

Unimpeded access to the most appropriate products, including the latest innovations, is very important to a successful diabetes treatment program.

We believe that CMS should approach the topic of diabetes equipment and supplies very carefully, thoughtfully and perhaps incrementally. If these products are subjected to competitive bidding, we recommend that CMS consider these products under its proposal to "phase in some individual product categories in a limited number of competitive bidding areas in order to test and learn about their suitability for competitive bidding". In fact, **since diabetes equipment and supplies were not included in the two Medicare competitive bidding demonstration projects, we recommend that any competitive bidding for diabetes supplies and equipment be limited to no more than one competitive bidding area, at least during the first round of bidding.** We note, too, that in selecting suppliers to contract with Medicare, CMS would need to take special care to ensure that beneficiaries throughout a competitive bidding area would continue to have convenient geographical access to the many distribution channels available for diabetes supplies today.

## KEY COMMENTS AND RECOMMENDATIONS
With the above background in mind, below is our list of key comments and recommendations on the various elements of the proposed rule.

- We strongly support phasing in "some individual product categories in a limited number of competitive bidding areas in order to test and learn about their suitability for competitive bidding" (as discussed in the proposed rule). If CMS decides to subject diabetes equipment and supplies to competitive bidding, it should begin by doing so in no more than one MSA due to the fact that these products were not included in the demonstration projects.
- CMS must assure a reasonable geographic distribution of contract suppliers for DMEPOS products typically obtained by beneficiaries at a nearby retail outlet rather than delivered to their home.
- CMS must assure beneficiaries have reasonable access to a sufficient range of products within a HCPCS code to ensure individual requirements are met.
- CMS must recognize that blood glucose meters and test strips are an integrated system; if subjected to competitive bidding, these products must be included in the same product category.
- We strongly oppose basing the single payment amount on the median of winning bids. No contract supplier should be paid less than their bid amount.
- We strongly oppose requiring beneficiaries to use mail order for replacement supplies and also question a separate national or regional mail order program.
- CMS must adopt special policies in order to allow a manufacturer to serve as a contract supplier.
- CMS policies should require suppliers to inform the relevant DMEPOS manufacturer of any problem with the equipment or supplies so that the manufacturer can make the FDA-required reports and take any other appropriate action.
- CMS must assure that the physician authorization process is as simple as possible, especially during the first few rounds of competitive bidding.

## SPECIFIC COMMENTS & RECOMMENDATIONS TO THE PROPOSED RULE
Following is our detailed comments and recommendations to the proposed rule labeled with the captions recommended by CMS.

### Payment Basis (proposed §414.408)
CMS is proposing to update the single payment amount set under the competitive bidding process in subsequent years of the contract cycle by the percentage increase in the CPI-U for the 12 month period ending with June of the preceding calendar year. We strongly support this approach. We believe that it will help facilitate the bidding process and provide a reasonable and efficient means for adjusting Medicare payment amounts during each contract cycle.

4743

4

The proposed rule describes a potential grandfathering process for certain rental agreements. However, we believe that other important transition policies would be needed if certain diabetes supplies and equipment are subjected to competitive bidding in one or more areas. A large number of Medicare beneficiaries are already using glucose monitoring systems (that is, blood glucose meters and compatible test strips), and they may well have been using these items for a long period of time. Unfortunately, it seems quite possible that competitive bidding could force some, many or even most beneficiaries in an area to switch to a glucose monitoring system other than the one they are currently using. This would occur, for example, if contract suppliers offered only one brand of glucose monitoring system—or even several brands—not now commonly used by Medicare beneficiaries. Remember, too, that a beneficiary must have access to both a particular meter and the test strips designed for that specific meter; being allowed access to one without the other would be meaningless.

A sudden forced switching of glucose monitoring systems by large numbers of Medicare beneficiaries in an MSA could have a very disruptive effect not only on beneficiaries, but also on the physicians and diabetes educators who care for them. It could reduce beneficiary compliance with the testing regimen recommended by their physician and lead to a wide range of adverse outcomes. Such forced switching could also have cost implications for the Medicare program if it resulted in substantial numbers of claims for new glucose monitoring systems, a problem that could repeat itself in subsequent rounds of competitive bidding in a given area. **Note, for example, that Medicare now generally covers a new glucose meter only once every 5 years, but could find itself paying for new meters every three years under competitive bidding (the presumed length of supplier contracts), if contract suppliers elected to offer different brands of glucose monitoring systems during different contract cycles.**

Later in these comments, we offer several suggestions for minimizing the risk of such forced switching. However, even if all our suggestions were accepted, it might still not guarantee that some beneficiaries would not be forced to switch at some point. **We, therefore, urge CMS to adopt a transition policy under which beneficiaries now using a specific brand of DMEPOS could continue to have access to the supplies that are compatible with that specific brand for a period of six months following the start of a DMEPOS competitive bidding program in an area.** In the case of diabetic equipment and supplies, this would mean allowing beneficiary access to the test strips that are compatible with their current brand of glucose meter. Among other things, this transition policy would provide time for beneficiaries to consult with their physician or diabetes educator to assess the appropriateness of switching to another brand of glucose meter or the need for executing a physician authorization providing for more permanent access to a specific brand of DMEPOS. This transition policy could be implemented in a variety of ways. One option would be simply to require contract suppliers to comply with such a transition policy. In other words, they would agree to provide glucose test strips for the brands of meters now used by Medicare beneficiaries (and even a replacement meter, if necessary), even if such suppliers did not plan to offer that brand of test strips (and compatible meter) on a longer-term basis. Another option would be to give beneficiaries a six-month "grace period" during which they could continue to obtain replacement items from any qualified supplier.

In fact, given the potential disruptive effect if competitive bidding is implemented on a date certain in a large metropolitan area, we would encourage CMS to provide a **"grace or transition period"** of at least 90 days during which beneficiaries could obtain DMEPOS subject to competitive bidding from non-contract suppliers with these suppliers paid under the applicable fee schedule (or perhaps the single payment amount). When beneficiaries obtain DMEPOS in this way, they could be given educational materials explaining the new program, listing the contract suppliers available in their area and other important information. Expecting a sudden transformation in the DMEPOS marketplace to go smoothly is simply unrealistic, and recent experience with Medicare Part D shows us how difficult it is for beneficiaries to adjust to a new program without some kind of transition. We see nothing in the MMA that would preclude CMS from providing such a "grace or transition period."

**4744**

5

The proposed rule also addresses various beneficiary travel scenarios. However, we believe it is unrealistic for CMS to expect a beneficiary traveling into a competitive bidding area to be able to know which DMEPOS items are subject to competitive bidding in that area, identify and locate contract suppliers for that item, and determine which contract suppliers in the area might be offering the specific brand used by the beneficiary (since contract suppliers may well offer different brands). For example, a beneficiary might require replacement test strips that are compatible with their specific brand of glucose meter (which could even be a meter obtained from a contract supplier in the area where the beneficiary maintains a permanent residence). Perhaps they forgot to pack their test strips, or the test strips they brought were misplaced or damaged during the trip. How could CMS possibly assure that such a beneficiary would not have significant difficulties in obtaining the replacement items they need? We do not believe that it could. **We, therefore, conclude that CMS should allow beneficiaries who travel to obtain replacement supplies from any supplier, not just contract suppliers in a competitive bidding area.**

In the proposed rule, CMS also announces its intent to use its statutory authority to adjust DMEPOS payments in areas not subject to competitive bidding based on its experience under competitive bidding. CMS notes that it has "not yet developed a detailed methodology" for using this authority, and invites comments on this issue. To begin with, we strongly believe that <u>before</u> deciding whether and how it will apply the competitive bidding experience to DMEPOS payments in other areas of the country, CMS should fully assess the impact of competitive bidding on beneficiary access and quality within the designated MSA. Then, once CMS is in a position to develop a detailed methodology for applying the special authority, the agency should publish its proposed methodology for public comment as part of a future rule-making exercise. Since the authority in question is not effective until January 1, 2009 at the earliest, there is plenty of time for CMS to do this. This is an extremely important issue with potentially far-reaching consequences for all stakeholders, including beneficiaries, suppliers, and DMEPOS manufacturers, and it would not be appropriate to implement this special authority merely through manual instructions, especially since the policy in question is likely to easily satisfy the definition of a major rule.

## Competitive Bidding Areas (proposed §414.410)

We strongly disagree with CMS' proposal to adopt competitive bidding areas in 2007 and 2009 that go beyond MSA boundaries. We do not believe this would be compatible with the plain meaning of <u>in</u> an MSA. On the other hand, we do agree with CMS' view that it could adopt competitive bidding areas <u>smaller than</u> an MSA. In fact, we would encourage the agency to take advantage of this option to minimize the risk of adverse outcomes from DMEPOS competitive bidding, especially for products not included in the two Medicare demonstration projects, by limiting the area subject to competitive bidding. This approach might also provide a way for minimizing the complications when a selected MSA crosses state (or even DMERC) lines by restricting competitive bidding to the portion of the MSA that lies within a single state or the service area of a single DMERC. It would also have the added advantage of facilitating implementation of the new program, especially in 2007. Moreover, we believe that it would help increase the likelihood of a successful roll-out of the new competitive bidding program.

In terms of the proposed mail order competitive bidding program, **we strongly oppose the idea of <u>requiring</u> beneficiaries to use mail order for replacement supplies.** We believe this would be anticompetitive, effectively precluding other suppliers, such as retailers and independent pharmacies, from continuing to provide these products to Medicare beneficiaries, and would, therefore, have very serious business implications for the affected suppliers. We note, too, that during the May 22-23, 2006, meeting of the Program Advisory and Oversight Committee (PAOC), CMS staff did not mention that this was one of the options under consideration, and instead emphasized that the agency was <u>not</u> planning to require beneficiaries to use mail order. In addition, we do not see how beneficiaries could be required to use mail order for <u>replacement</u> supplies unless the contract mail order suppliers were at the same time required to offer <u>all</u> <u>brands</u> of such replacement supplies that beneficiaries around the country might need.

4745

6

Otherwise, a beneficiary might obtain a glucose meter from a supplier, even a contract supplier in one of the many competitive bidding areas scattered across the country, and then be unable to obtain compatible replacement test strips from the contract mail order supplier. Finally, while some beneficiaries may consider mail order the best option for them, other beneficiaries may do better with the kind of support that can only be provided by a face-to-face encounter with a pharmacist or other supplier. In sum, we urge CMS to preserve beneficiary access to mail-order and all other current distribution outlets, instead of forcing all beneficiaries to use only mail order (or any other single type of distribution outlet) for certain products or under certain circumstances.

