UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN ASSOCIATION FOR HOMECARE, et al.,<br><br>　　　　　Plaintiffs,<br><br>　v.<br><br>MICHAEL O. LEAVITT, et al.,<br><br>　　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)　Civil Action No. 08-992 (RMU)<br>)<br>)<br>)<br>)<br>)<br>) |

## MOTION FOR LEAVE
## TO FILE AS AN AMICUS CURIAE
## BY ABLECARE MEDICAL, INC.

Ablecare Medical, Inc. ("Ablecare") respectfully leaves of the Court to file an Amicus Brief regarding Plaintiffs' Application for a Preliminary Injunction and Request for an Expedited Hearing ("Plaintiffs' Motion").

Plaintiffs' Motion requests that this Court enjoin the implementation of Round 1 of the competitive acquisition program ("CAP") regarding Durable Medical Equipment, Prosthetics and Supplies ("DMEPOS") was mandated by the Medicare Prescription Drug, Improvement and Modernization Act of 2003 ("MMA"). Round 1 of the CAP is scheduled to be implemented on July 1, 2008.

Ablecare is one of the 325 businesses nationwide that were awarded contracts by Centers for Medicare & Medicaid Services ("CMS") during Round 1 of the CAP. The Injunction sought in Plaintiffs' Motion would have a profound and devastating impact on Ablecare. Ablecare respectfully requests leave to file a Brief as Amicus Curiae addressing the issues raised in Plaintiffs' Motion and in support of Defendants' Opposition to the motion.

In further support of its Motion for Leave, Ablecare submits the attached Memorandum

in Support and Proposed Order, along with a copy of the proposed Brief of Amicus Curiae

(attached as Exhibit 1).

Dated: June 26, 2008                     Respectfully submitted,


OF COUNSEL                        By:        /S/
Kathleen M. Trafford                        William P. McGrath, Jr. (DC Bar 422160)
     ktrafford@porterwright.com                  wmcgrath@porterwright.com
Ryan P. Sherman                             Porter Wright Morris & Arthur
     rsherman@porterwright.com              1919 Pennsylvania Avenue NW
Porter Wright Morris & Arthur               Suite 500
41 South High Street                        Washington, DC 20006-3434
Columbus, OH 43215-6194                     Telephone:    202 778-3000
Telephone:    614 227-2000                  Fax:          202 778-3063
Fax:          614 227-2100


ATTORNEYS FOR MOVANT
ABLECARE MEDICAL, INC.

### CERTIFICATE OF SERVICE

I hereby certify that the foregoing Motion For Leave To File As An Amicus Curiae By
Ablecare Medical, Inc. was served on the 26th day of June, 2008, via the Court's electronic filing
system (unless otherwise noted) upon the following:

Robert Fabrikant, Esq.                      Kathryn L. Wyer
Stephen B. Kinnaird                         United States Department of Justice
Sidley & Austin                             P.O. Box 883
1501 K Street NW                            Washington, DC 20044
8th Floor                                 *Counsel for Defendant United States*
Washington, DC 20005
*Counsel for Plaintiffs*


                                                 /S/
                                            William P. McGrath, Jr.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN ASSOCIATION FOR HOMECARE, et al., ) ) ) ) Plaintiffs, ) ) v. ) ) MICHAEL O. LEAVITT, et al., ) ) Defendants. ) ) | Civil Action No. 08-992 (RMU) |

## MEMORANDUM IN SUPPORT OF MOTION FOR LEAVE TO FILE AS AN AMICUS CURIAE BY ABLECARE MEDICAL, INC.

Ablecare Medical, Inc. ("Ablecare") respectfully leaves of the Court to file an Amicus Brief regarding Plaintiffs' Application for a Preliminary Injunction and Request for an Expedited Hearing ("Plaintiffs' Motion"). A copy of the proposed Brief of Amicus Curiae is attached as Exhibit 1.

## STATEMENT OF FACTS

Ablecare is one of the 325 businesses nationwide that were awarded contracts by Centers for Medicare & Medicaid Services ("CMS") during Round 1 of the CAP. Round 1 of the competitive acquisition program ("CAP") regarding Durable Medical Equipment, Prosthetics and Supplies ("DMEPOS") was mandated by the Medicare Prescription Drug, Improvement and Modernization Act of 2003 ("MMA"). Round 1 of the CAP is scheduled to be implemented on July 1, 2008. As described in greater detail in the Brief of Amicus Curiae, the Injunction sought in Plaintiffs' Motion would have a profound and devastating impact on Ablecare.

**ARGUMENT**

Courts have routinely granted amici permission to submit an amicus brief. "An amicus brief should normally be allowed ... when the amicus has unique information or perspective that can help the court beyond the help that the lawyers for the parties are able to provide." *Cobell v. Norton*, 246 F. Supp. 2d 59, 62 (D.D.C. 2003) (granting motion to file an amicus curiae brief in the United States District Court for the District of Columbia where the brief would not "simply repeat the arguments presented by the plaintiffs"), citing *Ryan v. CFTC*, 125 F.3d 1062, 1063 (7th Cir. 1997); *Kling v. Mentor Public School District*, 136 F. Supp. 2d 744 (N.D. Ohio 2001) (the court granted the Ohio Legal Rights Service leave to file an amicus brief in relation to the plaintiffs' motion for a preliminary injunction in the Northern District of Ohio); *In re Allied Pilots Class Action Litig.*, 2000 U.S. Dist. LEXIS 14068 (N.D. Tex. 2000) (the court granted the parties' motions for leave to file amicus briefs). Courts have held that "it is solely within the discretion of the Court to determine the fact, extent, and manner of participation by the amicus." *United States v. Microsoft Corp.*, No. 98-1232, 2002 WL 319366 at *2 (D.D.C. Feb. 28, 2002).

As described in greater detail in the Brief of Amicus Curiae (attached as Exhibit 1), Ablecare offers exactly the information that can assist this Court on the issues raised in Plaintiffs' Motion. Ablecare, from its unique (to this case) perspective as a successful bidder, can address several key issues raised in Plaintiffs' Motion, including: (a) whether the issuance of the injunction would cause substantial harm to others; and (b) whether the public interest would be served by issuance of the injunction.

**CONCLUSION**

Ablecare respectfully requests leave to file a Brief as Amicus Curiae addressing the issues raised in Plaintiffs' Motion and in support of Defendants' opposition to the motion.

Dated: June 26, 2008                        Respectfully submitted,


OF COUNSEL                                  By:        /S/
Kathleen M. Trafford                               William P. McGrath, Jr. (DC Bar 422160)
      ktrafford@porterwright.com                      wmcgrath@porterwright.com
Ryan P. Sherman                                    Porter Wright Morris & Arthur
      rsherman@porterwright.com                    1919 Pennsylvania Avenue NW
Porter Wright Morris & Arthur                      Suite 500
41 South High Street                               Washington, DC  20006-3434
Columbus, OH  43215-6194                           Telephone:     202 778-3000
Telephone:     614 227-2000                        Fax:           202 778-3063
Fax:           614 227-2100


ATTORNEYS FOR MOVANT
ABLECARE MEDICAL, INC.

## CERTIFICATE OF SERVICE

        I hereby certify that the foregoing Memorandum in Support of Motion For Leave To File As An Amicus Curiae By Ablecare Medical, Inc. was served on the 26th day of June, 2008, via the Court's electronic filing system (unless otherwise noted) upon the following:

Robert Fabrikant, Esq.                      Kathryn L. Wyer
Stephen B. Kinnaird                         United States Department of Justice
Sidley & Austin                             P.O. Box 883
1501 K Street NW                            Washington, DC  20044
8th Floor                                 *Counsel for Defendant United States*
Washington, DC  20005
*Counsel for Plaintiffs*



                                                   /S/
                                            William P. McGrath, Jr.

# EXHIBIT 1
# To
# Memorandum In Support of
# Motion for Leave

**Brief of Amicus Curiae
In Support of Defendants By Ablecare Medical, Inc.**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| AMERICAN ASSOCIATION FOR HOMECARE, et al., | ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 08-992 (RMU) |
| v. | ) ) | |
| MICHAEL O. LEAVITT, et al., | ) ) | |
| Defendants. | ) ) | |

## BRIEF OF AMICUS CURIAE IN SUPPORT OF DEFENDANTS
## BY ABLECARE MEDICAL, INC.

### I.    INTEREST OF AMICUS CURIAE

Ablecare Medical, Inc. ("Ablecare") is an Ohio corporation that was one of the 325

businesses nationwide that were awarded contracts by the Centers for Medicare and Medicaid

Services ("CMS") in Round One of the competitive bidding program now being challenged by

Plaintiffs. [Declaration of Dino Martis, ("Martis Decl."), at ¶4, attached as Ex. A.] Ablecare is a

Cincinnati based small business providing durable medical equipment throughout southwest

Ohio, Indiana, and Kentucky. [*Id.* at ¶2.] Ablecare specializes in Home Oxygen Respiratory

Services and also provides other home medical equipment, such as hospital beds, wheelchairs,

walkers and bath safety equipment. [*Id.*] Ablecare was founded in 1991 by Dino Martis and

employs 55 people in the Cincinnati area. [*Id.*]

Ablecare invested significant time, effort and resources into Round One of the Medicare

Durable Medical Equipment, Prosthetics, Orthotics and Supplies ("DMEPOS") competitive

bidding program. For example, Ablecare put together a team of ten upper- and mid-level

managers to oversee its bidding efforts. [*Id.* at ¶3.] Each team member spent approximately

three hundred hours on Ablecare's bidding efforts, for an estimated total cost to Ablecare of $600,000. [*Id.*] Its efforts were rewarded in March of this year, when CMS awarded Ablecare a total of nine separate contracts to supply medical equipment and supplies in the Cincinnati, Miami, Dallas, and San Juan metropolitan areas. [*Id.* at ¶4.]

Over the past three months, Ablecare has gone to great lengths, and incurred enormous expense, to ensure that it is prepared to service all of its new contracts on July 1, 2008. Ablecare spent approximately $400,000 on new customized software programs to administer and manage its increased business. [*Id.* at ¶5.] Ablecare has also purchased three "fast response team" vans, at a total cost of $126,000, to service its new customers. [*Id.*] In addition, Ablecare has hired four new employees, and expended considerable additional resources in identifying and interviewing other potential new employees. [*Id.*] Ablecare has also worked diligently to expand its existing lines of credit to allow it to add inventory. [*Id.*]

Finally, if Ablecare's Medicare contracts are rescinded, it will lose at least $7.5 million in new business over the next three years. [*Id.* at ¶6.]

The injunction sought by Plaintiffs would have a profound and devastating impact on Ablecare. Ablecare has spent much of the past year gearing up to compete in the new competitive bidding industry and service additional customers and regions. Enjoining the performance of Ablecare's contracts would not only deprive it of millions of dollars in new business, but it would also wipe out all of the time, effort, and money that Ablecare invested in the run-up to the July 1st implementation date. In short, if an injunction is issued, Ablecare will have spent hundreds of thousands of dollars, and thousands of employee hours, for nothing.

Moreover, despite having invested large sums of money into preparing winning bids for multiple contracts awarded through this long awaited competitive bidding program, Ablecare

will be greatly disadvantaged if Round One is re-bid. Ablecare has, in good faith, invested time and money into this process and taken the business risk to submit its lowest and best bid in a blind bidding competition. Now, the losing bidders know what those winning numbers are, and can bid accordingly in any re-bidding process.

At bottom, the relief requested by Plaintiffs is patently unfair to Ablecare and the other winning bidders, and would deprive these businesses of their property interest in the awarded contracts, through no fault of their own.

## II.    LAW AND ARGUMENT

### A.    Introduction

Plaintiffs seek an eleventh-hour preliminary injunction that would strip Ablecare — and 324 other similarly situated businesses — of over 1,000 hard-earned government contracts. In the process, Plaintiffs' proposed injunction would deprive Medicare recipients of long overdue cost-savings on the durable medical equipment on which they depend, while costing the government millions of dollars in increased Medicare payments and lost administrative costs incurred in conducting the first round of bidding. Plaintiffs seek this extraordinary relief despite the fact that they have had nearly five years to lobby, comment upon, oppose, and prepare for competitive bidding. Now, after thousands of hours and millions of dollars have been expended in an impressive effort to finally bring competitive, market-based pricing to the Medicare program, Plaintiffs ask this Court to turn back the clock. Despite their lofty appeal to the public interest, the relief sought by Plaintiffs is in no one's interest but their own. For this reason, *amicus curiae* Ablecare respectfully suggests that Plaintiffs' motion for a preliminary injunction should be denied.

As this Court is aware, a preliminary injunction is an extraordinary remedy, which is only

to be granted if the movant can demonstrate that the circumstances "clearly demand" such relief.

*Overstreet v. Lexington-Fayette Urban County Gov't*, 305 F.3d 566, 573 (6th Cir. 2002).  A

court must balance four factors when considering a motion for a preliminary injunction: "(1)

whether the movant has a strong likelihood of success on the merits; (2) whether the movant

would suffer irreparable injury without the injunction; (3) whether issuance of the injunction

would cause substantial harm to others; and (4) whether the public interest would be served by

issuance of the injunction."  *Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 760 (6th Cir. 2005).

Because Ablecare is a winning bidder serving thousands of Medicare recipients, this

memorandum is principally directed at the latter two considerations.  The Defendants, the federal

officials responsible for implementation of the DMEPOS competitive bidding program, and their

counsel, are well able to address the merits of the parties' positions.

      B.     Competitive Bidding Is In The Public And Government's Interest

The benefits of competitive bidding are as basic as they are obvious.  Under the current

DMEPOS pricing system, politics and inefficient bureaucratic processes, not the marketplace,

determine how much the government and Medicare patients pay for durable medical equipment.

By injecting competition into the system, Congress sought to harness the marketplace to obtain

better pricing on this equipment.  Congress's belief that competitive bidding would be good for

Medicare and its patients is by no means radical -- competitive bidding on federal government

projects, programs and initiatives is standard.  [*See, e.g.,* Federal Acquisition Regulations

System, Competition Requirements Policy, 48 C.F.R. 6.101(a) (describing federal government's

policy to "promote and provide for full and open competition in soliciting offers and awarding

government contracts."]

More importantly, Congress' belief that competitive bidding would be a boon to Medicare and its recipients has thus far proven correct. The old Medicare system — the "status quo" that Plaintiffs seek to keep in place — was plagued by inefficient and often outrageous pricing. For example, a Medicare patient in need of an oxygen concentrator might pay $1,443 in co-insurance to rent one for thirty-six months. [Memorandum from Mark McClellan, M.D., Administrator, Centers for Medicare and Medicaid Services, to Daniel R. Levinson, Inspector General, U.S. Department of Health and Human Services, p.1 (September 7, 2006), attached as Ex. B.] On top of this, Medicare would pay an additional $5,772, for a grand total of $7,215. [*Id.*] Meanwhile, the same oxygen canister could be purchased outright on the open market for less than one-tenth this price — $587. [*Id.*]

Outrageous pricing was not limited to oxygen canisters. The following table illustrates the difference between prices CMS paid for certain pieces of medical equipment and the price a consumer could receive if she purchased the same item on the internet:

| DMEPOS Device | CMS Fee (% above avg. internet price) | Illustrative Average Internet pricing | CMS payment above average internet price |
|---|---|---|---|
| Oxygen concentrator | $2,380 (+352%) | $677 | $1,703 |
| Standard power mobility device | $4,023 (+185%) | $2,174 | $1,849 |
| Hospital bed | $1,825 (+242%) | $754 | $1,071 |
| Continuous positive airway pressure device | $1,452 (+517%) | $281 | $1,171 |
| Respiratory assist device | $3,335 (+247%) | $1,348 | $1,987 |

[Laurence D. Wilson, Director, Chronic Care Policy Group, statement on DMEPOS Competitive Bidding Program before the House Committee on Small Business Subcomitee on Rural and

5

Urban Entrepreneurship (May 21, 2008), [hereinafter "Wilson Statement"], attached as Ex. C.]