Beginning in 2010, CMS is proposing to phase in a national or regional mail order competitive bidding program for certain items. We urge CMS to proceed cautiously in this regard. Since CMS will also have implemented competitive bidding in 80 MSAs by that point with more MSAs expected to be added after 2009, we believe there is a serious risk of confusion if a regional or national mail order competitive bidding program is overlaid on top of the regular competitive bidding program. In addition, since mail order firms will be permitted to bid during the early rounds of the competitive bidding program, it is not clear how a separate mail order program be made compatible with what has already occurred. For example, some mail order firms may have been selected as contract suppliers during the early rounds of the competitive bidding program, while other mail order firms were not selected or chose not to bid. Mail order firms selected during Rounds 1 and 2 for specific MSAs could end up being supplanted by other mail order firms choosing to bid on a regional or national basis. To the extent that CMS is planning to extend the competitive bidding program beyond the 100 MSAs already envisioned, the agency should simply continue to allow mail order firms to compete on the same basis as other suppliers. In short, **we question the whole notion of a separate competitive bidding program for mail order firms as opposed to a program under which mail order firms are allowed to compete fairly against other suppliers.**

### Criteria for Item Selection

The proposed rule notes that CMS "may elect to phase in some individual product categories in a limited number of competitive bidding areas in order to test and learn about their suitability for competitive bidding." As noted earlier, we strongly support this approach, especially with respect to DMEPOS products and supplies, such as glucose monitoring equipment, not included in the two Medicare demonstration projects. In fact, as we understand it, CMS expressly decided not to include glucose monitoring equipment in the Medicare demonstration projects, and we believe those demonstrations provide relatively limited information about how competitive bidding would work for products typically obtained at a wide range of retail outlets (as opposed to products delivered to the patient's home).

Among other things, the concept of phasing in some product categories would allow CMS to gain experience with different product distribution channels (for example, DMEPOS typically obtained by a beneficiary at a local retail outlet compared to products typically delivered to the patient's home). This approach would also simplify implementation during the early rounds of competitive bidding and minimize the risk of adverse beneficiary outcomes. We cannot emphasize enough how important we believe it is for CMS to avail itself of every possible means for proceeding cautiously as it implements the new competitive bidding program. Phasing in certain product categories will help CMS identify issues and make refinements prior to subjecting a large number of Medicare beneficiaries to a new system. As noted earlier, we recommend that any competitive bidding for diabetes equipment and supplies be restricted to a single competitive bidding area, at least during the first round of the bidding process.

As acknowledged in the proposed rule, the MMA gives CMS the authority to "exempt items for which the application of competitive bidding is not likely to result in significant savings." In terms of diabetes equipment and supplies, we believe that the history of Medicare DME fee schedule changes for these products since 1998 (described in more detail below) raises serious questions about whether competitive acquisition could achieve such "significant savings" because the Medicare program has already implemented a number of cost saving methods in this area.

7

To begin with, the MMA froze payments for glucose meters, test strips and lancets for 2004. It also mandated payment reductions for test strips and lancets for 2005 of 4.1 percent and up to 5.3 percent, respectively. The MMA also specifies a continuing payment freeze for glucose meters, test strips and lancets for the years 2006, 2007 and 2008. Payments for glucose meters, test strips and lancets were previously frozen in 1998, 1999, and 2000, and again in 2002. In sum, for the period 1998 to 2006, payments for glucose monitors, test strips and lancets were either frozen or reduced in 7 of these 9 years. Yet, while from January 1998 to May 2006, the consumer price index for all urban consumers (U.S. urban average) rose by almost 25 percent. This history causes us to question the feasibility of achieving significant additional Medicare savings through competitive acquisition without compromising Medicare beneficiary access or quality.

### Submission of Bids Under the Competitive Bidding Program (proposed §414.412)

We are concerned that CMS may not allow a sufficient amount of lead time for DMEPOS suppliers to submit bids. We believe that considerable advance notice will be required to permit suppliers in designated competitive bidding areas to negotiate with DMEPOS manufacturers, and fully assess the cost implications of new DMEPOS supplier quality standards and the related accreditation process (including the specific fees that the accrediting bodies yet to be selected by CMS will be charging for their accreditation services). We believe, for example, that it would be unrealistic for CMS to issue requests for bid (RFBs) immediately following publication of the final rule and then give suppliers only a short period of time to develop and submit their bids. Even DMEPOS manufacturers not planning to serve as direct suppliers will need some time to adjust once CMS has actually announced the 10 MSAs selected for Round 1 of competitive bidding and the specific product categories that will be used in each of these MSAs. **We, therefore, recommend that RFBs not be issued until 60 to 90 days following publication of the final rule in order to give suppliers and other stakeholders time to review the rule and understand its implications without also having to simultaneously deal with the RFBs. We also urge CMS to give suppliers in designated competitive bidding areas at least 90 days to submit their bids following release of the RFBs for Round 1.**

Moreover, ideally, suppliers would not have to submit bids until they have been accredited as meeting the new supplier quality standards and can therefore be certain they have built into their bids all the costs of complying with those standards. As we understand it, during the recent PAOC meeting, a representative of one of the major accrediting organizations in the country said that it would take 3 to 6 months for suppliers in the designated competitive bidding areas to be accredited once CMS has selected the accrediting organization(s). In any case, as we will emphasize again later in our comments on the single payment amount, **if supplier bidding ends up preceding supplier accreditation, then CMS must ensure that only the bids of accredited suppliers end up being used in calculating the single payment amounts for DMEPOS items under the competitive bidding program.**

The proposed rule does not propose specific product categories but assumes that interested bidders would be required to submit bids on all items included in a product category. However, for some DMEPOS, manufacturers are now serving as direct suppliers. In fact, for some products (for example, insulin pumps), manufacturers may now be the principal source of the product. Medicare supplier and claims data should help CMS assess this. For other DMEPOS products, manufacturers might wish to begin serving as direct suppliers under competitive bidding. However, manufacturers of specialized equipment might obviously not be in a position to bid on every item included in a product category, especially if CMS decides to create very large categories. This creates a problem. CMS could attempt to carefully design product categories to avoid shutting out manufacturers or it could adopt special rules for manufacturers wishing to bid. Of course, the latter would also require adjustments to the methodology for calculating composite bids (or their equivalent) if a manufacturer were not required to bid on every item in a product category. We have no definitive solution to suggest at this time but **we do believe it would be a mistake for CMS to exclude manufacturers from competitive bidding—and even seriously**

8

disrupt the existing marketplace for certain products. In this regard, we also wish to note that a bidding manufacturer would obviously only be in a position to offer their own brands of DMEPOS, but we again do not believe that this should automatically exclude them from the opportunity to bid and serve Medicare beneficiaries.

**If CMS elects to subject elements of the diabetes supplies and equipment policy group to competitive bidding, we urge the agency to recognize that blood glucose monitors and test strips function as a system (a specific brand of test strip is only compatible with a specific brand or very closely related brands of glucose monitors). This means that both components of the system should either be excluded from competitive bidding in an area or both components included in the same product category.** In fact, if CMS decides to implement competitive bidding for blood glucose monitoring equipment, we believe that a reasonable product category would include the basic code for blood glucose monitors (E0607), the code for test strips (A4253), the code for control solutions (A4256), the code for lancets (A4259), and the code for lancing devices (A4258).

**Conditions for Awarding Contracts (proposed §414.414)**
The proposed rule notes that individual products subject to competitive bidding will be identified by HCPCS codes and "will be further described in the RFB." However, no details are provided to explain what such further description might entail. Such further description of products in the RFBs would provide a means for assuring continued beneficiary access to a range of products now reported by a single HCPCS code. For example, for any single HCPCS code, CMS could specify product features that would need to be included among the brands offered by a contract supplier, or specify a minimum number of different brands that would need to be available to Medicare beneficiaries. In the context of blood glucose meters, this is important because nearly all meters are reported by the same HCPCS code (E0607), although they have different handling properties, different display readabilities (e.g., Spanish displays), and different data managing capabilities (which may, in some cases, provide clinical advantages), and any one of these differences can be extremely important to the individual patient. A "least common denominator" meter is not likely to meet everyone's needs. Failing to recognize differences between products could also have the unintended consequence of stifling innovation aimed at improving this category of products.

As part of its "further description" of products, CMS could also specify the need to offer those that carry adequate warranties (which are typically offered by manufacturers, not suppliers). For some DMEPOS products, it could specify the need to offer products that are backed up by manufacturer-run patient support systems (for example 24-7 toll-free lines that accommodate the principal languages spoken by Medicare beneficiaries living in a competitive bidding area), especially for products where this is the common (but not necessarily universal) practice today.

Companies such as LifeScan provide such patient support systems, but CMS should not assume that all manufacturers of diabetes equipment and supplies do so or will continue to do so. In fact, it seems quite possible that contract suppliers could end up offering DMEPOS products lacking the most advanced features or the current level of patient support in order to bid low (or to maximize their profits after they are selected as contract suppliers). We realize that the supplier quality standards may address some of these concerns. However, we urge CMS to recognize that not all products reported with a single HCPCS code today are equivalent in quality, and so a competitive bidding system that does not further specify the expected quality of deliverables risks creating a two-tiered system, under which Medicare beneficiaries in competitive bidding areas have access to only a small subset of the products available to beneficiaries in areas not subject to competitive bidding, and those products may lack important features as compared to the other products in the marketplace.

To the extent that supplier decisions about product offerings would force beneficiaries to switch from the DMEPOS products they now use to other brands, bidding suppliers should be required

**4748**

9

to include a plan for educating patients about the use of the new product so that the potentially negative consequences of a forced switch are minimized.

CMS proposes to have bidding suppliers indicate how many units of each product they would be able to offer in a competitive bidding area. However, it is not clear how CMS plans to verify whether these supply estimates are reasonable. For example, the ability to offer a product must specifically include the ability to support the volume of product offered (for example, patient counseling, training, handling patient calls in a timely fashion, working with prescribing physicians, etc.). CMS also needs to understand that, at least for some DMEPOS products, the supply might not be completely within the control of the bidder. For example, if a supplier's promised capacity and bid price assumes that a store brand or a product that now comprises a tiny share of the marketplace will be the only one offered under one of the HCPCS codes in a product category, how will CMS assess whether the <u>manufacturer</u> of that particular product will be capable of increasing supply fast enough to meet beneficiary needs for that item?