In light of this pricing structure, it is not difficult to understand why some DMEPOS suppliers

have so doggedly opposed competitive bidding.

This government waste did not go unnoticed by the Government Accountability Office

("GAO"). For over a decade, the GAO repeatedly advised Congress that Medicare was paying

higher than market rates for its durable medical equipment. [Kathleen M. King, GAO Health

Care Director, statement before Subcommittee on Health of the House Committee on Ways and

Means (May 6, 2008), attached as Ex. D.] Finally, in 1997, Congress passed the Balanced

Budget Act of 1997, which required CMS to test competitive bidding as a new way to set fees

for durable medical equipment. [*Id.*] The test took place in two metropolitan statistical areas

between 1999 and 2002 – Polk County, Florida and San Antonio, Texas. [*Id.*]

The results of those tests were positive and refute many of the public interest concerns

raised by Plaintiffs' in their motion. First, and not surprisingly, competitive bidding "produced

lower prices, leading to lower allowed charges for the Medicare program and reduced payments

by beneficiaries." [Thomas J. Hoerger, Ph.D., Senior Fellow, RTI International, statement

before Subcommittee on Health of the House Committee on Ways and Means (May 6, 2008),

attached as Ex. E.] In addition, and in direct contravention to the fears raised by Plaintiffs, "[t]he

demonstration had relatively little effect on beneficiary access, quality, and product selection.

Beneficiaries remained as satisfied with their suppliers as they were before the demonstration."

[*Id.*] In light of this demonstrative evidence, Plaintiffs' speculative fears about potential harm to

the public through the implementation of the competitive bidding program should be given little

or no weight.

Buoyed by this successful test run, Congress passed the Medicare Prescription Drug, Improvement and Modernization Act ("MMA") in 2003, directing CMS to establish a competitive bidding program for the purchase of durable medical equipment. 42 U.S.C. § 1395w-3(a)(1). While Plaintiffs would have this Court believe that CMS engaged in an ill-considered and headlong rush into the implementation of this program, quite the opposite is true. CMS has spent much of the past five years attempting to ensure that the bidding process is implemented efficiently and fairly. CMS solicited comments, conducted focus groups, consulted with stakeholders, issued draft quality standards for comment, and held a special Open Door Forum to explain the draft standards. [Wilson Statement, *supra*, 5.] Prior to opening the bidding window, CMS went to great lengths to educate companies about the bidding process:

> CMS established a dedicated website, with a comprehensive array of important information for suppliers, including a tool kit, fact sheets, webcasts, and questions and answers. CMS also held open door forums, bidders' conferences, and sent listserv announcements in order to disseminate key information about the program.

[*Id.*] In light of these efforts, it is difficult to identify anything more that CMS could have done to solicit comments and educate bidders about the process.

And, as with the test program before it, the process worked. 325 companies, both large and small, managed to navigate the process and submit qualified, winning bids. [CMS Fact Sheet, "Suppliers Selected for New Program That Reduces Costs for Certain Durable Medical Equipment", *at* http://www.cms.hhs.gov/apps/media/fact_sheets.asp (May 19, 2008), attached as Ex. F.] Over 1,000 contracts were awarded to these companies. [*Id.*] The success of the bidding program is demonstrated by the savings that Medicare and its recipients will receive. On average, beneficiaries in the 10 metropolitan areas subject to the first round of bidding will receive a 26% savings on their durable medical equipment purchases. [Wilson Statement, *supra*,

5.] By 2010, when the program is fully implemented, total savings to Medicare and its recipients is expected to reach $1 billion annually. [*Id.*]

Given these numbers, Plaintiffs' assertion that the public interest would be better served by scrapping the first round of competitive bidding, delaying the second round, and continuing with the status quo, rings hollow. Moreover, Plaintiffs' suggestion that an injunction will only delay implementation of the competitive bidding program for a few months is not accurate. Plaintiffs seek not only a delay in implementation but also a restructuring of the entire program. Plaintiffs' request would necessarily require this Court to throw out the completed first round of bidding, compel CMS to implement new standards and procedures, and re-bid the contracts all over again. If history is any indication, this process is likely to take years, not months. Medicare recipients, many of whom are elderly and on a fixed budget, quite literally cannot afford to wait this long.

In addition, because CMS has already begun educating Medicare recipients about the change-over to the new program, an injunction is also likely to cause mass confusion. Earlier this month, CMS began sending all beneficiaries in the affected areas an introductory letter explaining the new program and a brochure listing all of the winning suppliers in their area. [CMS Press Release, "Medicare Launches Outreach Effort to Help Beneficiaries with New Program That Lowers Costs for Durable Medical Equipment" http://www.cms.hhs.gov/apps/media/press_releases.asp (June 9, 2008), attached as Ex. G.] CMS has also distributed information about the new program on its website, over its 1-800-MEDICARE phone line, and through local State Health Insurance and Assistance program offices. [*Id.*] If an injunction is issued on the eve of implementation, it will be difficult, if not impossible, for CMS to notify the tens of thousands of Medicare recipients in the affected areas

of the change in service plans. Senior citizens and others in fragile health will be confused and panicked as to where and how to secure the equipment they need to stabilize their medical conditions.

The Medicare program, and the taxpayers who fund it, will also be significantly harmed by an injunction. First, like its recipients, CMS will lose the 26% average savings gained through the bidding process. As noted above, those savings could reach $1 billion annually by 2010. Indeed, Representative Fortney "Pete" Stark has estimated that putting the program on hold would cost $3.1 billion over five years. [Mindy Yochelson, "Durable Medical Equipment Bipartisan Bidding Delay Bills Offered in House, Senate by Committee Leaders," BNA News, *at* http://mycmes.org (June 20, 2008), attached as Ex. H.] Given the magnitude of this number, it is clear that even a short delay in implementation could result in losses in the tens of millions of dollars. Aside from the lost savings, Medicare also stands to lose the millions of dollars that it invested in implementing the first round of bidding. Because Plaintiffs are essentially seeking a "mulligan" on the first round of bidding, CMS would be forced to expend twice the amount of effort and money on one round of bidding. Finally, because all of the bidders, both winners and losers, have now seen the winning bid numbers in the first round of bidding, they are likely to bid more strategically in any re-bidding process, likely resulting in lower savings than those achieved in the completed round of bidding.

C.     A Preliminary Injunction Would Cause Irreparable Injury To Ablecare And Other Winning Bidders

A preliminary injunction would have a potentially devastating impact on Ablecare's business. Because Plaintiffs' request effectively asks this Court to scrap the first round of bidding in favor of a new bidding process, Ablecare stands to lose all of the government

9

contracts awarded to it in Round One. Such an injunction would harm Ablecare, and the other 324 winning bidders, in three distinct ways.

First, all of the time, money, and effort invested into securing bids and preparing to service those bids will have been wasted. As noted in Ablecare's statement of interest, it has invested hundreds of thousands of dollars in this process. Hundreds of employee hours were spent compiling the bids and hundreds more have been spent preparing to perform on the winning contracts. [Martis Decl., at ¶3.] In addition, Ablecare has hired four new employees, purchased three new vans, and spent $400,000 on new computer software. [*Id.* at ¶5.] Nor is Ablecare alone in having made such a significant investment. The 324 other winning bidders also have invested similar time and resources into this process. Indeed, a coalition of winning bidders was recently formed for the purpose of lobbying against an industry-backed effort to scrap or delay implementation of the competitive bidding program. The founder of that group, Jeffrey Holman, recently commented upon the considerable efforts that winning bidders have undertaken in preparation for servicing their competitively awarded contracts. "When you talk to members [of the winning bidders coalition] you find out that trucks have been purchased, inventory sometimes put into place, warehouses have been filled. Expansions of phone and computer systems have been done." [Mike Moran, "Some Winning Providers Lobby Against NCB Delay," HME News, *at* http://mycmes.org (June 23, 2008), attached as Ex. I.] If an injunction is issued, all of these efforts will have been for naught.

Second, an injunction will require CMS to cancel the nine contracts already awarded to Ablecare, and the more than 1,000 contracts awarded to the other winning bidders. Ablecare conservatively estimates that the cancellation of these contracts will result in a loss of

approximately $7.5 million in future business. [Martis Decl., at ¶6.] The other 324 winning bidders undoubtedly stand to lose millions more.

Finally, re-opening the bidding process would prejudice Ablecare and all of the other winning bidders. Now that the original winning bid numbers have been disclosed, losing bidders will have a competitive advantage in re-formulating their bids the second time around. The losing bidders now know the targets they need to hit to be awarded a contract.

D.      Plaintiffs Will Not Be Irreparably Harmed By Competitive Bidding

When weighed against the significant harm that an injunction would cause to the government, millions of taxpayers, thousands of Medicare recipients, and hundreds of businesses, Plaintiffs' alleged harm pales in comparison. While Ablecare is not unsympathetic to the plight of Plaintiffs and other providers who stand to lose business as a result of having failed to secure a bid, it is an unfortunate, yet fundamental aspect of competitive bidding that, for every winning bid, there will also be one or more losing bids. Indeed, if courts issued injunctions every time a losing bidder raised concerns about the fairness of a bidding process, few competitively bid contracts would ever be enforced.

Moreover, while Plaintiffs understandably seek to amplify the harm that they stand to suffer, it is important to remember that no losing bidders have been shut out of the DMEPOS program. Contracts have been awarded only in ten metropolitan areas, and for a period of only three years. Plaintiffs will have a second opportunity to secure contracts in these ten metropolitan areas in another thirty-six months. In addition, the "status quo" that Plaintiffs so vociferously seek to impose in this case already remains in place throughout the rest of the nation. Plaintiffs are free to continue to compete in those areas as they have before. And, when

11

Round Two of the competitive bidding takes places in an additional seventy metropolitan areas next year, Plaintiffs will have yet another opportunity to secure CMS contracts.

Unfortunately, rather than focusing their efforts on securing future government contracts, Plaintiffs have instead sought to wrest away over 1,000 contracts that were rightfully awarded to 325 fellow Medicare suppliers.  In the process, Plaintiffs have asked this Court to dismantle a competitive bidding program five years in the making and ten years overdue.  While Plaintiffs' narrow pecuniary interests would be well served by such a ruling, the broader public interest in securing access to affordable, market-priced healthcare equipment plainly would not be.

## III.    CONCLUSION

For the foregoing reasons, *amicus curiae* Ablecare Medical, Inc. respectfully requests that this Court deny Plaintiffs' request for a preliminary injunction.

Dated: June 26, 2008                           Respectfully submitted,


OF COUNSEL                          By:    _____/S/_____
Kathleen M. Trafford                       William P. McGrath, Jr. (DC Bar 422160)
    ktrafford@porterwright.com                 wmcgrath@porterwright.com
Ryan P. Sherman                            Porter Wright Morris & Arthur
    rsherman@porterwright.com              1919 Pennsylvania Avenue NW
Porter Wright Morris & Arthur              Suite 500
41 South High Street                       Washington, DC  20006-3434
Columbus, OH  43215-6194                   Telephone:    202 778-3000
Telephone:    614 227-2000                 Fax:          202 778-3063
Fax:          614 227-2100


                              ATTORNEYS FOR *AMICUS CURIAE*
                              ABLECARE MEDICAL, INC.

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was served on the 26th day of June, 2008, via the Court's electronic filing system (unless otherwise noted) upon the following:

Robert Fabrikant, Esq.
Stephen B. Kinnaird
Sidley & Austin
1501 K Street NW
8th Floor
Washington, DC  20005
*Counsel for Plaintiffs*

Kathryn L. Wyer
United States Department of Justice
P.O. Box 883
Washington, DC  20044
*Counsel for Defendant United States*

_____/S/_____
William P. McGrath, Jr.

13

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| AMERICAN ASSOCIATION FOR HOMECARE, et al., | ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 1:08-cv-00992 |
| | ) | Judge Urbina |
| v. | ) ) | |
| MICHAEL O. LEAVITT, et al., | ) ) | |
| Defendants. | ) ) | |

**DECLARATION OF DINO MARTIS**

Pursuant to 28 U.S.C. § 1746, I, Dino Martis, do declare and say:

1.      I am the President of Ablecare Medical, Inc. ("Ablecare"). I founded Ablecare in 1991.

2.      Ablecare is a Cincinnati-based small business that specializes in Home Oxygen Respiratory Services and provides other durable medical equipment, such as hospital beds, wheelchairs, walkers and bath safety equipment, to southwest Ohio, Indiana, and Kentucky. Ablecare currently employs 55 people in the Cincinnati area.

3.      Ablecare invested substantial time, effort, and resources into Round One of the CMS competitive bidding program. Ablecare organized a team of ten managers to oversee its bidding efforts. Ablecare's management team worked a total of over 3000 hours and Ablecare spent approximately $600,000 to support its management team and to develop competitive bids.

4.      In March of 2008, CMS awarded Ablecare nine separate contracts to supply durable medical equipment and supplies in Cincinnati, Dallas, Miami, and San Juan.

5.      Over the past three months, Ablecare has committed significant resources to prepare for the July 1, 2008 implementation date such as:

      a.      spending approximately $400,000 on customized software programs to manage its increased business;

b.    purchasing three "fast response team" vans at a total cost of $126,000 to service its new customers;

c.    hiring four new employees and expending time and money to locate other potential new employees; and

d.    working diligently to expand its existing lines of credit to allow for additional inventory needs.

6.    If the Medicare contracts that CMS awarded to Ablecare are rescinded, Ablecare will lose at least $7.5 million in new business over the next three years in addition to the over $1 million it has already expended.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_____
Dino Martis
President of Ablecare Medical, Inc.

Executed on this 26th day of June, 2008.

# EXHIBIT B

# ► A P P E N D I X ~ C



DEPARTMENT OF HEALTH & HUMAN SERVICES                Centers for Medicare & Medicaid Services

Administrator
Washington, DC 20201

**DATE:**     SEP 7 2006

**TO:**     Daniel R. Levinson
Inspector General
Office of Inspector General

**FROM:**     Mark B. McClellan, M.D., Ph.D.
Administrator

**SUBJECT:**     Office of Inspector General (OIG) Draft Report: "Medicare Home Oxygen
Equipment: Cost and Servicing," (OEI-09-04-00420)

Thank you for the opportunity to review and comment on this OIG report which compares
Medicare spending on oxygen concentrators with suppliers' average purchase price and
describes the nature and frequency of servicing concentrators and portable equipment.
Regarding equipment costs, the report found that the average purchase price for concentrators is
$587; under the current payment system suppliers would receive a total of $7,215 for 36 months,
a figure significantly in excess of the equipment acquisition costs. Indeed, the report finds that
Medicare beneficiary coinsurance during a 36 month rental period of $1,443 would be in excess
of twice the equipment purchase price. Regarding servicing, the report finds that minimal
servicing and maintenance is necessary for concentrators and portable equipment and that
servicing tasks can be performed in less than 5 minutes. Notably, the report found suppliers
performing services that a beneficiary could be doing. This is an important report by the OIG
that concludes Medicare will continue to pay excessively for oxygen equipment, even after
implementation of the provisions of the Deficit Reduction Act of 2005 (DRA) affecting oxygen
equipment.