In the proposed rule, CMS promises to match supply and demand in selecting the number of winning suppliers. However, **no mention is made anywhere of the need to assure that winning suppliers will be geographically distributed across the entire competitive bidding area,** rather than concentrated in one portion of the area. While this may be less of a concern in the case of DMEPOS products typically delivered to a beneficiary's home, it is a major issue when the products are typically obtained by the beneficiary from a retail outlet. Today, beneficiaries most likely obtain such products from a retailer near their home. Although the proposed rule generally requires contract suppliers to serve an entire competitive bidding area, in the case of retail outlets, a beneficiary must first travel to a specific retailer to request service. We acknowledge that it will be very difficult to assure a reasonable geographic distribution of contract suppliers, since this will require an intimate knowledge of the marketplace in each competitive bidding area. However, without great care, the competitive bidding program could end up disadvantaging lower-income beneficiaries living in rural or inner city areas, minorities, or other vulnerable subsets of beneficiaries. And in the case of diabetes equipment and supplies, these might be the very population subsets with high rates of diabetes and most in need of unimpeded access to blood glucose monitoring equipment. In fact, CMS might find it necessary to select suppliers with bids above the pivotal bid (or its equivalent) in order to assure full coverage of an area.

We note Congressional sensitivity to this very issue in Medicare Part D, where prescription drug plans are expected to have a network of pharmacies that ensures "convenient access" and TRICARE standards are used as a model for assessing this. For example, under Medicare Part D, at least 90 percent of Medicare beneficiaries living in urban areas and served by a particular Part D plan, on average, must live within 2 miles of a network pharmacy. We recommend that Medicare's DMEPOS competitive bidding program be designed to assure a similar level of "convenient access," at least for diabetes supplies.

Other negative outcomes are also possible in selecting contract suppliers under the proposed methodology. We believe it would be anti-competitive, for example, for CMS to select a single chain of drug stores (with multiple locations) to serve a competitive bidding area. While this would technically satisfy the requirement to select at least two suppliers for an area, this "two" would in reality represent a single corporate entity. CMS has shown sensitivity to the notion of market concentration by proposing to restrict the size of the marketplace that a supplier network could represent, but this same issue could arise outside of the network context.

<u>**Determining Single Payment Amounts for Individual Items (proposed §414.416)**</u>
CMS is leaning in favor of setting the single payment amount for a HCPCS code at the median of the bids at or below the pivotal bid for the code. **We strongly oppose this.** To begin with, the proposed methodology does not propose to "weight" the bids by the amount of product being promised by the bidding supplier. Thus, the bid from a supplier proposing to provide 100 units would be treated the same as a bid from a supplier proposing to provide 100,000 units. This

10

could end up meaning that the single payment amount would be below—perhaps substantially below—the amount bid by the suppliers with the capacity to serve the bulk of the competitive bidding area.

Second, as noted earlier in these comments, CMS must only use the bids of accredited suppliers in calculating the single payment amount, and so if supplier bidding precedes supplier accreditation, then CMS will have to determine whether presumptive "winning" bidders have subsequently been accredited and thereby qualify to have their bid used in the payment calculation. Otherwise, the bid of an unaccredited supplier could inappropriately bias the calculation of the single payment amount (for example, that bid might be unduly low simply because the supplier had not taken into account all the costs involved in meeting quality standards).

Third, as CMS acknowledges, the Medicare DMEPOS competitive bidding demonstration projects did not base payment on the median of winning bids, but an adjustment factor was applied in order to minimize having the payments set below the prices bid by winning suppliers. As a result, CMS does not have experience using the median of winning bids in a competitive bidding program, and it is hard to predict what impact this approach would have. We believe that the same kind of payment adjustment used in the demonstration projects or another equivalent approach should be used to help assure that winning bidders actually win. For example, perhaps CMS could set the single payment amount at the 90th percentile of winning bids or no lower than 5 percent below the highest winning bid. If the median is used as proposed, some winning bidders may be forced to reduce beneficiary access, product quality and beneficiary service in order to live within the single payment amount.

CMS is proposing to allow contract suppliers with bids below the single payment amount to offer rebates to beneficiaries equal to the difference between their actual bid and the single payment amount. We join the members of the PAOC in believing that such rebates could lead to fraudulent and abusive practices by both contract and non-contract suppliers. We urge CMS to reconsider this proposal.

### Terms of Contracts (proposed §414.422)
The proposed rule mentions a non-discrimination contract provision, which is intended to assure "that all beneficiaries inside and outside of a competitive bidding area receive the same products that the contract supplier would provide to other customers." Unfortunately, the proposed rule provides very little detail about what would be expected or how CMS would assure that the provision was being met. It is not clear, for example, whether this contract provision relates to the range of products reported by a single HCPCS code. However, contract suppliers may be inclined to offer fewer choices of product within a particular HCPCS code under the Medicare competitive bidding program than they offer to other customers. The final rule needs to discuss this issue in more detail so that suppliers and beneficiaries will be able to understand what CMS has in mind, and know what protections are being afforded to beneficiaries by the non-discrimination provision.

We note, too, that the draft bidding sheet (Form B) asks bidding suppliers to list the models of DMEPOS products for each HCPCS code, but there appears to be considerable uncertainty, both inside and outside of CMS, about what this information is intended to imply and how it will be used by CMS in evaluating bids. For example, by listing a specific brand, would the bidding supplier be making a commitment to offer that brand throughout the contract period? Will CMS be using the information to determine whether a bidding supplier is planning to offer an adequate range of brands or choices for each HCPCS code? If so, how does CMS propose to do this? Would the model information submitted by bidding suppliers serve as a means for making an "up front" assessment of whether a supplier would be likely to satisfy the proposed non-discrimination contract term? Would a bidder later be able to add new brands (for example, new products on the market) or would Medicare beneficiaries be denied access to products brought to market after bids were submitted or awarded (for the full period of the Medicare supplier contract)? We doubt

**4750**

11

this is what CMS intends and urge CMS to explain the purpose of requesting such brand information.

The proposed rule also proposes to place the burden of repairing or replacing patient-owned items subject to competitive bidding on contract suppliers. In doing so, however, we believe that CMS may misunderstand what happens today and the respective roles of suppliers and product manufacturers in the process. For products such as glucose monitors, for example, it is a manufacturer warranty that applies, not a guarantee on the part of the supplier. More importantly, FDA regulations require manufacturers, not suppliers, to evaluate product complaints and inform the agency, as required under the Medical Device Reporting regulations (21 CFR 820.198 and CFR 803), in cases where problems are considered to be "reportable" events. CMS policies on item repair (and/or supplier quality standards) could, therefore, become an obstacle to manufacturer discharge of these regulatory obligations. **CMS policies should instead require suppliers to inform the relevant DMEPOS manufacturer of any problem with the equipment or supplies, including any adverse effects involving Medicare beneficiaries, so that the manufacturer will be in a position to address the problem, report to the FDA, or take other corrective action if needed.** In addition, CMS policies should in no way imply that a product warranty is the supplier's legal obligation as opposed to that of the product manufacturer.

## Opportunity for Participation by Small Suppliers
The MMA requires the Secretary to take appropriate steps to ensure that small suppliers of items and services have an opportunity to be considered for participation in the DMEPOS competitive bidding program. In our view, the proposed rule has not gone far enough in this regard. CMS has proposed a definition of "smallness" that includes roughly 90 percent of all suppliers. We doubt that Congress intended to mandate special procedures for nearly all suppliers, as opposed to a smaller subset of suppliers. In addition, while nearly all suppliers may meet the Small Business Administration's definition of a small business, this masks a wide range of "smallness."

We urge CMS to provide a fairer and more balanced commercial climate for small suppliers. One option would be to permit truly small suppliers (perhaps defined by the number of full time equivalent employees in the firm, or by total revenues substantially below the SBA cut-off for a small business) to serve less than the full competitive bidding area. Another option would be to permit truly small suppliers to send in a modified "bid" that simply promises to accept the single payment amount or even to be deemed as having submitted such a bid, rather than requiring them to submit a complete bid. This approach would have the added advantage of preventing the bids of very small suppliers from having an undue (and inappropriate) impact on the calculation of the single payment amount in a competitive bidding area. In addition, special treatment for truly small suppliers is likely to have a positive impact on beneficiary access, since smaller suppliers are more likely to be serving less populated areas of a competitive bidding area and located closer to the homes of beneficiaries living in these less populated areas than other contract suppliers.

## Opportunity for Networks (proposed §414.418)
CMS is proposing to allow suppliers to form networks for bidding purposes, and sees this as one of its special accommodations for small suppliers. However, a very similar option offered to suppliers during the Medicare demonstration projects went unclaimed. We anticipate a similar outcome here. The proposed network option appears to be very complicated in design and it seems rather unlikely that a group of interested suppliers would be able to create a network in time to submit bids.

## Education and Outreach
The proposed rule provides relatively little information about CMS' plans to educate beneficiaries about the competitive bidding program. We believe that this issue should be discussed in more detail in the final rule. **We believe that CMS may underestimate the difficulty of such an education program, given the range of products that might be subjected to competitive bidding, the large number of suppliers now serving Medicare beneficiaries (including**

4751

12

essentially every local pharmacy), the range of items (and brands) covered by many HCPCS codes for DMEPOS and the diversity of features offered by these products. In addition, there are the further complications that arise when beneficiaries travel. According to the proposed rule, traveling beneficiaries will have to determine whether the area they are visiting is a competitive bidding area, which DMEPOS are subject to competitive bidding in that area, where the contract suppliers are located, and which brands each of these contract suppliers has chosen to offer for purposes of the competitive bidding program. In effect, a beneficiary coming from a non-competitive bidding area and using a specific brand of glucose meter could either find it extremely difficult—or even impossible—to locate replacement test strips for that brand if glucose testing equipment were subject to competitive bidding in the area they were visiting.

Moreover, since the beneficiary would be visiting and perhaps far from their usual source of medical care, even a physician authorization might be difficult to execute. We again urge CMS to consider allowing beneficiaries who travel to a competitive bidding area to obtain replacement supplies from any supplier, not just contract suppliers, in that area. This would greatly simplify the beneficiary education process.