Home oxygen equipment and oxygen contents are covered under the durable medical equipment
(DME) benefit and payment is made on the basis of monthly fee schedule amounts that are
modality neutral (i.e. the same payment amount applies regardless of whether the patient uses a
gaseous, liquid or concentrator system). Prior to passage of the DRA, these monthly payments
continued for as long as medically necessary. The DRA limited Medicare payment to 36
monthly rental payments after which equipment ownership transfers to the beneficiary. The
DRA did not change Medicare's current fee schedule amount of about $200 per month. Of the
$200, Medicare pays 80 percent or $160, and the beneficiary pays 20 percent or $40.

The draft report provides valuable insight for the Centers for Medicare & Medicaid Services
(CMS) on the suppliers' average purchase price for oxygen concentrators. The OIG report found
that concentrators cost about $587, on average, to purchase. The report also found that suppliers
rented used concentrators to about 73 percent of the sampled beneficiaries. With the current
$200 monthly payment amount, suppliers would receive a total of $7,215 for 36 months, a figure
significantly in excess of the equipment acquisition costs. Medicare beneficiary coinsurance

A P P E N D I X ~ C

Page 2 – Daniel R. Levinson

during a 36 month rental period would be $1,443 and the coinsurance payments exceed the costs of purchasing two concentrators.

The draft report also provides details for CMS on the maintenance and servicing that is actually done during a supplier's visit. The report finds that minimal servicing and maintenance is necessary for concentrators and portable equipment. The report found suppliers performing services that a beneficiary could do, such as a cleaning a concentrator's external filter. This finding is based on reports from suppliers, on actual on-site observation and accompanying suppliers on their visits to beneficiaries' homes.

The report also found that suppliers checked concentrators every 4 months but it does not indicate whether servicing every 4 months is an appropriate servicing schedule. It points out that these servicing tasks take minimal time to perform and can be performed in less than 5 minutes, however, the initial delivery and set-up can take as long as one hour. Also, according to manufacturer guidelines, more comprehensive preventive maintenance need only be performed annually or after several thousand hours of use. This report substantiates that oxygen concentrators are sturdy and long lasting equipment that require minimal maintenance and servicing. This information is very useful as CMS develops policy on maintenance and servicing for beneficiary-owned oxygen equipment.

The draft report also provides information on the refilling of contents for portable systems. Unlike concentrators, most portable oxygen systems require refilling tanks. The exceptions are the new technology of oxygen equipment such as the transfilling machines and the portable concentrators. The report found that suppliers picked up empty tanks and delivered full ones once every 3 months. As the report indicates, after ownership of equipment, Medicare will make a separate payment for refilling portable tanks, currently about $21 per month and that such payment amount may not be an adequate amount to reimburse suppliers for providing portable refills. The appropriateness of current payment structure for beneficiary owned oxygen equipment has been amplified in light of the recent changes by the DRA. This is critical information as CMS develops policy for beneficiary-owned equipment, specifically for portable systems.

Finally, the report contains an estimate of the savings for a policy that would reduce the number of months for which Medicare would make rental payments for oxygen concentrators from 36 to 13 months. We are concerned that the savings estimate presented in Table 1 for such policy is too high. As the report indicates, this estimate does not include an offset for separate payments that Medicare would make for maintenance and servicing after ownership transfers to a beneficiary after 13 months under such policy. Also, the estimate is for a policy that would reduce the number of monthly rental payments from 36 to 13 for concentrators only. As such, there could be incentives for suppliers to switch oxygen modality to oxygen tanks in order to continue to receive the $200 monthly payment amounts from Medicare for months 14 through 36. The estimate does not make an adjustment for such potential behavior shift or any other potential behavior changes. Savings are typically presented by the Congressional Budget Office

A P P E N D I X ~ C

Page 3 – Daniel R. Levinson

(CBO) and the CMS Office of the Actuary (OACT) as estimates of Federal budget savings, that is excluding coinsurance and Part B premium savings to beneficiaries. As footnote 3 indicates, such Federal savings are typically 60 percent of savings without these offsets. Thus, the figures presented in Table 1 are higher than would be presented by CBO or OACT. CBO and OACT also present savings on a fiscal year basis and on a cash rather than incurred basis which would also reduce the estimates presented in Table 1.

The Department of Health and Human Services is committed to ensuring that changes in Medicare payment rules for home oxygen affecting Medicare beneficiaries and suppliers are implemented in a way that fosters access to needed items and services in a cost effective manner. This commitment is reflected in the proposed rule that was published on August 3, 2006 at CMS 1304-P [71 Fed Reg 44082 (August 3, 2006)], that would establish certain policies designed to implement the DRA changes and other changes in a way that safeguard beneficiary access to quality items and new technology and ensure access to oxygen contents and maintenance and servicing of beneficiary owned equipment.

**OIG Recommendation**

Recommends that CMS work with Congress to further reduce the rental period for oxygen equipment.

**CMS Response**

We agree. The Administration's fiscal year 2007 budget contained a proposal to reduce the monthly rental limit for oxygen from 36 to 13 months.

**OIG Recommendation**

Recommends that CMS determine the necessity and frequency of nonroutine maintenance and servicing for concentrators.

**CMS Response**

In the proposed rule published on August 3, 2006, CMS proposed to pay for reasonable and necessary nonroutine service and maintenance for oxygen concentrators. Nonroutine service and maintenance would cover tasks that a trained technician needs to perform such as the concentrator flow rate prescribed by the physician and checking the concentration of oxygen delivered by the unit but would exclude tasks that a beneficiary does such as cleaning the concentrator's external (dust) filter. The proposed rule did not propose a specific frequency schedule though we would be interested to receive comments during the comment period on servicing schedules.

A P P E N D I X ~ C

Page 4 – Daniel R. Levinson

**OIG Recommendation**

Recommends that CMS determine if a new payment methodology is appropriate for portable oxygen systems.

**CMS Response**

In the proposed rule published on August 3, 2006, CMS proposed to revise payment for refilling portable oxygen tanks after ownership. The rule proposes to raise the payment amount from $21 to $55. We are accepting comments on the appropriateness of this payment amount for the refilling of portable contents after ownership.

We conclude by offering thanks to the OIG for this informative report that provides essential information that CMS can use to achieve the goals of the Agency to improve beneficiary access to necessary equipment and services and implement cost effective Medicare payments for home oxygen equipment.  Over the past several years we have worked closely with the OIG on issues affecting Medicare payment for oxygen equipment and we look forward to continuing this collaboration on these very important issues.

# EXHIBIT C

**Testimony**

Statement by
**Laurence D. Wilson,**
**Director, Chronic Care Policy Group**

on
**DMEPOS Competitive Bidding Program**

before
**House Committee on Small Business Subcommittee on Rural and Urban Entrepreneurship**

**Wednesday, May 21, 2008**

Good morning Chairman Shuler, Ranking Member Fortenberry, and distinguished members of the Subcommittee.  I am pleased to be here today on behalf of the Centers for Medicare & Medicaid Services (CMS) to discuss the durable medical equipment, prosthetics, orthotics and supplies (DMEPOS) competitive bidding program mandated by the Medicare Prescription Drug, Improvement, and Modernization Act (MMA) of 2003.  This major initiative will reduce beneficiary out-of-pocket costs, improve the accuracy of Medicare's DMEPOS payments, help combat supplier fraud, ensure beneficiary access to high quality DMEPOS items and services, and save taxpayers billions of dollars.

**Overview**

CMS is the largest purchaser of health care in the United States, serving over 92 million Medicare, Medicaid, and SCHIP beneficiaries.  Medicare alone covers roughly 44 million individuals, with total gross Medicare benefit outlays and administrative costs projected to reach approximately $499 billion in Fiscal Year (FY) 2009.1  CMS projects that gross spending for Medicare will equal approximately $8.7 billion on DME alone in 2009.  Each year, DMEPOS suppliers provide items and services including power wheelchairs, oxygen equipment, walkers and hospital beds to millions of Medicare beneficiaries.

Medicare currently pays for DMEPOS items and services using fee schedule rates for covered items.  In general, fee schedule rates are calculated using historical supplier charge data from about 20 years ago that may not be reflective of an appropriate payment amount for today's market.  Relying on historical charge data has resulted in Medicare payment rates that are often higher than prices charged for identical items and services when furnished to non-Medicare customers.  Medicare beneficiaries and taxpayers bear the cost of these inflated charges.  Table 1 shows the differences between the current CMS fees for certain devices compared to the average prices a consumer would see if shopping for that device on the Internet.

**Table 1: Illustrative Comparison Prices Pre-Competitive Bidding**

| DMEPOS Device (rank by use) | CMS Fee (% above average internet price) | Illustrative Average Internet Pricing | CMS payment above average internet price |
|---|---|---|---|
| Oxygen concentrator (#1) | $2,380  (+352%) | $677 | $1,703 |
| Standard power mobility device (#3) | $4,023  (+185%) | $2,174 | $1,849 |
| Hospital bed (#4) | $1,825  (+242%) | $754 | $1,071 |
| Continuous positive airway pressure device (#5) | $1,452  (+517%) | $281 | $1,171 |

| Respiratory assist device BiPAP (Bi-level Positive Airway Pressure) (#18) | $3,335 (+247%) | $1,348 | $1,987 |

Under the new DMEPOS competitive bidding program, beginning in 10 metropolitan statistical areas (MSAs) on July 1, 2008, Medicare payment to suppliers for certain equipment and supplies will be calculated based on competitive bids submitted by accredited suppliers that meet both quality and financial standards.  Suppliers who meet all of the requirements of the program and submit bids in the winning range will be awarded contracts in designated competitive bidding areas.  These Medicare contract suppliers will then serve beneficiaries in the 10 competitive bid areas and will be monitored by CMS on their performance, quality and customer service.  Requiring suppliers to submit bids, including information on price, accreditation, and financial standards will ensure continued access to high-quality medical equipment and supplies at more reasonable prices to beneficiaries and the Medicare program.  These changes, which result in more accurate pricing and improved oversight, also support CMS' efforts to reduce Medicare waste, fraud and abuse.

## Beneficiary Savings

The success story of DMEPOS competitive bidding is reflected in the amount of money that beneficiaries will save as a result of lower coinsurance across the board for these products.  Competitive bidding will successfully reduce the amount Medicare will pay for these items and has brought the payment amounts in line with that of a competitive market.  When fully implemented in 2010, the program is projected to save Medicare and taxpayers $1 billion annually[2] – and these savings will directly translate to lower coinsurance for beneficiaries.  Further, the projected overall savings to Part B of the Medicare program should slow the annual increase of the Part B premium Medicare beneficiaries pay each month.

Across all 10 MSAs participating in the initial phase of competitive bidding and in each product category, beneficiaries will see an average savings of 26 percent when the new payment rates go into effect on July 1, 2008.  For example, beneficiaries in Orlando who use oxygen will save 32 percent.  Before competitive bidding, Medicare paid $199.28 a month for oxygen rental in Orlando and, after the bid process; the price will be reduced to $140.82 per month.  The beneficiary, who has been paying coinsurance of $39.86 per month, will soon be paying $28.17 per month, a savings of $140 per year.  In Charlotte and Cincinnati, beneficiaries will save 30 percent, Miami beneficiaries will save 29 percent, Pittsburgh 28 percent, Cleveland 27 percent, Kansas City 25 percent, Dallas 23 percent and Riverside 22 percent[3].

Average savings generated for some commonly used items, for which Medicare pays 80 percent and beneficiaries pay 20 percent of the allowed amount following payment of the annual Part B deductible, is summarized in the following chart[4]:

### Table 2: Examples of Medicare and Beneficiary Savings

| Item/Period of Service | Current Allowed Amount** | New Allowed Amount** | Medicare Savings 80% of Difference | Beneficiary Savings 20% of Difference |
|---|---|---|---|---|
| **Concentrator** | | | | |
| Per month | $199.28 | $140.82 | $46.77 | $11.69 |
| Per year | $2,391.36 | $1,689.84 | $561.24 | $140.28 |
| Per 3 years* | $7,174.08 | $5,069.52 | $1,683.72 | $420.84 |
| **Hospital Bed** | | | | |
| Per month | $140.46 | $99.28 | $32.94 | $8.24 |

| Per 13 months* | $1,474.78 | $1,042.46 | $345.86 | $86.46 |

**Diabetic Supplies**

| | | | | |
|---|---|---|---|---|
| Per month | $82.68 | $47.53 | $28.12 | $7.03 |
| Per year | $992.16 | $570.36 | $337.44 | $84.36 |
| Per 3 years | $2,976.48 | $1,711.08 | $1,012.32 | $253.08 |

* Beneficiary takes over ownership of equipment after end of rental payment period
** 20% of current and new allowed amount is paid by the beneficiary out-of-pocket

In the competitive bidding areas, Medicare suppliers are currently paid based on fee schedule amounts that average $82.68 per month for diabetic testing supplies (100 lancets and test strips) of which the beneficiary pays 20 percent (approximately $16.54 per month on average).  The payment is the same regardless of whether the supplies are mailed to the beneficiary's home or purchased at local stores (e.g., pharmacies).  Under the competitive bidding program, the average Medicare-allowed monthly payment amount for these supplies in the competitive bidding areas will be reduced 43 percent from $82.68 to $47.53, in those cases where the beneficiary chooses to obtain the supplies on a mail order basis.  If the beneficiary does not wish to receive their replacement testing supplies in the mail, they can elect to obtain them from a local store with no reduction in the allowed payment amount or beneficiary coinsurance amount.

**Quality and Financial Standards**

The program provides important safeguards to ensure high quality, good customer service, and improved oversight.  These safeguards also ensure a level playing field for suppliers competing for contracts under the competitive bidding program.

*Quality and Accreditation Standards*.  The MMA required the establishment of quality standards for DMEPOS suppliers to be applied by independent accreditation organizations.  The quality standards address the set up and delivery of items and services, beneficiary education on the use of these products, suppliers' accountability, business integrity, performance management, and other areas.  CMS conducted a wide variety of activities to involve stakeholders (including many targeted specifically for small business suppliers) and the public in development of these standards.  Specifically:

- We conducted focus groups early in this process to provide small suppliers with an opportunity to share concerns about the impact quality standards would have on their businesses.
- We consulted with various stakeholders, including small supplier business owners, physicians, homecare association members, trade association members, accreditation organizations, clinical experts, and industry attorneys.
- We presented draft quality standards to the Program Advisory and Oversight Committee (PAOC) to provide advice on the Medicare DMEPOS competitive bidding program and quality standards.
- On September 26, 2005, we posted the draft standards on our web site for a 60-day public comment period that ended November 28, 2005.
- We held a special Open Door Forum to explain the draft quality standards and to solicit comments.

CMS received more than 5,600 public comments on the draft quality standards.  Based on these comments, we made significant revisions to reduce the burden on small suppliers while continuing to ensure quality services for Medicare beneficiaries.  All suppliers selected as Medicare contract suppliers in Round I of the competitive bidding program must be accredited under these standards, and all DMEPOS suppliers nationally must be accredited by September 30, 2009.