## Monitoring and Complaint Services for the Competitive Bidding Program
The proposed rule provides no specifics about the proposed complaint monitoring system (for example, how the system will work or where it will be housed). The final rule needs to provide more information about this system. In addition, we urge CMS to assure that ombudsmen are designated for each competitive bidding area and that they play an important role in addressing and resolving beneficiary complaints. The proposed rule appears to suggest that CMS has not yet firmly decided whether to create an ombudsman program for the DMEPOS competitive bidding program. We believe that ombudsmen are absolutely essential to protect Medicare beneficiaries and that experience during the Medicare competitive bidding demonstration projects confirms this.

## Physician Authorization/Treating Practitioner (proposed §414.420)
CMS is proposing to implement a physician authorization mechanism under which a physician or treating practitioner would be able to indicate that a specific brand of DMEPOS is necessary to avoid an adverse medical outcome (that is, when a range of products are described by a single HCPCS code and the specific brand in question is not otherwise available from contract suppliers).

We urge CMS to keep the physician authorization process as simple as possible, especially during the early rounds of the competitive bidding program. A "dispense as written" approach or simply documentation in the medical record should suffice. In addition, the issue or definition of adverse outcome will vary from one category of DMEPOS to another and may not be amenable to a "one size fits all" policy. For example, in the case of glucose monitoring equipment, specific features of a glucose meter and/or the test strips compatible with that meter may be essential in facilitating patient compliance with the physician-recommended testing regimen. Thus, different patients may require different products (all currently reported under the same HCPCS code) to meet their needs. A beneficiary forced to switch to another brand of meter or to use a meter with limited functionality might simply choose to test less frequently or not to test at all, which could adversely affect his or her glucose control. In this case, while the adverse outcome might not be immediate, it is well understood that poorly managed diabetes may ultimately lead to adverse outcomes that could have been prevented or ameliorated.

In sum, to the extent that CMS attempts to define the term "adverse outcome," we urge the agency to recognize that the term has different implications for different categories of DMEPOS. For example, since blood glucose monitoring is not a treatment per se, the concept of adverse outcomes in the case of such equipment is far different from that for other DMEPOS used for treatment purposes, such as TENS devices, infusion pumps, and nebulizers. Given all of this, we

4752

13

believe that Medicare beneficiaries would be better served if CMS did not attempt to "second guess" physicians on the issue of adverse outcome, especially during the early rounds of the competitive bidding program.

**We recommend, instead, that CMS monitor the use of physician authorizations, determine the reasons for their use (for example, perhaps because contract suppliers are only offering products with less advanced features that will not adequately meet their patients' needs), and assess the need for potential changes in the competitive bidding program, not solely in the physician authorization process, based on this experience.** Ideally, the competitive bidding program will be designed and implemented in a way that minimizes the need for physician authorizations, especially since such authorizations are a very inefficient means for assuring beneficiary access and quality.

In implementing the physician authorization process, CMS also needs to be mindful of the fact that certain DMEPOS products, such as replacement test strips for a particular brand of glucose meter, will be needed on a regular basis. To the extent that a physician determines that a patient should use (or continue to use) a specific brand of glucose meter, CMS should not require a physician authorization each time a beneficiary must obtain replacement test strips for such meter. Instead, if a physician authorization is required for replacement test strips, one such authorization no more frequently than every six months should be all that is required. Otherwise, the physician authorization process would become extremely burdensome for products requiring frequent replacement supplies and thereby impose a significant barrier to beneficiary access. Under not too dissimilar circumstances now, when a particular beneficiary requires, for example, more than 100 glucose test strips per month, the ordering physician must document in the patient's medical record the need for a frequency of testing that exceeds the utilization guidelines, and new documentation must be present at least every six months, not every time the patient requires a new supply of test strips. A similar documentation requirement could be used to implement the physician authorization mechanism under DMEPOS competitive bidding.

### Gap-filling (proposed §414.210(g))
LifeScan is extremely concerned about the proposed new functional technology assessment methodology for gap-filling. While CMS notes that this new methodology would involve a functional assessment, a price comparison analysis, and a medical benefit assessment, the proposed rule does not provide much detail about exactly how this would be done, what data would be used, what role product manufacturers and other stakeholders would have in the process, and how the process would be made reasonably transparent. As it stands, we view the proposed functional assessment as a kind of "black box" and this makes it difficult for us to offer thoughtful comments. **We urge CMS to eliminate this provision from the final rule and use a separate rule-making process to request comments on a more fully-developed proposal, one that includes specific examples of how this kind of assessment would be done with appropriate input from stakeholders.**

### Regulatory Impact Analysis
The proposed rule does not provide estimates of the full costs of administering the competitive bidding program. We believe these costs will be quite significant, especially if the program is managed in a way designed to minimize adverse outcomes for beneficiaries, such as those that would arise from access barriers and reductions in quality.

We also urge CMS to take into account the potential impact of the competitive bidding program on other Medicare expenditures. We fear, for example, that savings from competitive bidding could simply translate into increased Medicare expenditures for other services, such as emergency department visits and hospital admissions, especially if competitive bidding ends up reducing beneficiary access to high quality DMEPOS. Although not directly addressing DMEPOS competitive bidding, a report published in the June 1, 2006 issue of the *New England Journal of Medicine* by Hsu et al. indicates how a cost-savings intervention (a cap on annual drug benefits)

**4753**

14

can increase Medicare expenditures for services such as emergency department visits and non-elective hospitalizations, and even increase beneficiary deaths.

**Fee Schedule Updates for Class III Devices**

The background section of the proposed rule requests comments on the appropriate Medicare fee schedule percentage change for Class III durable medical equipment for 2007 and 2008. CMS plans to consider these comments along with recommendations made by the Government Accountability Office (GAO) in a March 2006 report.

We believe that the GAO report has some serious flaws and is misleading. Rather than recommend a specific update factor for Class III devices, the report simply says that future updates should be "the same" or "uniform" for both Class III and Class II devices. In addition, the report compares unfavorably to the standard payment adequacy assessments and payment update recommendations found each year in the March report of the Medicare Payment Advisory Commission (MedPAC). For example, in its March 2006 report, MedPAC assesses the adequacy of Medicare payments for hospital inpatient and outpatient services, physician services, outpatient dialysis services, skilled nursing facility services, home health services, long-term care hospital services and inpatient rehabilitation facility services. Following each detailed assessment, MedPAC then recommends an update policy for each provider category for the coming year. The GAO report never justifies its alternative assessment methodology or its failure to take into account changes over time in manufacturer costs for Class III devices.

In short, we urge CMS not to rely on the GAO report in reaching a decision about the appropriate update factor for Class III devices for 2007. Until a more thorough assessment of the issue can be completed, we recommend that the update for Class III devices continue to be based on changes in CPI-U.

We welcome the opportunity to comment on the proposed rule and we hope these comments will help CMS craft a final rule that will assure continued beneficiary access and quality.

Sincerely,

Eric P. Milledge
Company Group Chairman

**4754**

EXHIBIT 2

CMS-1270-P-1194

| | | |
|---|---|---|
| **Submitter :** | **Ms. Sandra Rindt** | Date: 06/30/2006 |
| **Organization :** | **R** | |
| **Category :** | **Health Care Professional or Association** | |

**Issue Areas/Comments**

**Administrative or Judicial Review**

Administrative or Judicial Review

We are asking for clarification of the last words in this section this Rule . It is unclear at what level reviews will be denied. We strongly disagree with the inability to tell our story. Removing administrative or judicial review takes away our freedom of speech which is clearly unconstitutional under the Equal Protection law.

**Opportunity for Networks**

Opportunity for Networks

Why do you limit a network to have 20% of the Medicare market within a competitive bidding area yet a single large company can have 80% of the Medicare market share? The statement that each member of the network must be independently eligible to bid defeats the entire purpose of networking. If we had the ability to service the entire MSA we would not rely on networking. We strongly disagree with the primary legal entity being responsible for billing Medicare and receiving and distributing payment. Why must we adjust our entire billing process if we want to network and participate in competitive bidding? We want to be responsible for our own financials. We strongly suggest that if CMS needs to decrease cost then simply lower the allowables and monitor the compliance of the current 21 standards. This would simplify this very complex, cumbersome and unfair Competitive Bidding Proposal.

**Opportunity for Participation by**
**Small Suppliers**

Opportunity for Participation by Small Suppliers

We strongly disagree with using the SBA s definition of small business. This definition puts small businesses under the definition of $6 million in annual sales. This section clearly states that 90% of DMEPOS suppliers had Medicare allowed charges of less than $1 million in 2003. If you increase this number to include all payers it would still be much less than $3 million. This is a clear contradiction to the SBA s definition of small business. Small businesses will have to endure large expenses in order to participate in Medicare billing, with 90% of us having less than $1 million in Medicare allowed charges this will put many of us out of business. Is your purpose to wean out small business? You have rejected the carving out of areas for small businesses because it could lead to confusion for the beneficiary if faced with multiple competitive bidding sub-areas. The entire concept of competitive bidding will do just that. Our beneficiaries may have to go to three different locations to obtain oxygen, a hospital bed and a wheelchair. This will also cause a tremendous burden on our discharge planners trying to coordinate these services before discharge. The ultimate burden may lie on the hospital with extended inpatient days. You claim to recognize the importance that small business plays in this industry yet you only propose two ideas to protect us, multiple winners and separate bidding competitions for product categories. There needs to be much more emphasis to protect those who do less than 3 million in sales a year. Things such as: " Implementing partial SBA " Allowing the small business owner to continue to service their area by accepting the current bid without having to participate in the bidding process. " Recognize the tremendous cost involved in the accreditation process and preparing for competitive bidding. " Redefining small business definition to under 3 million You must remember that eliminating the small businesses will affect our country negatively with a rise in both unemployment and public side.

EXHIBIT 3



**U.S. SMALL BUSINESS ADMINISTRATION**
**WASHINGTON, D.C. 20416**

OFFICE OF THE ADMINISTRATOR

March 14, 2007

Mr. Laurence D. Wilson
Director, Chronic Care Policy Group
    Centers for Medicare and Medicaid Services
Department of Health and Human Services
7500 Security Boulevard
Baltimore, Maryland 21244

Dear Mr. Wilson:

Thank you for your letter of January 25, 2007, requesting approval of an alternative size standard for the Centers for Medicare and Medicaid Services' (CMS) Medicare Durable Medical Equipment, Prosthetics, Orthotics, and Supplies (DMEPOS) Competitive Bidding Program.