*Financially viable business partners*.  The MMA also requires that suppliers meet financial standards in order to contract with Medicare under the competitive bidding program.  These financial standards allow Medicare to assess the ability of suppliers to provide quality items and services in sufficient quantities to meet beneficiaries' needs.  Ultimately, financial standards for

suppliers will help maintain beneficiary access to quality items and services by ensuring that contract suppliers are viable entities able to consistently provide quality items and services to patients for the life of their contracts. They also help to weed out disreputable operators that prey on Medicare and beneficiaries from legitimate suppliers acting in the best interests of their patients. As part of bid solicitation, each supplier submitted required financial documentation, including balance sheets, statements of cash flows, and profit and loss statements from tax returns. CMS evaluated each bidder's financial documentation to determine whether the supplier had met the standards required to participate in the program.

It is important to note that the financial documentation requirements were crafted in a way that considers small suppliers' business practices and constraints, while remaining consistent with the financial standards mandate of the MMA. We have limited the number of financial documents that a supplier must submit so that the requirement will be less burdensome for all suppliers, including small suppliers. We believe we have balanced the needs of small suppliers with the needs of beneficiaries in requesting documents that will provide us with sufficient information to determine the financial soundness of a supplier, regardless of its size.

## Final Regulations

 Two of the goals of CMS' final regulations implementing the competitive bidding program were ensuring that beneficiaries maintained access to quality items and services, and that small suppliers had an opportunity to participate in the program.

*Beneficiary protections*.    We anticipate that competitive bidding will save money for beneficiaries and taxpayers, while ensuring beneficiary access to high-quality items. The following are specific examples of the beneficiary protections established in the competitive bidding program:

- Contract suppliers must be accredited and meet the newly established financial and quality standards, and DMEPOS quality standards and accreditation requirements and, as a result, will maintain a business model that that supports quality, customer service, and access to care for beneficiaries.  The independent accrediting organizations will play a key role in ensuring that contract suppliers continue to meet these quality standards.
- CMS' regulations require that multiple contract suppliers are selected to meet beneficiary demand in each competitive bidding area. This means that beneficiaries will have access to the services they need and that competition among winning suppliers, based on quality, customer service, will provide beneficiaries with choices regarding the source of their medical equipment and supplies.
- For the first time in the history of the Medicare program, the performance of suppliers will be monitored through beneficiary satisfaction surveys that measure their level of satisfaction with the services they receive from contract suppliers.
- Beneficiaries will have no financial liability to a non-contract supplier unless they are presented with and sign an advance beneficiary notice before a product is furnished to them. This protects beneficiaries from inadvertent financial liability in excess of what a contract supplier could offer
- When a physician specifically prescribes a particular brand name product or mode of delivery to avoid an adverse medical outcome, contract suppliers are required either to furnish that item or mode of delivery, to assist the beneficiary in finding another contract supplier in the competitive bidding area that can provide that item or service, or to consult with the physician to find a suitable alternative product or mode of delivery for the beneficiary.
- Beneficiaries will be able to obtain repairs of equipment they own from either a contract or non-contract supplier with a valid Medicare billing number.
- Replacement parts needed to repair beneficiary-owned equipment may also be obtained by a beneficiary from either a contract or non-contract supplier with a valid Medicare billing number, even if the parts are competitively bid items.
- Contract suppliers are required to make available the same items to beneficiaries that they make available to non-Medicare customers.  For transparency, we will post on our web site a list of brands furnished by each contract supplier.
- Under the grandfathering rules, a beneficiary will have the opportunity to make arrangements with a non-contract supplier that will allow the beneficiary to continue to receive certain rented items from the same supplier (grandfathered supplier) that had been furnishing the item to the beneficiary before the implementation of the competitive bidding program, provided the supplier is willing to do so. If a non-contract supplier agrees to furnish

"grandfathered" items to one beneficiary, it must furnish those items to all beneficiaries who elect to continue receiving the grandfathered items from that supplier.

*Small Supplier Considerations:*  In developing this important new program, CMS worked closely with suppliers, manufacturers and beneficiaries through a transparent public process.  This process included many public meetings and forums, the assistance of the PAOC (which included representation from the small supplier community), small business and beneficiary focus groups, notice and comment rulemaking, and other opportunities to hear the concerns and suggestions of stakeholders.  As a result, CMS' policies and implementation plan pay close attention to the concerns of these constituencies, in particular those of small suppliers.

The first round of the DMEPOS competitive bidding program is now complete.  During the implementation of this program, CMS adopted numerous strategies to ensure small suppliers have the opportunity to be considered for participation in the program.  For example:

- CMS worked in close collaboration with the Small Business Administration to develop a new, more appropriate definition of "small supplier" for this program.  Under this definition, a small supplier is a supplier that generates gross revenues of $3.5 million or less in annual receipts including Medicare and non-Medicare revenue rather than the previous standard of $5 million. We believe that this $3.5 million standard is representative of small suppliers that provide DMEPOS to Medicare beneficiaries.
- Further, recognizing that it may be difficult for small suppliers to furnish all the product categories under the program, suppliers are not required to submit bids for all product categories.  The final regulation implementing the program allows small suppliers to join together in "networks" in order to meet the requirement to serve the entire competitive bidding area.
- In addition, to help ensure that there are multiple suppliers for all items in each competitive bidding area (CBA), each bidder's estimated capacity, for purposes of bid evaluation only, was limited to 20 percent of the expected beneficiary demand for a product category in a CBA. This policy ensures that multiple contract suppliers for each product category were selected and that more than enough contract suppliers are selected to meet demand for items and services in area.  For most areas and product categories, the result of this policy will be an increase of the number of contracts awarded by CMS beyond the statutory threshold of two contracts per product category per CBA.

 The regulation also established a 30 percent target for small supplier participation in the program.

CMS recognizes that under existing Medicare law and policies, physicians and other treating professionals sometimes supply certain items of DMEPOS to their patients as part of their professional service.  The competitive bidding program preserves this physician-patient relationship by allowing physicians and other treating practitioners to continue supplying certain items to their patients without participating in the bidding process.

*Considerations for Low Population Density Areas and Rural Areas:*

The statute also provides CMS with discretionary authority for exempting low population density areas within urban areas and rural areas that "are not competitive" from competitive bidding unless there is a significant national market through mail order for a particulate item or service. In the final rule, we indicated that we were finalizing our proposal to allow for the use of this authority if data indicated that an area was not competitive based on one or more of the following indicators:

- Low utilization of DMEPOS items by Medicare beneficiaries receiving fee-for-service benefits relative to similar geographic areas;
- Low number of suppliers of DMEPOS relative to other similar geographic areas; and
- Low number of Medicare beneficiaries receiving fee-for-service benefits in the area relative to other similar geographic areas.

For Round 1, we used this discretionary authority to exempt a large portion of Eastern Riverside and San Bernardino Counties in the Riverside MSA.  We also exempted whole counties in the

densities that were too low relative to other parts of the MSA and that the allowed charges for DMEPOS items attributed to these areas were low relative to the MSA as a whole, indicating that the areas were not competitive when compared to other parts of the MSA. We will use a similar process to determine which areas might be exempted during Round Two.

**The Bidding Process**

The initial round of DMEPOS competitive bidding (Round 1) officially closed on September 25, 2007. We received a total of 6,209 bids for the competitively bid products across all 10 Metropolitan Statistical Areas (MSAs) in which CMS is proceeding with competitive bidding. Of the bids received, 1,335 were winning bids. Our target for small supplier participation was exceeded, with 64 percent of contracts offered to small suppliers during the initial round of contract offers. Winning bids were offered a contract and as of April 18, 2008, 1,254 contracts have been signed by suppliers, a 96 percent acceptance rate. We are aware that a number of suppliers had their bids disqualified, and the majority of these were for failing to submit the supporting financial documentation that was outlined in the Request for Bids. This documentation is critical for determining whether suppliers meet financial standards, as required by the MMA. These standards are essential to ensure that Medicare contracts only with financially sound suppliers capable of serving beneficiaries needs over the life of the contract.

In order to ensure that bidders were fully informed about this new program, CMS made a significant effort to educate and communicate with potential bidders on the bidding process, including the required documentation, and the rules and procedures for submitting a successful bid. Preliminary education began months before the final regulation was issued, and the formal education campaign began on April 2, 2007, the day the final regulation was released. Also in April 2007, CMS hosted a special Open Door Forum on DMEPOS competitive bidding in which more than 1,000 suppliers participated. Prior to opening the supplier bid window on May 15, 2007, CMS established a dedicated website5, with a comprehensive array of important information for suppliers, including a tool kit, fact sheets, webcasts, and questions and answers. CMS also held Open Door Forums, bidders' conferences, and sent listserv announcements in order to disseminate key information about the program.

**Outreach**

CMS is making great efforts to ensure the program's success. Our outreach plan includes extensive communication to four major categories of stakeholders: beneficiaries, partner groups (the local Area Agencies on Aging, the State Health Insurance Assistance Programs (SHIPs), beneficiary advocacy groups and other local organizations that come in contact with Medicare beneficiaries), providers (doctors, social workers, discharge planners and others), and DMEPOS suppliers (including the new contract suppliers, non-contract suppliers and grandfathered non-contract suppliers).

Our beneficiary outreach will include a direct mailing to all beneficiaries in the Round 1 MSAs, which will contain a letter, a brochure that outlines the new program and a list of all Medicare DMEPOS contract suppliers in their MSA. A beneficiary fact sheet is also available, and will be available through partner groups and providers. We will also rely heavily on our partner groups to assist in this transition. My staff and I have been in contact with, and will continue to meet with, partner groups to educate them on this program and ask for support as the program is implemented.

Provider outreach includes doctors, social workers, referral agents, discharge planners and others. This information is delivered through the Center for Medicare Management listservs, Medicare Learning Network Matters articles, training sessions, and teleconferences. Provider outreach aims to educate providers on how to communicate with the beneficiary about this new program and where to refer their Medicare beneficiaries who need DMEPOS. The communication pieces are delivered through the same avenues as the technical program requirements as well as through local and national medical, social work, referral agent and discharge planning organizations. We are considering conducting a direct mailing to providers as well.

DMEPOS suppliers are reached through the provider outreach method as well as through the

Competitive Bidding Implementation Contractor (CBIC). Throughout the bidding process, the CBIC, in conjunction with CMS, delivered information and messages to suppliers to assist in understanding the program and its requirements through email messages, the CBIC website, bidders' conferences, teleconferences and direct conversations.  Soon, a program manual outlining technical program requirements including policies and claims processing requirements will be available to suppliers on the CMS website.  All suppliers, including the new contract suppliers, non-contract suppliers and grandfathered non-contract suppliers should be receiving an email notice that information about the program requirements is available.

Our outreach strategy is administered both at the national and the regional level.  Our CMS Regional Office staff has targeted local organizations, including local Chambers of Commerce, State Departments of Insurance and local elected officials to request that they share information with their members or constituents.

Once the program begins, Regional Offices will respond to general inquiries from beneficiaries and stakeholders and may refer inquiries/complaints that are beneficiary or claims specific to 1-800-MEDICARE, which will be the primary point of contact for beneficiaries.  Inquiries and complaints may also be referred to the DME claims processing contractor or local ombudsman depending upon their nature and scope.  Inquiries and complaints will be tracked for internal reporting purposes.

In order to ensure that beneficiaries are able to access quality DMEPOS, we will be monitoring the program closely at multiple levels.  CMS is committed to ensuring a smooth transition for beneficiaries, providers and suppliers when the new payment rates take effect on July 1, 2008.

- The performance of contract suppliers will be monitored through beneficiary satisfaction surveys that measure beneficiaries' level of satisfaction with the services they receive under the competitive bidding program.
- CMS will track the number of questions SHIPs receive about DMEPOS issues.
- CMS will track the volume of questions and requests for DMEPOS information on 1-800-MEDICARE.
- CMS will track payments and claims to non-contracted suppliers for grandfathered supplies.
- CMS will track the number of Advance Beneficiary Notices (ABNs) issued by non-contract suppliers in a competitively bid area (CBA) for competitively bid items.
- CMS will track the shift from non-contract to contract suppliers for the DMEPOS competitively bid products, comparing before and after July 1 and over time.

**Conclusion**

The first round of the competitive bidding process has proven to be successful.  Medicare beneficiaries in CBAs will realize, on average, a 26 percent savings on certain commonly used DMEPOS, and small suppliers account for 64 percent of the winning bids.  CMS has taken care to implement this program in a way that emphasizes the needs of beneficiaries while addressing the concerns of small suppliers.  CMS has already begun a comprehensive outreach and education campaign in order to ensure a smooth transition for beneficiaries come July 1.  We set out to provide beneficiaries with quality DMEPOS, at a lower price, from reliable suppliers in communities.  We have lower prices, we have reliable suppliers and we are in the process of educating beneficiaries and suppliers about this new program.  Our extensive monitoring network will signal any issues that arise and allow us to move to correct them quickly and efficiently.

[1] Department of Health and Human Services, Budget in Brief: FY 2009.
[2] Federal Register, April 10, 2007, page 18079
[3] CMM data derived from bid results
[4] http://www.cms.hhs.gov/apps/media/press/factsheet.asp?
[5] www.dmecompetitivebid.com

Last revised: June 24,2008

U.S. Department of Health & Human Services · 200 Independence Avenue, S.W. · Washington, D.C. 20201

# EXHIBIT D



**United States Government Accountability Office**

Testimony

Before the Subcommittee on Health, Committee on Ways and Means, House of Representatives

For Release on Delivery
Expected at 1:00 p.m. EDT
Tuesday, May 6, 2008

# MEDICARE

# Competitive Bidding for Medical Equipment and Supplies Could Reduce Program Payments, but Adequate Oversight Is Critical

Statement of Kathleen M. King
Director, Health Care



G A O
Accountability * Integrity * Reliability

May 6, 2008

# G A O
Accountability · Integrity · Reliability

# Highlights

Highlights of GAO-08-767T, a testimony
before the Subcommittee on Health,
Committee on Ways and Means, House of
Representatives

# MEDICARE

## Competitive Bidding for Medical Equipment and Supplies Could Reduce Program Payments, but Adequate Oversight Is Critical

## Why GAO Did This Study

For more than a decade, GAO has reported that Medicare has paid higher than market rates for medical equipment and supplies provided to beneficiaries under Medicare Part B. Since 1989, Medicare has used fee schedules primarily based on historical charges to set payment amounts. But this approach lacks flexibility to keep pace with market changes and increases costs to the federal government and Medicare's 44 million elderly and disabled beneficiaries. The Balanced Budget Act of 1997 required the Centers for Medicare & Medicaid Services (CMS)—the agency that administers Medicare—to test competitive bidding as a new way to set payments. CMS did this through a demonstration in two locations in which suppliers could compete on the basis of price and other factors for the right to provide their products. The Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (MMA) required CMS to conduct competitive bidding on a large scale and suppliers to obtain accreditation.

GAO was asked to describe the effects that competitive bidding could have on Medicare program payments and suppliers and the need for adequate oversight to ensure quality and access for beneficiaries in a competitive bidding environment. This testimony is based primarily on GAO work conducted from May 1994 to January 2007, which GAO updated by interviewing CMS officials and reviewing agency documents.

To view the full product, including the scope and methodology, click on GAO-08-767T. For more information, contact Kathleen M. King at (202) 512-7114 or kingk@gao.gov.