Specifically, for the purpose of this program, you request approval to adopt a size standard of $3.5 million in average annual receipts to define a small supplier. I approve your requested size standard of $3.5 million with two revisions to your draft final rule. First, as required by 13 CFR 121.903(a)(1)(ii), the final rule shall reference the U.S. Small Business Administration's (SBA) regulations describing the calculation of annual average receipts—13 CFR 121.104. This regulation calculates the receipts-size of a business based on an average of its last 3 completed fiscal years and includes the receipts of all affiliates. Second, the draft language should rephrase the reference to SBA from "As recommended by the SBA...." to "In coordination with SBA....."

I agree with the reasons you provided for requesting a $3.5 million size standard. On May 1, 2006, CMS proposed to adopt a $6 million size standard that SBA previously had established for the home health equipment and pharmacy industries. After your review of comments on the proposal and meetings with focus groups of small suppliers, you conclude that SBA's size standard captured more suppliers as small than intended for the Program. Under a $3.5 million size standard, a more reasonable proportion of suppliers qualify as small.

I am pleased to work with you in providing additional opportunities for small suppliers to participate in the DMEPOS Competitive Bidding Program. If you need additional information about small business size standards, please contact Gary M. Jackson, Assistant Administrator for the Office of Size Standards at (202) 205-6464.

Sincerely yours,

Steven C. Preston

Federal Recycling Program    Printed on Recycled Paper

EXHIBIT 4

**INSTRUCTIONS FOR COMPLETING BID FORMS FOR MEDICARE DMEPOS COMPETITIVE BIDDING PROGRAM**

**Eligibility and Submission Requirements**

All suppliers must be in good standing and have an active National Supplier Clearinghouse number (NSC#), meet any local or State licensure requirements, if any, for the item being bid, and be accredited by a Centers for Medicare & Medicaid Services (CMS) approved accreditation organization (or have pending accreditation) to be eligible to bid.

Each bidder must complete its bid online using the information collected on the Office of Management and Budget (OMB) approved forms (Form10169A – Application; Form 10169B – Bidding Sheet). Bid forms are due by 9:00 p.m. prevailing Eastern time on September 25 2007. (Hardcopy bid submission is available to those suppliers without access to a computerized system by calling the Competitive Bidding Implementation Contractor (CBIC) at (877) 577-5331.

### BID FORMS

### Form A

Form A needs to be completed for each Competitive Bidding Area (CBA). The listing of CBAs and the bidding forms are found at the following website:

http://www.cms.hhs.gov/competitiveacqfordmepos(1)_overview.asp?

Form A requests general information about an individual supplier with a single location, suppliers with common ownership and multiple locations, or networks, as well as financial information. A separate Form A, as well as separate financial statements for each entity, must be submitted every time a supplier submits a bid as a different bidder or entity. For example, if a supplier is bidding as an individual company and also as the primary supplier with a network, it will have to submit a separate Form A with each bid. If a supplier has multiple locations within the CBA, the supplier must complete all required information on Form A for each location. If a network is bidding, the primary supplier must complete and submit Form A for every member of the network for each location and they must complete all location specific questions for each location in the CBA. Location specific questions are the following: H; I; J; K;L; M;N; and O. If a supplier needs to resubmit a document, the entire package needs to be resubmitted.

### Form B

Form B contains the bidding sheets, which are product category specific. Bidders must complete a separate bidding sheet for each product category. Bidders must

1

record on the bidding sheet their bid prices and estimated capacity for the designated items as well as other product-category and item specific information.

**Bidding Process**

All information captured on the electronic bid forms is the same as the information outlined in the OMB approved Application and Bidding Forms. (Hardcopy applications are acceptable in those rare instances where a computerized system is unavailable. Hardcopy documents can be obtained by calling the CBIC at (877) 577-5331. Electronic forms must be submitted by 9:00 p.m. prevailing Eastern time on September 25, 2007. Hard copy documents must be postmarked by 9:00 p.m., September 25, 2007.

The CBIC will notify suppliers once their bids have been received.

1) The electronic bid Form A and Form B are accessed through the Competitive Bid Submission System (CBSS). The CBSS will show a private, unique home page for each bidder. Bidders can visit their individual home pages on the CBSS to check the completion status of their electronic bids.

2) CMS reserves the right to request any needed clarification or corrections to a submitted application or to the hardcopy documents. In those instances where we request clarification or corrections, we will do this uniformly.

3) Bidders can visit their individual CBSS home pages to check the status of the receipt of their hardcopy documents. It is the bidders' responsibility to ensure that they have submitted the complete package of all required hardcopy documents to the CBIC, depending on the type of supplier. The home page will show whether a package has been received. However, this does not mean that the package is necessarily accurate, completeness or meets CMS criteria.

4) The system will remain open for at least 15 days after the bidding window ends to allow bidders to check the completion status of their electronic bids and verify receipt of hardcopy documents by the CBIC.

5) The system will have an edit that will not allow suppliers to bid unless supplier accreditation status is pending or complete. The supplier accreditation status must be pending or complete at time of bidding. The accreditation organization must be approved by CMS. CMS cannot contract with suppliers who are not accredited by a CMS-approved accreditation organization. For a listing of CMS-approved accrediting organizations, please visit:
http://www.cms.hhs.gov/CompetitiveAcqforDMEPOS/downloads/DMEPO S_Accreditation_Organizations.pdf

*Revised 9/13/07*

2

6) A different bidder number will be assigned whenever a supplier submits a bid as a different entity. (For example, if a supplier bids as a network for one product category and bids as an individual for another product category, the same supplier will receive two different bidder numbers.)

7) Bids will be evaluated to ensure that they are bonafide. Additional financial information may be requested, such as manufacturer invoices. In the event there is a determination that the bid is not bonafide, the bid will be eliminated from consideration.

8) After the bidding window closes, all bids are considered final and cannot be amended by the supplier.

The bidding window will be open for 60 days. Bids can be submitted from 6:00 a.m. prevailing Eastern time – 9:00 p.m. prevailing Eastern time during this time period. However, there may be a few times when the system is unavailable for maintenance. Every effort will be made to notify suppliers in advance when the website will not be available. Once the bidding window ends, all bids are considered final and cannot be amended by the supplier. However, CMS may seek clarification from a supplier about elements of a bid. CMS will not share information about any supplier's proposal with other suppliers.

**Process for Submission of Required Documents**

All hardcopy documents required as attachments to the electronic bid submission must be sent to the CBIC as one complete package. Each document must be identified by the supplier's bidder number to ensure that this information is placed with the correct application. We strongly recommend that the package be sent to the CBIC using a method that can be tracked (e.g., certified mail). Irrespective of whether the bid is submitted electronically or by mail, the supplier must sign the certification statement identified on the application and submit that with the hardcopy financial documents. All documents must be postmarked by 9:00 p.m., September 25, 2007, and mailed to one of the following addresses:

CBIC                                CBIC
PO Box 907                          Bldg. 200, Suite 400
Augusta, GA 30999                   2743 Perimeter Pkwy.
                                    Augusta, GA 30909

**Process for Changing Bid Submission**

Bidders have 60 days to submit bids. Bidders will be permitted to amend their bids as many times as they deem necessary prior to the 60-day deadline for submitting

3

bids. Once the bid submission deadline has passed, no further amendments to the bids will be permitted.

A change in any of the hard copy attachments to the electronic or hard copy bid submission necessitates submission of a complete package of new documents in order for the bid to be considered. These new documents must include the supplier's name and bidder number on each page. The revised package must be post marked by 9:00 p.m. on September 25, 2007.

### Basic Bidding Rules

1) CMS will not allow more than one bid per item in a product category from a supplier.

2) Suppliers that share common ownership, as defined in the Medicare DMEPOS Competitive Bidding Final Rule and RFB instructions, can only submit one bid on behalf of all locations within the CBA. If a company with common ownership submits multiple bids, all bids will be rejected. Suppliers with multiple locations are not allowed to submit separate bids for the same product category in a CBA. If that company wins, all locations within the CBA will be considered contract suppliers for that product category.

3) Network member suppliers will not be allowed to bid separately from their network for the same product category in the same CBA. Network members can only join one network per product category per CBA. Only small suppliers who are unable to service the entire CBA independently can become members of a network.

4) Network members and suppliers with multiple locations who share common ownership must bid on the same product categories within the CBA.

5) Bids must include the cost of furnishing the item throughout the geographic area that makes up the CBA, except for entities that are eligible for limited participation in the Competitive Bidding Program, as defined in the Medicare Competitive Bidding Final Rule. Only Skilled Nursing Facilities (SNFs) And Nursing Facilities (NFs) are eligible to be specialty suppliers.

6) Bids that exceed the current Medicare fee schedule amount cannot be submitted.

7) Furnishing the item includes the cost of providing the item and any requisite services directly associated with the item, such as proper beneficiary and caregiver training and follow-up, manufacturer's shipping charges, maintaining rented equipment in proper order, education, delivery, set-up and retrieval.

8) The bidding form will identify if a product will be paid on either a rental or purchase basis and whether the bid should represent a purchase or rental amount. The bid price for a purchase item is based upon the purchase of a new item.

9) The RFB form requires suppliers to identify the item for which they are bidding by Manufacturer, Model Name and Number. We recognize that suppliers may change models in later periods of the bidding cycle. For purposes of transparency, we will be posting the list of manufacturers, model names and numbers, by supplier, on the internet to allow beneficiaries to make an informed choice among suppliers. Suppliers must furnish Medicare and non-Medicare customers the same range of items including the same brand names, makes and models.

10) The Medicare single payment amount established through bidding will remain in effect for the full term of the contract.

In addition to the electronic and hard copy Request for Bid forms that must be completed, the following is a checklist of documents that must be submitted in hardcopy to the CBIC:

- Certification Statement signed by the authorized official.
- Supplier Financial Statements.
- Supplier's Credit Report and Score.
- Signed Legal Contracts between all network members, if applicable.
- Signed Letters of Intent to Enter into an Agreement if supplier plans to expand its capacity through the use of subcontractors.
- Settlement Agreement and Corporate Integrity Agreement, if applicable.
- Copy of Accreditation Organization's Certificate of Accreditation, if available.

The signed Letters of Intent to Enter into an Agreement must include the following information:

- Clear identification the parties.
- Description of the items/functions/services to be performed by the subcontractor.
- Language clearly indicating that the subcontractor has agreed to supply items/functions/services.
- Anticipated length of agreement.
- Signature of an authorized official of each party.