## What GAO Found

Competitive bidding could reduce Medicare program payments by providing an incentive for suppliers to accept lower payments for items and services to retain their ability to serve beneficiaries and potentially increase their market share. Fundamentally different from fee schedules based on historical charges to Medicare, competitive bidding allows the market to help CMS determine payment amounts. In the demonstration, the new fee schedule amounts were based on the winning suppliers' bids for items included and 50 percent to 55 percent of the bids from suppliers were selected. Evidence from CMS's competitive bidding demonstration suggests that competition saved Medicare $7.5 million and saved beneficiaries $1.9 million—without significantly affecting beneficiary access. For the competitive bidding program, CMS required suppliers to obtain accreditation based on quality standards and provide financial documents to participate. This added scrutiny gives CMS the chance to screen out suppliers that may not be stable, legitimate businesses, which could contribute to lower rates of improper payment. CMS also evaluated the bids based on demand, capacity, and price and chose suppliers whose bids were at or under a certain amount. CMS estimates that the first round of its competitive bidding program will result in payment amounts that average 26 percent less than the current fee schedule amounts. Competitive bidding also changes Medicare's relationship with suppliers and departs from Medicare's practice of doing business with any qualified provider, because it is designed to limit the number of suppliers to those whose bids are at or under a certain amount.

Because of concerns that competitive bidding may prompt suppliers to cut their costs by providing lower-quality items and curtailing services, ensuring quality and access through adequate oversight is critical for the success of the competitive bidding program. In September 2004, GAO indicated that quality assurance steps could include monitoring beneficiary satisfaction, setting standards for suppliers, giving beneficiaries a choice of suppliers, and selecting winning bidders based on quality and the dollar amount of the bids. As competitive bidding expands, problems that beneficiaries might experience could be magnified. Therefore, continued monitoring of beneficiary satisfaction will be critical to identify problems with suppliers or with items provided to beneficiaries. As required in the MMA, GAO will review and report on the competitive bidding program's impact on suppliers and manufacturers and its effect on quality and access for beneficiaries.

Mr. Chairman and Members of the Subcommittee:

I am pleased to be here as you discuss the Medicare competitive bidding program for durable medical equipment (DME), prosthetics, orthotics, and supplies—products referred to in this statement as medical equipment and supplies.[1] For more than a decade, we and the Department of Health and Human Services (HHS) Office of Inspector General (OIG) have periodically reported that Medicare, administered by the Centers for Medicare & Medicaid Services (CMS), has paid higher than market rates for various medical equipment and supply items.[2] These overpayments increase costs to the program and to Medicare's 44 million elderly and disabled beneficiaries. CMS reported in 2007 that total Medicare expenditures for medical equipment and supplies were about $10 billion.[3]

Since 1989, Medicare has paid for medical equipment and supplies through fee schedules that list a maximum and minimum payment amount. The schedules are based on average supplier charges on Medicare claims in 1986 and 1987 and have been updated in some years to reflect inflation.[4] However, this payment approach lacks flexibility to keep pace with market changes, and as a result, Medicare often pays higher prices than other public payers for medical equipment and supplies. The Balanced Budget Act of 1997 (BBA)[5] required CMS to test competitive bidding as a new way for Medicare to set fees for Part B items and services specified by CMS, which the agency did through a demonstration focused on medical

---

[1]Medicare guidance defines DME as equipment that serves a medical purpose, can withstand repeated use, is generally not useful in the absence of an illness or injury, and is appropriate for use in the home. DME includes items such as wheelchairs, hospital beds, and walkers. Medicare defines prosthetic devices (other than dental) as devices that are needed to replace body parts or functions. Prosthetic devices include artificial limbs and eyes, enteral nutrients, ostomy bags, and cardiac pacemakers. Medicare defines orthotic devices to include leg, arm, back, and neck braces that provide rigid or semirigid support to weak or deformed body parts or restrict or eliminate motion in a diseased or injured part of the body. Medicare-reimbursed supplies are items that are used in conjunction with DME and are consumed during the use of the equipment, such as drugs used for inhalation therapy, or need to be replaced frequently (usually daily), such as surgical dressings.

[2]A list of related GAO products is included at the end of this statement.

[3]These expenditures reflect claims submitted April 1, 2006, through March 31, 2007.

[4]CMS has established a process to price new items that are added to the fee schedule.

[5]Pub. L. No. 105-33, § 4319(a), 111 Stat. 251, 392 (1997).

equipment and supplies.[6] Competitive bidding is a process in which suppliers of medical equipment and supplies compete for the right to provide their products on the basis of established criteria, such as quality and price. About a year after the demonstration concluded, the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (MMA) required CMS to conduct a competitive bidding program for DME, supplies, off-the-shelf orthotics, and enteral nutrients and related equipment and supplies on a large scale.[7]

In my testimony today, I will discuss (1) the effects that competitive bidding could have on Medicare program payments and suppliers and (2) the need for adequate oversight to ensure quality and access for beneficiaries in a competitive bidding environment. My testimony is based primarily on our previously issued work, conducted from May 1994 to January 2007, which we updated with information on the competitive bidding process by interviewing CMS officials and reviewing agency documents. We shared a statement of facts regarding this testimony with CMS and incorporated the agency's comments as appropriate. We conducted this performance audit from April 2008 through May 2008 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

In summary, competitive bidding could reduce Medicare program payments by providing an incentive for suppliers to accept lower payments for items and services to retain their ability to serve beneficiaries and potentially increase their market share. Fundamentally different from fee schedules based on historical charges to Medicare, competitive bidding allows the market to help CMS determine payment amounts. In the demonstration, the new fee schedule amounts were based

---

[6]Medicare Part B helps pay for certain physician, outpatient hospital, laboratory, and other services, and medical equipment and supplies. Beneficiaries are required to pay a monthly premium for their Part B coverage.

[7]The competitive bidding program changes the way that Medicare determines the payment amounts for medical equipment and supplies by replacing the current fee schedule payment amounts for selected items in certain areas with payment amounts based on competitive bids submitted by Medicare suppliers. Pub. L. No. 108-173, § 302(b), 117 Stat. 2066, 2224.

on the winning suppliers' bids for items included and 50 percent to 55 percent of the bids from suppliers were selected. Evidence from CMS's competitive bidding demonstration suggests that competition saved Medicare $7.5 million and saved beneficiaries $1.9 million—without significantly affecting beneficiary access. For the competitive bidding program, CMS required suppliers to obtain accreditation based on quality standards[8] and provide financial documents to participate. This added scrutiny gives CMS the chance to screen out suppliers that may not be stable, legitimate businesses, which could contribute to lower rates of improper payment. CMS also evaluated the bids based on demand, capacity, and price and chose suppliers whose bids were at or under a certain amount. CMS estimates that the first round of its competitive bidding program will result in payment amounts that average 26 percent less than the current fee schedule amounts. Competitive bidding also changes Medicare's relationship with suppliers and departs from Medicare's practice of doing business with any qualified provider, because it is designed to limit the number of suppliers to those whose bids are at or under a certain amount.

Because of concerns that competitive bidding may prompt suppliers to cut their costs by providing lower-quality items and curtailing services, ensuring quality and access through adequate oversight is critical for the success of the competitive bidding program. In September 2004, GAO indicated that quality assurance steps could include monitoring beneficiary satisfaction, setting standards for suppliers, giving beneficiaries a choice of suppliers, and selecting winning bidders based on quality and the dollar amount of the bids. As competitive bidding expands, problems that beneficiaries might experience could be magnified. Therefore, continued monitoring of beneficiary satisfaction will be critical to identify problems with suppliers or with items provided to beneficiaries. As required in the MMA, GAO will review and report on the competitive bidding program's impact on suppliers and manufacturers and its effect on quality and access for beneficiaries.

---

[8]The quality standards are to be applied by one or more independent accreditation organizations designated by the agency. Accreditation is a process of certifying that health care organizations comply with specific standards and requirements.

## Background

Medicare is the federal program that helps pay for a variety of health care services for about 44 million elderly and disabled beneficiaries. Most Medicare beneficiaries participate in Medicare Part B, which helps pay for certain physician, outpatient hospital, laboratory, and other services; medical equipment and supplies, such as oxygen, wheelchairs, hospital beds, walkers, orthotics, prosthetics, and surgical dressings; and certain outpatient drugs.[9] Medicare Part B pays for most medical equipment and supplies using a series of fee schedules. Generally, Medicare has a separate fee schedule for each state that includes most items, and there are upper and lower limits on the allowable amounts that can be paid in different states to reduce variation in what Medicare pays for similar items in different parts of the country. Medicare pays 80 percent of the lesser of the actual charge for the item or fee schedule amount for the item, and the beneficiary pays the balance. Beneficiaries typically obtain medical equipment and supplies from suppliers, who submit claims to Medicare on beneficiaries' behalf. Suppliers include medical equipment retail establishments and outpatient providers, such as physicians, home health agencies, and physical therapists. To handle claims processing for medical equipment and supplies, CMS contracts with durable medical equipment Medicare administrative contractors.

## The Competitive Bidding Demonstration

Using its authority under the BBA, CMS conducted a competitive bidding demonstration to set Medicare Part B payment rates for groups of selected medical equipment and supplies.[10] CMS contracted with Palmetto Government Benefits Administrators (Palmetto) to administer the competitive bidding demonstration,[11] which was implemented in two

---

[9]Outpatient drugs covered under Part B include self-administered drugs, such as certain immunosuppressive and oral anticancer drugs, or drugs administered in conjunction with DME, such as inhalation drugs used with a nebulizer. A nebulizer is a device driven by a compressed air machine that allows the patient to take medicine in the form of a mist or wet aerosol.

[10]These groups were enteral nutrients, equipment and supplies, hospital beds and accessories, nebulizer inhalation drugs, manual wheelchairs and accessories, noncustomized general orthotics, oxygen contents, equipment and supplies, surgical dressings, and urological supplies.

[11]In this role, Palmetto was responsible for helping to plan the demonstration; educating beneficiaries, suppliers, and other stakeholders about the demonstration; soliciting and evaluating bids; processing claims; and responding to inquiries and complaints about the demonstration. CMS maintained oversight responsibility for the demonstration, reviewed all documents and Palmetto decisions, and made final design and policy decisions.

locations—the Polk County, Florida, metropolitan statistical area and parts of the San Antonio, Texas, metropolitan statistical area.

Two cycles of bidding took place in Polk County, with competitively set fees effective from October 1, 1999, to September 30, 2001, and from October 1, 2001, to September 30, 2002. One cycle of bidding took place in San Antonio, and competitively set fees were effective from February 1, 2001, to December 31, 2002. Bidding and implementation processes were similar at both locations. The demonstration ended on December 31, 2002.

## The Competitive Bidding Program

In December 2003, the MMA required CMS to conduct competitive bidding for DME, supplies, off-the-shelf orthotics, and enteral nutrients and related equipment and supplies on a large scale.[12] The MMA required that competition under the program begin in 10 of the largest metropolitan statistical areas in 2007, in 80 of the largest metropolitan statistical areas in 2009, and in other areas after 2009. The law established a new accreditation requirement for all Medicare suppliers of medical equipment and supplies and required CMS to develop financial and quality standards to use in selecting suppliers for the competitive bidding program. The law required CMS to take appropriate steps to ensure that small suppliers have an opportunity to be considered for participation in the competitive bidding program. CMS was required to establish a methodology for selecting bids from suppliers so that enough suppliers were selected to meet demand for competitively bid items within a given area. The law specified that at least two suppliers would be selected in each competitive area. The law also precluded judicial or administrative review of CMS's decisions to establish payment amounts, award contracts, designate areas for competition, select items and services, phase in implementation, and determine the bidding structure and number of suppliers selected under the competitive bidding program. The MMA required that an advisory committee be established to assist in carrying out the program.

To help implement the competitive bidding program, CMS published its notice of proposed rulemaking on May 1, 2006, and its final rule on April 10, 2007. CMS's final rule provided more detail on the agency's implementation steps. For example, the law specified that the agency could not award a contract to an entity unless it met applicable financial standards specified by the Secretary of HHS. In its regulation, CMS

---

[12]Pub. L. No. 108-173, § 302(b), 117 Stat. 2066, 2224.

specified the financial documents that had to be submitted by suppliers to be considered as potential bidders. Similarly, while the law indicated that the agency needed to ensure that small suppliers had an opportunity to participate, the regulation sets out a process to include a certain number of small suppliers based on the percentage of those who bid and met all applicable requirements.

CMS established the initial round of bidding in 10 metropolitan statistical areas that included Charlotte, N.C.; Cincinnati, Ohio; Cleveland, Ohio; Dallas, Tex.; Kansas City, Mo.; Miami, Fla.; Orlando, Fla.; Pittsburgh, Pa.; Riverside, Calif.; and San Juan, P.R. On April 9, 2007, CMS opened the initial registration of suppliers for the first round of bidding and the bid period opened on May 15, 2007. As part of its program implementation for the first round, CMS conducted a supplier-education campaign, which included meetings, listserve announcements, a dedicated Web site, and a toll-free help desk. The bid period closed on September 25, 2007. CMS concluded bid evaluations and began the contracting process in March 2008, and the agency plans to announce the first round of winning suppliers in May 2008. Suppliers whose bids were disqualified because their bid did not meet program and bidding requirements will receive a letter informing them of the reason or reasons for their disqualification. After the program begins, suppliers whose bids were not chosen generally cannot receive Medicare payment for the competitively bid items in the metropolitan statistical areas included in the competitive bidding program. However, suppliers of certain rental items or oxygen that did not become suppliers in the competitive bidding program could continue to serve their existing Medicare customers. Suppliers that did not have bids chosen in the first round of the program may bid in the future rounds of competition. CMS said it plans to conduct a beneficiary-education campaign before the program goes into effect on July 1, 2008.

## Competitive Bidding Could Reduce Program Payments by Creating an Incentive for Suppliers to Accept Lower Payment Amounts

Competitive bidding could reduce Medicare program payments by providing an incentive for suppliers to accept lower payment amounts for items and services to retain their ability to serve beneficiaries and potentially increase their market share. Using competition to obtain market prices in order to set payments for medical equipment and supplies is a new approach for Medicare that is fundamentally different than relying on fee schedules based on suppliers' historical charges to Medicare. Competitive bidding allows the market to provide information to CMS on what amounts suppliers will accept as payment to serve beneficiaries.

In its demonstration, CMS used a competitive bidding process to determine which suppliers would be included and the competitively set fees that they would be paid. From among the bidders, the agency and Palmetto selected multiple demonstration suppliers to provide items in each group of related products. Suppliers could submit bids and have winning bids for one or more groups of items. These suppliers were not guaranteed that they would increase their business or serve a specific number of Medicare beneficiaries. Instead, the demonstration suppliers had to compete for beneficiaries' business. All demonstration suppliers were reimbursed for each competitively bid item provided to beneficiaries at the demonstration fee schedule amounts. The new fee schedules were based on the winning suppliers' bids for items included in the demonstration. Any Medicare supplier that served demonstration locations could provide items not included in the demonstration to beneficiaries.