5

- Language obligating the subcontractor to abide by State and Federal privacy and security requirements, including the privacy provisions stated in the regulation for this program.

**Confidentiality**

CMS will maintain the confidentiality of proprietary and financial information provided when a bidder submits its bid(s). CMS will protect this information to the extent provided by law and will follow the procedure stated in Title 45 CFR 5.65. However, an independent evaluator will be granted access to suppliers' or networks' bidding information. Any reports that are done to evaluate the program will be reported in an anonymous or aggregate format. Bidding information may be reviewed for evaluation purposes by the US Government Accountability Office (GAO) and the Department of Health and Human Services (DHHS) Office of Inspector General (OIG), and the Department of Justice (DOJ), as permitted by law. CMS will request that the GAO and DHHS/OIG report bidding information in an anonymous or aggregate format.

Contractor staff with access to bid information will be required to sign a statement agreeing to maintain the confidentiality of each bidder's information.

**Form A: Application**

All Suppliers must complete Item #1. A separate Form A must be submitted every time a supplier submits a bid as a different bidder or entity. However, a separate Form A will not be required when the same supplier submits separate bids for different product categories within the same CBA. For example, if a supplier is bidding as an individual company and as the primary supplier with a network, it will have to submit a separate Form A with each bid because it is considered a different bidder or entity. The primary supplier must complete and submit Form A for all members of the network per location. If a supplier has multiple locations with common ownership in the CBA, location specific information must be provided for each location within the CBA.

**Type of Supplier**:  Supplier must indicate what type of supplier it is (supplier can choose only one):

Individual Supplier with a Single Location _____

Supplier with Common Ownership and Multiple Locations _____

Primary Network Supplier_____

**Specialty Supplier:**  Supplier must indicate if it is bidding as a specialty supplier. (A specialty supplier is an entity that is eligible for limited participation in the Competitive Bidding Program, as defined in the Medicare DMEPOS Competitive Bidding Final Rule.  Only Skilled Nursing Facilities (SNFs) and Nursing Facilities (NFs) are eligible to be specialty suppliers.)

**Competitive Bid Area:**  The Competitive Bidding Areas have been identified by the CBIC by counties and zip codes at www.dmecompetitivebid.com.

**Product Category:**  Select each product category for which the supplier or network is submitting a bid.

**Item 1 Supplier's Identifying Information**

A. Legal Business Name, Mailing Address, Telephone Number, Email and Fax No. – Indicate the supplier's legal business name and mailing address. This is the name that is reported to the Internal Revenue Service (IRS) for tax reporting purposes.

The supplier must provide an address where it can be directly contacted by CMS or the CBIC. This address will be used to send the supplier information concerning the Medicare Program. This address cannot be that of a billing agency, management service organization or staffing company.

7

Provide the business telephone number of the supplier. This is the telephone number at which the supplier can be contacted by CMS or the CBIC. This must be the telephone number at which beneficiaries can contact the supplier directly. Telephone numbers must include area codes and be entered (XXX) XXX-XXXX. Provide the e-mail address of the contact person. Provide the supplier's fax number. Fax numbers must include area codes and be entered (XXX) XXX-XXXX.

B.  Supplier's Business Information – Indicate the length of time the supplier completing this form has been supplying DMEPOS items in the CBA. Provide information in total number of years and months.

C.  Supplier's Primary Physical Address – Indicate the supplier's complete primary physical address if it is not the same as the mailing address.

D.  Tax Identification Number – Indicate the Tax Identification Number issued by the IRS for the supplier completing this form. This is the number issued by the IRS and used to report tax information to the IRS. If a sole proprietor, Social Security Number may be used.

E.  NSC/NPI Number – Provide the supplier's NSC number. The NSC number is the National Supplier Clearinghouse number. It is the ten digit number that is required to bill Medicare for DMEPOS transactions. The NSC number must be specific to the particular location submitting the bid – it should not be the corporate number. Suppliers with multiple locations that share common ownership must list their NSC numbers for all locations within the CBA. Provide supplier's NPI #.

F.  Service Type – Indicate the methods the supplier will use to provide items and services to beneficiaries in a CBA. Check all boxes that apply:  Retail Location; Mail Order; Home Delivery.

G.  Doing Business As – Indicate the "doing business as" (DBA) name if different from the legal business name reported in A for this business location. The "doing business as" name is the name the supplier is generally known by to the public.

H.  Additional Physical Locations – Indicate all physical addresses of the supplier within the CBA. Information must be provided on all locations for which there is common ownership located within the CBA. Post office boxes and drop boxes are not acceptable for physical addresses. The physical address(s) must be the actual address(s) where the supplier conducts business with its customers. Address(s) must be the address(s) where beneficiaries can contact the supplier directly. Please use only two-letter postal abbreviations. Zip code and telephone number (with area code) must be included.

8

If a supplier has multiple locations within the CBA, the supplier must complete all required information on Form A for each location. If a network is bidding, the primary supplier must complete and submit Form A for every member of the network for each location and it must complete all location specific questions for each location providing services in the CBA.

I.    Accreditation Information for Locations Serving this CBA - Indicate the name(s) of the Medicare-approved accreditation organization that has accredited the supplier, or from which the supplier has applied for accreditation, and provide the accreditation issue and expiration dates (or expected issue and expiration dates). Indicate product specific area (s) in which the supplier is accredited (i.e., oxygen, general DME). Each location in the CBA that shares common ownership and each member of the network must verify that it is accredited.

J.    Type of Business - Select the supplier's type of business. Please select only one response. If "Other" is selected, briefly describe the supplier's type of business. Check all that apply.

A business corporation is a commercial enterprise or establishment comprised of many employees and is legally recognized as a separate entity.

A general partnership is a contract entered into by two or more persons in which each agrees to furnish either a part of the capital or labor for a business enterprise and by which each shares in a proportion of profits and losses.

A joint venture is a business that is co-owned by another individual, organization or business.

A sole proprietorship is an unincorporated business that is owned by one individual.

A professional corporation is a commercial enterprise or establishment engaged in a specific activity or area of expertise comprised of one or more employees who are educated in the specific activity or area of expertise. A professional corporation is legally recognized as a separate entity.

A franchise is a form of business organization in which a firm which already has a successful product or service enters into a continuing contractual relationship with other businesses (franchisees) operating under the franchisor's trade name and usually with the franchisor's guidance.

A publicly traded company is a company which has issued securities through an offering and which are now traded on the open market.

9

K. Establishment Information - Indicate the two-letter postal abbreviation for the state in which the supplier is established or incorporated. Indicate the date the supplier was established or incorporated. Dates should be entered MM/DD/YYYY. If supplier was incorporated at a previous time in another state, please indicate.

L. Contact Person – Provide the name(s), title, telephone number and e-mail address of the authorized person (s) who should be contacted to answer questions regarding the supplier's bid.

M. Financial Information – The following information must be submitted: Suppliers that submit individual tax returns that include business taxes are required to submit the Schedule C (the Profit and Loss Statement) from their 1040 Tax Return for the immediate 3 years prior to the date on which the bid is submitted. In addition to the tax return information, these suppliers are also required to submit a Compiled Balance Sheet (Statement of Financial Position), a Statement of Cash Flow (Statement of changes in Financial Position) and a Statement of Operations (Income Statement) for the past three years prior to the date on which the bid is submitted. Suppliers are also required to submit a copy of their current credit report, which must have been completed within 90 days prior to the date on which the bid is submitted. The credit report must be prepared by one of the following: Experian; Equifax; or TransUnion.

Limited partnerships and partnerships must submit their Schedule L from their 1065, U.S. Return of Partnership Income from the immediate 3 years prior to the date on which the bid is submitted, in addition to the financial documents required of suppliers that submit individual tax returns, as listed above.

Suppliers that submit corporate tax returns are required to submit the Schedule L (Balance Sheet) from their tax return for the immediate 3 years prior to the date on which the bid is submitted. In addition to the tax return information, these suppliers are also required to submit a Statement of Cash Flow (Statement of Changes in Financial Position), and a Statement of Operations (Income Statement) for the immediate 3 years prior to the date on which the bid is submitted. Suppliers are also required to submit a copy of their current credit report, which must have been completed within 90 days prior to the date on which the supplier submits its bid. The credit report must be prepared by one of the following: Experian; Equifax; or TransUnion.

All documents that are not prepared as part of a tax return must be certified as accurate by the supplier and must be prepared on an accrual or cash basis of accounting.

10

Suppliers that are publicly traded companies must submit a copy of their 10-K Filing Reports with the Securities Exchange Commission for the immediate 3 years prior to the date on which the bid is submitted. If a supplier is a wholly owned subsidiary of a publicly traded company, it must submit the parent company's 10-K filing, in addition to its own financial information that every corporate supplier must submit.

New suppliers are required to submit projected financial statements to substitute for any year for which they do not have past financial information because they were not in business as a DMEPOS supplier. For networks, the primary supplier must submit to the CBIC the certified financial statements of each network member, and all hard copy documents in one complete package.

If a supplier is submitting an individual bid and is also part of a network, the supplier must submit separate financial statements to support both the individual bid and the network bid. However, a supplier cannot submit a bid for a product category if it is also a member of a network that has also submitted a bid for that product category.

N. <u>Sanctions</u> – The bidding supplier must disclose information about any current or past (within the last five years), sanctions, or debarments in which it was involved. If applicable, settlement agreements or corporate integrity agreements must be submitted. Sanctions include, but are not limited to, debarment from any Federal program, revocation from the Medicare Program, sanctions issued by the Department of Health and Human Services (DHHS) Office of the Inspector General (DHHS/OIG), or sanctions issued at the State or local level. This includes any actions taken against any member of the board of directors, chief corporate officers, high-level employees, affiliated companies, network members or subcontractors. Please provide additional information regarding any previous or current sanctions.

O. <u>Key Personnel</u> – Provide a listing of names and titles of the key personnel of your company. The key personnel include such staff as officers, partners, directors, managing employees or members of the board of directors.

P. Additional Information (Optional) – This space is provided for suppliers to explain their answers if additional room is required to respond to questions on Section A. Please mark these explanations with the appropriate item letter and/or number(s) to avoid confusion.