Evidence from the demonstration suggests that, for the items selected, competition helped set lower payment amounts and resulted in estimated program savings of $7.5 million. The demonstration's independent evaluators also estimated that beneficiaries saved $1.9 million. The demonstration provided evidence to health policy experts, including us and the Medicare Payment Advisory Commission, that competitive bidding for medical equipment and supplies could be a viable way for the program to use market forces to set lower payments without significantly affecting beneficiary access.[13]

About a year after the demonstration ended, the MMA required CMS to implement competitive bidding on a large scale and added requirements that suppliers would have to meet to participate in the competitive bidding program. The MMA also required the agency to develop quality standards and for suppliers to be assessed on those standards by accreditation organizations. In addition, the agency had to include a financial and quality assessment of suppliers as part of competitive bidding.

The competitive bidding program was structured to operate much like the demonstration. Suppliers submitted bids, along with other materials specified by CMS. The application required suppliers to submit 3 years of

---

[13]The Medicare Payment Advisory Commission is an independent federal body established by the BBA to advise the U.S. Congress on issues affecting the Medicare program. Medicare Payment Advisory Commission, *Report to the Congress: Variation and Innovation in Medicare*, (Washington, D.C., 2003).

financial documents, including income statements, credit reports, and balance sheets. The review of the financial documents was used as part of the criteria for determining which bids to consider. The bidders had to have a valid Medicare supplier billing number and be accredited. Suppliers had to submit bids for one or more groups of items. CMS then evaluated the bids based on demand, capacity, and price and chose bids that were at or under a certain amount.

CMS estimates that the first round of its competitive bidding program will result in payment amounts that overall average 26 percent less than the current fee schedule amounts for the groups of items included, leading to savings for the Medicare program and its beneficiaries. CMS based its estimate on the price points suppliers submitted with their bids, weighted by market area and past utilization of items in each group. The estimated savings differed by groups of items, with the largest savings of 43 percent estimated for mail-order diabetic supplies.

Competitive bidding changes Medicare's relationship with suppliers. Competitive bidding is designed to reduce payments by allowing CMS to choose suppliers based on their bids—a change from the long-standing policy that any qualified provider can participate in the program. The competitive bidding process was designed to limit the number of suppliers to those whose bids were at or under a certain amount while ensuring that enough suppliers were included to meet beneficiary demand. In the demonstration, 50 percent to 55 percent of the suppliers' bids were selected. With few exceptions, only the suppliers whose bids were chosen could be reimbursed by Medicare for competitively bid items provided to beneficiaries residing in the demonstration area.[14]

Furthermore, competitive bidding could help reduce improper payments because it provides CMS with the authority to select suppliers, based in part on new scrutiny of their financial documents and other application materials. In November 2007, CMS estimated that 10.3 percent of Medicare payments made to suppliers of medical equipment and supplies were

---

[14]Transition policies allowed beneficiaries to continue receiving oxygen equipment and supplies and nebulizer drugs from their original suppliers, regardless of whether the suppliers were included in the demonstration. However, the supplier had to accept the new fees set by the demonstration. Transition policies also allowed beneficiaries to maintain pre-existing rental agreements or purchase contracts with their suppliers of enteral nutrition equipment, hospital beds and accessories, and manual wheelchairs and accessories. These suppliers were paid under the normal statewide Medicare fee schedule for the duration of the rental period.

improper—more than double the percentage of improper payments to other Medicare providers. Providing additional scrutiny of suppliers gives CMS the opportunity to screen out those whose finances do not indicate that they are stable, legitimate businesses.

## Adequate Oversight Is Critical to Ensure Quality and Access

Because of concerns that competitive bidding may prompt suppliers to cut their costs by providing lower-quality items and curtailing services, ensuring quality and access through adequate oversight is critical. Limiting the number of suppliers could potentially affect beneficiaries' access to quality items and services if there are an insufficient number to meet their needs. For some beneficiaries, having a choice of suppliers for some items and services could be important.

In our September 2004 report, we evaluated CMS's competitive bidding demonstration and recommended implementation actions for CMS to consider, including how to ensure access to quality items and services for beneficiaries. We indicated that quality assurance steps could include monitoring beneficiary satisfaction, setting standards for suppliers, providing beneficiaries with a choice of suppliers, and selecting winning bidders based on quality, in addition to the dollar amounts of bids.

The demonstration projects used several approaches for ensuring quality and services for beneficiaries, including monitoring beneficiary satisfaction and applying quality measures as criteria to select winning suppliers. During the demonstration, CMS and Palmetto used full-time, onsite ombudsmen to respond to complaints, concerns, and questions from beneficiaries, suppliers, and others. In addition, to gauge beneficiary satisfaction, independent evaluators of the demonstration fielded two beneficiary surveys by mail—one for oxygen users and another for users of other products in the demonstration. These surveys contained measures of beneficiaries' assessments of their overall satisfaction, access to equipment, and quality of training and service provided by suppliers. Evaluators reported survey results indicating that beneficiaries generally remained satisfied with both the products provided and with their suppliers. The independent evaluators identified some areas for concern, including a decline in the use of portable oxygen among users and the possible shift away from suppliers making home deliveries, which may have indicated that suppliers were visiting new medical equipment users less frequently to provide routine maintenance visits.

Because we considered careful monitoring of beneficiaries' experiences essential to ensure that any quality or access problems were identified quickly, we recommended that CMS monitor beneficiary satisfaction with the items and services provided under the new competitive bidding program. As competitive bidding expands and affects larger numbers of beneficiaries, problems such as those identified in the evaluations of the demonstration projects could become magnified. Therefore, continued monitoring of beneficiary satisfaction will be critical to identifying problems with suppliers or with items provided to beneficiaries. When such problems are identified in a timely manner, CMS may develop steps to address them. Such monitoring is important, not just when required by statute, but as part of an ongoing effort to ensure that the Medicare program is serving its beneficiaries effectively.

CMS agreed with our recommendation and stated that the agency would monitor the beneficiary satisfaction with the quality and services provided under the competitive bidding process. CMS also stated in the preamble of its final rule on accreditation of suppliers published August 18, 2006, that it expects that implementing medical equipment and supplies quality standards and accreditation will lead to increased quality of items and services throughout the industry. Furthermore, CMS stated that it plans to provide education to Medicare beneficiaries on the competitive bidding process using approaches such as press releases, fact sheets, and notices.

We will be assessing CMS's implementation of the competitive bidding program. As part of the MMA, we are required to review and report on the program's impact on suppliers and manufacturers and on quality and access of items and services provided to beneficiaries. As part of this review, we have been specifically requested to assess CMS's implementation of the program.

## Concluding Observations

We believe that competitive bidding could reduce payments for both the Medicare program and beneficiaries. The independent evaluators estimated savings achieved in the demonstration, and CMS has projected reductions in payment amounts in its competitive bidding program for both Medicare and its beneficiaries. In addition, the new financial standards and accreditation process being implemented in conjunction with the competitive bidding program should help improve the financial viability and quality of medical suppliers providing services to Medicare beneficiaries. But competitive bidding also provides incentives that could affect access to services and lower quality of items and services provided to beneficiaries, which need to be monitored carefully.

Mr. Chairman, this concludes my prepared statement. I will be happy to answer any questions that you or members of the Subcommittee may have.

## Contacts and Acknowledgments

For further information regarding this testimony, please contact me at (202) 512-7114 or kingk@gao.gov. Contact points for our Offices of Congressional Relations and Public Affairs may be found on the last page of this testimony. Sheila Avruch, Assistant Director; Catina Bradley; Kelli Jones; Kevin Milne; Lisa Rogers; and Timothy Walker made contributions to this statement.

# Related GAO Products

*Medicare: Improvements Needed to Address Improper Payments for Medical Equipment and Supplies.* GAO-07-59. Washington, D.C.: January 31, 2007.

*Medicare Durable Medical Equipment: Class III Devices Do Not Warrant a Distinct Annual Payment Update.* GAO-06-62. Washington, D.C.: March 1, 2006.

*Medicare: More Effective Screening and Stronger Enrollment Standards Needed for Medical Equipment Suppliers.* GAO-05-656. Washington, D.C.: September 22, 2005.

*Medicare: CMS's Program Safeguards Did Not Deter Growth in Spending for Power Wheelchairs.* GAO-05-43. Washington, D.C.: November 17, 2004.

*Medicare: Past Experience Can Guide Future Competitive Bidding for Medical Equipment and Supplies.* GAO-04-765. Washington, D.C.: September 7, 2004.

*Medicare: CMS Did Not Control Rising Power Wheelchair Spending.* GAO-04-716T. Washington, D.C.: April 28, 2004.

*Medicare: Challenges Remain in Setting Payments for Medical Equipment and Supplies and Covered Drugs.* GAO-02-833T. Washington, D.C.: June 12, 2002.

*Medicare Payments: Use of Revised "Inherent Reasonableness" Process Generally Appropriate.* GAO/HEHS-00-79. Washington, D.C.: July 5, 2000.

*Medicare: Access to Home Oxygen Largely Unchanged; Closer HCFA Monitoring Needed.* GAO/HEHS-99-56. Washington, D.C.: April 5, 1999.

*Medicare: Need to Overhaul Costly Payment System for Medical Equipment and Supplies.* GAO/HEHS-98-102. Washington, D.C.: May 12, 1998.

*Medicare: Home Oxygen Program Warrants Continued HCFA Attention.* GAO/HEHS-98-17. Washington, D.C.: November 7, 1997.

*Medicare: Excessive Payments for Medical Supplies Continue Despite Improvements.* GAO/HEHS-95-171. Washington, D.C.: August 8, 1995.

This is a work of the U.S. government and is not subject to copyright protection in the United States. The published product may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.

| GAO's Mission | The Government Accountability Office, the audit, evaluation, and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
|---|---|
| Obtaining Copies of GAO Reports and Testimony | The fastest and easiest way to obtain copies of GAO documents at no cost is through GAO's Web site (www.gao.gov). Each weekday, GAO posts newly released reports, testimony, and correspondence on its Web site. To have GAO e-mail you a list of newly posted products every afternoon, go to www.gao.gov and select "E-mail Updates." |

Order by Mail or Phone

The first copy of each printed report is free. Additional copies are $2 each. A check or money order should be made out to the Superintendent of Documents. GAO also accepts VISA and Mastercard. Orders for 100 or more copies mailed to a single address are discounted 25 percent. Orders should be sent to:

U.S. Government Accountability Office
441 G Street NW, Room LM
Washington, DC 20548

To order by Phone:  Voice:  (202) 512-6000
                     TDD:    (202) 512-2537
                     Fax:    (202) 512-6061

To Report Fraud, Waste, and Abuse in Federal Programs

Contact:

Web site: www.gao.gov/fraudnet/fraudnet.htm
E-mail: fraudnet@gao.gov
Automated answering system: (800) 424-5454 or (202) 512-7470

Congressional Relations

Ralph Dawn, Managing Director, dawnr@gao.gov, (202) 512-4400
U.S. Government Accountability Office, 441 G Street NW, Room 7125
Washington, DC 20548

Public Affairs

Chuck Young, Managing Director, youngc1@gao.gov, (202) 512-4800
U.S. Government Accountability Office, 441 G Street NW, Room 7149
Washington, DC 20548

# EXHIBIT E

Statement of Thomas J. Hoerger, Ph.D., Senior Fellow, Research Triangle Institute (RTI) International

Testimony Before the Subcommittee on Health
of the House Committee on Ways and Means

May 06, 2008

Mr. Chairman and Members of the Committee, I am pleased to appear before you today to provide you with information on research I have performed on Medicare competitive bidding programs for Part B services.

My name is Thomas J. Hoerger. I am a Senior Fellow at RTI International and also director of the RTI-University of North Carolina Center of Excellence in Health Promotion Economics. RTI International is an independent, nonprofit research organization based in North Carolina that performs research and technical services for the U.S. Government and private sector clients.

Since 1991, I have led a series of six studies on the design, evaluation, and implementation of competitive bidding for Medicare Part B services. All of these studies were funded by the Centers for Medicare & Medicaid Services (CMS). In one of these studies, my colleagues and I evaluated the impact of Medicare's competitive bidding demonstration for DMEPOS. After that evaluation, I led an RTI project to provide technical assistance to CMS on the design and implementation of the DMEPOS Competitive Bidding Program. That project ended on August 31, 2007; thus, I am aware of the general design of the bidding program but I have no direct knowledge of specific issues relating to how suppliers were selected in the first round of bidding for the program.

Today, my comments focus on our evaluation of the DMEPOS competitive bidding demonstration as well as on the general potential value of using competitive bidding to set prices for DMEPOS.

**Evaluation of the DMEPOS Competitive Bidding Demonstration**

The demonstration project took place in two metropolitan statistical areas between 1999 and 2002, with two rounds of bidding taking place in Polk County, Florida and one round of bidding taking place in San Antonio, Texas. We evaluated the impact of the demonstration on (1) Medicare expenditures, (2) beneficiary access to care, (3) quality of care, (4) competitiveness of the market, and (5) the reimbursement system. Data sources for the evaluation included site visits and telephone discussions with key demonstration participants, focus groups, surveys of beneficiaries and providers, bid analysis, and claims analysis.

Our full evaluation report was included as part of CMS's required Report to Congress on the demonstration project and is available for downloading at http://www.rti.org/pubs/DMEPOS_final-report.pdf. Briefly, we reached the following conclusions.

- Competitive bidding produced lower prices, leading to lower allowed charges for the Medicare program and reduced copayments by beneficiaries. We estimated that the demonstration reduced Medicare allowed charges by $9.4 million, or 19%. Medicare program expenditures fell by about $7.5 million, and beneficiary payments fell by about $1.9 million.
- The demonstration had relatively little effect on beneficiary access, quality, and product selection. Beneficiaries remained as satisfied with their suppliers as they were before the demonstration.
- The estimated reductions in program expenditures exceeded the estimated costs of implementation.
- Because the demonstration reduced allowed charges, supplier revenues had to fall, and that result was probably viewed as a negative effect by suppliers in general. As expected, demonstration suppliers gained market share as a group, while nondemonstration suppliers lost market share.

Overall, we concluded that the impacts of the demonstration were largely positive.   Page 3 of 6

Case 1:08-cv-00992-RMU    Document 23-8    Filed 06/26/2008

## The Rationale for Competitive Bidding

Looking more broadly at the use of competitive bidding for DMEPOS, the basic rationale for competitive bidding is relatively simple: ask suppliers how much they are willing to accept in payment for providing DMEPOS to beneficiaries. Then offer contracts to those suppliers offering the lowest prices, ensuring that enough suppliers who are accredited and follow predetermined quality standards are selected to serve all beneficiaries. Thus, in principle, competitive bidding gives suppliers strong incentives to reveal their underlying costs and meet accreditation and quality standards, and allows CMS to select suppliers who can provide DMEPOS products most efficiently, thereby using program funds and taxpayer dollars in the most prudent way.

Although the basic rationale for competitive bidding for DMEPOS is simple, implementing competitive bidding is more complicated. As they say, the devil is in the details, and there are a lot of details when it comes to implementation. In the interest of time, I will only mention 3 of the most important issues.

First and foremost is quality. The biggest concern with competitive bidding is that after offering low prices, winning bidders will provide low-quality products and little or no service to beneficiaries. Congress and CMS have attempted to address this issue by requiring accreditation for all DMEPOS suppliers serving Medicare, both in competitive bidding areas and in other areas. With this accreditation, specific quality standards are also imposed for each product category. Finally, multiple suppliers were selected in each bidding area and product category. Thus, suppliers will need to provide quality in order to attract beneficiaries.

Second, in selecting winning bidders, CMS must take great care to ensure that enough suppliers are selected to serve the Medicare beneficiaries in an area. This requires CMS to carefully balance beneficiary access and program expenditures, because selecting more suppliers will cause the winning bid to increase. It is important to achieve the right balance.