## **Item 2-- Application for Networks**

11

The Primary Supplier must complete Form A (Items 1 and Item 2) for each member of the network. A network's estimated capacity is limited to 20% of the Medicare market. Supplier participation in a network is limited to 20 members. A network may only consist of suppliers who meet the definition of a small supplier (total annual revenue less than $3.5 million). Only small suppliers who are unable to independently service the entire CBA may join a network. Network members can only join one network per product category per CBA. A network may submit bids for multiple product categories. Only one bid for each item in a product category will be accepted from a network. Network member suppliers will not be allowed to bid separately from their network for the same product category within the same CBA. Member suppliers will not be allowed to join more than one network for the same product category within the same CBA. Networks must have signed legal contracts in place before the network can submit a bid. The Primary Supplier must submit to the CBIC the certification statements, and all hard copy documents for each network member in one package. The Primary Supplier must submit all financial documentation required of the primary member, for each network member, including a copy of a current credit report which must have been completed within 90 days prior to the date on which the supplier submits its bid. The credit report must be provided by one of the following credit bureaus: Experian; Equifax; or TransUnion.

A. NSC Number/NPI Number -The NSC and NPI Identification Numbers of the primary supplier in the network must be provided. Each supplier will submit its own claims, bill Medicare and receive reimbursement on its own behalf. The NSC number(s) must be specific to the bidder's location – not the corporate number. Provide the NPI number, if such number has been assigned to the supplier.

B. Primary Supplier's Legal Business Name - Provide the legal business name of the primary supplier. The primary supplier's legal business name is the name that is reported to the Internal Revenue Service (IRS) for tax purposes.

C. Network Member's Name, NSC and NPI Number - Each member of the network must be identified. Provide each member's legal business name and NSC and NPI identification numbers. A supplier's legal business name is the name that is reported to the Internal Revenue Service (IRS) for tax reporting services. The NSC number (s) must be specific to the bidder's location – not the corporate number. Provide the NPI number, if such number has been assigned to the supplier.

D. Signed Legal Contracts - Signed, legal contracts between all network members must be submitted along with all hardcopy documentation. If signed, legal contracts are not submitted, the network bid will be considered incomplete and will not be considered in the evaluation process.

12

**Form B:** – **INDIVIDUAL FORM MUST BE COMPLETED FOR EACH PRODUCT CATEGORY. PLEASE LIST PRODUCT CATEGORY.**

Indicate the Supplier's Legal Business Name and Bidder Number at the top of each page. If this is a Network bid, indicate the Primary Supplier's Legal Business Name and Bidder Number. This does not apply to hard copy bidders.

1) Indicate the total revenue collected for this product category, in the CBA by the supplier during the last calendar year. For suppliers with multiple locations that share common ownership, provide total revenue for all locations. For networks, provide total revenue for all member suppliers. Also indicate the percentage of the total revenue in this product category that was collected from Medicare. Estimates are acceptable.

2) Indicate the total number of customers in the CBA for whom the supplier provided or serviced this product category during the past calendar year. For suppliers with multiple locations that share common ownership, provide the combined total number of customers to whom they have provided items in this product category. For networks, provide the combined total number of customers to whom they have provided items in this product category.

   Also indicate the percentage of customers for this product category which were Medicare beneficiaries. Estimates are acceptable.

3) Indicate the counties within this CBA in which you, as a supplier or network, are currently serving customers for this product category. (If the supplier or network does not serve an entire county, please indicate the zip codes the supplier or network currently does not serve in these counties for this product category.) Servicing a customer refers to delivery of an item and service within this product category that supplier provided that resulted in payment to you for that item and service.

   Indicate what percentage of the total geographic area in these counties the supplier or network currently serves Medicare beneficiaries.

4) The codes listed are the HCPCS codes, based on CMS data, that are the top three codes in terms of volume for this product category. Please list by HCPCS code, the number of units provided to total customers during the last calendar year in this CBA. Please also list by HCPCS code, the number of units provided to Medicare beneficiaries during the last calendar year in this CBA.

5a) Indicate the percentage increase in volume supplier or network would be capable of providing for that product category. This increase should represent the aggregate amount applicable for all codes in the product category during a projected 12 month period for the first year of the

13

contract.

5b) If supplier or network plans to expand, please explain the business expansion plan directly on the form. The business expansion plan must address the elements on the form.

5c) If supplier or network plans to expand through the use of subcontractors, please identify the legal entities with which the supplier or network anticipates entering into a subcontracting agreement. Indicate the expected function of the subcontractor(s), as well.

5d) Subcontracting does not eliminate your responsibility to ensure quality standards and meet all other competitive bidding requirements. Signed letters of intent must be attached. These letters represent an agreement to enter into a subcontracting relationship but are not legal contracts.

6) Indicate if supplier is submitting a bid in any other CBA for any product category. Please indicate the product category, as well as the CBA.

7) This space may be used to elaborate on earlier questions. Please include question number with the response.

**Bidding Sheet**

Items C, F, and G must be completed by the supplier. In the case of a network, this must be completed by the primary supplier; in the case of common ownership with multiple locations, this must be completed by the authorized official. Suppliers cannot condition their bids in any way.

The following is a description of each column on the bidding sheet:

Column A - HCPCS Codes -- Indicates the CMS Health Care Common Procedure Coding System code for each item in the product category. In some instances, this column may include a combination of codes to represent the item for which you are submitting the bid. Bidders shall not enter any information in this column.

Column B - Item Description -- Describes each item in the product category for which the bidder will submit a bid. Bidders shall not enter any information in this column.

Column C - Models to be Provided -- Bidders must enter the Manufacturer, Model Name and Number of the items they will make available to beneficiaries.

If filing this form in hardcopy, please provide this information on a separate attachment to the bidding sheet labeled "C" Models to be provided. Please include supplier's name and bidder number on this form.

Column D - Rental or Purchase -- Indicates whether an item should be bid as a rental or purchase. Bidders shall not enter any information in this column.

Column E - Item Weight -- Indicates the item weight for each item in the product category. Item weights will be determined based on the utilization of the individual item compared to other items within that product category based on historic Medicare claims. Bidders shall not enter any information in this column.

Column F - Total Estimated Capacity -- Bidders must enter their total estimated Medicare capacity on the bid sheet. The total estimated Medicare capacity is the capacity of units by HCPCS code that the bidder currently supplies plus any additional capacity the bidder would be capable of providing per HCPCS code.

Column G - Bid Price -- Bidder must indicate its bid price in this column for each item in the product category.

**The bid price submitted for the item MUST cover the following:**

15

- Bids must include the cost of furnishing the item throughout the geographic area that makes up the CBA, except for entities that are eligible for limited participation in the Competitive Bidding Program, as defined in the Medicare Competitive Bidding Final Rule. Only Skilled Nursing Facilities (SNFs) and Nursing Facilities (NFs) are eligible to be specialty suppliers.

- Furnishing the item includes the cost of providing he item and any requisite services directly associated with the item, such as proper beneficiary and caregiver training and follow-up, manufacturer's shipping charges, maintaining rented equipment in proper order, education, delivery, set-up and retrieval.

- The bid amount for each item cannot exceed the current Medicare fee schedule amount for that HCPCS code.

- Purchase bids are based upon the purchase of a new item. Rental bids are based upon a monthly rental amount. Policy concerning whether we pay a claim as purchase or rental is described in Section 42CFR 414.408 of the Medicare DMEPOS Competitive Bidding final rule.

- The RFB form requires suppliers to identify the item for which they are bidding by Manufacturer, Model Name and Number. We recognize that suppliers may change models in later periods of the bidding cycle. For purposes of transparency, we will be posting the list of manufacturers, model names and numbers, by supplier, on the internet to allow beneficiaries to make an informed choice among suppliers. Suppliers must furnish Medicare and non-Medicare customers the same range of items including the same brand names, makes and models.

- The Medicare single payment amount established through bidding will remain in effect for the full term of the contract.

### Certifying Statement signed by Authorized Representative of Supplier

Only an authorized official can sign the certifying statement on behalf of the company. An authorized official is an appointed official to whom the supplier has granted the legal authority to enroll it in the Medicare program, to make changes and/or updates to the supplier's status in the Medicare program (e.g., new practice locations, change of address, etc.), to verify correctness of information on the form, and to commit the supplier to fully abide by the laws, regulations, and program instructions of Medicare. The authorized official must be the supplier's general partner, chairman of the board, chief financial officer, chief executive officer, president, direct owner of the supplier organization or must hold a position of similar status and authority within the supplier's organization. The authorized official also has the legal authority to submit a bid on behalf of the company and to enter into a contract with Medicare to provide competitive bid items to Medicare

16

beneficiaries.

The Certifying Statement must be signed separately by the authorized official of each member of a network.

## Form C: DMEPOS Contract Supplier Quarterly Report

Form 10169C, the Contract Supplier's Quarterly Report regarding products supplied to beneficiaries must be submitted to the CBIC, no later than 10 days after each calendar year quarter ends.

Aggregate information must be sent regarding the number of items furnished by manufacturer, model name and number for those items that have been furnished to beneficiaries.

1) Provide Contract Supplier's Legal Business Name and Bidder Number. The Contract Supplier's Legal Business Name is the name that is reported to the Internal Revenue Service (IRS) for tax reporting purposes.

2) If reporting as a Network, provide the Primary Supplier's Legal Business Name and Bidder Number. The Primary Supplier's Legal Business Name is the name that is reported to the Internal Revenue Service (IRS) for tax reporting purposes.

3) Indicate the Competitive Bid Area(s) (CBAs) which this quarterly report covers.

4) Indicate the calendar year and quarter for which the quarterly report submission applies.

5) Indicate the approximate number of items provided to Medicare beneficiaries by number supplied, HCPCS Code, manufacturer, model name and number.

6) Quarterly Report must be signed and dated by an authorized official. An authorized official is an appointed official to whom the supplier has granted the legal authority to enroll it in the Medicare program, to make changes and/or updates to the supplier's status in the Medicare program (e.g., new practice locations, change of address, etc.), to verify correctness of information on the form, and to commit the supplier to fully abide by the laws, regulations, and program instructions of Medicare. The authorized official must be the supplier's general partner, chairman of the board, chief financial officer, chief executive officer, president, direct owner of the supplier organization, or must hold a position of similar status and authority within the supplier's organization.

17

18

## Appendix A – Definitions

*Assets*: Economic resources of an enterprise that are recognized and measured in conformity with generally accepted accounting principles. Assets also include certain deferred charges that are not resources but that are recognized and measured in conformity with generally accepted accounting principles.