Third, suppliers should be treated fairly in the bidding process. This means providing adequate information about the program and the bidding process and general information about how bids will be evaluated. However, CMS cannot release the proprietary bids of individual suppliers.

## Additional Details on the Evaluation

The Evaluation of Medicare's Competitive Bidding Demonstration for DMEPOS was conducted by the University of Wisconsin-Madison Center for Health Systems Research and Analysis and RTI International under CMS Contract No. 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. Authors of the final evaluation report included Sara Karon, Thomas Hoerger (Project Director), Shulamit Bernard, Kevin Tate, Richard Lindrooth, Teresa Waters, and Kay Jewell.

Selected key results from the evaluation, taken from the Executive Summary, include the following:

## Medicare Expenditures

- In Polk County, Round 1 demonstration prices were lower than the existing Florida fee schedule for at least 90% of all items in 4 product categories. For surgical dressings, most demonstration prices were higher. Almost all Round 2 demonstration prices were lower than the Florida fee schedule.
- In San Antonio, demonstration prices were lower than the existing Texas fee schedule for all items in 4 product categories. In the remaining category, more than half of the demonstration prices were lower.
- For most demonstration items, the demonstration did not have a statistically significant effect on utilization.
- Assuming that the demonstration had no impact on utilization, we estimate that the demonstration reduced allowed charges in Polk County by $4.7 million during its 3 years of operation. We

estimate that the demonstration reduced allowed charges in San Antonio by $4.6 million during its 23 months of operation.

- Combining savings from both sites, we estimate that the demonstration reduced allowed charges by nearly $9.4 million (19.1 percent). Medicare expenditures (defined as allowed charges less co-payments and deductibles) fell by about $7.5 million, and beneficiary payments fell by about $1.9 million.

**Beneficiary Access**

- Beneficiary survey data showed few statistically significant demonstration impacts on access-related survey measures in Polk County and San Antonio. This suggests that the demonstration had little overall impact on beneficiary access in these sites.
- In Polk County, most demonstration suppliers chose to serve every zip code in Polk County. Similarly, in San Antonio, most suppliers chose to serve all three counties in the demonstration area.
- The transition to demonstration prices and suppliers passed relatively smoothly in Polk County and San Antonio. The smooth transitions appeared to be related to the existence of transition policies and the willingness of nondemonstration oxygen suppliers to continue serving their patients. As a result, there was relatively little disruption of existing relationships between suppliers and beneficiaries during the transition.
- Our Polk County beneficiary survey analysis detected a statistically significant decline in the provision of portable oxygen equipment and an increase in conserving device usage among new users under the demonstration. We also detected a decline in maintenance visits among new users of medical equipment in the demonstration area. Other statistically significant impacts in Polk County included changes in the ways beneficiaries order and receive their equipment, as well as declines in some types of training for urologicals and surgical dressings users.
- In contrast, beneficiary surveys in Texas indicate that the demonstration did not have a significant impact on portable oxygen and conserving device use in San Antonio, nor was there a decline in maintenance visits for new users of medical equipment.
- To further evaluate the impact of the demonstration on portable oxygen use in Polk County, we analyzed claims data. This analysis indicates that the demonstration had a negative and statistically significant impact on the percentage of new oxygen users who received portable oxygen, especially during Round 2. However, the negative impact was smaller in magnitude than the impact suggested by the beneficiary survey.
- Referral agents who ordered equipment and supplies for their patients reported a few problems with access during the first months of the demonstration. Agents later became more familiar with demonstration rules and demonstration-eligible suppliers, and began using suppliers with whom they were comfortable. In general, referral agents did not think that the demonstration had a negative impact on beneficiaries' access to care, but the agents believed this was due to the additional responsibilities they assumed to ensure access and quality.

**Quality and Product Selection**

- Users of oxygen and other medical equipment in Polk County and San Antonio were highly satisfied with their experiences with their DMEPOS suppliers. Survey data show that overall satisfaction ratings were high before the demonstration and remained high 1 year after implementation.
- Survey data indicate that quality of DMEPOS products and services was high before and after the demonstration in both Polk County and San Antonio. There were few statistically significant demonstration impacts on quality-related survey measures, suggesting that the demonstration had little overall impact on quality.
- During site visits to Polk County in Round 1, concerns were raised about the quality of urological supplies. Some suppliers believed that—partly through supplier inexperience—prices in Round 1 were set too low. Prices rose in Round 2, and a urological supplier with a strong reputation was added as a demonstration supplier.
- During site visits to San Antonio, referral agents reported a number of issues related to wheelchair service provided by some demonstration suppliers. Some suppliers did not provide the level of

service expected by referral agents in terms of equipment setup and delivery, initial fitting and adjustments, and responsiveness to problems. Agents responded by cutting referrals to these suppliers and by taking increased responsibility for ensuring quality service to their patients.

- San Antonio suppliers reported on product selection in a supplier survey. Most suppliers reported little change in the products they supplied before and after the demonstration began.

## Competitiveness of the Market

- Thirty suppliers submitted a total of 71 bids in Polk County in Round 1 of the demonstration. Sixteen suppliers, both large and small firms, were selected as demonstration suppliers. Twenty-six firms submitted a total of 52 bids for the four product categories in Round 2, and 16 suppliers (62 percent) were awarded demonstration status. The number of firms submitting bids for urological supplies in Round 2 fell from 9 to 7, and the number of suppliers bidding for surgical dressings fell from 8 to 4. These product categories had the fewest Round 1 demonstration suppliers.

- Entry into and exit from the market were still possible in the presence of competitive bidding. Half of the Round 2 demonstration suppliers in Polk County also had demonstration status in Round 1, but half did not.

- Seventy-nine firms submitted a total of 169 bids for the five product categories in San Antonio. Overall, 65 percent of the suppliers that submitted bids won demonstration status in at least one product category.

- As a group, demonstration suppliers gained market share during the demonstration, whereas nondemonstration suppliers lost market share. In product categories where there were transition policies that allowed nondemonstration suppliers to continue to serve existing customers, the increase in market share for demonstration suppliers occurred gradually.

- The demonstration had relatively little effect on market concentration.

- As expected, individual suppliers generally gained market share if they were demonstration suppliers and lost market share if they were nondemonstration suppliers. Some demonstration suppliers in Polk County, gained substantial market share. However, being named as a demonstration supplier did not guarantee increased market share. In San Antonio, many demonstration oxygen suppliers had little or no increases in market share due to the fact that many of the largest suppliers in the predemonstration period were granted demonstration status.

## Reimbursement System

- From an operational standpoint, CMS and Palmetto GBA were able to successfully implement the demonstration project. The project team was able to effectively solicit, collect, and evaluate bids; educate suppliers, referral agents, and beneficiaries; monitor quality and behavior; and administer claims throughout the demonstration.

- Although the overall implementation was successful, not everything went perfectly. A flaw in the weighting system used to evaluate bids in Round 1 of the Polk County demonstration led to higher prices in the surgical dressings category. In San Antonio, CMS delayed the start of the demonstration by 1 month, and delivery of the demonstration directories was delayed until very close to the actual starting date. Such problems were relatively minor and reflect one of the benefits of conducting demonstration projects: the ability to learn from the demonstration and apply the lessons if the demonstrated system is adopted on a wider scale.

- For the entire demonstration, CMS and Palmetto GBA costs of implementation totaled about $4.8 million between 1995 and 2002. The costs of implementing the demonstration were nearly 50 percent lower than the projected $9.4 million reduction in Medicare allowed charges associated with the demonstration.

## Administered Fee Schedules for DMEPOS

Previously, Medicare used an administered fee schedule to set DMEPOS prices. The fee schedule was based on historical DMEPOS prices, with periodic updates for inflation, occasional price fees mandated by legislation, and occasional price reductions for items that were believed to be overpriced. Since the fee schedule was established, DMEPOS products have experienced great technological change,

utilization has increased dramatically, labor costs have risen, and the cost of delivering many DMEPOS products has increased.  As a result, there is little reason to believe that the administered fee schedule reflects the prices that would be set in a perfectly competitive market for DMEPOS products.

It can be difficult to adjust an administered fee schedule to reflect market forces.  The administrators of the fee schedule lack information to know when costs have risen or fallen and they typically lack authority to make changes to the fee schedule.  Suppliers have no incentive to say when the costs of providing DMEPOS have fallen, and a strong incentive to say that costs have risen.  The Government Accountability Office (GAO) has conducted a series of studies concluding that Medicare pays too much for selected DMEPOS items.  The industry has responded, sometimes with good reason, that the prices cited by the GAO do not reflect the full cost of serving Medicare beneficiaries.

# EXHIBIT F

Print This Page

Return to Previous Page

## Fact Sheets

**Details for: SUPPLIERS SELECTED FOR NEW PROGRAM THAT REDUCES COSTS FOR CERTAIN DURABLE MEDICAL EQUIPMENT**

Return to List

**For Immediate Release:** Monday, May 19, 2008

**Contact:** CMS Office of Public Affairs
202-690-6145

### SUPPLIERS SELECTED FOR NEW PROGRAM THAT REDUCES COSTS FOR CERTAIN DURABLE MEDICAL EQUIPMENT
### PROSTHETICS, ORTHOTICS, AND SUPPLIES

**Program Background**

The Medicare durable medical equipment, prosthetics, orthotics, and supplies (DMEPOS) competitive bidding program was mandated by the Medicare Prescription Drug, Improvement and Modernization Act of 2003 ("Medicare Modernization Act" or "MMA"). The new program's objectives include:

- Assuring beneficiary access to quality DMEPOS;
- Reducing the amount Medicare pays for DMEPOS items;
- Reducing financial burden on beneficiaries by reducing the coinsurance they pay for DMEPOS items; and
- Contracting with suppliers who meet quality and financial standards.

It is also anticipated that since suppliers must be accredited to participate, the program will help deter fraud with respect to DMEPOS suppliers.

Competitive bidding provides a way to harness the marketplace to obtain a better value for Medicare beneficiaries using DMEPOS items and services. The new program changes the way that Medicare determines the payment amounts for these items and services under Part B of the Medicare program by replacing the current DMEPOS fee schedule payment amounts for selected items in certain areas with payment amounts based on competitive bids.

The program will start in 2008 in competitive bidding areas (CBAs) defined by codes within ten of the largest Metropolitan Statistical Areas (MSAs).  The MSAs in Round 1 include Charlotte, Cincinnati, Cleveland, Dallas, Kansas City, Miami, Orlando, Pittsburgh, Riverside and San Juan.  The program will expand to 70 additional MSAs in 2009 and additional areas after 2009.

The competitive bidding program will offer beneficiaries in the designated CBAs access to quality DMEPOS products and services and lower out-of-pocket costs.  The program also provides special considerations for small suppliers, defined as having gross revenues of $3.5 million or less, to participate in the competitive bidding program.  When fully implemented, the program is projected to save Medicare about $1 billion annually.

CMS conducted a demonstration program on the DMEPOS competitive bidding program from 1999 through 2002 in which patient impact and quality of care were assessed. The demonstration projects in Texas and Florida produced significant savings for beneficiaries and taxpayers without hindering access to DMEPOS items and services.  In designing the current DMEPOS competitive bidding program, CMS built on the experiences from those demonstrations.

**New Payment Rates**

As a result of the competitive bidding process, the amounts that Medicare will pay for the 10 product categories included in Round 1 of the DMEPOS Competitive Bidding Program overall average 26% less than Medicare's current fee schedule amounts.

If there were not enough qualified, accredited suppliers that submitted bids in a certain competitive bidding area to assure that beneficiaries have access to a particular DMEPOS product category, then that product category was not included in the competitive bidding program for that area.

The 10 product categories included in the program for the first 10 areas are:

1. Oxygen supplies and equipment;*
2. Standard power wheelchairs, scooters, and related accessories (includes wheelchair cushions);
3. Complex rehabilitative power wheelchairs and related accessories (includes wheelchair cushions);*
4. Mail-order diabetic supplies;
5. Enteral nutrients, equipment, and supplies;*
6. Continuous Positive Airway Pressure (CPAP) devices and Respiratory Assist Devices (RADs) and related supplies;
7. Hospital beds and related accessories;*
8. Negative pressure wound therapy devices and related supplies and accessories;* +
9. Walkers and related accessories; and
10. Group 2 support surfaces including mattresses and overlays (in Miami-Fort Lauderdale-Miami Beach only).

* These items are not included in Puerto Rico.

+ These items are not included in Kansas City.

The program will be successful in lowering Medicare payments as well as beneficiary out-of-pocket expenses for necessary items.  A complete list of payment amounts is available at the following Web site:  http://www.dmecompetitivebid.com.

## Suppliers Selected

A total of 325 suppliers receiving 1,345 contracts were selected for the ten Round 1 communities. To participate in the program, suppliers were required to meet Medicare's financial and quality standards.  In addition, suppliers had to be accredited by one of CMS' approved accrediting organizations to be eligible to receive a contract.

Suppliers had to meet certain business and product-specific service standards in order to be accredited by a CMS approved accreditation organization.  For example, business standards focus on administration, financial management, human resource management, consumer services, performance management, product safety and information management.  Product-specific service standards include intake, delivery and setup, training and instruction of the beneficiary and/or their caregiver and follow-up service.  The accreditation process also included an unannounced survey performed on site at the supplier location.  Each bidding supplier was required to provide certain basic accounting statements, tax extracts, and a credit report and score.  CMS used this financial information to determine whether each supplier would be able to participate in the program and maintain viability for the duration of the contract period.

Based on bids submitted by these suppliers, beneficiaries and U.S. taxpayers will see prices, on average, 26 percent lower than they currently pay for the same items.  CMS received bids from 1005 suppliers.  There were just under 6,200 bids for one or more product categories in competitive bidding areas (CBAs)where competitive bidding is being implemented.  CMS offered contracts to 23 percent of suppliers who submitted bids.  These suppliers were in the winning price range and met quality and financial standards and disclosure requirements. Sixty-one percent of the bids submitted were priced higher than the winning range, and just over half of these high-priced submissions were disqualified because they failed to meet other bid requirements. The remaining 16 percent of bids would have been in the winning range had they not been disqualified. A complete list of contract supplier names is available at the following Web site:  http://www.dmecompetitivebid.com/cs.

## Education Efforts

Over the past six weeks, CMS has provided information about the program to State Health Insurance and Assistance Programs (SHIPs), Area Offices on Aging (AoA), beneficiary advocacy organizations like AARP and other partners, physicians, DME referral agents, suppliers,

beneficiaries and their caregivers in the 10 first-round communities. These efforts have educated providers and partners on how to communicate with the beneficiary about this new program and where to refer Medicare beneficiaries for information about medical equipment and supplies.

CMS will continue the education and outreach campaign in the coming weeks to beneficiaries and their caregivers through partners, physicians, DME referral agents, suppliers, the media and other information intermediaries to ensure they understand the new program and what they need to do before its implementation on July 1, 2008. A key feature is a June direct mailing to ALL beneficiaries in the 10 first round communities, which will contain an introductory letter, a brochure that outlines the new program and a list of all Medicare DMEPOS contract suppliers in their area. A beneficiary fact sheet is also available through partner groups and providers.