*Balance Sheet:* The position statement; that is, it presents the cumulative financial position of a firm at a specific date. The balance sheets reports financial position in terms of the basic economic model of the enterprise: Assets = Creditors' Equity + Owners' Equity.

*Bid*: An offer to furnish an item for a particular price and time period that includes, as appropriate, any services that are directly related to the furnishing of the item.

*Bid Price*: The amount for which a supplier offers to provide a competitive bid item to Medicare beneficiaries during the competitive bid program.

*Bidders' Conference*: A meeting, that could be conducted by telephone or in person, sponsored by CMS and designed to provide potential bidders technical details of the competitive bid program and the bidding forms. Participation is recommended but not required.

*Bidder Number*: System generated number that identifies each unique bidding entity. Every time a supplier submits a bid as a different legal entity, it will be assigned a new bidder number.

*Bidding Window:* The period of time during which the supplier can submit bids for consideration in a competitive bid round.

*Competitive Bidding Area (CBA):* An area established by the Secretary for purposes of the Medicare DMEPOS Competitive Bidding Program.

*Competitive Bid Cycle*: A competitive bid cycle is the period of time ranging from the establishment of competitive bid prices until the next competitive bid cycle begins or the current competitive bid cycle ends. Competitive bid cycles are limited to a three year period.

*Competitive Bidding Implementation Contractor (CBIC)*: The CMS contractor that helps implement the Medicare DMEPOS Competitive Bidding Program.

*Competitive Bidding Program*: A program established under this rule in a CBA to solicit supplier bids, establish a single payment amount, and award contracts within a designated CBA.

*Competitive Range*: Phrase used to describe the subset of suppliers whose

19

composite bid prices are equal to or are less than the pivotal bid price for the product category.

*Composite Bid:* The sum of a bidding supplier's weighted bids for all items within a product category for purposes of allowing a comparison across bidding suppliers.

*Contract supplier:* An entity that is awarded a contract by CMS to furnish items under a competitive bidding program.

*Entity:* For competitive bidding purposes, the term entity refers to a unique bidder. For example, every time a supplier submits a bid as an individual company and then submits a different bid as a member of a network for a different product category or in a different CBA, it will be considered a different entity. However, if a supplier with common owners and multiple locations submits a bid, all the locations furnishing competitive bid items within the designated CBA are considered one entity.

*Fee Schedule:* A schedule of fees for various items and services used in determining payment for a particular item or service.

*HCPCS:* Healthcare Common Procedure Coding System.

*Income Statement:* Reports on the results of an entity's operations for a given period of time as opposed to a specific point in time.

*Item:* A product included in a competitive bidding program that is identified by a HCPCS code, which may be specified for competitive bidding, or a combination of codes and/or modifiers, and includes services directly related to the furnishing of that product to the beneficiary.

Items that may be included in a competitive bidding program are:
(1) Durable medical equipment (DME), as defined in §414.202 and further classified into the following categories:
  (a) Inexpensive or routinely purchased items, as specified in §414.220(a);
  (b) Items requiring frequent and substantial servicing, as specified in §414.222 (a);
  (c) Oxygen and oxygen equipment, as specified in §414.226(b); and
  (d) Other DME (capped rental items), as specified in §414.229.
(2) Supplies necessary for the effective use of DME.
(3) Enteral nutrients, equipment, and supplies.
(4) Off -the-shelf (OTS) orthotics, which are orthotics described in section 1861(s)(9) of the Act that require minimal self-adjustment for appropriate use and do not require expertise in trimming, bending, molding, assembling, or customizing to fit a beneficiary.

20

*Item weight:* A number assigned to an item based on its beneficiary utilization rate in a competitive bidding area when compared to other items in the same product category.

*Network Member Supplier*: Any member of a network including the primary supplier for the network.

*Network*: A group of two or more eligible small suppliers, who meet certain requirements, including that they cannot independently service an entire CBA, that collectively submit a bid, as a single entity..

*NPI:* National Provider Identifier. Identifier for use in electronic healthcare transactions.

*NSC*: The National Supplier Clearinghouse number required to bill Medicare for DMEPOS.

*Product Category:* A grouping of related items that are used to treat a similar condition that are included in a competitive bidding program.

*Request For Bids* (RFB): A formal procurement process by which CMS is requesting eligible Medicare DMEPOS suppliers to submit the amount for which they would furnish items and services included in the competitive bid program.

*Sanction*: Sanctions would include, but are not limited to, debarment from any Federal program, revocation from the Medicare program, sanctions issued by the DHHS OIG, or sanctions issued at the State or local level. This includes any actions taken against any member of the board of directors, chief corporate officers, high level employees, affiliated companies, network members or subcontractors.

*Specialty Supplier*: SNFs or NFs that are eligible for limited participation (allows the entity to only serve their own residents) in the Competitive Bidding Program, as defined in the Medicare DMEPOS Competitive Bidding Final Rule.

*Statement of Financial Position*: An alternative term for the term "balance sheet". The financial position of an enterprise at a particular time comprises its assets, liabilities, and owners' equity and the relationship among them, plus contingencies, commitments, and other financial matters that pertain to the enterprise at the time.

*Subcontractor:* An entity, including an individual or individuals, that contracts with a supplier to supply a service either to the supplier or directly to the beneficiary, for which Medicare reimburses the supplier the cost of the service.

*Supplier*: An entity with a valid Medicare supplier number, including an entity that furnishes an item through the mail.

21

EXHIBIT 5

## Lim, Tony (HHS/OGC)

**From:** CMS CMSProviderResource

**Sent:** Friday, May 25, 2007 5:05 PM

**To:** all_ffs_providers@list.nih.gov

**Subject:** CMS Announces Financial Measures for the Medicare DMEPOS Competitive Bidding Program

### Financial Measures for the Medicare Durable Medical Equipment, Prosthetics, Orthotics, and Supplies (DMEPOS) Competitive Bidding Program

The Centers for Medicare & Medicaid Services (CMS) released today the measures that will be used to evaluate the financial stability of suppliers that bid under the new Medicare DMEPOS Competitive Bidding Program. All bids must include certain financial documentation in order for the supplier to be considered for a contract under the program. CMS and its Competitive Bidding Implementation Contractor (CBIC) will evaluate each bidder's financial documentation to determine whether the supplier will be able to participate in the program and maintain viability for the duration of the contract period.

The financial measures are standard accounting ratios commonly used to evaluate financial health. The following financial ratios will be used:

- ➢ Current ratio = current assets/current liabilities
- ➢ Collection period = (accounts receivable/sales) x 360
- ➢ Accounts payable to sales = accounts payable/net sales
- ➢ Quick ratio = (cash + accounts receivable)/current liabilities
- ➢ Current liabilities to net worth = current liabilities/net worth
- ➢ Return on sales = net sales/inventory
- ➢ Sales to Inventory
- ➢ Working capital = current assets – current liabilities
- ➢ Quality of earnings = cash flow from operations/(net income + depreciation)
- ➢ Operating cash flow to sales = cash flow from operations/(revenue – adjustment to revenue)

CMS and the CBIC will calculate each bidder's financial ratios using the financial information submitted as part of the bid. CMS and the CBIC will also be utilizing the supplier's credit history in evaluating the financial health of the supplier.

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

If you received this message in error, please go to *http://www.cms.hhs.gov/apps/mailinglists/* to unsubscribe to the appropriate listserv. Please DO NOT respond to this email. This email is a service of CMS and routed through an electronic mail server to communicate Medicare policy and operational changes and/or updates. Responses to this email are not routed to CMS personnel. Inquiries may be sent by going to *http://www.cms.hhs.gov/ContactCMS/* Thank you

**Lim, Tony (HHS/OGC)**

| | |
|---|---|
| **From:** | CMS HOMEHEALTH_HOSPICE_DMEODF-L |
| **Sent:** | Friday, May 25, 2007 5:07 PM |
| **To:** | ALLODF-L@LIST.NIH.GOV; 'HOMEHEALTH_HOSPICE_DMEODF-L@LIST.NIH.GOV'; PHYSICIANODF-L@LIST.NIH.GOV; SNF_LTCODF-L@LIST.NIH.GOV; PHARMACYODF-L@LIST.NIH.GOV |
| **Subject:** | Web Posting Financial Measures for the Medicare DMEPOS Competitive Bidding Program |

## Web Posting
## Financial Measures for the Medicare Durable Medical Equipment, Prosthetics, Orthotics, and Supplies (DMEPOS) Competitive Bidding Program

The Centers for Medicare and Medicaid Services (CMS) released today the measures that will be used to evaluate the financial stability of suppliers that bid under the new Medicare DMEPOS Competitive Bidding Program. All bids must include certain financial documentation in order for the supplier to be considered for a contract under the program. CMS and its Competitive Bidding Implementation Contractor (CBIC) will evaluate each bidder's financial documentation to determine whether the supplier will be able to participate in the program and maintain viability for the duration of the contract period.

The financial measures are standard accounting ratios commonly used to evaluate financial health. The following financial ratios will be used:

> ➢ Current ratio = current assets/current liabilities
> ➢ Collection period = (accounts receivable/sales) x 360
> ➢ Accounts payable to sales = accounts payable/net sales
> ➢ Quick ratio = (cash + accounts receivable)/current liabilities
> ➢ Current liabilities to net worth = current liabilities/net worth
> ➢ Return on sales = net sales/inventory
> ➢ Sales to Inventory
> ➢ Working capital = current assets – current liabilities
> ➢ Quality of earnings = cash flow from operations/(net income + depreciation)
> ➢ Operating cash flow to sales = cash flow from operations/(revenue – adjustment to revenue)

CMS and the CBIC will calculate each bidder's financial ratios using the financial information submitted as part of the bid. CMS and the CBIC will also be utilizing the supplier's credit history in evaluating the financial health of the supplier.

6/24/2008

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| AMERICAN ASSOCIATION FOR HOMECARE; and ACE DRUG, INC., dba HOLLYWOOD MEDICAL SUPPLY, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 08-992 (RMU) |
| MICHAEL O. LEAVITT in his official capacity as Secretary of the Department of Health and Human Services, and KERRY M. WEEMS, in his official capacity as Acting Administrator for the Centers for Medicare & Medicaid Services, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## [Proposed] ORDER

Upon consideration of plaintiffs' Application for a Preliminary Injunction and Request for

Expedited Hearing, defendants' opposition thereto, and the entire record herein, it is hereby

ORDERED, that plaintiffs' application is DENIED.

_____
The Honorable Ricardo M. Urbina
United States District Judge