To help consumers find a list of Medicare contract suppliers in the 10 initial areas of the program, visit www.medicare.gov("Medicare Spotlights" or look under "Search Tools" and select "Find Suppliers of Medical Equipment in Your Area") or call 1-800-MEDICARE (TTY users should call 1-877-486-2048). For personalized assistance regarding the new program, consumers may also visit their local State Health Insurance and Assistance Program (SHIP) office.

**Timeline of Events**

**March 2008**        CMS announces new payment rates for Round 1 derived from competitive bidding and begins contracting process with suppliers

**April to July 2008**    CMS conducts beneficiary, supplier, referral agent, partner education

and outreach campaign

**May 2008**        CMS announces the Medicare contract suppliers for Round 1

**July 1, 2008**    Payment rates for Medicare contract suppliers for Round 1 go into effect

# # #

Help with Case Formats and Plug-Ins

Submit Feedback

Return to Previous Page

# EXHIBIT G

Print This Page

Return to Previous Page

## Press Releases

**Details for: MEDICARE LAUNCHES OUTREACH EFFORT TO HELP BENEFICIARIES WITH NEW PROGRAM THAT LOWERS COSTS FOR DURABLE MEDICAL EQUIPMENT**

Return to List

**For Immediate Release:** Monday, June 09, 2008

**Contact:** CMS Office of Public Affairs
202-690-6145

**MEDICARE LAUNCHES OUTREACH EFFORT TO HELP BENEFICIARIES WITH NEW PROGRAM THAT LOWERS COSTS FOR DURABLE MEDICAL EQUIPMENT**
PROGRAM THAT LOWERS COSTS FOR DURABLE MEDICAL EQUIPMENT, PROSTHETICS, ORTHOTICS, AND SUPPLIES

*Competitive bidding program provides access to high quality products and services*

*available from Medicare-contract suppliers*

Nearly four million people with Medicare living in ten communities across the nation will receive information about a new program that will lower their costs for certain medical equipment and supplies by changing how Medicare pays for these items. The Centers for Medicare & Medicaid Services (CMS) will begin mailing letters on the new program, which begins July 1, to beneficiaries later this month

"Beginning July 1, Medicare beneficiaries will see lower costs for some of their durable medical equipment and supplies – as much as a 43 percent savings for certain items – and the assurance they will have accredited and financially sound suppliers providing them with equipment and supplies," said CMS Acting Administrator Kerry Weems. "It is important that people with Medicare who use certain medical equipment and supplies know they can call

1-800-MEDICARE or go to www.medicare.gov to see if their current supplier is a Medicare-contract supplier or what they may need to do to find a new supplier approved by Medicare."

The resources being mailed to beneficiaries will include a brochure about the new program and a list of Medicare contract suppliers in their area.  CMS is also sending similar information about the new program and the list of Medicare contract suppliers to local partner groups and durable medical equipment (DME) referral agents, such as hospital discharge planners, physicians' office staff and home health agency social workers.  The ten Round One communities include certain ZIP codes in the areas of Charlotte, N.C.; Cincinnati and Cleveland, Ohio; Dallas/Fort Worth, TX; Kansas City KS-MO; Miami and  Orlando, Fla.; Pittsburgh, Pa.; Riverside, Calif. and San Juan, Puerto Rico.

The new program, required by the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (MMA), uses the competitive marketplace to establish prices for certain durable medical equipment, prosthetics, orthotics, and supplies. Under the new program, bids submitted by suppliers were evaluated and the bids within the winning range established the competitive prices that beneficiaries – and Medicare – will pay. Suppliers who were accredited, met financial and quality standards and bid within the winning range were offered contracts under the competitive bidding program. By using these selected contract suppliers, Medicare beneficiaries should receive high quality items at an average saving of 26 percent from approved suppliers.

To take advantage of these savings, most people with Medicare who live in one of these areas and are enrolled in original Medicare may choose a new supplier if their current supplier is not a contract supplier. Beneficiaries can choose to continue to rent certain durable medical equipment, such as oxygen equipment and hospital beds, from their current suppliers even if they are not a contract supplier. But in those cases, the supplier must become a grandfathered supplier. Beneficiaries may continue using the grandfathered supplier until the rental period for their equipment ends (at which point the beneficiary takes ownership of the item) or beneficiaries may switch to a contract supplier.

Beneficiaries renting equipment from a non contract supplier that is not a grandfathered supplier should be aware that the current supplier should pick up the equipment and then the beneficiaries should switch to a Medicare contract supplier if they want Medicare to continue to pay for the items. The beneficiary can contact a new contract supplier to arrange for delivery of new items. If beneficiaries do not hear from their supplier before July 1 and they live in a covered area, they should contact their supplier or Medicare to find out if the supplier intends to continue services as a grandfathered supplier.

Beneficiaries pay 20 percent of the cost for medical equipment and supplies, and Medicare pays 80 percent. Beneficiaries who wish to use a non-contract or non-grandfathered supplier will be asked to sign an Advance Beneficiary Notice (ABN). By signing the ABN, beneficiaries are indicating they understand Medicare probably won't pay for the item or service that they receive from this supplier and that they will likely be responsible for the cost of the item or service.

Beneficiaries and the general public can find a list of Medicare contract suppliers in the ten initial areas of the program by visiting www.medicare.gov (under "Search Tools" select "Find Suppliers of Medical Equipment in Your Area") or by calling 1-800-MEDICARE (TTY users should call 1-877-486-2048). People can also visit the local office of their State Health Insurance and Assistance Program, Area Office on Aging and a number of community organizations who can provide information on the program.

A copy of the beneficiary letter and brochure is available at http://www.cms.hhs.gov/PressContacts/10_PR_DMEPOS.asp  Additional information on the DMEPOS competitive bidding program is available at www.cms.hhs.gov/DMEPOSCompetitiveBid.

Page Last Modified: 5/14/07 12:00 PM
Help with File Formats and Plug-Ins

Submit Feedback

Return to Previous Page

# EXHIBIT H

Case1:08-cv-00992-RMC    Document 23-11    Filed 06/26/2008    Page 2 of 4

Written by Mindy Yochelson - BNA

Sunday, 22 June 2008 05:57

Volume 19 Number 25 Page 683
Friday, June 20, 2008

ISSN 1521-4699

Legislative News

Durable Medical Equipment Bipartisan Bidding Delay Bills Offered In House, Senate By Committee Leaders

Bipartisan bills that would delay the Medicare durable medical equipment competitive bidding program for 18 months and make other hanges to the controversial program were introduced in the House and Senate by the chairmen and ranking members of two crucial panels.

The Medicare DMEPOS Competitive Acquisition Reform Act of 2008 (S. 3144) was submitted June 17 by Finance Committee Chairman Max Baucus (D-Mont.) and Sen. Chuck Grassley (R-Iowa), the ranking member. As of June 18, it had 25 co-sponsors.

"I am supportive of competitive bidding as a means of reducing cost, but that cannot be accomplished at the expense of low quality and inconsistent care," Baucus said. "The competitive bidding program for durable medical equipment should stay on hold until it's certain hat seniors will get the products they need in a way that works for them."

Grassley said the bill would "help prevent many small home medical equipment suppliers from going out of business." He said that their leaving the market would be particularly disastrous to beneficiaries in Iowa where "access to needed medical supplies has already been
limited by the floods."

Identical to House Bill

The legislation is identical to H.R. 6252, a bill introduced June 12 by Ways and Means Health Subcommittee Chairman Fortney Pete Stark (D-Calif.) and Dave Camp (R-Mich.), the ranking member.

Among various provisions, the legislation would:

terminate contracts in the first 10 metropolitan statistical areas (MSAs) in round one and restart the contracting process in those areas in 2009; delay round two contracting in the next 70 MSAs until 2011; delay payment adjustments in non-competitive bid areas until round two is completed; require CMS to notify bidders about paperwork discrepancies and give suppliers the opportunity to correct within a easonable time frame; exempt rural areas and MSAs with a population of less than 250,000 for at least five years; require the department of Health and Human Services Office of Inspector General to verify calculations used to determine the pivotal bid amount
and winning bids; and, ensure that supplies, whether they are billing Medicare directly or are a subcontractor, are accredited as of Oct. 1, 2009.

The bill would give CMS $120 million to implement the program.

Stark said that temporarily putting the program aside would cost $3.1 billion over five years.

9.5 Percent Cut

To pay for this delay, the legislation would reduce payment rates for covered items by 9.5 percent nationwide starting in 2009. Suppliers would not receive an additional increase of 2 percent until 2014, although starting in 2010, they would receive an increase based on the
consumer price index.

"The cost of delaying the program is fully paid for by the DME industry," Stark said in remarks for the House floor.

The legislation also would exclude complex rehabilitation wheelchairs and related accessories from bidding, negative pressure wound therapy from the first round of bidding, and exclude physicians and other practitioners from accreditation requirements until CMS develops provider-specific standards.

The National Coalition for Assistive and Rehab Technology (NCART), a coalition of providers and manufacturers of assistive and rehab technologies, praised the bill for exempting complex rehab devices.

Stark said that, despite provisions of his bill, he would prefer to end the bidding program completely.

Instead of repeating bidding in the remainder of the MSAs, he said, " I think Medicare might better be served and significant administrative costs saved by taking what we learned in this first round to change the fee schedule rates by which we pay for DME now."

Passed by Congress in 2003, the bidding program, slated to begin July 1 in the first round of 10 MSAs, was intended in part to save the Medicare program money.

After releasing the names of 325 suppliers that had signed contracts in the 10 areas, CMS said in May that prices, on average, would be 26 percent lower than what is currently being paid.

CMS has been continuing to roll out the program. A CMS spokesman told BNA June 12 that any delay in the implementation of the program would delay the savings that Medicare beneficiaries will see when they buy or rent their medial equipment and supplies from fully accredited suppliers.

New Group Represents Winning Bidders

A new group, open to and representing the 325 winning suppliers, is lobbying Congress not to delay the program.

The Contracted Medicare Equipment Suppliers Association of America said that they have "worked too hard, and spent too much time and money to win these contracts to have them stolen from us in the 11th hour."

The problems complained of by unsuccessful bidders can "be easily rectified without the need for delay, as well as the expense of repeating the entire process," the group said. For instance, those that were disqualified for insufficient financials can be reviewed and re-evaluated.

"It is absolutely sinful to scrap all of the thousands of hours of hard work performed by Medicare employees in evaluating these bids, only to have them repeat the process again in 18 months at a huge cost to Medicare as well as the patients," the group said in a statement.

Further, to replace the program with a 9.5 percent cut in the competitive bidding categories "would be devastating to DME providers who do not have plans in place to accommodate it."

Diabetic Supplies

On the other side of the issue, the Diabetes Access to Care Coalition June 18 released a study outlining how the bidding program could negatively impact beneficiaries who will have to rely on mail order diabetic supplies. It called for a halt on expansion of competitive acquisition of diabetes supplies in the absence of further research.

"Given the current, inadequate level of understanding regarding the effects of competitive bidding, we believe that before competitive acquisition is extended, careful evaluation of Medicare patient behavior, particularly behavior of vulnerable beneficiaries in navigating competitive systems, is essential," the group said.

The analysis, written by The George Washington University School of Public Health and Health Services, said it would be ironic if, "it turned out that the very absence of safeguards incentivized suppliers to over-supply products, [resulted in] actually increasing spending
but not improving health outcomes."

The analysis called for the development of explicit patient protections which, it said, "are needed in the area of marketing, enrollment and disenrollment, benefit design, quality standards, and patient protections."

A June 16 brief by the Republican Study Committee on bidding is available at
http://www.house.gov/hensarling/rsc/doc/pb_061608_dme.doc
. The Web site for the new contractor's group is http://www.mycmes.org

# EXHIBIT I

Written by Mike Moran - HME News

Monday, 23 June 2008 04:25

**Some winning providers lobby against NCB delay**

By Mike Moran Editor - **06.23.2008**

HOLLYWOOD, Fla. - A group of providers who won contracts in Round 1 of national competitive bidding traveled to Washington last week to lobby against an industry-backed effort to delay the program.

"We've all invested a lot of time and money in being prepared to go live July 1," said Jeffrey Holman, a winning Florida provider and founding member of the Contracted Medical Equipment Suppliers Association of America. "When you talk to members, you find out that trucks have been purchased, inventory sometimes put into place, warehouses have been filled. Expansions of phone and computer systems have been done. Now we are somehow being cast as the bad guys because we did everything right and won."

As of Friday, 50 to 60 of the 350 winning providers in Round 1 had joined the new association, said Holman, president of First Priority Medical Services in Hollywood, Fla.

Between Thursday and Friday last week, he added, members of the group visited about 20 congressional offices to lobby against the delay.

"As we speak, I'm standing outside Sen. Obama's office, waiting hopefully to speak with his legislative aid on health care," he told HME News at about 3 p.m. Friday. "We're trying to make some noise."

The competitive bidding program has flaws, he acknowledged, but they can be easily fixed and should not lead to delaying the program.

House and Senate bills to delay competitive bidding, S. 3144 and H.R. 6252, would terminate Round 1 contracts, which are scheduled to take effect July 1, and re-bid them in 18 to 24 months. They would also delay Round 2 until at least 2011. To pay for delay, the industry agreed to a 9.5% payment cut nationwide for all product categories included in Round 1 of the program. (As part of competitive bidding, CMS plans to slash prices for the products, on average, by 26%.)

Michael Reinemer, AAHomecare's vice president of communications and policy, said no one discounts the "heroic efforts" by the winning bidders to comply with the program under very tight deadlines.

"But I think looking at the situation more broadly you have to recognize that this program is a disaster, a train wreck," he said. "It has to be fixed for the sake of future rounds."

Reinemer also mentioned that a number of winning bidders have said they'd prefer a 9.5% cut rather than go ahead with competitive bidding.

Winning bidder Tom Mullaney, who does not belong to the Contracted Medical Equipment Suppliers Association, isn't one of them.

"As a business person, it needs to go through because of the amount of time and money we've spent," said Mullaney, president of Mullaney Medical in the Cincinnati competitive bidding area. "As a provider, I think it is a bad plan. I've been on record from the beginning that service is going to go down. But that is true in any part of health care where you want to save money."

John Gallagher, vice president of government relations for The VGM Group, called the program extremely flawed and said "it has to go away" for the good of the

entire industry. Additionally, Jones said that House bill to delay competitive bidding includes language that would allow winning providers, in the event that the program is delayed, to recoup from the government money spent gearing up to service the bid.

"Good luck trying to get that," Mullaney said.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN ASSOCIATION FOR<br>HOMECARE, et al.,<br><br>        Plaintiffs,<br><br>      v.<br><br>MICHAEL O. LEAVITT, et al.,<br><br>        Defendants. | )<br>)<br>)<br>)<br>)<br>)   Civil Action No. 08-992 (RMU)<br>)<br>)<br>)<br>)<br>)<br>) |

**ORDER**

Upon Consideration of the Motion For Leave To File As An Amicus Curiae By Ablecare Medical, Inc., and the materials submitted in support thereof ("the Motion") and the Opposition to the Motion, and for good cause showing,

It is hereby ORDERED that:

1.      The Motion is granted; and

2.      the Brief of Amicus Curiae in Support of Defendants By Ablecare Medical, Inc. (attached as Exhibit 1 the Memorandum in Support of the Motion) is hereby deemed filed.  The Clerk of this Court is directed to provide all counsel with electronic notice of this Order, which shall constitute service of the Brief of Amicus Curiae.


                                 _____
                                   Ricardo M. Urbina
                                   United States District Judge